# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC, | ) | CASE NO. 1:07 CV 3424 |
| | ) | |
| Plaintiff, | ) | JUDGE: DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | **FIRST AMENDED** |
| | ) | **VERIFIED COMPLAINT** |
| DUNKIN' DONUTS, INCORPORATED | ) | |
| ET AL., | ) | (MONEY DAMAGES), BREACH OF |
| | ) | CONTRACT,  UNFAIR COMPETITION, |
| | ) | UNJUST ENRICHMENT, FRAUD, |
| Defendants. | ) | COMMERCIAL IMPRACTICABILITY, |
| | ) | FRUSTRATION OF PURPOSE, |
| | ) | INTENTIONAL INTERFERENCE WITH |
| | ) | CONTRACT (INJUNCTIVE RELIEF) |
| | ) | TEMPORARY RESTRAINING ORDER |
| | ) | AND PERMANENT INJUNCTION |
| | ) | |
| | ) | **Jury Demand Endorsed Hereon** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

Plaintiff, Progressive Foods, LLC ("Progressive"), for its Complaint against Defendants Baskin-Robbins USA Co., ("B-R"), Dunkin' Donuts Incorporated ("D-D"), and Third Dunkin' Donuts Realty, Inc. ("3rd D") alleges and states as follows:

## PARTIES AND JURISDICTION

1.     Progressive is involved in commercial real estate development and operation of restaurant properties and is an Ohio Limited Liability Company, with a principal place of business in the City of Parma, County of Cuyahoga and State of Ohio.

2.      Defendant B-R is a California Corporation with a principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts 02368.

3.      Defendant B-R regularly conducts business in the County of Cuyahoga, State of Ohio and was a party to events and acts underlying the within action in the City of Parma, County of Cuyahoga, State of Ohio.

4.      Defendant D-D is a Delaware Corporation with a principal place of business at 14 Pacella Park Drive, Randolph, Massachusetts 02368.

5.      Defendant D-D regularly conducts business in the County of Cuyahoga, State of Ohio and was a party to events and acts underlying the within action in the City of Parma, County of Cuyahoga, State of Ohio.

6.      Defendant 3rd D is a Massachusetts Corporation with a principal place of business at 130 Royall Street, Canton, Massachusetts 02021.

7.      Defendant 3rd D regularly conducts business in the County of Cuyahoga, State of Ohio and was a party to events and acts underlying the within action in the City of Parma, County of Cuyahoga, State of Ohio.

8.      All underlying transactions, including: (i) the pertinent agreements between the parties; (ii) the applicable commercial real estate development; (iii) the verbal commitments and representations concerning additional site selection and development of the subject real estate; and (iv) the tortious conduct occurred and/or was to be completed in Cuyahoga County, Ohio and surrounding area.

9.      All commercial real estate and all territories subject to commercial real estate development, construction and support was and/or were to be located and completed in the County of Cuyahoga, State of Ohio and the surrounding area.

## COUNT ONE (*Breach of Contract*)

10.     The Plaintiff's Breach of Contract Claim arises under state law.

11.     On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered into a Multiple Unit Store Development Agreement.  (Hereinafter referred to as "SDA" and a copy of which is attached to the original complaint as Exhibit "1.")

12.     On or about February 23, 2005, Progressive and 3rd D entered into a commercial Lease of Dunkin' Donuts/Baskin-Robbins Shop relevant to the completion of construction and lease of real estate located at 7742 Lakeshore Blvd., Mentor, Ohio, and relevant to Progressive's development under the SDA. ("Mentor Lease") (The Mentor Lease is in the possession of the Defendants and is voluminous and, therefore, not attached.  A copy will be provided upon request.)

13.     On or about January 27, 2006 Progressive and 3rd D entered into a commercial Lease of Dunkin' Donuts/Baskin-Robbins Shop relevant to the completion of construction and lease of real estate located at 22200 Lakeshore Blvd., Shore Center Shopping Plaza, Euclid, Ohio, and relevant to Progressive's development under the SDA. ("Euclid Lease") (The Euclid Lease is in the possession of the Defendants and is voluminous and, therefore, not attached.  A copy will be provided upon request.)  (The Euclid Lease and the Mentor lease will be referred to collectively as the "Leases".)

