# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC, | ) | Case No. 1:07 CV 3424 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DUNKIN' DONUTS INCORPORATED, BASKIN-ROBBINS USA, CO., and THIRD DUNKIN' DONUTS REALTY, INC., | ) | **DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| Defendants and Plaintiffs-in-Counterclaim and Third Party Complaint, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EITAN FLANK, MIKE FLANK, SHAUL FLANK, JOEL SAUSEN, and KEVIN DAUBENMIRE, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

Eric L. Yaffe, Esq.
Jeffrey L. Karlin, Esq.
Ashley M. Ewald, Esq.
GRAY, PLANT, MOOTY, MOOTY &
   BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC  20037-1931
Telephone:     (202) 295-2200
Facsimile:      (202) 295-2257
eric.yaffe@gpmlaw.com
jeffrey.karlin@gpmlaw.com
ashley.ewald@gpmlaw.com

*Attorneys for Defendants and Plaintiffs-in-Counterclaim*

Dated: June 5, 2009

Daniel F. Gourash, Esq. (0032413)
SEELEY, SAVIDGE, EBERT &
   GOURASH CO.
26600 Detroit Road
Cleveland, Ohio  44145-2397
Telephone:     (216)566-8200
Facsimile:      (216) 566-0213
rdanderle@sseg-law.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

STATEMENT OF THE ISSUES TO BE DECIDED...................................................v

SUMMARY OF ARGUMENT PRESENTED ........................................................vi

I.     INTRODUCTION...........................................................................................1

II.    STATEMENT OF FACTS ...............................................................................1

       A.  Contractual Disclaimers.........................................................................3

       B.  Progressive's Default Under the SDA ....................................................5

II.    LAW AND ARGUMENT .................................................................................6

       A.  Legal Standard.......................................................................................6

       B.  All Of Progressive's Claims are Barred Because the SDA Specifically Disclaimed
           Any Claims for Lost Profits or Dunkin's Site Selection...............................6

       C.  Most of Progressive's Claims Are Barred By the SDA and Franchise Agreements'
           Two-Year Contractual Limitations Provisions..........................................12

       D.  The Claim for Unjust Enrichment is Barred Because a Contract Governs .. the Parties'
           Relationship ........................................................................................13

       E.  Progressive's Fraud Claim Fails as a Matter of Law Because It Could Not Have
           Reasonably Relied on any Alleged Promises by Dunkin' .........................14

       F.  The Claims for Civil Conspiracy and Intentional Interference with Contract Fail
           Because an Entity Cannot Conspire with Itself.......................................15

       G.  Progressive Cannot Raise Claims for Unfair Competition or Frustration of
           Commercial Purposes Because Neither Claim Applies to the Facts Here.................16

       H.  The Claim for Injunctive Relief Is Moot ................................................17

       I.   Progressive Breached the Terms of its SDA with Dunkin' .......................18

CONCLUSION......................................................................................................18

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amadasu v. The Christ Hospital*, 514 F.3d 504 (6th Cir. 2008)..................................................15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..............................................................6

*Atelier District, LLC v. Parking Co. of America, Inc.*, No. 07AP-87, 2007 WL 4564304
(Ohio Ct. App. Dec. 31, 2007).....................................................................................................17

*Beta Lasermike, Inc. v. Swinchatt*, No. 18059, 2000 WL 262628
(Ohio App 2d Dist. Mar. 10, 2000)................................................................................................7

*Bonfield v. AAMCO Transmissions, Inc.*, 717 F. Supp. 589 (N.D. Ill. 1989) .............................11

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...........................................................................6

*Cottman Transmission Systems, LLC v. Kershner*, 536 F. Supp. 2d 543 (E.D. Pa., 2008) ..........14

*Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947 (D.Mass. 1995) ..........................10

*Dunkin' Donuts Franchised Restaurants LLC v. Cardillo Capital, Inc.*,
No. 2:07-278, 2007 WL 2209245 (M.D. Fla. July 30, 2007)........................................................9

*General Envtl. Science Corp. v. Horsfall*, 753 F.Supp. 664 (N.D.Ohio 1990) ............................7

*Hall v. Burger King Corp.*, 912 F. Supp. 1509 (S.D. Fla. 1995)..................................................8

*Hays v. Mobil Oil Corp.*, 930 F.2d 96 (1st Cir. 1991) ...............................................................12

*Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327, 1996 WL 346607 (10th Cir. June 25, 1996) .......8

*Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*,
31 F.3d 573 (7th Cir. 1994) .....................................................................................................8, 15

*Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039 (4th Cir. 1987) ........................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)....................................6

*Mecham v. United Consumers Club Franchising Corp.*, 312 F.3d 909 (8th Cir. 2002)...........7, 15

*Morrison v. Back Yard Burgers, Inc.*, 91 F.3d 1184 (8th Cir. 1996)............................................8

*O'Neal v. Burger Chef Sys, Inc.*, 860 F.2d 1341 (6th Cir. 1988) ...............................................14

*Onebeacon Am. Ins. Co. v. ADT Sec. Servs., Inc.*, No. 07-11464, 2008 WL 2484862
(D. Mass. June 13, 2008)...........................................................................................12

*Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804 (1st Cir.1971)....................................16

*Reynolds Indus., Inc. v. Mobil Oil Corp.*, 618 F.Supp. 419 (D. Mass. 1985) .............................12

*Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y. 1989) ..................................................8

*Verderber v. Perry*, No. 98-1625, 1999 WL 525953 (D. Mass. March 8, 1999) ........................13

## STATE CASES

*Cent. Realty Co. v. Clutter*, 406 N.E.2d 515 (Ohio 1980) ...........................................................11

*Cf. Masingill v. EMC Corp.*, 694 N.E. 2d 401 (Mass. Ct. App. 2007)........................................14

*Chase Precast Corp. v. John J. Paonessa Co.*, 566 N.E.2d 603 (Mass. 1991)............................17

*Commerce Bank & Trust Co. v. Hayek*, 709 N.E. 2d 1122 (Mass. Ct. App. 1999).....................13

*Hambleton v. R.G. Barry Corp.*, 465 N.E. 2d 1298 (Ohio 1984)................................................13

*Hummel v. Hummel*, 14 N.E.2d 923 (Ohio 1938)........................................................................13

*Kannavos v. Annino*, 356 Mass. 42-47 (1969) ...........................................................................14

*Landskroner v. Landskroner*, 797 N.E.2d 1002 (Ohio Ct. App. 2003) .......................................16

*McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E. 2d 188 (Mass. 1990) ..............................14

*Nota Construction Corp. v. Keyes Associates, Inc.*, 45 Mass.App.Ct. 15 (1990) .......................14

*Rezendes v. Prudential Ins. Co.*, 189 N.E. 826 (Mass. 1934) .....................................................11

*Riseman v. Orion Research, Inc.*, 394 Mass. 311 (1985)............................................................16

*Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41 (1991) ....................................................16

*Schwanbeck v. Federal Mogul Corp.*, 412 Mass. 703 (1992)...............................................9, 11

*Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947) .............................................................................13

## MISCELLANEOUS

Williston on Contracts (4th ed. 2003) .......................................................................10

Fed. R. Civ. P. 56(c)...................................................................................................6

## STATEMENT OF THE ISSUES TO BE DECIDED

1.  Whether all of Progressive's claims are barred as a matter of law by the terms of the Multiple Unit Store Development Agreement ("SDA"), the Franchise Agreements, and the disclosure documents it received from Dunkin', all of which provided that Dunkin' was not responsible for guaranteeing the success of the sites that it approved and/or selected and that Progressive could not rely on any representations made to it by Dunkin', but instead was responsible for its own independent investigation and evaluation of the business and locations?

2.  Whether most of Progressive's claims are barred as a matter of law by the two-year contractual limitations period set forth in the SDA and Franchise Agreements which bar all claims arising out of the relationship between the parties?

3.  Whether Progressive's remaining claims are barred on legal grounds?

4.  Whether summary judgment should be entered in favor of Dunkin' on its counterclaim against Progressive given that Progressive breached its payment obligations, even after receiving notice and an opportunity to cure its breach?

## SUMMARY OF ARGUMENT PRESENTED

All of Progressive's claims in this case are barred by the unambiguous terms of the SDA and Franchise Agreements, under which Progressive disclaimed any cause of action for lost profits or operating losses.  The contracts, together with Uniform Franchise Offering Circulars, specifically provided that the franchisee shoulder all of the risk of opening and operating the franchises at issue.  Progressive further acknowledged in these documents that it received no promises or guarantees by Dunkin' as to the success of any of its franchises.  Therefore, Progressive is precluded as a matter of law from raising any claim seeking the recovery of its start-up costs and operating losses.  Moreover, nearly all of Progressive's claims are barred by two-year contractual limitation provisions that appear in both the SDA and Franchise Agreements.  Because Progressive admits in the First Amended Complaint that it informed Dunkin' of all of its claims more than two years before it filed suit, the claims must be dismissed as a matter of law.

Progressive's other claims fail as well.  Its unjust enrichment claim is barred because such a claim applies only where there is no contract that controls the relationship between the parties, which is not the case here.  Its fraud claim also fails as a matter of law due to the integration clauses in the contracts, as well as Progressive's own acknowledgement that Dunkin' made no oral representations to it outside of the four corners of the contracts.  Its claims for civil conspiracy and intentional interference with contract fail because Dunkin's employees all work for the same company, Dunkin' Brands, Inc., and Dunkin' cannot conspire with itself.  Progressive's remaining claims fail because they are moot – the unfair competition and frustration of commercial purposes claims do not apply to the facts here, and the request for injunctive relief would be superseded by a finding in Dunkin's favor on its other claims.

Finally, Dunkin' is entitled to summary judgment on its counterclaim because there is no dispute that Progressive failed to pay $100,000 that it owed to Dunkin' pursuant to the terms of the SDA.

## I.     INTRODUCTION

This motion is based on a simple and straightforward principle: that when a party enters into an agreement in which it specifically accepts the risk of a business venture, it should be required to adhere to the bargain it made.  Progressive Foods, LLC would have it otherwise and is seeking to have the Court impose liability on franchisors Dunkin' Donuts and Baskin-Robbins despite the fact that the parties' agreement  specifically disclaims such liability.  We anticipate that Progressive will respond to this motion with numerous alleged facts that they will contend foreclose summary judgment and require further discovery.  However, regardless of whether any of those facts are true, they are irrelevant because the contract that governs the relationship between the parties specifically prevented Progressive from raising exactly the kinds of claims they are seeking to raise in this lawsuit – that Dunkin' was somehow obligated to provide them with a profitable business and successful franchise sites.  No further discovery is necessary to decide this motion because the contracts already anticipated and sought to prevent this kind of lawsuit from being filed.  Defendants therefore respectfully ask that summary judgment be entered in their favor, all of the claims set forth in the First Amended Complaint be dismissed, and its claim for termination of the agreement as issue granted as well.