14.     The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

15.     The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

16.     Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

17.     The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

18.     The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

19.     Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

20.     The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

21.     The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

22.     Due to the above failures on the part of the Defendants, the Defendants controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

23.     Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

24.     The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.   However, all of those operational issues within Progressive's control have been addressed.

25.     During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

26.     Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

27.     As Progressive was instituting that new store development, the Defendants made evident their desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

28.     Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' conspiracy to completely prevent further development became manifest and evident.

29.     Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

30.     The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

31.     The Defendants had no intention to and did not negotiate Progressive's expansion in good faith.

32.     The Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

33.     Despite the Defendants' failures under the Agreements, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or about September 10, 2007, the Defendants sent a correspondence to the Progressive purporting to provide seven (7) days notice to cure certain alleged defects under the SDA. (Hereinafter

referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

34.     Despite the Defendants' letter, Progressive is not in default under any of the provisions of the SDA.

35.     In fact, Progressive herein alleges and claims that the Defendants are in breach of the SDA, and the Agreements and their own protocol and requirements; and that any lack of development or payment for such non-developed stores was entirely caused by the Defendants breach, wrongful conduct, fraud and civil conspiracy.

36.     Upon receipt of the Cure Letter, Progressive again informed the Defendants that there were no defaults and that there can be no obligation to pay for development when the Defendants were refusing to permit such development.

37.     Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

38.     The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

39.     The Defendants have frustrated the commercial purpose of their agreement by unreasonably withholding Progressive's right to further development under the Agreements.

40.     The Defendants have failed in their obligations under the Agreements and have acted in concert to prevent Progressive's further development.

41.     It is clear that Progressive has met or exceeded the requirements imposed on other parties similarly situated.

42.     In addition to the damage claims set forth below and in light of the recent Termination Letter, Progressive requires immediate relief in the form of an injunction to prevent the Defendants from selling its territory development to any third party, which would be a further breach of the SDA and the Agreements.

43.     Immediate relief is required to enjoin the Defendants from enforcing the Termination Letter, from further breaching the SDA and the Agreements and from impinging upon this Plaintiff's right to exclusive Cleveland area development pursuant to the SDA.

44.     Defendants have breached their contracts and procedures with the Plaintiff.

45.     Progressive has been damaged as a result of that breach in an amount in excess of $25,000, to be proven at trial.

## COUNT TWO (*Unjust Enrichment*)

46.     The Plaintiff's unjust enrichment claim arises under state law

47.     Defendants have been unjustly enriched by virtue of withholding monies previously paid by Plaintiff and receiving royalties and other payments for uncompleted or underperformed development requirements.

48.     On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered into the SDA (A copy of which is attached to the original Complaint as Exhibit "1.")

49.     On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

50.     On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

51.     The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an

active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

52.     The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

53.     Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

54.     The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

55.     The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

56.     Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

57. The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

58.     The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

59.     Due to the above failures on the part of the Defendants, the Defendants controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

60.     Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

61.     The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.   However, all of those operational issues within Progressive's control have been addressed.

62.     During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants were receiving funds and fees from and related to the Stores despite the Defendants' failures and their not being entitled to such funds and fees.

63.     In addition, the Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

64.     These damages represented by Defendants unjust enrichment by virtue of withholding monies previously paid by Plaintiff and receiving royalties and other payments for uncompleted or underperformed development requirements is in excess of $25,000.

## COUNT THREE (*Unfair Competition*)

65.     The Plaintiff's Unfair Competition Claim arises under state law.

66.     On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered into the SDA (A copy of which is attached to the original complaint as Exhibit "1.")

67.     On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

68.     On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

69.     The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

70.     The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

71.     Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

72.     The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

73.     During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

74.     Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

75.     As Progressive was instituting that new store development, the Defendants made evident their desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

76.     Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' conspiracy to completely prevent further development became manifest and evident.

77.     Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

78.     The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

79.     The Defendants had no intention to and did not negotiate Progressive's expansion in good faith.

80.     The Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores, as well as, to release the specified development area to others in an attempt to compete unfairly with Progressive and in contravention of the SDA.

81.     Progressive is not in default under any of the provisions of the SDA.

82.     In fact, Progressive herein alleges and claims that the Defendants are in breach of the SDA, and the Agreements and their own protocol and requirements; and that any lack of development or payment for such non-developed stores was entirely caused by the Defendants breach, wrongful conduct, fraud and civil conspiracy.