## II.     STATEMENT OF FACTS

Dunkin' and Baskin-Robbins are sister companies that are engaged in the business of selling franchises and providing their brand names and services to franchisees operating under their trademarks.  (Countercl. ¶¶ 1-2).  (For ease of reference, Dunkin' and Baskin-Robbins are referred to collectively as "Dunkin'").  Progressive is a Dunkin' franchisee with three locations in Mentor, Chardon and Euclid.  (First Amended Compl. ¶ 16.)  On September 1, 2004, Progressive signed a Multiple Unit Store Development Agreement (SDA) under which it was granted the right to develop and open six stores on the east side of Cleveland between April 2005

and January 2008.  (First Amended Compl. at ¶ 11; *See also* Ex. 1.D, SDA.) (attached hereto.)

Dunkin' built and sold to Progressive the buildings at Mentor and Euclid; Progressive built

Chardon itself.  (First Amended Compl. at ¶¶ 12, 13; Jack Laudermilk Certification "Laudermilk

Cert.", Ex. 1, ¶ 9) (attached hereto.)  The fourth store was scheduled to open by January 1, 2007;

however, it was never opened because Dunkin' placed Progressive on development hold due to

Progressive's frequent failures to pay royalties, advertising, and rent fees and its other

operational problems.  (Laudermilk Cert. ¶ 9; Ex. 1.D, SDA.)

The SDA required Progressive to pay initial franchise fees of $40,000 per location for a

total of $240,000 on a prescribed schedule. (Ex. 1.D, SDA.)  Per the schedule, $120,000 was due

upon signing the contract, $60,000 was due on July 1, 2005, and $60,000 was due on July 1,

2006.  (*Id.*)  In exchange for the payments, Dunkin' agreed to set aside the territory for

Progressive and not allow any other franchisees to develop stores within the SDA boundaries.

The fees were nonrefundable and were to be paid even if Progressive failed to open any of the

locations.  (Ex. 1.D, SDA ¶ 2.A; *id.* at Ex. B § I.C ("Total initial Franchise Fees are payable in

full even if some or all of the units to which they relate do not open.").)  The SDA further

provided that if Progressive defaulted on its payments and did not cure the default within seven

days of receipt of a Notice to Cure, Dunkin' could terminate the SDA.  (Ex. 1.D, SDA ¶ 11.)

The SDA, which was by its terms governed by Massachusetts law, also provided that any

"amendment, change or variance" to the terms of the agreement would have to be in writing. (*Id.*

¶¶ 19, 21.)

Progressive also entered into leases with Dunkin' for the Mentor and Euclid stores.  (First

Amended Compl. ¶¶ 12-13.).  Dunkin' had no affirmative obligations under the leases aside from

substantially completing the premises for occupation and allowing the quiet enjoyment of the

premises as long as the lease was not breached. (Leases ¶ 10(a)-(b).)  The Dunkin' entity listed

on the leases, Third Dunkin' Donuts Realty Inc., was later succeeded-in-interest by DB Real

Estate Assets I LLC and DB Real Estate Assets II LLC.  (Answer and Countercl. ¶ 6.)  Third

Dunkin' had no employees of its own and was merely a legal entity that owned real estate on

behalf of the Dunkin' franchise system.  (Laudermilk Cert. ¶ 11.)  All individuals who worked

on behalf of Third Dunkin' were employees of Dunkin' Brands, Inc.  (*Id.* ¶ 12.)

### A.    Contractual Disclaimers

Nothing in the parties' contracts required Dunkin' to provide successful sites or profitable

locations for the franchises.  Instead, the SDA, the disclosure documents provided by Dunkin' to

Progressive prior to entering into the SDA, and the Franchise Agreements all contained multiple

provisions in which Dunkin' disclaimed any responsibility for the success of the sites chosen for

the stores.  Progressive also agreed in the SDA that it was responsible for investigating potential

sites and assumed all associated risk.  Indeed, the contracts specifically laid the responsibility for

choosing sites and making the business profitable firmly at Progressive's feet.

Paragraph 19 of the SDA, for example, stated that Dunkin' made no representations that

induced Progressive into entering the agreement and that the success of the venture was

"speculative" and depended on "the ability of the [franchisee] as an independent business

person."  Progressive acknowledged in that same provision that it did its own independent

investigation of the Dunkin' system and did not rely upon "any representation as to profits which

the [franchisee] might be expected to realize . . . ." (Ex. 1.D, SDA ¶ 19.).  The SDA further

stated that Dunkin' did "not make any representations or warranty to the potential success of the

business venture contemplated hereby" (*Id.*); and disclaimed any guarantee by Dunkin' as to the

"suitability or potential" of the store locations" that Dunkin' approved under the agreement.  (*Id.*