83.     Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

84.     The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

85.     The Defendants have failed in their obligations under the Agreements and have acted in concert to prevent Progressive's further development.

86.     It is clear that Progressive has met or exceeded the requirements imposed on other parties similarly situated.

87.     The aforementioned conduct constitutes unfair competition.

88.     Progressive has been injured in an amount in excess of $25,000.00, to be proven at trial.

## COUNT FOUR (*Injunctive Relief*)

89.     The Plaintiff's Injunctive Relief Claim arises under state law.

90.     On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered the SDA.

91.     On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

92.     On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

93.     The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

94.     The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional

representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

95.     Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

96.     The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

97.     The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

98.     Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

99.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

100.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

18

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

101.    Due to the above failures on the part of the Defendants, the Defendants controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

102.    Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

103.    The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.  However, all of those operational issues within Progressive's control have been addressed.

104.    During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

105.    Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

106.    As Progressive was instituting that new store development, the Defendants made evident their desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

107.    Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' conspiracy to completely prevent further development became manifest and evident.

108.    Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

109.    The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

110.    The Defendants had no intention to and did not negotiate Progressive's expansion in good faith.

111.    Despite the Defendants' failures under the Agreements, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or about September 10, 2007, the Defendants sent a correspondence to the Progressive purporting to provide seven (7) days notice to cure certain alleged defects under the SDA. (Hereinafter referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

112.    Despite the Defendants' letter, Progressive is not in default under any of the provisions of the SDA.

113.    In fact, Progressive herein alleges and claims that the Defendants are in breach of the SDA, and the Agreements and their own protocol and requirements; and that any lack of

development or payment for such non-developed stores was entirely caused by the Defendants breach, wrongful conduct, fraud and civil conspiracy.

114.    Upon receipt of the Cure Letter, Progressive again informed the Defendants that there were no defaults and that there can be no obligation to pay for development when the Defendants were refusing to permit such development.

115.    Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

116.    The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

117.    The Defendants have failed in their obligations under the Agreements and have acted in concert to prevent Progressive's further development.

118.    It is clear that Progressive has met or exceeded the requirements imposed on other parties similarly situated.

119.    In addition to the damage claims set forth below and in light of the recent Termination Letter, Progressive requires immediate relief in the form of an injunction to prevent the Defendants from selling its territory development to any third party, which would be a further breach of the SDA and the Agreements.

120.    Immediate relief is required to enjoin the Defendants from enforcing the Termination Letter, from further breaching the SDA and the Agreements and from impinging upon this Plaintiff's right to exclusive Cleveland area development pursuant to the SDA.

121.    Injunctive relief is essential to prevent irreparable harm to the Progressive including but not limited to interfering with Progressive's exclusive right of Cleveland area and surrounding area development contained in the SDA.  Injunctive relief is necessary in order to preserve Progressive's rights under the SDA and to avoid potential harm to any third party to whom the Defendants may attempt to permit development in breach of the SDA.

122.    Therefore, Progressive seeks injunctive relief to prevent the Defendants from violating Plaintiff's development rights.

### COUNT FIVE (*Frustration of Commercial Purpose*)

123.    The Plaintiff's Frustration of Commercial Purpose claim arises under state law.

124.    On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered into the SDA.

125.    On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

126.    On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

127.    The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

128.    The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

129.    Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

130.    The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

131.    The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

132.    Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

133.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

134.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

135.    Due to the above failures on the part of the Defendants, the Defendants controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

136.    Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

137.    The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.   However, all of those operational issues within Progressive's control have been addressed.

138.    During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

139.    Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

140.    As Progressive was instituting that new store development, the Defendants made evident their desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

141.    Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' conspiracy to completely prevent further development became manifest and evident.

142.    Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful

conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

143.    The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

144.    The Defendants had no intention to and did not negotiate Progressive's expansion in good faith.

145.    The Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

146.    Despite the Defendants' failures under the Agreements, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or about September 10, 2007, the Defendants sent a correspondence to the Progressive purporting to provide seven (7) days notice to cure certain alleged defects under the SDA. (Hereinafter referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

147.    Despite the Defendants' letter, Progressive is not in default under any of the provisions of the SDA.

148.    In fact, Progressive herein alleges and claims that the Defendants are in breach of the SDA, and the Agreements and their own protocol and requirements; and that any lack of

development or payment for such non-developed stores was entirely caused by the Defendants breach, wrongful conduct, fraud and civil conspiracy.