¶ 22.)  In fact, the SDA provided that it was "critical" that Progressive "conduct its own investigation of the trade areas or territories under consideration, and that [Progressive should] rely only on its own information and analysis relating to all aspects of developing a Unit within the Store Development Area." (*Id.*)  On the signature page for the SDA, Progressive's owners were asked to identify any representations that Dunkin' may have made that were not expressly set forth in the Agreement. (*Id.* p. 17.) They handwrote "None." (*Id.*)

The disclaimers and acknowledgments in the SDA are also set forth in the disclosure documents that Dunkin' provided to Progressive prior to signing the SDA and the Franchise Agreements.  Progressive received a Uniform Franchise Offering Circular (UFOC) in both 2004 and 2005.  (Laudermilk Cert. ¶ 13)  The UFOC informs prospective franchisees about the investment they are considering, including the nature of the investment and the roles of franchisor and franchisee in the development and operation of the stores.  (*Id.* ¶ 14.)  Both the 2004 and 2005 UFOC specifically stated that "[t]he extent to which you may succeed at any particular location cannot be predicted."  (Exs. 1.E-1.F, UFOC at Item 19.)  The UFOCs also warned Progressive that Dunkin's approval of any franchise sites was "not a representation or warranty that you will achieve any specific level of sales or profits, or that you will be successful." (*Id.*, UFOC at Item 1.)  Each urged the franchisees to make a "careful investigation" of the sites and the business and that their "success depends on your ability as an independent business person."  (*Id.*)

Each of the Franchise Agreements Progressive signed prior to opening its stores had a twenty-year term and obligated Progressive to pay franchise royalties and advertising fees based on a percentage of gross sales.  (Exs. 1.A-1.C, Franchise Agreement p. 1 §§ B, C-F.)  As with the SDA, each Franchise Agreement also contained broad disclaimers about the risky nature of the

4

investment.  Paragraph 18 of the Franchise Agreement stated that the franchise was a "speculative venture," that there were no representations made to the franchisees by Dunkin' about profits or sales, and that Dunkin' employees were not authorized to make such representations.  An addendum to each Franchise Agreement dealing with the development of a newly-opened store (such as those involved here) stated that Dunkin's approval of a site was "not a representation or warranty that the Unit [would] be profitable or that [the Franchisee would] achieve any particular level of sales at the Unit."  (Exs. 1.A-1.C, Special Terms and Conditions ¶ 1.0.)

In addition to disclaimers, both the SDA and the Franchise Agreement also contained two-year limitations provisions.  The clause in the SDA stated that "any and all claims . . . arising out or relating to" the SDA, the "relationship between" Progressive and Dunkin', or Progressive's operation of the stores must be commenced within two years after the discovery of the facts giving rise to such claim or the action "shall be barred."  (Ex. 1.D, SDA ¶ 18.F(5).)  The clause in the Franchise Agreements contained the same language.  (Exs. 1.A-1.C, Franchise Agreement ¶ 11.7.5.)  Finally, the SDA had an integration clause that stated that the contract was the entire agreement between the parties and that there were "no representations, inducements, promises or agreements, oral or otherwise between the parties not embodied within . . . ."  (*Id.* ¶ 19.)

**B.  Progressive's Default Under the SDA**

Progressive failed to make payments totaling $100,000 that were due to Dunkin' Donuts under the SDA.  (Gary Zullig Certification, Ex. 2, ¶ 7.) (attached hereto)  After a year of trying to secure payment, on September 10, 2007, counsel for Dunkin' sent Progressive a Notice of Default & Notice to Cure giving Progressive seven days to make these three payments.

(Laudermilk Cert. ¶ 15.)  On September 22, 2007, after Progressive failed to make the payments, counsel for Dunkin' sent Progressive a Notice of Termination that terminated the SDA, effective immediately upon receipt.  (*Id.* ¶ 16.)  On October 3, 2007, Progressive filed suit against Dunkin' in state court alleging numerous claims, which Dunkin' removed to this Court.  (*Id.* ¶ 17.) Dunkin' answered and filed a counterclaim against Progressive and its owners for breach of contract due to their failure to pay the fees due and owing under the terms of the SDA.  (*Id.* ¶ 18.)  Pending judicial resolution of the issues in this case, Dunkin' has kept Progressive's SDA territory set aside and has refused to allow any other franchisees to develop within its boundaries. (*Id.* at 19.)

## II.     LAW AND ARGUMENT

### A.     Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There is no genuine issue of fact if the evidence is such that no reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is an integral part of the litigation process which may be used to secure a just, speedy, and inexpensive determination of an action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### B.     All Of Progressive's Claims are Barred Because the SDA Specifically Disclaimed Any Claims for Lost Profits or Dunkin's Site Selection

Progressive's contention that Dunkin' is somehow liable for all of the franchisee's start-up costs and operating losses since its shops opened because the franchisor allegedly has a duty

to pay under both the SDA and the Leases or under the common law has no support whatsoever.[1]
Neither the plain language of the SDA nor the Leases contains any provision that obligates
Dunkin' to guarantee the success of any of Progressive's franchises.  Nor did the agreements
require Dunkin' to cover Progressive's operating losses or start-up costs if the investment turned
out badly.  In fact, the SDA specifically disclaimed any claim for lost profits or operating losses,
stating that it was the franchisee that shouldered the risk arising from the development of any of
the stores to be opened.  The SDA also made clear – in the integration clause and elsewhere –
that Dunkin' had not made any statements or promises to the franchisee about the success of any
of the sites that were chosen or approved as franchise locations other than what appeared in the
document itself.  Instead, the SDA stated that it was Progressive's responsibility to investigate
the site and the surrounding trade area on its own and that it could not rely on Dunkin's
evaluation of either.  Given these provisions, Progressive's contention that Dunkin' had a duty to
compensate Progressive for its entire investment and any operating losses incurred in the short
time these businesses have been in operation fails as a matter of law.