149.    Upon receipt of the Cure Letter, Progressive again informed the Defendants that there were no defaults and that there can be no obligation to pay for development when the Defendants were refusing to permit such development.

150.    Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

151.    The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

152.    The Defendants have frustrated the commercial purpose of their agreement by unreasonably withholding Progressive's right to further development under the Agreements.

153.    The Defendants have wrongly prevented Progressive from developing and have frustrated the commercial purpose of the agreement.

154.    Therefore, Progressive seeks injunctive relief to prevent the Defendants from violating Plaintiff's development agreement.

## COUNT SIX (*Intentional Interference with Contract*)

155.    The Plaintiff's Intentional Interference with Contract claim arises under state law.

156.    On or about September 1, 2004, the Defendants B-R and DD and the Plaintiff entered into the SDA.

157.    On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

158.　　On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

159.　　The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

160.　　The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

161.　　Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

162.　　The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

163.　　The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

164.　　Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

165.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

166.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

167.    Due to the above failures on the part of the Defendants, the Defendants controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

168.    As Defendant 3rd D was not a party to any of the agreements, its conduct in facilitating the aforementioned breaches and problems associated with the agreements was wrongful and without privilege.

169.    The Defendant 3rd D prevented the remaining Defendants from honoring Progressive's right to develop any further stores under the SDA.

170.    Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

171.    As Progressive was instituting that new store development, the Defendants, through 3rd D's interference and directives made evident the desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development

30

by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

172.   Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

173.   The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.   Specifically, the Defendants, through 3rd D's interference and control caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

174.   The Defendant 3rd D controlled the actions of Defendants and intentionally interfered with the SDA by forcing the remaining Defendants to not negotiate Progressive's expansion in good faith.

175.   The Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

176.   Despite the Defendants' failures under the Agreements, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or about September 10, 2007, the Defendants, through 3rd D's interference and control sent a correspondence to the Progressive purporting to provide seven (7) days notice to cure certain

alleged defects under the SDA. (Hereinafter referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

177.    Despite the Defendants' letter, Progressive is not in default under any of the provisions of the SDA.

178.    Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

179.    The fact that Progressive has received a Termination Letter clearly indicates that the Defendants, through 3rd D's control and interference are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

180.    The Defendant 3rd D intentionally interfered with the SDA by and between Progressive and D-D and B-R, without legal justification or privilege and to the financial detriment of Progressive.

181.    Progressive has been injured in an amount in excess of $25,000.00, to be proven at trial.

### **COUNT SEVEN (*Civil Conspiracy*)**

182.    The Plaintiff's Civil Conspiracy Claim arises under state law.

183.    On or about September 1, 2004, the Defendants and the Plaintiff entered into the SDA.

184.    On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

185.    On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

186.    The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

187.    The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

188.    Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

189.    The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

190.    The Defendants were the cause of numerous problems, which directly caused operational issues for Progressive resulting from the Defendants faulty selection, construction, development, support and additional errors of the Defendants' contractors.

191.    Specifically, the Defendants failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

192.    The Defendants further failed in their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

193.     The Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

194.     The above failures were done in concern by and between the Defendants to create problems in Progressive's operation of the Stores.

195.     Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

196.     The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.   However, all of those operational issues within Progressive's control have been addressed.

197.     During the period of time when the parties were attempting to remedy the operational issues created by the Defendants intentional and collectively caused failures, the Defendants refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

198.     Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

199.    As Progressive was instituting that new store development, the Defendants made evident their conspiracy to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

200.    Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' conspiracy to completely prevent further development became manifest and evident.

201.    Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

202.    The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively, intentionally and through a combined effort caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

203.    The Defendants conspired and interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

204.    Despite the Defendants' failures under the Agreements, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or

about September 10, 2007, the Defendants sent a correspondence to the Progressive purporting to provide seven (7) days notice to cure certain alleged defects under the SDA. (Hereinafter referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

205.    Despite the Defendants' letter, Progressive is not in default under any of the provisions of the SDA.

206.    In fact, Progressive herein alleges and claims that the Defendants are in breach of the SDA, and the Agreements and their own protocol and requirements; and that any lack of development or payment for such non-developed stores was entirely caused by the Defendants breach, wrongful conduct, fraud and civil conspiracy.