Indeed, courts have consistently dismissed claims by franchisees who allege they were
promised profitable business by franchisors in the face of contractual language that disclaimed
any guarantee of success.  *See Mecham v. United Consumers Club Franchising Corp.*, 312 F.3d
909, 912 (8th Cir. 2002) (franchisee could not bring a claim based on a franchisor's alleged
representations regarding sales and profits where the franchise agreement contained a disclaimer
as to the profitability of the business and the franchisee confirmed in writing that he had not

---

[1] The SDA provides that Massachusetts law applies to *any* claims arising out of the agreement.  (Ex. 1.D,
SDA at ¶ 18.D.)  Ohio courts enforce such choice of law clauses.  *See, e.g., General Envtl. Science Corp. v.
Horsfall*, 753 F.Supp. 664, 675 (N.D.Ohio 1990); *Beta Lasermike, Inc. v. Swinchatt*, No. 18059, 2000 WL 262628
(Ohio App 2d Dist. Mar. 10, 2000) (attached hereto as Exhibit 3).

relied on any such representations); *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir. 1994) (dismissing claims by franchisee based on franchisor's representations regarding sales estimates after franchisee stated in writing that he had not relied on any such representations); *Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327 (table), 1996 WL 346607, at *4 (10th Cir. June 25, 1996) (same, where franchise disclosure document contained express disclaimer of any earnings or profit representations) (attached hereto as Exhibit 4).

In fact, the disclaimer provisions and integration clauses in the SDA bar such claims even if the record showed (and it does not) that Dunkin' had made promises to Progressive concerning the success of the shops. *See Hall v. Burger King Corp.*, 912 F. Supp. 1509 (S.D. Fla. 1995) (franchisees could not base a claim on franchisor's representations about prospects of success of restaurant where franchise agreement stated that franchisees made independent investigation of business); *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146, 1152 (S.D.N.Y. 1989) (franchisees' reliance on prior representations was unreasonable); *Morrison v. Back Yard Burgers, Inc.*, 91 F.3d 1184, 1185 (8th Cir. 1996) (unreasonable for franchisee to rely on alleged misstatements after receiving UFOC). Thus, Progressive cannot base any claim – whether in contract or tort – on statements made by Dunkin' about the viability of the sites, projected sales figures, or profit levels, even if they had been made.

The same is true for Progressive's allegation that Dunkin' wrongfully prevented it from developing the three remaining stores under the SDA. Dunkin' had no obligation under the SDA to allow Progressive to develop more stores and therefore no liability for preventing that from happening. In fact, while there are extensive provisions in the SDA that speak to the franchisee's obligation to open all of the locations set forth in the development schedule, there are *no* provisions that impose liability on Dunkin' for failing to allow the franchisee to open those same

stores.  Therefore, Dunkin' was free to prevent Progressive from opening any other stores until it solved its operating issues and became current on its payment obligations.  As further proof that it has no claim, it is noteworthy that Progressive has never sought damages for being prevented from developing the additional three shops.

Nor was it a breach for Dunkin' to terminate the SDA for nonpayment of the remaining portion of fees it owed under that agreement.  As explained above, Progressive was obligated to make these payments regardless of whether it opened any the locations identified by the SDA. Thus, when Progressive failed to pay all of the fees it owed, Dunkin' was within its rights to issue a notice of default and to terminate the SDA after the cure period expired.  (SDA ¶¶ 2.A, 11.)  The fee provisions contained in the SDA are unambiguous.  Under Massachusetts law, it is "elementary that an unambiguous agreement must be enforced according to its terms." *Schwanbeck v. Federal-Mogul Corp.,* 592 N.E. 2d 1289, 1292 (Mass. 1992).  Furthermore, a franchisee's obligation to pay fees to a franchisor is a vital part of any franchise relationship. *Dunkin' Donuts Franchised Restaurants LLC v. Cardillo Capital, Inc.,* No. 2:07-278, 2007 WL 2209245, at *4 (M.D. Fla. July 30, 2007) ("Failure to make payments called for under a contract constitutes a breach going to the root of the contract.") (attached hereto as Exhibit 5).  Thus, the termination of the SDA for Progressive's non-payment of fees was proper and acts as a bar to any claim by Progressive that it was entitled to proceed with the development of the remaining stores.

Progressive's purported defense to its nonpayment breach – that Dunkin' itself breached the SDA – flies in the face of the general principle that when one party to a contract contends that the other party has breached its agreement, the non-breaching party may either stop performance and assume the contract is void, or continue its performance and sue for damages.

However, "under no circumstances may the non-breaching party stop performance <u>and</u> continue to take advantage of the contract's benefits." *Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947, 955 (D.Mass. 1995) (citing *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 376 (3d Cir. 1992), *aff'd*, 70 F.3d 206 (1st Cir. 1995). The undisputed facts here show that Progressive failed to cure its financial defaults, and thus it does not matter whether Dunkin' allegedly breached the SDA as well (which Dunkin' denies).