207.    Upon receipt of the Cure Letter, Progressive again informed the Defendants that there were no defaults and that there can be no obligation to pay for development when the Defendants were refusing to permit such development.

208.    Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

209.    The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are conspiring to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

210.    The Defendants have conspired to withhold Progressive's right to further development under the Agreements.

211.    The Defendants have intentionally failed in their obligations under the Agreements and have acted in concert to prevent Progressive's further development.

212.    It is clear that Progressive has met or exceeded the requirements imposed on other parties similarly situated.

213.    The Defendants D-D, B-R and 3rd D, acted intentionally and in concert to deprive Progressive of its legal entitlement to development under the SDA.

214.    The Defendants conduct was willful and proximately caused the deprivation of Progressive's property and financial interest.

215.    Progressive has been injured in an amount in excess of $25,000.00, to be proven at trial.

## COUNT EIGHT (*Fraud*)

216.    The Plaintiff's Fraud Claim arises under state law.

217.    On or about September 1, 2004, the Defendants D-D and B-R and the Plaintiff entered into the SDA

218.    On or about February 23, 2005, Progressive and 3rd D entered into the Mentor Lease.

219.    On or about January 27, 2006 Progressive and 3rd D entered into the Euclid Lease.

220.    The Defendant 3rd D was not a party to the SDA, but had similar development and construction responsibilities with respect to the real estate development at issue; and was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support.

221.    The Defendants D-D, B-R and 3rd D individually and/or collectively represented and promised both within and outside of the SDA and the Leases to perform site selection, construction and development of those multiple stores set forth within the SDA. (Additional

representations and promises outside of the SDA and the Leases hereinafter referred to as the "Facilitation Representations.")

222. Pursuant to the SDA, the Leases and the Facilitation Representations (collectively referred to as "The Agreements"), Progressive developed stores located in Mentor, Chardon, and Euclid (collectively referred to as the "Stores").

223. The Defendants completed the site selection and development of all Stores including Mentor, Chardon and Euclid.

224. The Defendants purposefully and with the intent to defraud Progressive directly caused operational issues for Progressive resulting from the Defendants faulty, construction, development, support and additional errors of the Defendants' contractors.

225. Specifically, at the onset of the agreements and during the initial stages of development under the SDA, the Defendants purposefully and with malice and/or reckless disregard for Progressive's property rights, failed in their site selection, construction, development and support obligations with respect to the Mentor Store under The Agreements by, among other things, the following:

- Poor site selection resulting in inflated labor costs and minimal morning traffic;

- Faulty construction;

- Incorrect outlets;

- Missing and incomplete paperwork;

- Inoperative drive through timer and air conditioner

- Punch list failures including (i) stained bricks, (ii) missing light fixtures, (iii) improper lighting, (iv) leaking counter units, and (v) faulty window fastening.

- Failure to assist in opening;

- Lack of construction assistance;

- Intrusive and unhelpful activity;

- Poor site selection assistance;

- Lack of marketing;

- Improper retrofit design work;

- Lack of support in Progressive's efforts to decrease waste and labor costs.

226.    The Defendants further acted in the same fraudulent manner with respect to their site selection, construction, development and support obligations with respect to the Chardon Store under The Agreements by, among other things, the following:

- Failure in due diligence resulting in cost overruns;

- Failure to timely complete construction;

- Design flaws;

- Improper site design;

- Poor advance planning;

- Lack of market assistance;

- Foundation failures and improper construction;

- Improper financing support and delays

227.    In a similar manner and with the same intent and/or recklessness, the Defendants further failed in their site selection, construction, development and support obligations with respect to the Euclid Store under The Agreements by, among other things, the following:

- Plumbing failures in design, construction and remedial work;

- Improper lighting;

40

- Faulty design and construction defects;

- Interference with store operations;

- Failure to provide promised services and equipment;

- Failures in CPL system and capacity

228.    Due to the above conduct on the part of the Defendants, the Defendants purposefully controlled and were the cause of any difficulties that Progressive encountered in the eventual operation of the Stores.