In addition, Progressive's claim for the return of its initial investment – which includes, among other things, the cost of purchasing the franchises and constructing the one store it built on its own – is not viable. Progressive cannot claim that Dunkin' is liable for both its lost operating costs *and* its investment because the franchisee had to first make the initial investment even to be in a position to make profits or incur losses. Progressive's request for the return of its start-up costs is tantamount to asking for rescission of the SDA – even though Progressive never raises this as a specific claim in the First Amended Complaint. Rescission is an alternative to an action for damages and requires a substantial or material breach of the contract. 5 Williston on Contracts, § 68:2 (4th ed. 2003). It must be initiated within a reasonable time and must be communicated to the other party, and one may not do anything inconsistent with "the title or ownership being in the vendor and still seek rescission." 284 Williston, § 68:24. Putting aside the fact that five years after entering into the SDA with Dunkin, Progressive has never sought rescission, this remedy is simply not available to Progressive. The contract was performed to a substantial degree, as Progressive opened three of the six locations that it contracted for and Dunkin' has not allowed any other franchisees to develop inside the territory. Thus, Progressive's claims for its initial investment costs also fail as a matter of law.

Finally, Progressive cannot use the fact that the SDA and Franchise Agreements were drafted by Dunkin' as a basis to escape the plain language of the contracts.  The use of standard contracts by franchisors does not render them "contracts of adhesion."  *Bonfield v. AAMCO Transmissions, Inc.*, 717 F. Supp. 589, 596 (N.D. Ill. 1989) (franchise agreement presented on a "take it or leave it" basis not a contract of adhesion).  Even if that were the case, it would only mean that *ambiguous* contractual language would be interpreted in favor of the economically smaller party.  *Schwanbeck v. Federal Mogul Corp.*, 412 Mass. 703, 706 (1992) (it is "elementary that an unambiguous agreement must be enforced according to its terms"); *Cent. Realty Co. v. Clutter*, 406 N.E.2d 515, 517 (Ohio 1980) (same).  Where there is no ambiguity in the words of a contract – as here – they must be given their natural and ordinary meaning and be fully enforced.  *See Rezendes v. Prudential Ins. Co.*, 189 N.E. 826, 828 (Mass. 1934).

In short, Progressive specifically and intentionally disclaimed in the SDA any claims it had for operating losses, lost profits, or Dunkin's choice of or approval of a site for any of the locations at issue.  Progressive is suing Dunkin' after being in business for less than three years (and less than a year after opening the Euclid shop).  For a franchisee to throw in the towel so early in a twenty-year business relationship and claim it should be compensated for all of its operating losses and start-up costs would effectively make every franchisor the guarantor of success for every franchisee – a step that no court has ever taken.  Frankly, there is no way for Progressive to know whether the stores will be successful or not at this point and no legal principle imposing liability on a franchisor for selling a franchise or approving a site which ends up losing money during the initial years of operation.  Dunkin' is thus entitled to summary judgment on all claims raised against it in the First Amended Complaint.

### C.   Most of Progressive's Claims Are Barred By the SDA and Franchise Agreements' Two-Year Contractual Limitations Provisions

The SDA's two-year contractual limitations provision (which is identical to the one set forth in the Franchise Agreements) also bars most of Progressive's claims.  Limitations provisions are fully enforced under Massachusetts law.  *Hays v. Mobil Oil Corp.*, 930 F.2d 96, 100 (1st Cir. 1991) (one-year contractual limitations period valid and enforceable); *Reynolds Indus., Inc. v. Mobil Oil Corp.,* 618 F.Supp. 419, 423 (D. Mass. 1985) (finding "no evidence that a one-year limitations provision is contrary to Massachusetts public policy"); *see also Onebeacon Am. Ins. Co. v. ADT Sec. Servs., Inc.*, No. 07-11464, 2008 WL 2484862 (D. Mass. June 13, 2008) (barring a claim for damages in a breach of contract action based on a one-year limitations provision in a standard residential services contract) (attached hereto as Exhibit 6).

The limitations provisions here are broadly written and apply to any claim "arising out of or relating to" the contract, the relationship between Progressive and Dunkin', or Progressive's operation of its stores.  Any such claims had to be commenced within two years after discovery of facts giving rise to such a claim or action.  Thus, any claims that were known to Progressive more than two years before it filed suit on October 3, 2007 are completely barred – as most of them are.  Progressive admitted in its First Amended Complaint that it had notified Dunkin' of "all of the issues and problems and their claims against [the franchisor] on or about August 3, 2005." (First Am. Compl. ¶ 23.)  Therefore, the contractual limitations period bars most of the allegations set forth in the First Amended Complaint, including any claims relating to the SDA (signed September 1, 2004), site selection and construction for the locations at Mentor (which

opened January 27, 2005) and Chardon (which opened August 26, 2005) and any development

and construction activities related to the Euclid store that occurred prior to October 3, 2005.[2]

### D.    The Claim for Unjust Enrichment is Barred Because a Contract Governs the Parties' Relationship

Progressive's claim for unjust enrichment is also barred on legal grounds.  This claim is

based on the allegation that Dunkin' withheld monies paid by Progressive and received royalties

and other payments for "uncompleted or underperforming development requirements . . . ."