229.    Progressive timely notified the Defendants of all of the issues and problems and their claims against the Defendants on or about August 3, 2005.

230.    The Defendants and Progressive have since attempted to remedy all of Defendants failures without success.   However, all of those operational issues within Progressive's control have been addressed.

231.    During the period of time when the parties were attempting to remedy the operational issues created by the Defendants failures, the Defendants wrongfully and fraudulently refused to permit Progressive to develop any further stores as was Progressive's right under the SDA.

232.    Specifically, Progressive was attempting to develop a new store by an SDA deadline of January 1, 2007.

233.    As Progressive was instituting that new store development, the Defendants made evident their desire to prevent Progressive from further development and to force them out of the SDA contract and Cleveland area development by wrongfully refusing to honor Progressive's requests to proceed forward and have the new store opened by January 1, 2007.

234.     Although the Defendants' breaches of the Agreements were the subject of discussion and continuous compromise between the parties, it was not until January 1, 2007, that the Defendants' fraud in attempting to completely prevent further development became manifest and evident.

235.     Although Progressive has attempted to have the Defendants retract their decision to prevent further development, the manifestation of their malicious design and wrongful conduct occurred as the January 1, 2007 deadline passed without Defendants relinquishing their position of completely frustrating Progressive's right to further development.

236.     The Defendants had no contractual right under the SDA or any ancillary agreement to refuse to honor Progressive's development rights under the SDA under the facts of this case.  Specifically, the Defendants exclusively caused all problems that were the basis for the refusal to permit further development and Progressive had already remedied all alleged operational issues within their control.

237.     The Defendants had no intention to and did not negotiate Progressive's expansion in good faith.

238.     The Defendants fraudulently interfered with Progressive's rights under the SDA in an effort to release themselves from the financial obligations of future site selection, development and support for the additional stores.

239.     Despite the Defendants' intentional and/or reckless failures with respect to the development and leasehold issues, and in complete accord with their intention to dishonor the SDA and their conspiracy to force the January 1, 2007 deadline to pass without Progressive being able to commence any possible development, on or about September 10, 2007, the Defendants sent a correspondence to the Progressive purporting to provide seven (7) days notice

to cure certain alleged defects under the SDA. (Hereinafter referred to as the "Cure Letter" and a copy of which is attached to the original Complaint as Exhibit "2.")

240.    Despite Defendants' contractual breaches and tortious conduct, on or about September 22, 2007 the Defendants wrongfully and without legal basis or entitlement sent a letter terminating Progressive's rights under the SDA. (the "Termination Letter" attached to the original Complaint as Exhibit "3.")

241.    The fact that Progressive has received a Termination Letter clearly indicates that the Defendants are attempting to supersede Progressive's right to exclusive development of certain facilities pursuant to the SDA.

242.    It is clear that Progressive has met or exceeded the requirements imposed on other parties similarly situated.

243.    The conduct of the Defendants D-D, B-R and 3rd D, and each of them constitutes an act(s) of fraud upon Progressive.

244.    Progressive has been injured in an amount in excess of $25,000.00, to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor as follows:

A.    Compensatory damages in an amount in excess of $25,000 to be proven at trial;

B.    Punitive damages;

C.    Permanent Injunction;

D.    Treble damages;

E.    Attorneys' fees and the costs of this action; and

F.      Such other and further relief as this Court deems just and equitable.

**BENESCH, FRIEDLANDER,**                    Respectfully submitted,
    **COPLAN & ARONOFF LLP**

                                             /s/ Edward J. Stoll, Jr.
                                             THOMAS R. BRULE (#0060146)
                                             EDWARD J. STOLL, JR. (#0063533)
                                             200 Public Square, Suite 2300
                                             Cleveland, Ohio  44114-2378
                                             Telephone:      216-363-4500
                                             Facsimile:      216-363-4588
                                             E-Mail:  tbrule@bfca.com
                                                       estoll@bfca.com

                                             *Attorney for Plaintiff Progressive Foods, LLC*

**JURY DEMAND**: The Plaintiff hereby demands a trial by jury of all issues and claims asserted
in the original Verified Complaint.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed electronically and by regular U.S. Mail on this 15th day of February, 2008 using the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Edward J. Stoll
Edward J. Stoll (0063533)
*One of the Attorneys for the Plaintiff*