First Am. Compl. ¶ 64. Although not clearly identified, it is apparent that Progressive is referring

to the $140,000 it paid to Dunkin' under the SDA along with royalty fees on its gross sales paid

under the Franchise Agreements.

Unjust enrichment, however, is a doctrine of quasi-contract.  In *Hambleton v. R.G. Barry*

*Corp.*, 465 N.E. 2d 1298, 1302 (Ohio 1984), the court observed that the claim "arises out of the

obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain

. . . ." *Citing Hummel v. Hummel*, 14 N.E. 2d 923, 925-26 (Ohio 1938).  Under Massachusetts

and Ohio law, this claim applies only where there is no contract that controls the relationship

between the parties.  *Verderber v. Perry*, No. 98-1625, 1999 WL 525953 *5 (D. Mass. March 8,

1999) ("Massachusetts law does not allow litigants to override an express contract by arguing

unjust enrichment.") (attached hereto as Exhibit 7); *Ullmann v. May*, 72 N.E.2d 63, 66 (Ohio

1947) (same).

In this case, there are contracts – the SDA and Franchise Agreements – that govern the

relationship between the parties.  In addition, the SDA required Progressive to pay initial

franchise fees without regard to whether any of the franchises set for development actually

opened and the Franchise Agreements required Progressive to pay fees on all gross sales.

---

[2] The limitations provision may not apply to certain aspects of the Euclid franchise since it opened in February 2006.

Therefore, there was no benefit derived by Dunkin' to which it was not entitled under the agreements between the parties.  Progressive's claim for unjust enrichment thus cannot be brought under these circumstances.

    **E.**    **Progressive's Fraud Claim Fails as a Matter of Law Because It Could Not Have Reasonably Relied on any Alleged Promises by Dunkin'**

Progressive's fraud claim is similarly flawed.  A claim of fraudulent inducement of a contract requires proof that the deceived party was led to believe and understand that the agreement was substantially different from what it really was.  *McEvoy Travel Bureau, Inc. v. Norton Co.,* 563 N.E. 2d 188, 192-95 (Mass. 1990).  Absent such fraudulent inducement, a party will be bound to agreements signed voluntarily, even if not read.  *Commerce Bank & Trust Co. v. Hayek,* 709 N.E. 2d 1122, 1127 (Mass. Ct. App. 1999).  *Cf. Masingill v. EMC Corp.,* 694 N.E. 2d 401, 404 (Mass. Ct. App. 2007) (it is unreasonable to rely on oral representations specifically contradicted by subsequent written contract).  In Massachusetts, a business fiduciary may have an affirmative duty to speak if he fails to speak about a material fact.  *Kannavos v. Annino,* 356 Mass. 42-47, 50 (1969); *Nota Construction Corp. v. Keyes Associates, Inc.,* 45 Mass.App.Ct. 15, 19 (1990).  However, franchisors do not have a fiduciary relationship with their franchisees, *O'Neal v. Burger Chef Sys, Inc.,* 860 F.2d 1341, 1346 (6th Cir. 1988), which Progressive acknowledged in its Franchise Agreements.  (Exs. 1.A-1.C, Franchise Agreements at ¶ 12.0.)

Courts uniformly dismiss claims for fraudulent inducement where the franchise agreement has an integration clause stating that the parties were not induced to enter into the contract based on prior representations.  *See Cottman Transmission Systems, LLC v. Kershner,* 536 F. Supp. 2d 543, 551 (E.D. Pa., 2008) (granting motion to dismiss for negligent misrepresentation based on projected earnings in a UFOC where franchise agreement contained an integration clause disclaiming prior representations); *Hoover Universal, Inc. v. Brockway*

*Imco, Inc.*, 809 F.2d 1039, 1044 (4th Cir. 1987) (buyer who failed to make an investigation may not assert fraud unless the seller intentionally diverted the buyer from a reasonable inquiry).

Progressive's fraud claim fails as a matter of law because it was unreasonable to rely on any statements that were not set forth in the SDA.  This is especially so because the SDA clearly (1) required Progressive to conduct its own independent investigation into the profitability of a Dunkin' location and the viability of the sites, and (2) Progressive specifically agreed that there were no guarantees of success for the businesses.  Such disclaimers bar fraud claims against franchisors.  *See Mecham*, 312 F.3d at 912 (no reasonable reliance on franchisor's alleged representations); *Hardee's of Maumelle*, 31 F.3d at 576.

### F.     The Claims for Civil Conspiracy and Intentional Interference with Contract Fail Because an Entity Cannot Conspire with Itself

Progressive's claims for civil conspiracy and intentional interference with contract fail because they are based on a fiction: that Third Dunkin' Realty Inc. is an entity independent from Dunkin' and that it has its own employees who acted to conspire with Dunkin' and meddle with Progressive's contractual relationships.  Progressive alleges that Third Dunkin' conspired to prevent it from developing any additional stores under the SDA.  (First Am. Compl. ¶ 213.)  In addition, Progressive claims that Third Dunkin' "prevented the remaining Defendants from honoring Progressive's right to develop any further stores under the SDA." (*Id.* at ¶¶ 169, 171.) However, all individuals who worked on behalf of Third Dunkin' were employees of Dunkin' Brands Inc.  Therefore, Third Dunkin' and Dunkin' were part of the same corporate entity.

Employees of a single corporate entity cannot conspire with each other.  Such claims are barred by the "intracorporate conspiracy" doctrine, which provides that "where all of the defendants are members of the same collective entity, there are not two separate 'people' to form a conspiracy." *Amadasu v. The Christ Hospital*, 514 F.3d 504, 507 (6th Cir. 2008) (quoting *Hull*

*v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 510 (6th Cir. 1991). The same is true here. While Third Dunkin' and Dunkin' were separate legal entities, Third Dunkin' acted only through the employees of Dunkin'. Thus, Third Dunkin' could not, as a matter of law, have entered into any conspiracy with Dunkin' to do anything.

The same principle applies to Progressive's claim for interference with contract. A claim of interference "with an advantageous business relationship involves one who, without privilege to do so, intentionally induces or causes a third person not to enter into or continue a business relationship with another." *Riseman v. Orion Research, Inc.*, 394 Mass. 311, 314 (1985), citing *Comey v. Hill*, 387 Mass. 11, 19 (1982). The claim fails when a party is alleged to have been "guilty of tortious interference with its own contract." *Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41, 50 (1991). Since Third Dunkin' had no employees of its own (and acted only through Dunkin's employees), it could not interfere with any contract at all.

### G.  Progressive Cannot Raise Claims for Unfair Competition or Frustration of Commercial Purposes Because Neither Claim Applies to the Facts Here

Both Massachusetts and Ohio law have limited the tort of unfair competition to cases of trademark infringement or commercial disparagement. In Ohio, "unfair competition ordinarily consists of representations by one person that his or her goods are those of another, made for the purpose of deceiving the public." *Landskroner v. Landskroner*, 797 N.E.2d 1002, 1017 (Ohio Ct. App. 2003). It also extends to "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another." *Id.*, quoting *Henry Gehring Co. v. McCue*, 154 N.E. 171 (Ohio Ct. App. 1926). Massachusetts limits this tort to the palming off of products where consumers would be confused as to the source of goods and services. *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 807 (1st Cir.1971). Progressive does not claim that Dunkin' engaged in trademark

infringement or commercial disparagement of its products and, certainly, there are no allegations of palming off.  Therefore, this claim also fails as a matter of law.

The claim for "Frustration of Commercial Purpose" is based on the contention that Dunkin' "unreasonably with[held] Progressive's right to further development under the [SDA and Leases]."  (First Am. Compl. ¶ 153.)  Frustration of purpose is, however, not an affirmative claim but a defense to a claim for breach of contract based on the principle that "unanticipated occurrences, the risk of which should not fairly be thrown on the promisor, has made performance vitally different from what was reasonably to be expected."  *Chase Precast Corp. v. John J. Paonessa Co.,* 566 N.E.2d 603, 606 (Mass. 1991); *Atelier District, LLC v. Parking Co. of America, Inc.*, No. 07AP-87, 2007 WL 4564304 *7 (Ohio Ct. App. Dec. 31, 2007) ("frustration of purpose" doctrine not widely accepted in Ohio) (attached hereto as Exhibit 8).  This doctrine has no application here.

H.     **The Claim for Injunctive Relief Is Moot**

Progressive seeks injunctive relief to prevent Dunkin' from re-selling the SDA to a third party, to enjoin it from terminating the SDA, and to require it to allow Progressive to develop the additional three locations.  However, whether or not Progressive can obtain this relief is dependent upon the outcome of Progressive's affirmative claims and Dunkin's counterclaims in this action.  If the Court finds that Dunkin' had the right to terminate the SDA – based on the undisputed fact that Progressive failed to pay the required fees – then it follows that Progressive cannot obtain an injunction relating to the contract.  Therefore, the claim for injunctive relief need not be specifically addressed as a part of the determination of this motion.

**I.      Progressive Breached the Terms of its SDA with Dunkin'**

Dunkin' is also entitled to summary judgment on its counterclaim against Progressive and

its owners.  As explained above, the claim is based on the undisputed fact that Progressive failed

to make payments of $100,000 in initial franchise fees to Dunkin' under the SDA.  Dunkin'

issued a notice to cure and terminated the contract only after Progressive failed to cure the

default.  The SDA provides Dunkin' with the right to terminate the SDA under such

circumstances and thus judgment should be entered on Dunkin's counterclaim on that basis.

## CONCLUSION

For the foregoing reasons, Dunkin' respectfully requests that its Motion for Summary

Judgment be granted.

Respectfully submitted,

/s/ Jeffrey L. Karlin
Eric L. Yaffe, Esq.
Jeffrey L. Karlin, Esq.
Ashley M. Ewald, Esq.
GRAY, PLANT, MOOTY, MOOTY &
   BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC  20037-1931
Telephone:     (202) 295-2200
Facsimile:     (202) 295-2257
eric.yaffe@gpmlaw.com
jeffrey.karlin@gpmlaw.com
ashley.ewald@gpmlaw.com

Daniel F. Gourash, Esq. (0032413)
SEELEY, SAVIDGE, EBERT &
   GOURASH CO.
26600 Detroit Road
Cleveland, Ohio  44145-2397
Telephone:     (216)566-8200
Facsimile:     (216) 566-0213
rdanderle@sseg-law.com
*Attorneys for Defendants and Plaintiffs-in-
Counterclaim*

Dated:  June 5, 2009

18

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of June, 2009, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Jeffrey L. Karlin