## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC, | ) | Case No. 1:07 CV 3424 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DUNKIN' DONUTS | ) | |
| INCORPORATED, BASKIN-ROBBINS | ) | |
| USA, CO., and THIRD DUNKIN' | ) | **PLAINTIFF'S RESPONSE TO** |
| DONUTS REALTY, INC., | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| Defendants and Plaintiffs- | ) | |
| in-Counterclaim and Third | ) | |
| Party Complaint, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EITAN FLANK, MIKE FLANK, | ) | |
| SHAUL FLANK, JOEL SAUSEN, and | ) | |
| KEVIN DAUBENMIRE, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

Plaintiff and Counterclaim Defendant, Progressive Foods, LLC, an Ohio limited liability company ("***Progressive***"), respectively submits this response to the Motion for Summary Judgment filed with the Court by successors in interest to Defendants Baskin-Robbins USA, Co. , a California corporation (together with its successor and assigns, if any, collectively, "***Baskin-Robbins***"), Dunkin' Donuts Incorporated, a Delaware corporation (together with its successors and assigns, if any, collectively, "***Dunkin' Donuts***"),  and Third Dunkin' Donuts Realty, Inc., a Massachusetts corporation (together with its successors and assigns, if any, collectively, "***Third Dunkin' Realty***", and Third Dunkin' Realty, together with Baskin-Robbins and Dunkin' Donuts, collectively, the "***Defendants***", and each of the Defendants, individually, a "***Defendant***") (such motion, the "***Motion for Summary Judgment***").

Progressive hereby moves the Court for an order, among other things, denying the Motion for Summary Judgment on all counts set forth in Plaintiff's First Amended and Verified Complaint as well as on Defendants' Counterclaim against Plaintiff and Third Party Defendants. There are genuine issues as to material facts, and Defendants have failed to meet their burden of proof in establishing that they are entitled to summary judgment as a matter of law.  More

specifically, as discussed in the accompanying Memorandum of Law, the Motion for Summary Judgment must be denied because it is based on alleged contractual disclaimers that are ineffective under their express terms, under applicable law, or both, to defeat Plaintiff's claims.

In addition, Defendants' Motion for Summary Judgment must be denied to the extent that it relies on temporal limitations to bar Plaintiff's claims because such limitation, even if enforced as written, either do not, by their express terms, apply to such claims, or, if and to the extent that such standards do so apply, do not bar such claims because such claims were brought within the period permitted by such limitations.  Summary judgment would also be inappropriate as to Defendants' counterclaim for breach of contract because operation of the contractual provision on which the alleged breach is based is limited by other contractual provisions that, if read so as to avoid patent ambiguity, make clear that no breach by Progressive occurred under the circumstances of the present case.

This response is based upon the accompanying Memorandum in Support, accompanying exhibits, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court from time to time.

Respectfully submitted,

/s/ Thomas R. Brule
Thomas R. Brule, Esq. (0060146)
BRULE LAW FIRM, LLC
80 Berkshire Park Drive
Chagrin Falls, Ohio 44022
Telephone:       (216) 789-4229
Facsimile:       (216) 916-4744
E-mail:          brulet@gmail.com

Dated: December 31, 2009                    *Attorney for Plaintiff and Defendant-in Counterclaim*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of December, 2009, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ Thomas R. Brule

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC, | ) | Case No. 1:07 CV 3424 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | |
| | ) | |
| DUNKIN' DONUTS | ) | |
| INCORPORATED, BASKIN-ROBBINS | ) | |
| USA, CO., and THIRD DUNKIN' | ) | **PLAINTIFF'S MEMORANDUM IN** |
| DONUTS REALTY, INC., | ) | **SUPPORT OF ITS RESPONSE TO** |
| | ) | **DEFENDANTS' MOTION FOR** |
| Defendants and Plaintiffs-in-Counterclaim and Third Party Complaint, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EITAN FLANK, MIKE FLANK, | ) | |
| SHAUL FLANK, JOEL SAUSEN, and | ) | |
| KEVIN DAUBENMIRE, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

Thomas R. Brule, Esq. (0060146)
BRULE LAW FIRM, LLC
80 Berkshire Park Drive
Chagrin Falls, Ohio 44022
Telephone:    (216) 789-4229
Facsimile:     (216) 916-4744
E-mail:        brulet@gmail.com

*Attorney for Plaintiff and Defendant-in Counterclaim*

Dated: December 31, 2009

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF THE ISSUES TO BE DECIDED ............................................. viii

SUMMARY OF ARGUMENT PRESENTED........................................................ ix

I.      INTRODUCTION ............................................................................................. 1

II.     STATEMENT OF FACTS .............................................................................. 4

        A. Site Identification ..................................................................................... 7

        B. Site Control................................................................................................ 18

        C. Unit Design................................................................................................ 20

        D. Construction and Equipping of Units ...................................................... 21

        E. Financing of Units ..................................................................................... 26

II.     LAW AND ARGUMENT ................................................................................ 30

        A. Legal Standard........................................................................................... 30

        B. None of Progressive's Claims are Barred by Contractual Disclaimers in the SDA or
           the Franchise Agreements ........................................................................ 31

        C. No Contractual Disclaimers Exist for the Benefit of Defendant Third Dunkin' Realty
           ..................................................................................................................... 40

        D. Defendants are Equitably Estopped, by their Own Conduct, from Relying on the
           SDA's Provisions Relating to Identification and from Denying Their Obligation to
           Identify Suitable Sites for Units in the Store Development Area .......................... 42

        E. Defendants Baskin-Robbins and Dunkin' Donuts Agreed, by their Own Conduct, to
           Modify the SDA so as to Assume, together with Defendant Third Dunkin' Realty,
           Sole Responsibility for Site Identification ............................................... 54

        F. Judicial Precedent Does Not Support the Granting of Defendants' Motion for
           Summary Judgment.................................................................................... 57

        G. The Provisions of the SDA do Not Support the Granting of Defendants' Motion for
           Summary Judgment.................................................................................... 62

        H. Progressive's Claims Are Not Barred By the Temporal Limitations for
           Commencement of Actions under the SDA and Franchise Agreements ................. 74

        I. Progressive's Claim for Unjust Enrichment is Not Barred Because it Relates to
           Progressive's Overpayment of Initial Franchise Fees under the SDA ................... 77

        J. Defendants are not Entitled to Summary Judgment on Progressive's Fraud Claims 79

K.   Defendants are not Entitled to Summary Judgment on Progressive's Claims for Civil Conspiracy and Intentional Interference with Contract .......................................... 87

L.   Progressive's Claim for Injunctive Relief Is Not Moot .......................................... 89

M.   Defendants are not Entitled to Summary Judgment on their Counterclaim ............ 89

CONCLUSION ......................................................................................................... 92

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970) .................................................. 30

*Amadisu v. The Christ Hospital*, 514 F. 3d 504 (6th Cir. 2008)................................ 41

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................ 30

*Brennan v. Carvel Corp.*, 929 F.2d 801 (1st Cir. 1991) ...................................... 51, 82

*Celotex Corp. v. Catrett*, 477 U.S. 317(1986) ......................................................... 30

*Cent. States Stamping Co. v. Terminal Equip. Co.* 727 F.2d 1405 (6th Cir. 1984) ................. 85

*Cottman Transmission Systems, LLC v. Kershner*, 536 F. Supp. 2d 543 (ED. Pa., 2008) ........ 82

*Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146 (6th Cir. 1995) ............................... 30

*Cross v. Northwest Airlines*, 998 F. Supp. 803 (N.D. Ohio 1998) ............................. 31

*Davis v. Portline Transportes Maritime Int'l*, 16 F.3d 532 (3d Cir.1994) ................ 71

*Donoghue v. IBC/USA (Publications), Inc.*, 886 F.Supp. 947 (D.Mass. 1995) ................. 73

*Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996) ............. 71

*Gaines v. Farese*, 798 F.2d 1414, No. 85-5324, 1986 WL 17303, at *2 (6th Cir. July 11, 1986) ................................................................................................. 31

*Guarino v. Brookfield Township Trustees*, 980 F.2d 399 (6th Cir. 1992) ................. 31

*Hall v. Burger King Corp.*, 912 F. Supp. 1509 (S.D. Fla. 1995) ............................... 61

*Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327, 1996 WL 346607 (10th Cir. June 25, 1996) 60, 61

*Hardee 's of Maumelle, Ark,, Inc. v. Hardee 's Food Sys., Inc.*, 31 F.3d 573 (7th Cir. 1994).................................................................................. 61

*Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir.1995)...................................... 70

*Honey Dew Associates, Inc. v. M & K Food Corp.*, 241 F.3d 23 (1st Cir. 2001)...................... 90

*Hoover Universal, Inc. v. Brockway Imco, Inc.*, 809 F.2d 1039 (4th Cir. 1987)...................... 82

*Lujan v. National Wildlife Fed'n*, 497 U.S. 871 .......................................................... 72

*Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33 (1st Cir. 2008) .................................. 50, 82

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................ 30

*Mecham v. United Consumers Club Franchising Corp.*, 312 F. 3d 909 (8th Cir. 2002)........... 61

*Morrison v. Back Yard Burgers, Inc.*, 91 F. 3d 1184 (8th Cir. 1996) ........................................ 62

*Pfeil v. Rogers*, 757 F.2d 850 (7th Cir. 1985) .......................................................... 70

*Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y. 1989) ................................. 57, 58, 59

*S &R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371 (3d Cir. 1992) ......................... 73

*Sellers v. M.C. Floor Crafters, Inc.* 842 F.2d 639 (2d Cir. 1988) ............................. 71

*Union Mut. Ins. Co. of Maine v. Wilkinson*, 80 U.S. 222 (13 Wall.) (1871) ............. 79

*United States v. Hodges X-Ray, Inc.*, 759 F.2d 557 (6th Cir. 1985) .......................... 30

*Verderber v. Perry*, No. 98-1625, 1999 WL 525953 (D. Mass. March 8, 1999) ....................... 79

*White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943 (6th Cir. 1990) ................. 30

## STATE CASES

*AZ Servicenter Inc. v. Segall*, 334 Mass. 672 (1956) .................................................. 90

*Alexander v. Snell*, 424 N.E.2d 262 (Mass. App. Ct. 1981) ................................. 51, 82

*Anderson v. Fox Hill Village Homeowners Corp.*, 676 N.E.2d 821 (Mass. 1997) ....................... 42

*Anderson v. Wellman Products Group*, 812 N.E.2d 995 (Ohio App. 9 Dist. 2004) ................. 43

*Antonellis v. Northgate Constr. Corp.*, 362 Mass. 847 (1973) ........................... 51, 82

*Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941) ...................................... 57

*Beatty v. Geggenheim Exploration Co.* (119) 122 N.E. 378 ...................................... 54

*BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603 (2d Cir. 1996) ........................ 73

*Boylston Development Group, Inc. v. 22 Boylston Street Corp.*, 591 N.E.2d 157 (Mass. 1992) 43

*Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432 (1992) ............................. 51, 55, 56, 82

*Cellucci v. Sun Oil Co.*, 320 N.E.2d 919 Mass. App. 1974) .........................................................

*Cleveland v. Marblehead*, 2001 WL 279763 (Ohio App. 6 Dist. Mar. 23, 2001) ................... 43

*Columbus Trade Exchange, Inc. v. AMCA International Corp.*, 763 F.Supp. 946 (S.D.Ohio 1991)
.............................................................................................................................. 43

*Connelly v. Fellsway Motor Mart, Inc.*, 270 Mass. 386, 170 N.E. 467 (1930) ....................... 57

*Cummings Property, LLC v. National Communications Corp.*, 449 Mass. 490 (2007) ........... 90

*Delta School of Commerce, Inc. v. Wood*, 298 766 S.W.2d 424 (1989) ................................ 62

*Donoghue v. IBC USA (Publications), Inc.*, 886 F.Supp. 947 (D.Mass. 1995) ....................... 73

*Drew v. Christopher Constr. Co., Inc.*, 41 N.E.2d 1018 (1942) ................................ 79

*Edwards v. Sullivan and Cogliano Companies, Inc.*, 2002 WL 441968 (Mass.App.Div. March 15, 2002) ................................................................................................................ 43

*First Federal Savings & Loan Association v. Perry's Landing, Inc.*, 463 N.E.2d 636 (1983) . 43

*First Pa. Mortgage Trust v. Dorchester Sav. Bank*, 481 N.E.2d 1132 (1985) ........................ 56

*Flynn v. Wallace, 359 Mass.* 711 (1971) .................................................................. 56

*Galmish v. Cicchini*, 90 Ohio St. 3d 22 (Ohio 2000) ...................................... 79, 80, 81

*Gossels v. Fleet Nat. Bank*, 876 N.E.2d 872 (Mass. App. Ct. 2007) ........................................ 82

*Hambleton v. R.G. Barry Corp.*, 465 N.E. 2d 1298 (Ohio 1984) .............................................. 79

*Honey Farms, Inc. v. Exxon Mobil Corp*, 26 Mass.L.Rptr. 105, 2009 WL 3085798 (Mass. Super. 2009) ........................................................................................................ 41

*Hummel v. Hummel*, 14 N.E. 2d 923 (Ohio 1938) ...................................................... 79

*Kelly v. Marx*, 428 Mass. 877 (1999) ...................................................................... 90

*L.W. Severance & Sons, Inc. v. Angley*, 125 N.E.2d 415 (Mass. 1955) .................................. 55

*MacKeen v. Kasinskas*, 132 N.E.2d 732 (1956) ) ........................................................ 43

*Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319 (5th Cir. 1988) .................. 73

*Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688 ............................................... 68

*Miles v. Perpetual S. & L. Co.*, 338 N.E.2d 1367 (1979) ............................................. 83

*NPS LLC v. Minihane*, 451 Mass. 417 (Mass. 2008) ............................................... 90

*Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630 (1990) ) ............................................. 43

*Rae v. Air-Speed, Inc.*,  435 N.E.2d 628 (Mass. 1982) ) ........................................... 41

*Rezendes v. Prudential Ins. Co.*, 189 N.E. 826 (Mass. 1934) ....................................... 39

*Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co.*, 452 N.E.2d 308 (Mass. App. Ct.) 56

*Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41(1991) ....................................... 55, 88, 89

*Smith v. Safe Auto Ins. Co.*, 901 N.E.2d 298 (Ohio App. 6 Dist. 2008) .................................. 43

*Starinki v. Pace* 535 N.E.2d 328 (1987) ) ............................................................... 83

*Stathos v. Bowden*, 728 F.2d 15 (1st Cir. 1984) ) ...................................................... 87

*Swinton v. Whitinsville Sav. Bank*, 42 N.E.2d 808 (1942) ) ............................................. 82

*TAL Fin. Corp. v. CSC Consulting, Inc.*, 446 Mass. 422 (2006) ) ........................................... 90

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996) ) ..... 83

v

*Thomas v. Barnes*, 31 N.E. 683 (Mass. 1892) ) .......................................................................... 56

*Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947) .............................................................................. 79

*Wagner v. Graziano Const. Co.*, 136 A.2d 82 (Pa. 1957) ) ........................................................ 55

*Walworth v. BP Oil Co.*, 678 N.E.2d 959 (Ohio App. 8 Dist. 1996) ) ....................................... 43

*Wolf v. Prudential-Bache Securities, Inc.*, 672 N.E.2d 10 (Mass. App. Ct. 1996) ) ........... 84, 85

## MISCELLANEOUS

Corbin on Contracts) ............................................................................................................. 54

E. Allan Farnsworth, Contracts (2d ed. 1990) ) ....................................................................... 55

Restatement (Second) of Contracts ................................................................................ 41, 50

FED. R. CIV. P. 56(c) .......................................................................................................... 30, 31

FED. R. CIV. P. 56(e) .................................................................................................... 70, 71, 72

## STATEMENT OF THE ISSUES TO BE DECIDED

1.  Whether Progressive's claims are barred as a matter of law by the terms of the SDA (as hereinafter defined), the Franchise Agreements (as hereinafter defined), or the disclosure documents disseminated by Defendants?

2.  Whether any one or more of Progressive's claims are barred as a matter of law by the purported two-year contractual limitations period set forth in the SDA and Franchise Agreements?

3.  Whether Progressive's remaining claims are barred on legal grounds?

4.  Whether summary judgment should be denied to Defendants on their counterclaim by reason of application of the express language of the SDA under the circumstances of the present case or, in the alternative, by the unenforceability of the SDA's liquidated damages provisions?

## SUMMARY OF ARGUMENT PRESENTED

Neither the terms of the SDA (as hereinafter defined) nor the terms of the Franchise Agreements (as hereinafter defined) bar Progressive's claims in this case.  To the extent that the Motion for Summary Judgment is based on alleged contractual disclaimers contained in one or more of the SDA (as hereinafter defined) and the Franchise Agreements (as hereinafter defined), such disclaimers, under their express terms, under applicable law, or both, do not disclaim liability for the acts of Defendants giving rise to Progressive's complaints. All of these contracts, together with the UFOCs (as hereinafter defined), specifically acknowledge that success of the franchises at issue depends, to a large extent, on factors other than the ability of Progressive.

Such other factors include, *inter alia*, (a) Defendants' performance and observance of their respective obligations under the SDA, the Franchise Agreements, the Third Dunkin' Leases (as hereinafter defined), and other agreements between one or more of the Defendants and Progressive the existence of which Defendants are equitably estopped from denying under applicable law by reason of their own conduct, and (b) the accuracy and completeness of the representations made by Defendants to induce Progressive to enter into the Leases and the NCB Loan Documents (as hereinafter defined) to which it is a party, and cause Progressive Chardon Real Estate (as hereinafter defined) to enter into the Progressive Chardon Site Purchase Agreement (as hereinafter defined) and the NCB Loan Documents to which it is a party, and to devote money, time, and effort to operate the stores at each of the Progressive Sites.  Therefore, none of the SDA, the Franchise Agreements, or the UFOC precludes Progressive's claims in this case.  Moreover, Defendants' Motion for Summary Judgment must be denied to the extent that it relies on contractual limitations periods to bar Plaintiff's claims because such limitations, even if enforced as written, either do not, by their express terms, apply to such claims, or, if and to the extent that such standards do so apply, do not bar such claims because such claims were brought within the periods.

Progressive's other claims are supported by applicable law as well. Its unjust enrichment claim is appropriate because such claim relates to Progressive overpayment of Initial Franchise

Fees to one or more of Defendants as a consequence of which such Defendants have been unjustly enriched, and recovery of which is not controlled by any contract among Progressive and any one or more of Defendants.  Thus, the Motion for Summary Judgment must be denied as to such claim.

The Motion for Summary Judgment must be denied as to Progressive's fraud claim to the extent that such motion relies on disclaimers in the SDA and the Franchise Agreements because such disclaimers either do not disclaim Defendants liability for the conduct giving rise to Progressive's fraud claim, or do not disclaim the making of representations to induce Progressive to enter into the Leases and the NCB Loan Documents to which it is a party, and cause Progressive Chardon Real Estate to enter into the Progressive Chardon Site Purchase Agreement and the NCB Loan Documents to which it is a party, and to and to devote money, time, and effort to operate the stores at each of the Progressive Sites.  To the extent that the Motion for Summary Judgment relies on integration clauses in the SDA and Franchise Agreements because, under applicable law, the extent to which an agreement is integrated is one of fact for the Court to be viewed, together with all inferences therefrom, in the light most favorable to Progressive. And, in any event, Defendant Third Dunkin' Realty is not, under applicable law, an intended or third-party beneficiary of any of the disclaimers in the SDA and the Franchise Agreements.

The Motion for Summary Judgment must be denied as to Progressive's claim for injunctive relief because such claim is moot only if the Court finds that Defendants were entitled to terminate the SDA and, for reasons hereinbefore mentioned and discussed in greater detail below, Defendants had no such right and are not entitled to a finding that they did on a summary judgment motion.

Finally, the Motion for Summary Judgment as to Defendants' counterclaim for payment of $100,000 allegedly owed by Progressive under the SDA must be denied. Operation of the provision of the SDA on which Defendants' counterclaim depends is limited by other contractual provisions that, if read so as to avoid patent ambiguity, make clear, under the circumstances of the present case, that Progressive is not indebted to any one or more of Defendants in such amount.

## 1.    INTRODUCTION

In the Motion for Summary Judgment, Defendants place heavy reliance on so-called "disclaimers" to persuade the Court that, regardless of whether the facts alleged by Progressive are true,[1] the Motion for Summary Judgment must nevertheless be granted as a matter of law. Yet, a careful reading of these disclaimers will reveal that they are, by their express terms, not as comprehensive as Defendants would lead the Court to believe. Neither the SDA nor the Franchise Agreements disclaim any responsibility on the part of Defendants for identification of the sites upon which Progressive would operate stores within the Store Development Area described in the SDA. This is because the SDA and the Franchise Agreements contemplated that Progressive would identify the sites, and the Defendants party to the SDA would approve them.

In order to meet their ambitious expansion goals in the Cleveland-area market, and nationally, however, Defendants identified the sites themselves. The sites that Progressive would ultimately receive were identified by Defendants long before the SDA was signed. The Defendants invested substantial sums of money in their due diligence efforts to identify suitable sites. In real estate, retail, dining establishments and many other types of business endeavors, the words "location, location, location" have been a mantra for decades. Sometimes, after Defendants had spent considerable time and money investigating the suitability of a prospective site in the Cleveland area, Defendants' diligence efforts would lead certain officers of Defendants to raise serious questions as to whether the site was suitable- that is whether the site satisfied objective standards customarily employed by Defendants in identifying sites on which a franchise, if operated in accordance with Defendants' standards, could be successful. If such a site were not sold or leased to a franchisee, however, Defendants would forfeit their entire investment in due diligence, and would be delayed in their expansion efforts, which would, no doubt, reflect badly on the Defendants' area Development Manager. Defendants do not operate franchise stores – their business consists entirely of selling franchises and selling and leasing real

---

[1]    *Id*. ("[R]egardless of whether any of those facts are true, they are irrelevant because the contract that governs the relationship between the parties specifically prevented Progressive from raising exactly the kinds of claims they are [sic] seeking to raise in this lawsuit.").

property and equipment to franchisees.  And Defendants stood to lose even more money in those cases where Defendant Third Dunkin' Realty had, in order to secure a site, already committed itself to buy or lease the site from the owner before having a franchisee lined up to take the site. This situation, when it arose, provided a strong economic incentive for Defendants' Development Managers, who were responsible for meeting the expansion goals established by Defendants' management at the executive level, to persuade a franchisee to buy or lease the site in question from Third Dunkin' Realty.  This led Defendants' conduct to depart from the agreement contemplated by the SDA and the Franchise Agreements, whereby Progressive would conduct its own diligence on a prospective site, perform its own suitability analysis, and, if Progressive determined the site to be suitable, negotiate a lease or purchase of the site from the owner (conditioned on approval of the site by the Defendants party to the SDA), obtain any necessary permits and certifications from municipal authorities and others, and submit the entire package to Defendants Baskin' Robbins and Dunkin' Donuts for approval.

The disclaimers in the SDA and the Franchise Agreements contemplated no such departure.  Thus, when Defendants undertook to identify sites prior to the formation of the SDA, and to then select those sites for which Progressive in particular would be granted franchises, Defendants left the alleged safe harbor of the contractual provisions on which Defendants rely for their claimed entitlement to summary judgment as a matter of law.  Defendants are equitably estopped, by their own conduct, from denying an agreement to identify suitable sites for Progressive.

Nor did the disclaimers in the SDA and the Franchise Agreement contemplate Defendant Third Dunkin' Realty.  Defendants attempt to smooth over the fact that Defendant Third Dunkin' Realty is neither a party to, nor a beneficiary of, any of provisions of the SDA and the Franchise Agreements, and that Third Dunkin' Realty's own agreements with Progressive, such as the Third Dunkin' Realty Leases, and Progressive Chardon Real Estate, such as the Progressive Chardon Site Purchase Agreement, contain no such disclaimers.  Defendants' characterization of Third Dunkin' Realty as an entity of no significance to the case at bar, an incorporeal shoebox into which Defendants Dunkin' Donuts and Baskin-Robbins periodically deposited deeds and

other real-property conveyances for purposes of storage,[2] belies the substantial and controversial role that Third Dunkin' Realty played in the facts leading up to this suit.  Third Dunkin' Realty, which acquired an interest in all of the sites on which Progressive operates stores using the proprietary system and marks of Defendants Baskin-Robbins and Dunkin' Donuts, was actively involved, with the other Defendants, in site selection.  Moreover, under the Third Dunkin' Realty Leases, Third Dunkin' Realty agreed to act as general contractor for the retrofitting or construction of improvements on the real properties leased by Progressive from Third Dunkin' Realty thereunder.  Third Dunkin' Realty was involved with construction of improvements on the site leased by Progressive's in Chardon Ohio as well.  Third Dunkin' Realty's endeavors as general contractor evidence that it was an active business enterprise, incurring substantial monetary obligations with subcontractors and overseeing numerous construction projects.

Defendants' selection of Progressive's sites gave rise to representations by Defendants as to the suitability of those sites.  As to the integration clauses invoked by Defendants to preclude the reasonability of Progressive's reliance on these representations, the common law governing the SDA and the Franchise Agreements makes very clear that whether an agreement is integrated, in whole or in part, is a matter of fact for the trial court, and that in determining whether or not an agreement is so integrated, a trial court may consider parole evidence.  It is equally well settled under applicable common law that an action in fraud cannot be barred by general disclaimers or integration clauses – in order to effectively disclaim a representation or agreement, a disclaimer must be specific as to nature of the representation or agreement disclaimed.  Thus, a general disclaimer in the SDA by Defendants Baskin-Robbins and Dunkin' Donuts of any representation as to a franchisee's profits, or success, would not be effective to disclaim a representation by such Defendants as to the suitability of a site which the Defendants had identified and selected for Progressive merely because a breach of the representation might adversely affect Progressive's profits or chances of success, and would not, in any event, be effective to disclaim such a representation by Third Dunkin' Realty, a stranger to the SDA.  Thus, handful of cases cited by Defendants in support of their contention that "courts have

---

[2]     Motion for Summary Judgment, at 3 ("Third Dunkin' [Realty] had no employees of its own and was merely a legal entity that owned real estate on behalf of the Dunkin' franchise system.").

consistently dismissed cases by franchisees who alleged that they were promised profitable business by franchisors in the face of contractual language that disclaimed any guarantee of success"[3] do not support Defendants' claimed entitlement to summary judgment as a matter of law.

Nor is Defendants' claim for summary judgment helped by the contractual provisions of the SDA and the Franchise Agreements that purport to limit the period of time in which Progressive may commence an action. Progressive commenced the present action by filing its original complaint on October 3, 2007 (the "***Filing Date***") in the Court of Common Pleas of Cuyahoga County, Ohio, General Division (such complaint, the "***Original Complaint***"). Progressive's First Amended Verified Complaint filed was filed in the Court after Defendants' removal of such thereto (the Original Complaint, as so amended, the "***Amended Complaint***"). As explained below, even if the limitations provisions of the SDA and the Franchise Agreements were enforced as written, they would not bar the present action against Defendants Baskin-Robbins and Dunkin' Donuts because such action was commenced within the period allowed by such provisions. And, in any event, none of Progressive's actions against Defendant Third Dunkin' Realty are barred by such limitations. Neither a party to nor a beneficiary of the SDA and the Franchise Agreements, Third Dunkin' Realty is not entitled to rely on the provisions thereof. And Third Dunkin' Realty's own agreements with Progressive contain no limitations on when an action may be commenced.

## II.    STATEMENT OF FACTS

Defendant Baskin-Robbins, Defendant Dunkin' Donuts, and Plaintiff Progressive entered into a Multiple Unit Store Development Agreement, dated September 1, 2004 (such Multiple Unit Store Development Agreement, the "***SDA***"), a copy of which is attached hereto as **Exhibit A**.  The SDA, which is evidenced by a printed form prepared and supplied by Defendants Baskin-Robbins and Dunkin' Donuts, states in its preamble that Baskin-Robbins and Dunkin' Donuts are affiliated corporations doing business as "Allied Domecq Quick Service

---

[3]    Motion for Summary Judgment, at 7.

4

Restaurants."[4]   Thus, the SDA refers to Defendants Baskin-Robbins and Dunkin' Donuts, collectively, as "*ADQSR*").   Plaintiff Progressive is referred to in the SDA as "Developer."  At the outset, it is important to note that the term "ADQSR", as defined and used in the SDA,[5] does not include Defendant Third Dunkin' Realty, which is not a signatory to, a party to, a beneficiary of, contemplated by, or even mentioned in, the SDA.

The subject matter of the SDA is aptly described in its recitals and Section 1 thereof. The SDA sets forth the terms and conditions pursuant to which Defendants Baskin-Robbins and Dunkin' Donuts authorized Progressive and granted Progressive a license to develop and open, within the "Store Development Area" described in Exhibit A thereto (such area, the "*Store Development Area*"), the number of units (stores) specified in the SDA utilizing such Defendants' systems and proprietary marks, and the terms and conditions under which Progressive agreed to develop and open the number and mix of units specified in Exhibit B thereto in accordance with the schedule set forth in Exhibit C thereto (the "*Development Schedule*").  Exhibit B to the SDA specifies six (6) units, each a combination Baskin-Robbins Dunkin' Donuts unit (such units, collectively, the "*Specified Units*", and each of the Specified Units, individually, a "*Specified Unit*").[6]   The Development Schedule sets forth that one Specified Unit must open on or before April 25, 2005, and one additional Specified Unit must open on or before the first day of each January and June thereafter until June 1, 2008, the date by which all six (6) such Specified Units were to have been opened.[7]  The SDA also entitled, but did not obligate, Progressive to develop, following timely completion of the Development Schedule and during the remainder of the four-year[8] term of the SDA, additional units (such units, collectively, the "*Additional Units*", and each of the Additional Units, individually, an "*Additional Unit*") within the Store Development Area subject to the applicable conditions set forth in Section 1 of the SDA.

---

[4]  SDA, at 1.
[5]  Although it is clear from the SDA that the term "ADQSR," as defined and used in the SDA, does not include Defendant Third Dunkin' Realty, a material issue of fact exists, as discussed below, as to whether, in other contexts, individuals who acted on behalf of Defendant Third Dunkin' Realty used, when so acting, the same commercial identifiers, such as "ADQSR", "Allied Domecq", and the like, as individuals acting on behalf of Defendants Baskin-Robbins and Dunkin' Donuts.
[6]  SDA, Exhibit B, Part I (captioned "Specified Units"), Subpart A (captioned "Number and Mix").
[7]  SDA, Exhibit C.
[8]  The SDA provides, at Exhibit B, Part III (captioned "Store Development Agreement Term; Arbitration Location"), Subpart A, that the term of the SDA shall expire on September 1, 2008.

In consideration of its right and license to develop units pursuant to the SDA, Progressive agreed to pay franchise fees to Defendants Baskin-Robbins and Dunkin' Donuts.  The "Initial Franchise Fees" for the Specified Units were to aggregate $240,000, or $40,000 for each of the six Specified Units.[9]  Initial Franchise Fees aggregating $120,000 were due on execution of the SDA,[10] and it is undisputed that these amounts were timely paid by Progressive. Under the SDA, as originally in effect, a second payment of $60,000, and a third payment, of like amount, were scheduled to become due on July 1, 2005 and July 1, 2006, respectively.[11]  As discussed below however, the parties to the SDA orally modified the SDA to, among other things, suspend payment of the second and third payments.  The franchise fee for each Additional Unit, if any, was to be determined by reference to the current Initial Franchise Fees at the time the proposed location of such Additional Unit was approved by Defendants Baskin-Robbins and Dunkin' Donuts and a franchise agreement therefore was executed, and was to be due on the date of execution of such franchise agreement.[12]  The SDA also contemplated the payment of continuing franchise fees, continuing advertising fees, and marketing start-up fees for each Specified Unit developed thereunder.[13]  Defendants have not alleged non-payment of these continuing franchise fees, continuing advertising fees, and marketing start-up fees as a basis for terminating the SDA.[14]

The principle benefit conferred upon Progressive by the SDA is Progressive's right and license to develop Specified Units and Additional Units using the systems and proprietary marks of the Defendants Baskin-Robbins and Dunkin' Donuts.  The principal obligations assumed by Progressive pursuant to the SDA were to develop the Specified Units in accordance with the Development Schedule and to pay the Initial Franchise Fees, continuing franchise fees, continuing advertising fees, and marketing start-up fees.  The SDA further provided that, for each unit to be opened thereunder, Progressive would execute and deliver to ADQSR

---

[9]   SDA, Exhibit B, Part I (captioned "Specified Units"), Subpart B, (captioned "Initial Franchise Fees").
[10]  *Id.*
[11]  SDA, Exhibit B, Part I (captioned "Specified Units"), Subpart B, (captioned "Initial Franchise Fees").
[12]  SDA, Exhibit B, Part II (captioned "Additional Units:  Initial Franchise Fees").
[13]  SDA, Exhibit B, Part I (captioned "Specified Units"), Subpart D, (captioned "Continuing Fees").
[14]  The September 10, 2007 Notice of Default & Notice to Cure, over the signature of Defendants' counsel, Nancy L. Sponseller, Esq., states that "[t]he amount of money [Progressive] owe[s] pursuant to the SDA but [has]failed to pay is $100,000.00.  This amount consists of three payments:  $40,000 owed on July 1, 2005; $35,000 owed on July 1, 2006; and $25,000 also owed on July 1, 2006."

(Defendants Baskin-Robbins and Dunkin' Donuts), a franchise agreement and other standard, customary agreements applicable to the brands, form of distribution, type of unit and location to be opened.[15]  The continuing franchise fees and advertising fees for each brand were to be as set forth in the Uniform Franchise Offering Circular delivered to Progressive in connection with the SDA.

With respect to the units to be developed under the SDA, Section 6 of the SDA provided, in part:

6.      Development and Approval of Locations

For each unit to be opened under this Agreement, Developer [Progressive], at its sole expense, shall be solely responsible for identifying locations within the Store Development Area for all units, acquiring control of locations by purchase or lease for a period not less for the term of the respective unit set forth in Exhibit B [of the SDA] (or such other period as ADQSR may approve), and for constructing and equipping a unit at each such location in accordance with the then-current standards procedures, plans and specifications utilized by ADQSR for each brand, form of distribution, type of unit and the location.[16]

Thus, as among Baskin-Robbins, Dunkin' Donuts, and Progressive, Progressive had purportedly assumed the responsibility for identifying locations for units within the Store Development Area, acquiring control of such locations, and for constructing and equipping a unit at each such location in accordance with the then-current standards procedures, plans and specifications utilized by Defendants Baskin-Robbins and Dunkin' Donuts.

But neither Progressive nor any of its members had any experience in the selection of locations for units of the type Progressive was authorized, licensed, and required to develop under the SDA.  Nor did Progressive and its members have experience in the design, construction, or equipping of such units.  Accordingly, Progressive turned for guidance to those who purportedly did.

A.      Site Identification

Notwithstanding the above-quoted provisions of the SDA, under which Progressive purportedly assumed, as among itself and Defendants Baskin-Robbins and Dunkin' Donuts, the sole responsibility for identifying locations for all units to be developed within the Store

---

[15]    SDA § 5A, at 3.
[16]    SDA § 6, at 3.

7

Development Area, the Defendants took it upon themselves, from the very inception of the Defendants' plans to expand their reach into the Store Development Area, to identify all locations therein upon which such units would be developed.  As admitted by Defendants, *all* of the Defendants, Baskin-Robbins, Dunkin' Donuts, and Third Dunkin' Realty, participated in the process of site identification.[17]

As early as November, 2003, and perhaps even earlier, the Defendants were already involved in negotiations for the acquisition of a parcel of real property located at 7742 Lakeshore Boulevard, Mentor Ohio 44060 (such parcel, the "**Mentor Site**") from Sky Bank, an Ohio banking corporation ("**Sky**"), as evidenced by the November 5, 2003 message of Kevin Dalpiaz ("**Dalpiaz**")[18] to Don Miller, a copy of which message is attached hereto as **Exhibit B**.  On April 2, 2004, Third Dunkin' Realty[19] and Sky executed a "Letter of Intent Purchase Land" making reference to the real property situated at "7742 Lakeshore Blvd., Mentor OH 44060," the address of the Mentor Site (such Letter of Intent Purchase Land, the "**Mentor Site LOI**").  The Mentor Site LOI, a copy of which is attached hereto as **Exhibit C**, was entered into almost five (5) full months before the SDA was ever signed, and specifically identifies "Third Dunkin' Donuts Realty, Inc. or its assignee" as the "Purchaser" of the referenced property and

---

[17]  *See* Answer of Dunkin' Donuts, Inc. and other Defendants to First Amended and Verified Complaint and Defendants' and Third Party Complaint, with Attachments ("**Defendants' Answer**"), ¶ 17, at 4 : "Defendants admit that they participated in the site selection and construction for the Progressive opened stores located in Mentor, Chardon, and Euclid Ohio."  The term "Defendants" is defined in Defendants' Answer so as to include, collectively, "Defendants Dunkin' Donuts Franchised Restaurants, LLC, successor-in-interest to Dunkin' Donuts Incorporated, Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA, Co., and DB Real Estate Assets I, LLC and DB Real Estate Assets II, LLC, successors-in-interest to Third Dunkin' Donuts Realty, LLC and Third Dunkin' Donuts, Inc."

[18]  In Defendants' Supplemental Disclosure Statement filed with the Court on March 5, 2009 ("**Defendants' Supplemental Disclosure**"), Defendants stated that "Mr. [Kevin] Dalpiaz, a Construction Manager for Dunkin' Donuts, is likely to have discoverable information relating to . . . Plaintiff's claims regarding construction of their shops."  For purposes of such Supplemental Disclosure Statement, the term "Dunkin' Donuts" is defined as follows: "Dunkin' Donuts Incorporated, Baskin-Robbins USA, Co., and Third Dunkin' Donuts Realty, Inc. and their respective affiliates, successors, subsidiaries and parents (all such entities taken together, 'Dunkin' Donuts') . . . ."  Thus, Defendants have identified Mr. Dalpiaz as a Construction Manager for all of the Defendants.  In addition, in response to Plaintiff's Notice of Rule 30(B)(6) Deposition of Persons of Defendants and their respective affiliates, successors, subsidiaries and parents, served upon Defendants on May 1, 2009, with respect to, among other topics, Defendants' knowledge of the construction and development of the Specified Units situated upon the Mentor Site, the Chardon Site, and the Euclid Site, respectively, Defendants produced Mr. Dalpiaz (*see* the May 15, 2009 Fed. R. Civ P. 30(b)(6) Deposition of Mr. Dalpiaz at pages 28 – 30).  Mr. Dalpiaz was produced by Defendants solely for the purpose of answering questions regarding store construction, as opposed to site identification.

[19]  In maintaining the Third Dunkin' Realty identified and negotiated its purchase of the Mentor Site, Progressive does not overlook that the that the prospective purchaser's signature on the Mentor Site LOI (as defined above) is "Allied Domecq QSR."  As noted above (*see supra* note 7), however, Progressive asserts that a material issue of fact exists as to whether, in varying contexts, individuals who acted on behalf of Defendant Third Dunkin' Realty used, when so acting, the same commercial identifiers, such as "ADQSR," "Allied Domecq," and the like, as individuals acting on behalf of Defendants Baskin-Robbins and Dunkin' Donuts.

summarizes the material terms under which Third Dunkin' Realty would consider entering into an agreement to purchase such property from Sky.

By mid-April, 2004, Defendants had retained local Ohio counsel to advise Defendants in connection with the proposed acquisition of the Mentor Site, as evidenced by the April 15, 2004 conflict wavier letter attached as **Exhibit D** hereto.  By April 23, 2004, a draft Purchase and Sale Agreement for the Mentor Site had already gone through at least one round of revisions in the negotiations between Third Dunkin' Realty and Sky, as evidenced by the April 23, 2004 letter addressed by Peter C. Nintcheff, Esq. to Edward J. Peppers, Development Manager, Allied Domecq QSR, a copy of which letter is attached hereto as **Exhibit E**.  On or about May 14, 2004, GPD Group ("**GPD**"), a firm providing Defendants with architectural, engineering and construction administration services in the greater Cleveland, Ohio area, rendered an invoice to Defendants, a copy of which invoice is attached hereto as **Exhibit F**, for services rendered in connection with the Mentor Site during the period of March 27, 2004 to April 30, 2004 (such invoice, the "***GPD Invoice for March and April 2004 Mentor Services***").  The Defendants' internal approval for investment in the Mentor Site was obtained on July 20, 2004, as evidenced by RAPID Resource Appropriation Request (the "***Mentor RAR***") attached hereto as **Exhibit G**.[20] The narrative portion of the Mentor RAR begins by stating that "[t]he development team along with New Market Entry *has identified a site* that warrants ADQSR involvement.  The site at 7742 Lakeshore Boulevard is at the intersection of Meadow Brook Drive in Mentor, OH. [Emphasis added.]"[21]  The Mentor RAR mentions a "franchisee" in several places without specifically mentioning Progressive, and the "Franchisee Info" section was left entirely blank except for the proposed franchisee name, which is given as "TBD."[22]  The Mentor RAR further states that "we [the Defendants] will then sell the store to an *as yet to be determined franchisee* for $312,060 [Emphasis added.],"[23] and concludes that "[a]pproval of this RAR will allow the

---

[20]    Mentor RAR, at 1.
[21]    Mentor RAR, p. 1
[22]    Mentor RAR, at 4.
[23]    Mentor RAR, at 2.

New Market Entry team to continue the process of rapidly moving the Dunkin' Donuts brand to multi-regional player prominence."[24]

In short, Defendants had already identified the Mentor Site before any specific franchisee had committed to operating a Baskin-Robbins/Dunkin' Donuts store there, and long before Progressive had, pursuant to Section 6 of the September 1, 2004 SDA, purportedly assumed, as among itself and Defendants Baskin-Robbins and Dunkin' Donuts, the responsibility for identifying sites within the Store Development Area. And, in any event, such an assumption of responsibility by Progressive, as among itself and Defendants Baskin-Robbins and Dunkin' Donuts, would not preclude a non-party stranger to the SDA, Defendant Third Dunkin' Realty, from assuming, as between itself and Progressive, the responsibility for identifying suitable sites for development within the Store Development Area.

Indeed, the earliest agreement executed by Progressive with respect to the Mentor Site was a September 1, 2004 agreement styled "Contract for the Sale of ADQSR Unit," by and among Defendant Baskin-Robbins, Defendant Dunkin' Donuts, and Progressive (such agreement, the "***Mentor Franchise Purchase Agreement***"), a copy of which agreement is attached as **Exhibit H** hereto. Under the Mentor Franchise Purchase Agreement, Defendants Baskin-Robbins and Dunkin' Donuts agreed to sell to Progressive, and Progressive agreed to buy from such Defendants, the Dunkin' Donuts/Baskin-Robbins franchise located at the Mentor Site, together with all of the right, title, and interest of Baskin-Robbins and Dunkin' Donuts in the signage and equipment at the Mentor Site.[25] Progressive agreed to pay to Defendants Baskin-Robbins and Dunkin' Donuts a Purchase Price of $312,060.00 for the "Dunkin' Donuts/Baskin-Robbins franchise located at 7742 Lakeshore Boulevard, Mentor, Ohio 44060 (PC #340982) the 'Franchise') including all of the Transferor's right, title and interest in the signage and equipment at said premises,"[26] of which a $31,000.00 deposit was to be paid to on the execution of the Mentor Franchise Purchase Agreement, and the $281,060.00 balance of which was to paid at closing,[27] which was scheduled to occur no earlier than April 25, 2005.[28] Progressive was

---

[24]  Mentor RAR, at 3.
[25]  Mentor Franchise Purchase Agreement § 1, at 1.
[26]  Mentor Franchise Purchase Agreement § 2, at 1.
[27]  *Id.*

therefore contractually committed to purchasing a franchise for the Mentor site by September 1, 2004, the very same date as the SDA.  This would allow virtually no time for identification of the Mentor Site by Progressive, further suggesting that the Mentor Site had been identified by the Defendants before Progressive entered into the SDA.

Sky and Third Dunkin' Realty entered into a definitive Purchase Agreement for the Mentor Site as of October 19, 2004, a copy of which agreement is attached hereto as **Exhibit I** (such agreement, the "***Mentor Site Purchase Agreement***").  Third Dunkin' Realty's purchase of the Mentor Site from Sky closed on or about October 26, 2004, as evidenced by the October 26, 2004 letter of Peter C. Nintcheff, Esq., identified in such letter as "counsel for and on behalf of Third Dunkin' Donuts Realty, Inc.," addressed to Shawn Ferry, Cleveland Title Services ("***CTS***"), authorizing CTS to close the transaction subject to CTS's compliance with the instructions set forth in such letter, a copy of which is attached hereto as **Exhibit J**.  If Progressive ever did receive a Uniform Franchise Offering Circular (a "***UFOC***") from Defendants in 2004, such receipt did not occur until December 22, 2004, as evidenced by the acknowledgement attached thereto.  A copy of the UFOC (without the exhibits thereto) that Progressive received on such date (the "***2004 UFOC***") is submitted herewith as Exhibit K hereto.

A Franchise Agreement, dated January 27, 2005, was made by and between Defendants Baskin-Robbins and Dunkin' Donuts and Plaintiff Progressive for a combination Dunkin' Donuts/Baskin-Robbins franchise at the Mentor Site (such Franchise Agreement, the "***Mentor Franchise Agreement***"), a copy of which is attached hereto as **Exhibit L**.  Within the Mentor Franchise Agreement, Defendants Baskin-Robbins and Dunkin' Donuts are referred to, individually or collectively, as "Franchisor," and Progressive is referred to as "Franchisee." Defendant Third Dunkin' Realty is neither a party to, nor a signatory of, the Mentor Franchisee Agreement, and there is neither any mention of, nor reference to, Third Dunkin' Realty in the Mentor Franchise Agreement.   The term "Franchisor" as used in the Mentor Franchise Agreement does not include Defendant Third Dunkin' Realty.

---

[28]     Mentor Franchise Purchase Agreement § 8, at 4.

Third Dunkin' Realty and Progressive did, however, enter into a Lease of Dunkin' Donuts/Baskin-Robbins Shop, dated February 23, 2005, setting forth, among other things, the terms and conditions pursuant to which Third Dunkin' Realty, referred to as "Landlord" therein, would lease to Progressive, and pursuant to which Progressive, referred to as "Tenant" therein, would lease from Third Dunkin' Realty, the Mentor Site (such Lease of Dunkin' Donuts/Baskin-Robbins Shop, the "***Mentor Lease***").   A copy of the Mentor Lease is attached hereto as **Exhibit M**.  Although not parties to the Mentor Lease, Defendants Baskin-Robbins and Dunkin' Donuts are referred to in the Mentor Lease, collectively, as "Franchisor."  The term "Franchisor" as used in the Mentor Lease does not include Defendant Third Dunkin' Realty.  Thus, the Mentor Lease makes a clear distinction between Defendant Third Dunkin' Realty, on the one hand, and Defendants Baskin-Robbins and Dunkin' Donuts, on the other.

A similar fact pattern exists with respect to the identification of the sites for Progressive's combination Dunkin' Donuts/Baskin-Robbins store in Chardon, Ohio, and Progressive's Dunkin' Donuts store in Euclid, Ohio, respectively.  Defendants Baskin-Robbins and Dunkin' Donuts entered into a Franchise Agreement, dated July 11, 2005, a copy of which is attached hereto as **Exhibit N**, setting forth the terms and conditions pursuant to which Progressive was authorized to utilize such Defendants' systems and proprietary marks in the operation of a unit located at 370 Center Street, Chardon, Ohio  44024 (such Franchise Agreement, the "***Chardon Franchise Agreement,***" and the parcel of real property having such address, the "***Chardon Site***").  The Chardon Site, however, was identified by Defendants as early as November of 2003, at least twenty (20) months prior to the Chardon Franchise Agreement, and about ten (10) months, if not more, prior to the September 1, 2004 SDA.

On November 28, 2003, GPD rendered an invoice to Defendants for services rendered in connection with  the Chardon Site from November 1, 2003 to November 28, 2003, a copy of which invoice is attached as **Exhibit O** hereto (such invoice, the "***GPD Invoice for November 2003 Chardon Services***").  Defendants' local Ohio counsel was engaged in negotiations for Third Dunkin' Realty's purchase of the Chardon Site no later than early February, 2004, as evidenced by the invoice, attached as **Exhibit P** hereto, for counsel's fees and disbursements

from February 3, 2004 to February 29, 2004.  On February 16, 2004, JMRWLR, LLC ("**JMRWLR**") and Defendant Third Dunkin' Realty entered into a Purchase and Sale Agreement pursuant to which Third Dunkin' Realty agreed to purchase from JMRWLR, and JMRWLR agreed to sell to Third Dunkin' Realty, the Chardon Site for $300,000, subject to adjustments and prorations as provided therein.  A copy of such agreement is attached hereto as **Exhibit Q** (such agreement, the "**JMRWLR Chardon Site Purchase Agreement**").  Defendants' finance committee approved of an investment in the Chardon Site on or about March 9, 2004, as indicated under the caption "Project Rationale & Background" in the supplemental RAPID Resource Appropriation Request (the "**Chardon RAR**"), a copy of which is attached hereto as **Exhibit R**.  Defendant Third Dunkin' Realty's purchase of the Chardon Site from JMRWLR closed no later than July 13, 2004, as evidenced by the Limited Warranty Deed attached hereto as **Exhibit S**, which was executed by JMRWLR on July 7, 2004 and recorded in the office of the Recorder of Geauga County, Ohio on July 13, 2004 (such deed, the "**JMRWLR Chardon Site Deed**").

It was not until January 15, 2005 that Third Dunkin' Realty and Progressive's members executed a letter of intent with respect to the sale and purchase of the Chardon Site, a copy of letter which is attached as **Exhibit T** hereto (such letter, the "**Chardon Site LOI**").  The Chardon Site LOI, which was, by its terms, non-binding,[29] contemplated that Progressive's members would form a new limited liability company to purchase the Chardon Site from Defendant Third Dunkin' Realty.  An Agreement of Sale, dated March 3, 2005, by and among Third Dunkin' Realty, as seller, and Eitan Flank, Shaul Flank, Mike Flank, and Joel Sausen, collectively, as buyers, set forth the terms and conditions pursuant to which Third Dunkin' Realty agreed to sell to such individuals, and such individuals (collectively, the "**Chardon Site Individual Buyers**") agreed to buy from Third Dunkin' Realty, among other things, the Chardon Site and all buildings and improvements thereon in consideration of the sum of $387,500.00 (such agreement, the "**Progressive Chardon Site Purchase Agreement**").[30]  Even the Progressive Chardon Site

---

[29] The penultimate paragraph of the penultimate page of the Chardon Site LOI provides that "[t]his letter of intent is not intended to create any binding or contractual obligation on the part of either party."

[30] Chardon Site Purchase Agreement § 1.

Purchase Agreement, a copy of which is attached hereto as **Exhibit U**, did not firmly commit the Chardon Site Individual Buyers or their assigns to buy the Chardon Site – Section 8(a) made the purchase of the Chardon Site contingent upon the completion and approval by the Chardon Site Individual Buyers of "such inspection and examination of the Premises [the Chardon Site] as Buyer [the Chardon Site Individual Buyers] may desire within 30 days of execution of this Agreement of Sale."[31]  No covenant in the Progressive Chardon Site Purchase Agreement obligated the Chardon Site Individual Buyers to complete and approve, or use best or any other efforts to complete and approve, such an inspection and examination; thus, the Chardon Site Individual Buyers could have declined to proceed with the purchase based on the non-occurrence of the Section 8(a) contingency.

As contemplated by the Chardon Site LOI, an entity by the name of Progressive Chardon Real Estate, LLC, an Ohio ("***Progressive Chardon Real Estate***") was formed on March 10, 2005 by the filing, with the office of the Secretary of State of Ohio, of Progressive Chardon Real Estate's Articles of Organization, a copy of which is attached hereto as **Exhibit V**.  On or about March 22, 2005, Progressive Chardon Real Estate and Progressive entered into a Ground Lease with respect to the Chardon Site, a copy of which lease is attached as **Exhibit W** hereto (such lease, the "***Chardon Lease***").  The Chardon Lease recites that Progressive Chardon Real Estate intends to purchase the Chardon Site, and that if and when Progressive Chardon Real Estate were to purchase the Chardon Site, Progressive Chardon Real Estate wished to improve the Chardon Site and lease the same to Progressive, on the terms and conditions set forth in the Chardon Lease.[32]  The Chardon Lease, however, could convey no interest in the Chardon Site to Progressive unless and until Progressive Chardon Real Estate, which itself had no interest in the Chardon Site as of the date of the Chardon Lease, acquired the Chardon Site.  This was recognized in the Chardon Lease, which provided that the effectiveness of the Chardon Lease was contingent upon Progressive Chardon Real Estate's acquisition and improvement of the Chardon Site as contemplated by the Chardon Lease, and that if Progressive Chardon Real Estate

---

[31]    Chardon Site Purchase Agreement § 8(a).
[32]    Chardon Lease, Recitals, at 1.

failed to so acquire and improve the Chardon Site, Progressive could by notice to Progressive Chardon Real Estate render the Chardon Lease immediately null and void.[33]

An Assignment of Purchase Agreement, dated April 25, 2005, a copy of which is attached hereto as **Exhibit X**, by and among the Chardon Site Individual Purchasers and Progressive Chardon Real Estate, assigned all rights of the Chardon Site Individual Purchasers under the Progressive Chardon Site Purchase Agreement to Progressive Chardon Real Estate. Accordingly, pursuant to a First Amendment to Real Estate Purchase Agreement dated April 28, 2005, a copy of which is attached hereto as **Exhibit Y**, by and among Third Dunkin' Realty, the Chardon Site Individual Buyers, and Progressive Chardon Real Estate, Third Dunkin' Realty consented to the assignment of all right, title, and interest of the Chardon Site Individual Buyers in and to the Progressive Chardon Site Purchase Agreement to Progressive Chardon Real Estate. Sometime in July, 2005, approximately one (1) year after JMRWLR conveyed the Chardon Site to Third Dunkin' Realty by the JMRWLR Chardon Site Deed, Third Dunkin' Realty conveyed the Chardon Site to Progressive Chardon Real Estate, as evidenced by the Limited Warranty Deed attached hereto as **Exhibit Z** (such deed, the "***Third Dunkin' Realty Chardon Site Deed***"). The Chardon Lease, between Progressive Chardon Real Estate and Progressive, would still not become effective, however, unless and until the Chardon Site were to be improved as contemplated thereby.[34]  Thus, Progressive acquired an interest in the Chardon Site no earlier than July 13, 2005.[35]  The Defendants had, however, identified the Chardon Site no later than November of 2003 when GPD rendered services related thereto, at least twenty (20) months prior to the Chardon Franchise Agreement, and about ten (10) months, if not more, prior to the date of the September 1, 2004 SDA.

Likewise, Defendants' identification of the site at 22200 Lakeshore Boulevard, Euclid, Ohio (the parcel of real property having such address, the "***Euclid Site,***" and the Euclid Site, together with the Mentor Site and the Chardon Site, collectively, the "***Progressive Sites***") occurred no later than November of 2003, as evidenced by GPD's invoice, a copy of which is

---

[33]  Chardon Lease § 25, at 29.
[34]  Chardon Lease § 25, at 29.
[35]  In fact, the effective date of the Chardon Lease, and Progressive's acquisition of a leasehold estate in the Chardon Site, would occur after July 13, 2005, inasmuch as the improvements contemplated by the Chardon Lease, which Defendants undertook to complete, were not finished prior to such date.

attached hereto as **Exhibit AA**, for services rendered in connection with the Euclid Site from November 1, 2003 to November 28, 2003 (such invoice, the "*GPD Invoice for November 2003 Euclid Services*").  Local Ohio counsel to the Defendants was negotiating a lease of the Euclid Site for Third Dunkin' Realty in early February, 2004, and perhaps earlier, as evidenced by the invoice attached as **Exhibit BB** hereto.  On or about July 27, 2005, Catherine Carter d/b/a Shore Center Shopping Center ("*Shore Center Shopping Center*") and Defendant Third Dunkin' Realty entered into a Ground Lease, a copy of which is attached hereto as **Exhibit CC**, pursuant to which Shore Center Shopping Center demised and leased to Third Dunkin' Realty, and Third Dunkin' Realty leased from Shore Center Shopping Center, the Euclid Site (such Ground Lease, the "*Euclid Prime Lease*").

The earliest agreement executed by Progressive with respect to the Euclid Site was an October 31, 2005 agreement titled "Contract for the Sale Prototype Test Store," by and among Defendant Dunkin' Donuts and Progressive (such agreement, the "*Euclid Franchise Purchase Agreement*" and, together with the Mentor Franchise Purchase Agreement, the "*Franchise Purchase Agreements*"), a copy of which agreement is attached as **Exhibit DD** hereto.  Under the Euclid Franchise Purchase Agreement, Defendant Dunkin' Donuts agreed to sell to Progressive, and Progressive agreed to buy from such Defendant, the Dunkin' Donuts franchise then being developed at the Euclid Site, together with all of the right, title, and interest of Dunkin' Donuts in the signage and equipment at the Euclid Site.[36]  Progressive agreed to pay to Defendant Dunkin' Donuts a Purchase Price of $278,000.00 for the Euclid franchise, together with a Marketing Start-Up Fee $5,000.00.[37]  The Purchase Price for the Euclid franchise and the Marketing Start-Up Fee were each payable at closing,[38] which was deemed to occur on the date that Progressive signed a franchise agreement for the Euclid site and paid the Purchase Price therefore.[39]

Third Dunkin' Realty and Progressive entered into a Lease of Dunkin' Donuts/Baskin-Robbins Shop, dated February 23, 2006, setting forth, among other things, the terms and

---

[36]  Euclid Franchise Purchase Agreement § 1, at 1.
[37]  Euclid Franchise Purchase Agreement § 2, at 1.
[38]  Euclid Franchise Purchase Agreement §§ 1-2, at 1.
[39]  Mentor Franchise Purchase Agreement § 8, at 4.

conditions pursuant to which Third Dunkin' Realty, referred to as "Landlord" therein, would lease to Progressive, and pursuant to which Progressive, referred to as "Tenant" therein, would lease from Third Dunkin' Realty, the Euclid Site (such Lease of Dunkin' Donuts/Baskin-Robbins Shop, the "*Euclid Sublease*" and, the Euclid Lease, together with the Mentor Lease, the "*Third Dunkin' Realty Leases*").  A copy of the Euclid Sublease is attached hereto as **Exhibit EE**.  And Defendant Dunkin' Donuts and Progressive entered into a Franchise Agreement, also dated February 23, 2006, a copy of which agreement is attached hereto as **Exhibit FF** (such agreement, the "*Euclid Franchise Agreement,*" and the Euclid Franchise Agreement, together with the Mentor Franchise Agreement and the Chardon Franchise Agreement, collectively, the "*Franchise Agreements*").  Thus, Progressive acquired an interest in the Euclid Site no earlier than February 26, 2006. The Defendants had, however, identified the Euclid Site no later than November of 2003 when GPD rendered services related thereto, at least thirty-six (36) months prior to the Euclid Franchise Agreement, and about ten (10) months, if not more, prior to the date of the September 1, 2004 SDA.

Defendants had substantially identified all of the Progressive Sites as early as November of 2003, before the SDA had ever been signed.  The Defendants' role in site identification, moreover, went beyond identifying potential sites for prospective franchisees which the franchisees could reject in favor of other sites identified by the franchisees in general. Progressive contends that even before the SDA was signed, and at all times thereafter, it was the Defendants' intention to select those sites within the Store Development Area for which Progressive in particular would be granted franchises, and Defendants knew which sites they would select for Progressive, or at least knew that the first three would be Mentor, Chardon, and Euclid.  The Defendants admit that they do not operate stores.[40]  Defendants, therefore, must have intended, from the time, no later than November, 2003, when they first began to identify sites within the Cleveland-area market, that each franchisee that acquired an exclusive license to develop stores within a territory in that market would develop stores on the very sites that

---

[40]  *See* Defendants' letter of September 8, 2009, filed with the Court on the same date, at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model if fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

Defendants had identified within such market.  Otherwise, because Defendants do not operate stores, the sites identified by Defendants would remain unused.  Defendants would be unable to recoup their expenses for the fees and disbursements of Defendants' local real estate counsel and their due diligence expenses paid to GPD.  And Defendants' plan to open at least fifteen stores per year (discussed below) in the Cleveland-area market would be delayed as franchisees identified their own sites and submitted them for approval as contemplated by the SDA.

Thus, in December of 2004, after the Mentor Site had been selected and as Defendants' financing personnel were facilitating credit for future sites in the Store Development Area, Mr. Joel Sausen of Progressive transmitted a message, a copy of which is attached hereto as **Exhibit GG**, to Andrea Mairella ("*Mairella*"), an individual identified by Defendants as a former Operations Manager of Dunkin' Brands, Inc., whose duties included coaching, counseling, and evaluating franchisees on operational and business issues,[41] in an attempt to find out which location the Defendants were going to select for Progressive's second Specified Unit.

### B.    Site Control

As described above, for each unit to be opened under the SDA, Progressive purportedly assumed, as among itself and Defendants Baskin-Robbins and Dunkin' Donuts, the sole responsibility for acquiring control,[42] for all units within the Store Development Area by purchase or lease for a period not less than the term of the respective unit set forth in Exhibit B of the SDA, or for such other period as such Defendants may approve.  Notwithstanding anything in the SDA to the contrary, however, the responsibility to acquire control of each of the Specified Sites acquired to date was assumed entirely by Defendants.

Defendant Third Dunkin' Realty entered into the Mentor Site LOI with Sky on April 2, 2004, about five (5) months before the SDA was signed.  The Mentor RAR specifically states that, as of July 20, 2004, the time at which Defendants' finance committee approved of Defendants' investment in the Mentor Site, the franchisee for the Mentor Site had not even been identified.  Under the Mentor Site Franchise Purchase Agreement, dated the very same date as

---

[41]    Defendants' Answers to Progressive Foods, LLC's First Set of Interrogatories, submitted to the Court on March 5, 2009, at 4.
[42]    Mentor Franchise Purchase Agreement § 5, at 3.

the SDA, Defendants Baskin-Robbins and Dunkin' Donuts agreed, as a part of the sale of the Mentor franchise to Progressive, to "execute and deliver, or cause one of its affiliates to execute and deliver, to the Transferee [Progressive], a lease covering the Premises [the Mentor Site] . . . ."[43]  Performance by Baskin-Robbins and Dunkin' Donuts of their obligations under this Section 5 would have been impossible had the Defendants not found a way to acquire control of the Mentor Site.[44]  Pursuant to the Mentor Site Purchase Agreement, Third Dunkin' Realty agreed to purchase the Mentor Site from Sky on October 19, 2004, and the actual purchase closed on or about October 26, 2004.

Third Dunkin' Realty entered into the Chardon Site Purchase Agreement with JMRWLR on February 16, 2004, over six (6) months prior to the SDA.  JMRWLR transferred title to the Chardon Site to Third Dunkin' Realty no later than July 13, 2004, the date on which the JMRWLR Chardon Site Deed was recorded in the office of the Recorder of Geauga County, Ohio.  Progressive Chardon Real Estate, which would ultimately lease the Chardon Site to Progressive pursuant to the Chardon Lease, would not acquire an interest in the Chardon Site until the Third Dunkin' Realty Chardon Site Deed was delivered in July, 2005.

Defendant Third Dunkin Realty's efforts to acquire control of the Euclid Site followed a course similar to that of the Mentor Site.  Third Dunkin' Realty acquired control of the Euclid Site on or about July 27, 2005, when Third Dunkin' Realty and Shore Center Shopping Center entered into the Euclid Prime Lease.  Under the October 31, 2005 Euclid Franchise Purchase Agreement, Defendants Baskin-Robbins and Dunkin' Donuts agreed, as a part of the sale of the Euclid franchise to Progressive, to "execute and deliver, or cause one of its affiliates to execute and deliver, to the Transferee [Progressive], a lease covering the Premises [the Euclid Site] . . . ."[45]  The Euclid Sublease, whereby Third Dunkin' Realty agreed to lease the Euclid Site to Progressive, was signed about seven (7) months later, on February 23, 2006.

---

[43]   Mentor Franchise Purchase Agreement § 5, at 2.
[44]   There is no evidence in the record that Progressive had agreed to a sale-leaseback whereby Progressive would have acquired control of the Mentor Site and then sold or leased it to one of the Defendants, who would have then leased the Mentor Site back to Progressive as lessee.
[45]   Euclid Franchise Purchase Agreement § 5, at 3.

### C.    Unit Design

The SDA required Progressive to construct and equip the Specified Units in accordance with the then-current standards procedures, plans and specifications utilized by Defendants Baskin-Robbins and Dunkin' Donuts for their respective brands.[46]  Each of Defendants' 2004 UFOC and Defendants' Uniform Franchise Offering Circular for 2005 (the "2005 UFOC" and, together with the 2004 UFOC, the "*UFOCs*"), a copy of which (without the exhibits thereto) is submitted as **Exhibit HH** hereto, stated that "[w]e [Defendants Baskin-Robbins and Dunkin' Donuts] will provide you with a copy of our standard plans and specifications for the brand(s) and type of store" and "[w]e will make available to you [Progressive] the standards for designing, constructing, equipping and operating your Store."[47]  Defendants did, in fact, undertake to perform all of the design work for each of the Specified Sties.

On or about February 20, 2004, one or more of the Defendants entered into a Master Agreement, dated of like date, with GPD, under which GPD agreed to provide Defendants with architectural, engineering and construction administration services throughout the Cleveland, Ohio market.  A copy of the Master Agreement with GPD is attached hereto as **Exhibit II** (such agreement, the "*Master Services Agreement*", or "*MSA*").  Among the several services that GPD agreed to provide to Baskin-Robbins and Dunkin' Donuts under the MSA were demolition plans, site plans, grading/drainage plans, soil erosion plans, landscape plans, foundation and framing plans, floor plans, roof plans, reflected ceiling plans, exterior elevations, interior elevations, millwork details, equipment plans, mechanical plans, site lighting and electrical plans, signage plans, utility plans, and wall sections and details.[48]  There should be no doubt that the purpose of the MSA was to memorialize an agreement under which GPD would, among other things, prepare site plans and specifications to Defendants, which Defendants would then use to construct stores in the Cleveland, Ohio market.  As evidenced by the GPD Invoice for March and April 2004 Mentor Services, the GPD Invoice for November 2003 Chardon Services, and the GPD Invoice for November 2003 Euclid Services, GPD provided such service for Defendants at

---

[46]    SDA § 6, at 3.
[47]    2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3, and 2005 UFOC, at 88 (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3.
[48]    MSA, at Article IV.

each of the Mentor Site, the Chardon Site, and the Euclid Site, in each case well before the date of the September 1, 2004 SDA.

### D.     Construction and Equipping of Units

Contrary to Section 6 of the SDA, which expressly provides that Progressive shall be solely responsible for constructing and equipping each Unit thereunder, the Defendants assumed sole and exclusive responsibility for the construction and equipping of the Specified Units at the Progressive Sites.  Section 5 of the Mentor Franchise Purchase Agreement, dated of even date as the SDA, provides, in relevant part:

> <u>Construction:</u>  Transferor [Defendants Baskin-Robbins and Dunkin' Donuts] will develop and equip the Premises [the Mentor Site] as a Dunkin' Donuts/Baskin Robbins satellite shop in accordance with ADQSR's then current standards and specifications.  Equipment shall include, but not be limited to, ADQSR's approved electronic information system and all furnishings and signage, exterior and interior including every installation in ADQSR's then current plans and specifications.  Equipment shall exclude any security system.[49]

Pursuant to the Mentor Lease, Defendant Third Dunkin' Realty agreed to act as general contractor for the construction and equipping of the Mentor Site.  Accordingly, Section 10 of the Mentor Lease provided, in relevant part:

> **10.  Landlord's Covenants**
> The Landlord [Third Dunkin' Realty] agrees:
> (a)  To complete, or to cause completion of, any work required to substantially complete the Premises [the Mentor Site] in accordance with Franchisor's plans and specifications with reasonable dispatch after commencement of the term of this Lease; . . . .[50]

The term "Franchisor" as used in the Mentor Lease is expressly defined therein so as to mean Defendants Baskin-Robbins and Dunkin' Donuts.[51]  The term does not include Defendant Third Dunkin' Realty.

The Mentor Lease contemplated that, as general contractor for the construction and equipping of the Specified Unit at the Mentor Site, Third Dunkin' Realty would select subcontractors and contract with the same for labor and materials to be furnished at the Mentor Site.  Thus, Section 10 of the Mentor Lease further provided, in relevant part:

---

[49]    Mentor Franchise Purchase Agreement § 5, at 3.
[50]    Mentor Lease § 10, at 4, .
[51]    Mentor Lease § 1.16, at 1.

21

> 10.      **Landlord's Covenants**
> The Landlord [Third Dunkin' Realty] agrees: . . .
>      (b)      To assign to Tenant [Progressive] all warranties and
> guaranties obtained from contractors, suppliers or others with respect to the
> performance, work and materials and equipment used in the construction
> and development of the Premises [the Mentor Site] and to use reasonable
> diligence in assisting Tenant in the enforcement of such warranties and
> guaranties; . . . .[52]

Notwithstanding Third Dunkin' Realty's express obligation to do so, no warranties or guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site were ever assigned to Progressive.

The Defendants likewise assumed sole and exclusive responsibility for the construction and equipping of the Chardon Site, as evidenced by the Allied Domecq Global Development Tracking form, a copy of which is attached hereto as **Exhibit JJ**, making specific reference to the Chardon Site, and setting forth, among the roles of various officer, employees, or agents of Defendants, "Dalpiaz, Kevin," as "CM," or Construction Manager. Having Dalpiaz act as a Construction Manager for the Chardon Site would make little sense if Progressive were constructing the Chardon Specified Unit itself.  It is noteworthy that none of the roles referred to in such Global Development Tracking form are assigned to Progressive officers, employees, or agents.  Thus, Larry Harris, one of Defendants' several Development Managers, or "DMs" for the Cleveland-area market, refers to the Chardon Site as "the corporately developed DD/BR located in Chardon Ohio" in his March 21, 2005 message to Ms. Colleen Roberts and Dalpiaz, a copy of which message is attached hereto as **Exhibit KK**.

Sections 10(a) and 10 (b) of the Euclid Sublease are virtually identical to the corresponding sections of the Mentor Lease, except that, in the case of the Euclid Sublease, references to the "Premises" are references to the Euclid Site, as opposed to the Chardon Site, and references to the "Franchisor" are references to Defendant Dunkin' Donuts, as opposed to Defendants Baskin-Robbins and Dunkin' Donuts, collectively.[53]   Under Section 10(a) of the Euclid Sublease, Defendant Third Dunkin' Realty agreed to complete, or cause completion of,

---

[52]    Mentor Lease § 10, at 4.
[53]    Unlike the franchises for the Mentor Site and the Chardon Site, each of which is a combination Baskin-Robbins/Dunkin' Donuts franchise, the franchise for the Euclid Site is solely a Dunkin' Donuts franchise.

with reasonable dispatch before commencement of the term of the Euclid Sublease, the Specified Unit at the Euclid Site in accordance with Franchisor Dunkin' Donuts plans and specifications and applicable governmental codes and regulations.[54]  As general contractor for the construction and equipping of the Specified Unit at the Mentor Site, Third Dunkin' Realty agreed, under Section 10(b) of the Euclid Sublease, to assign to Progressive all warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Euclid Site and to use reasonable diligence in assisting Progressive in the enforcement of such warranties and guaranties.  Again, no assignments were ever made to Progressive by Third Dunkin' Realty.

Each of the Mentor Lease and the Euclid Sublease expressly contemplated that Third Dunkin' Realty, as general contractor, would cause completion of the Specified Units at the Mentor Site and Euclid Site, respectively, by selecting and contracting for labor, materials, and equipment for such Specified Units with one or more subcontractors.  Otherwise, the assignment provisions of Section 10(b) of each of the Mentor Lease and the Euclid Sublease would be of no effect.  And Third Dunkin' Realty did, in fact, select subcontractors and contract with them for labor, materials, and equipment for the Specified Units at the Mentor Site, the Chardon Site, and the Euclid Site.  In the Defendants' Counterclaim & Third Party Plaintiffs' Answers to Progressive Foods, LLC's First Set of Interrogatories to Progressive's First Set of Interrogatories, a copy of which is attached hereto as **Exhibit LL**, the Defendants, in answer to Plaintiff's Interrogatory No. 15,[55] stated, in part, that they "did not choose subcontractors for any of Progressive's franchises and had no process for doing so."[56]  This answer is untrue – Defendants selected subcontractors for the Progressive sites and had at least one process for doing so, a sealed-bid process.

By way of non-exclusive example, a September 17, 2004 message, a copy of which message is attached hereto as **Exhibit MM**, addressed by one Jack Ferry (ostensibly a

---

[54]  Mentor Lease § 10, at 5.
[55]  Plaintiff's Interrogatory No. 15 requested Defendants to "[i]dentify and describe Dunkin's process for choosing subcontractors for the Stores, what the subcontractors' roles have been and what, if any, problems Dunkin' has had with these subcontractors."
[56]  Defendants/Counterclaim & Third Party Plaintiffs' Answers to Progressive Foods, LLC's First Set of Interrogatories to Progressive's First Set of Interrogatories, submitted to the Court on March 5, 2009, at 12.

representative of Defendants, judging by his e-mail address of "Jack Ferry/ARDUS/ADR/A-D@ADRUS") to, among others, Dalpiaz and Mairella states, in part, that "[a]s you (the addressees) know, based on a sealed bid process, Paramount was selected to furnish the equipment for all new stores in this new market."  The "new market" ostensibly refers to the Cleveland-area market, which would include, but encompass significantly more than, the Store Development Area under the SDA.  Although it was the Defendants, not Progressive, that selected Paramount to furnish equipment for all new stores in the Cleveland-area market, Mr. Ferry, by letter dated October 5, 2005, making reference to the Mentor Site, advised Paramount Restaurant Supply that "Paramount has been chosen by the franchisee to deliver and install the equipment at the above referenced store."  And further, "[b]y copy of this letter, I am advising the franchisee(s) that they will be contacted by the supplier at the conclusion of the equipment installation to obtain your feedback regarding the supplier's performance."  The only persons copied on the letter, however, appear from its face to include Mairella, Steve Collin (of no relationship to Progressive), and Dalpiaz.  The letter, a copy of which is attached hereto as **Exhibit NN**, appears, moreover, to be a standard form used by Defendants when selecting subcontractors for construction of franchise units, as evidenced by the generic references to "the franchisee" (there is no reference to Progressive in the letter],"), "this supplier" (not Paramount],"), "the supplier's performance" (not Paramount's performance].")".

Defendants' practice of selecting a subcontractor and then notifying the subcontractor that the subcontractor was chosen by the "franchisee" manifests itself on more than one occasion in the course of Defendants' alleged performance, as evidenced by **Exhibit OO** hereto, an October 7, 2004 e-mail from Dalpiaz to Mr. Ferry ("Go ahead and award the signs to Everbrite. Wagner signs will be the installer.") and Mr. Ferry's letter of the following day, a copy of which is attached hereto as **Exhibit PP**, addressed to Mr. Gary Steen at Everbrite, Inc. ("This letter will serve as notification that Everbrite has been chosen by the franchisee to deliver and install the equipment at [the Mentor Site])."  Even in the case of the Chardon Site, which was sold by Third Dunkin' Realty to Progressive Chardon Real Estate in July, 2005, the Defendants appear to have selected subcontractors for labor, materials, and equipment, as evidenced, in part, by the July 26,

2005 e-mail of Mr. Gary Steen, a copy of which is attached as **Exhibit QQ** hereto, on which Mr. David O'Leary of Dunkin' Brands, Inc. (having an e-mail address of david.o'leary@dunkinbrands.com) was copied ("[Mr. Steen] received my info on the variance issue directly from Dan Beeman of Wagner Signs who is the local installer Kevin Dalpiaz chose to handle the install on this project.").

Contrary to Defendants' contention that Third Dunkin' Realty "was merely a legal entity that owned real estate on behalf of the Dunkin' franchise system,"[57] Third Dunkin' Realty was an active business enterprise that undertook, as general contractor, to complete the construction and equipping of the Specified Sites developed under the SDA, and that, in connection with Third Dunkin' Realty's role as general contractor, selected numerous subcontractors and entered into contracts with these subcontractors for the furnishing of labor, materials, and equipment. On September 28, 2004, for example, Defendant Third Dunkin' Realty entered into a contract (the "***Mentor Site Nyman Subcontract***"), a copy of which is attached hereto as **Exhibit RR**, with Nyman Construction ("***Nyman***"). Under the Mentor Site Nyman Subcontract, Third Dunkin' Realty promised to pay Nyman the sum of $295,997.00, subject to additions and deductions as specified therein, in consideration of Nyman's promise to perform work at the Mentor Site. The Nyman Mentor Site Contract was signed on behalf of Third Dunkin' Realty by Dalpiaz, who, with full knowledge of Defendants, signed in his capacity as "Agent."[58]

On or about October 18, 2004, Third Dunkin' Realty entered into a contract with Wagner Electric Sign Co. of Elyria, Ohio ("***Wagner***"), a copy of which is attached hereto as **Exhibit SS**, such contract (the "***Mentor Site Wagner Subcontract***"). Under the Mentor Site Wagner Subcontract, Third Dunkin' Realty promised to pay the sum of $12,920.49 to Wagner in consideration of Wagner's promise to manufacture and install signage, awnings and related components at the Mentor Site. Although the Mentor Site Wagner Subcontract (which is in letter format) is addressed to "Allied Domecq QSR", it may be fairly inferred from the reference "Owner/Customer" on the second page thereof (under the caption "Permit(s) Fees are charged a cost.") that Third Dunkin' Realty signed the contract. Third Dunkin' Realty became the owner

---

[57] Motion for Summary Judgment, at 3.
[58] Mentor Site Nyman Subcontract, at 7.

of the Mentor Site in late October, 2004, when Third Dunkin' Realty acquired the Mentor Site from Sky.   It may also be fairly inferred that Third Dunkin' Realty, as general contractor, selected Wagner as one of the subcontractors to furnish labor, materials, and equipment at the Mentor Site – the Mentor Site Wagner Subcontract, which is addressed to "Kevin Dalpiaz" at "Allied Domecq QSR", states on its very first page of the Mentor Site Wagner Subcontract: "Thank you for allowing The Wagner Electric Sign Company the opportunity to  work with [the general contractor] on this sign project."   Again, Dalpiaz signed on behalf of Owner Third Dunkin' Realty in his capacity as Construction Manager.[59]

The obligations incurred by Third Dunkin' Realty to complete work under the Mentor Lease and the Euclid Lease, and the substantial monetary obligations incurred by Third Dunkin's Realty under the Mentor Site Nyman Subcontract,[60] the Mentor Site Wagner Subcontract, and numerous other subcontracts for the furnishing of labor, materials, and equipment at the Progressive Sites are hardly representative of a passive real estate holding company.   The fact that Dalpiaz, or any other person, who signed subcontracts on behalf of Third Dunkin' Realty as "Agent," "Construction Manager," or otherwise might also have been an employee of Dunkin' Brands, Inc.[61] is a matter of irrelevance; Third Dunkin' Realty was nevertheless bound by the acts of its agents to satisfy its significant obligations under subcontracts.

### E.    Financing of the Units

Beginning in July of 2005, Progressive began to participate in Defendants' financing program with National Cooperative Bank ("**NCB**"), whereby Defendants arrange financing for franchisees as described in the UFOCs furnished to Progressive by Defendants.[62]   On or about

---

[59]   Mentor Site Wagner Contract (unpaginated), last page.

[60]   To place Defendant Third Dunkin' Realty's monetary obligations under subcontracts in perspective, Progressive notes that the $295,997.00 that Third Dunkin' Realty obligated itself to pay under the Mentor Site Nyman Subcontract alone exceeded the entire $240,000 in Initial Franchise Fees under the SDA.  If Third Dunkin' Realty's monetary obligations under subcontracts related to other sites in the Cleveland-area market were equivalent to those incurred by Third Dunkin' Realty for the Mentor Site, Third Dunkin' Realty's monetary obligations under subcontracts for the Cleveland-area market alone would reach into the millions of dollars.

[61]   Motion for Summary Judgment, at 3.  In fact, as Defendants have admitted, in their Supplemental Disclosure Statement filed with the Court on March 5, 2009, Dalpiaz is a Construction Manager for each of Baskin-Robbins, Dunkin' Donuts, Third Dunkin' Realty, and their respective affiliates, successors, subsidiaries and parents, all of which are referred to collectively for purposes of such Supplemental Disclosure Statement as "Dunkin' Donuts."  *See supra* note 18.

[62]   2004 UFOC, (Item 10 (captioned "Financing")), at 3-9 (under caption "National Cooperative Bank ("NCB")"), and 2005 UFOC, (Item 10 (captioned "Financing")), at 75-80 (under caption "National Cooperative Bank ("NCB")").

July 7, 2005, Progressive and NCB entered into a Business Loan Agreement, a copy of which is attached hereto as **Exhibit TT** (such agreement, the "***Mentor Commercial Loan Agreement***"). Pursuant to the Mentor Commercial Loan Agreement, NCB agreed to make advances to Progressive in an aggregate principal amount not to exceed $373,500.00 at any time (all such advances, collectively, the "***Mentor Commercial Loan***").  Section 3K of the Mentor Commercial Loan Agreement set forth Progressive's representation and warranty to NCB, as of the date of the Mentor Commercial Loan Agreement, regarding the enforceability against the franchisor of each of the Franchise Agreements then existing.  Section 7I of the Mentor Commercial Loan Agreement expressly required Progressive to use the proceeds of the Mentor Commercial Loan solely for Progressive's business operations unless NCB consented to another use.  In connection with the Mentor Commercial Loan, Progressive and Progressive Chardon Real Estate entered into, a Security Agreement, a copy of which is attached hereto as **Exhibit UU**, made as of July 7, 2005, whereby each of Progressive and Progressive Chardon Real Estate granted to NCB, as security for the payment of the Mentor Commercial Loan and other specified obligations, a security interest in all or substantially all of the personal property and fixtures of Progressive and Progressive Chardon Real Estate (such security agreement, together with the Mentor Commercial Loan Agreement and all other documents executed by either or both of Progressive and Progressive Chardon Real Estate in connection with the Mentor Commercial Loan, collectively, the "***NCB Mentor Commercial Loan Documents***").

On or about July 22, 2005, Progressive Chardon Real Estate and NCB entered into a Business Loan Agreement, a copy of which is attached hereto as **Exhibit VV** (such agreement, the "***Chardon Mortgage Loan Agreement***").  Pursuant to the Chardon Mortgage Loan Agreement, NCB agreed to make advances to Progressive Chardon Real Estate in an aggregate principal amount not to exceed $225,000.00 at any time (all such advances, collectively, the "***Chardon Mortgage Loan***"). Section 3K of the Chardon Mortgage Loan Agreement set forth Progressive Chardon Real Estate's representation and warranty to NCB, as of the date of the Chardon Mortgage Loan Agreement, regarding the enforceability against the franchisor of each of the Franchise Agreements then existing.  Section 4I of the Chardon Mortgage Loan

Agreement expressly required Progressive Chardon Real Estate to use the proceeds of the Chardon Mortgage Loan solely for Progressive Chardon Real Estate's business operations unless NCB consented to another use.  In connection with the Chardon Mortgage Loan, Progressive executed a Guaranty Agreement, a copy of which is attached hereto as **Exhibit WW**, made as of July 22, 2005, whereby Progressive guaranteed the payment to NCB of, among other obligations of Progressive Chardon Real Estate, the Chardon Mortgage Loan (such guaranty agreement, the "***Progressive Chardon Mortgage Loan Guaranty***").   Moreover, Progressive and Progressive Chardon Real Estate entered into, a Security Agreement, a copy of which is attached hereto as **Exhibit XX**, made as of July 22, 2005, whereby each of Progressive and Progressive Chardon Real Estate granted to NCB, as security for the payment of the Chardon Mortgage Loan and the other obligations thereby secured,  a security interest in all or substantially all of the personal property and fixtures of Progressive and Progressive Chardon Real Estate (such security agreement, the together with the Chardon Mortgage Loan Agreement, the Progressive Chardon Mortgage Loan Guaranty, and all other documents executed by either or both of Progressive and Progressive Chardon Real Estate in connection with the Chardon Mortgage Loan, the "***NCB Chardon Mortgage Loan Documents***").

Also on or about July 22, 2005, Progressive Chardon Real Estate and NCB entered into a Business Loan Agreement, a copy of which is attached hereto as **Exhibit YY** (such agreement, the "***Chardon Commercial Loan Agreement***").   Pursuant to the Chardon Commercial Loan Agreement, NCB agreed to make advances to Progressive Chardon Real Estate in an aggregate principal amount not to exceed $744,324.50 at any time (all such advances, collectively, the "***Chardon Commercial Loan***").   Section 3K of the Chardon Commercial Loan Agreement set forth Progressive Chardon Real Estate's representation and warranty to NCB, as of the date of the Chardon Mortgage Loan Agreement, regarding the enforceability against the franchisor of each of the Franchise Agreements then existing.  Section 4I of the Chardon Commercial Loan Agreement expressly required Progressive Chardon Real Estate to use the proceeds of the Chardon Commercial Loan solely for Progressive Chardon Real Estate's business operations unless NCB consented to another use.  In connection with the Chardon Commercial Loan,

Progressive executed a Guaranty Agreement, a copy of which is attached hereto as **Exhibit ZZ**, made as of July 22, 2005, whereby Progressive guaranteed the payment to NCB of, among other obligations of Progressive Chardon Real Estate, the Chardon Commercial Loan (such guaranty agreement, the "***Progressive Chardon Commercial Loan Guaranty***").  Moreover, Progressive and Progressive Chardon Real Estate entered into a Security Agreement, a copy of which is attached hereto as **Exhibit AAA**, made as of July 22, 2005, whereby each of Progressive and Progressive Chardon Real Estate granted to NCB, as security for the payment of the Chardon Commercial Loan and the other obligations thereby secured, a security interest in all or substantially all of the personal property and fixtures of Progressive and Progressive Chardon Real Estate (such security agreement, together with the Chardon Commercial Loan Agreement, the Progressive Chardon Commercial Loan Guaranty, and all other documents executed by either or both of Progressive and Progressive Chardon Real Estate in connection with the Chardon Commercial Loan, the "***NCB Chardon Commercial Loan Documents***").

And on or about February 23, 2006, Progressive and NCB entered into a Business Loan Agreement, a copy of which is attached hereto as **Exhibit BBB** (such agreement, the "***Euclid Commercial Loan Agreement***").  Pursuant to the Euclid Commercial Loan Agreement, NCB agreed to make advances to Progressive in an aggregate principal amount not to exceed $423,000.00 at any time (all such advances, collectively, the "***Euclid Commercial Loan***").  Section 3K of the Euclid Commercial Loan Agreement set forth Progressive's representation and warranty to NCB, as of the date of the Euclid Commercial Loan Agreement, regarding the enforceability against the franchisor of each of the Franchise Agreements then existing.  Section 4I of the Euclid Commercial Loan Agreement expressly required Progressive to use the proceeds of the Euclid Commercial Loan solely for Progressive's business operations unless NCB consented to another use.  And Section 4G of the Euclid Commercial Loan Agreement required Progressive, as a condition to the disbursement of any proceeds of the Euclid Commercial Loan, to furnish NCB with a guaranty, of an unspecified limited amount, of Defendant Dunkin' Donuts (such guaranty, the "***Dunkin' Donuts Euclid Commercial Loan Guaranty***").  In connection with the Euclid Commercial Loan, Progressive and Progressive

Chardon Real Estate entered into a Security Agreement, a copy of which is attached hereto as **Exhibit CCC**, made as of February 23, 2006, whereby each of Progressive and Progressive Chardon Real Estate granted to NCB, as security for the payment of the Euclid Commercial Loan and other specified obligations, a security interest in all or substantially all of the personal property and fixtures of Progressive and Progressive Chardon Real Estate (such security agreement, together with the Euclid Commercial Loan Agreement and all other documents executed by either or both of Progressive and Progressive Chardon Real Estate in connection with the Euclid Commercial Loan, collectively, the "*NCB Euclid Commercial Loan Documents*", and the NCB Euclid Commercial Loan Documents, together with the NCB Mentor Commercial Loan Documents, the NCB Chardon Mortgage Loan Documents, and the NCB Chardon Commercial Loan Documents, collectively, the "*NCB Loan Documents*").

## II. LAW AND ARGUMENT

### A.   Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  The Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  And the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Similarly, the Court must view the evidence in the light most favorable to the nonmoving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus.*, 587-88; *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *White v. Turfway Park Racing Ass'n*, 909 F.2d 941, 943-44 (6th Cir. 1990).  In determining whether a factual issue is "genuine," the Court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And determination of whether a factual issue is "genuine" requires

consideration of the applicable evidentiary standards.  Thus, in most civil cases the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.  A fact is "material" if its resolution will affect the outcome of the lawsuit. *Id*. at 248.  The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp*. *v*. *Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).

The absence of a response to a summary judgment motion does not automatically entitle the moving party to a grant of summary judgment. *See Gaines v*. *Farese*, 798 F.2d 1414, No. 85-5324, 1986 WL 17303, at *2 (6th Cir. July 11, 1986).  Nor does the absence of such a response lessen the burden of a moving party to demonstrate the appropriateness of summary judgment. *See Cross v*. *Northwest Airlines*, 998 F. Supp. 803, 805 (N.D. Ohio 1998), (*citing Guarino v*. *Brookfield Township Trustees*, 980 F.2d 399, 410 (6th Cir. 1992)).

### B.    None of Progressive's Claims are Barred by Contractual Disclaimers in the SDA or the Franchise Agreements

Progressive has asserted, among other state-law claims, a claim for breach of contract in that Defendants failed in their site selection, design, construction, development and support obligations with respect to the Specified Unit at each of the Progressive Sites.[63]  Defendants admit that each and every one of the Defendants participated in the process of selecting and developing the Specified Units at the Mentor Site, the Chardon Site, and the Euclid Site.  Mere participation, in of itself and without more, flies in the face of the express provisions of the SDA which purport to impose sole responsibility for site identification on Progressive.  In fact, the Defendants involvement in site identification went beyond mere participation – Defendants, with no involvement from Progressive, had identified each of the Progressive Sites no later than November of 2003, all well in advance of the SDA.

---

[63]    Amended Complaint ¶19, at 4; ¶ 20-21, at 5.

By the Motion for Summary Judgment, Defendants attempt to shield themselves from the scrutiny of trial by invoking numerous "disclaimers" in the SDA and the Franchise Agreements. In particular, Defendants refer to Section 22 of the SDA, stating that "the SDA disclaimed any guarantee by Dunkin' [defined, for purposes of the Motion for Summary Judgment, as all of the Defendants] as to the 'suitability or potential of any of the store locations that Dunkin' approved under the agreement.'"[64]  Further, Defendants contend that "[t]he SDA also made clear in the integration clause and elsewhere that Dunkin' had not made any statements or promises to the franchisee about the success of any of the sites that were *chosen* or approved as franchise locations other than what appeared in the document itself." [65]  What the SDA actually provides on the subject, at Section 22, is as follows:

> ADQSR (Defendants Baskin-Robbins and Dunkin' Donuts) makes no representations or warranties with respect to the suitability or potential of locations which it approves.  ADQSR's approval merely reflects its bona fide belief that the proposed territory appears to be suitable for development of a unit of the brand(s), form of distribution and type approved.[66]

The SDA makes a very clear distinction between the *responsibility to identify sites*, an active duty (potentially involving, among other things, the location and appraisal of available real properties within the Store Development Area, environmental site assessments, surveying, the preparation of site sketches and demographic, traffic flow, and other civil engineering reports, and the evaluation of applicable zoning and other restrictions) purportedly placed on Progressive under Section 6 of the SDA, and the *right to approve of sites* (which can, if the process of site identification has been duly completed, consist of an armchair evaluation of a proposed site and the granting or withholding of consent thereto) reserved to Defendants Baskin-Robbins and Dunkin' Donuts. The above-quoted provision from Section 22 of the SDA disclaims representations and warranties about the suitability or potential of the latter – sites approved by Baskin-Robbins and Dunkin' Donuts, but not the former –sites identified, selected, or chosen by Baskin-Robbins and Dunkin' Donuts.

---

[64]    Defendants' Answer, ¶17, at 4.
[65]    Motion for Summary Judgment, at 7. (emphasis added).
[66]    SDA § 11, at 10.

The significance of the distinction between the responsibility for site identification and the right of approval is borne out by Section 6 of the SDA, which provides in relevant part:

> Each location proposed to be acquired by Developer (Progressive) shall be submitted in writing in advance to ADQSR (Defendants Baskin-Robbins and Dunkin' Donuts) for approval.
>
> Developer shall provide ADQSR with such information and data as ADQSR may reasonably request in connection with its evaluation of the location, including, without limitation, the cost of acquisition, development and construction, and, if the property is to be leased by Developer, a copy of the lease. Prior to the opening of each unit, Developer shall furnish to ADQSR all approvals and certifications required under the Franchise and ancillary agreements for that unit.[67]

Defendants have produced no evidence that they ever requested Progressive to furnish them with any information or data in connection with Defendants' evaluation of any of the Progressive Sites.  This is because the Defendants identified each of the Progressive Sites without any assistance of Progressive, and had either already obtained, or had independent means of obtaining through GPD (Defendants' architectural and engineering consultants for the Cleveland-area market) or others, all of the information and data about the sites that the Defendants deemed necessary or advisable to acquire.  And because Third Dunkin' Realty acquired each of the Progressive Sites without involvement by Progressive, the Defendants already knew the cost of acquisition.

Although Progressive opened units at three different sites in the Store Development Area, the record is devoid of any evidence that Progressive ever submitted any writing to any of the Defendants seeking approval as a condition to Progressive's acquisition of an interest in any of the Progressive Sites.  And the record contains no evidence that Defendants Baskin-Robins and Dunkin' Donuts ever granted any such approval.  This is because Progressive acquired, or caused Progressive Chardon Real Estate to acquire, an interest in all three of the Progressive Sites directly from Defendant Third Dunkin' Realty.  And, as general contractor, Defendant Third Dunkin' Realty directly oversaw development and construction of the Specified Unit at each of the Progressive Sites – no information from Progressive was required.  And, as evidenced by **Exhibit DDD**, **Exhibit EEE**, and **Exhibit FFF** hereto with respect to the Chardon Site, and

---

[67] SDA § 6, at 3-4.

**Exhibit GGG** hereto with respect to the Euclid Site, the Defendants, either themselves or through GPD, obtained certifications and approvals on their own.

The disclaimer in Section 22 of the SDA upon which Defendants rely in an attempt to avoid trial on the merits further provides, in relevant part, as follows:

> ADQSR (Defendants Baskin-Robbins and Dunkin' Donuts) may provide Developer (Progressive) with certain information as a part of Developer's review of a particular trade area or territory. Without limitation, this information may come in the form of maps indicating competition in the area and major shopping activity, employment centers and activity generators, or demographic reports. . . . ADQSR [does not] represent or warranty [sic] . . . that the information provided is accurate, complete, or current. Developer may not rely on the information provided by ADQSR. It is critical that Developer conduct its own investigation of the trade area or territories under consideration, and that Developer rely only on its own information and analysis relating to all aspects of developing a Unit within the Store Development Area. Developer agrees that it is Developer's responsibility to fully analyze the Store Development Area, to remain aware of changes in it, *and to seek a location that is most advantageous for Dunkin' Donuts [an/or] Baskin-Robbins . . . units*, as the case may be. [68]

The foregoing provision presupposes conduct of the parties whereby Progressive would conduct an investigation of trade areas within the SDA and thereby obtain its own information regarding population density and traffic-flow patterns in such trade areas, rely solely on the information so obtained to perform a suitability analysis of prospective sites within such trade areas (ignoring, in the process, any information that the Defendants might happen to furnish), and rely solely on such analysis to identify those sites within the Store Development Area that would be suitable for the development and successful operation of combination Baskin-Robbins/Dunkin' Donuts franchises. Such an agreement is precisely what appears to have been contemplated by Section 6 of the SDA, which by its terms placed responsibility for site identification on Progressive.

Section 6 of the SDA further contemplated that Progressive, having identified suitable sites within the Store Development Area, would, in the case of each such site that Progressive proposed to acquire, submit such location in writing to Defendants Baskin-Robbins and Dunkin' Donuts for approval, and would provide such Defendants with such information and data as they reasonably requested in connection with their evaluation of the site. If and when the location was approved by such Defendants, the SDA contemplated that Progressive would acquire control

---

[68]     SDA § 22, at 10. (emphasis added).

of the site by purchase or lease, construct a store thereon in accordance with the design standards established by Baskin-Robbins and Dunkin' Donuts, equip the stores with all signage and other equipment required by such Defendants, and then operate the stores as provided in the Franchise Agreements.  Defendants, however, ignored Section 6 entirely and took it upon themselves to identify the Progressive Sites themselves, acquire control of the Progressive Sites, and construct and equip the stores thereon.  In view of Defendants' conduct in selecting the Progressive Sites, notwithstanding the provisions of SDA Section 6, the independent investigation and analysis of trade areas contemplated by Section 22 of the SDA becomes a matter of irrelevance.

The distinction between site approval and site selection is expressly acknowledged by Defendants in the 2004 and 2005 UFOC disseminated by Defendants, each of which states that "[f]or new stores, *we may select the site, or we may approve a site that you select* and bring to us."[69]  Each UFOC goes on to state in relevant part:

> If you submit a site for our consideration, you must provide us with all required information about the site.  You must not sign a lease for a site before we approve it, unless it is subject to our site approval.   You may not begin construction on a site until we have approved it.  We do not typically pay 'finders' fees' for sites.
>
> In order to develop a new store, you may be required to sign an SDA.  *Under these agreements, you are responsible for locating and securing sites within boundaries specified by us.  All sites must be approved by us*, and must be developed by you in accordance with our requirements.  You cannot develop a site not approved by us.  We will not reimburse you for any costs you incur with respect to any location not approved by us.  While we try to promptly review nominated sites, there is no specified time period in which we must respond to your approval request.[70]

Defendants' reliance on Section 19 of the SDA to support the Motion for Summary Judgment is misplaced.  Such Section 19 provides, in relevant part:

> The success of the business venture contemplated to be undertaken by Developer (Progressive) by virtue of this Agreement is speculative and depends, to a large extent, upon the ability of Developer as an independent businessman, as well as other factors.  ADQSR (Defendants Baskin-Robbins and Dunkin' Donuts) does not make any representations or warranty as to the potential success of the business venture contemplated hereby.  Developer acknowledges that it has entered into this Agreement after making an independent investigation of ADQSR's Systems and operations, and not upon any representation as to profits which Developer in particular might be expected to realize, nor has anyone made

---

[69]   2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection"), and 2005 UFOC, at 95-96 (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection").") (emphasis added).

[70]   *Id.* (emphasis added).

any other representation which is not expressly set forth herein to induce Developer to accept this license and execute this Agreement.

By virtue of the foregoing provision, the parties to the SDA expressly acknowledged that the success of the business venture undertaken by Progressive pursuant to the SDA was speculative and was dependent not only on Progressive's capability as an independent business person, but on other factors as well.  These other factors would, at the very least, include the Defendants' performance and observance in good faith of their respective obligations to Progressive, including, without limitation, the Defendants' respective obligations to site selection, design, construction, development, and support.  It is also noteworthy that, contrary to Defendants' suggestion, nothing in the parties' joint acknowledgement regarding the speculative nature of the venture to be undertaken by Progressive allocates a disproportionate share of the risk (let alone the entire risk) of the venture to Progressive.

The foregoing Section 19 disclaims certain representations and warranties by ADQSR (but not by Defendant Third Dunkin' Realty) as to the potential success of the business venture contemplated by the SDA.  Neither Progressive's breach of contract claims, nor any of Progressive's other claims, are dependent upon any representation or warranty of such Defendants as to the potential success of such business venture.  As discussed below, Progressive's breach of contract claim, insofar as it arises from Defendants' failure of their obligations relating to site selection, is based in large part on Defendants' non-verbal conduct and silence as to matters within their knowledge giving rise to an equitable estoppel, not on any representation or warranty of success from Defendants Baskin-Robbins and Dunkin' Donuts. Nor does Progressive's fraud claim of necessity rely on an assurance from Baskin-Robbins or Dunkin' Donuts as to the potential success of the business venture contemplated by any of the Franchise Agreements.

Finally, Progressive acknowledged in Section 19 of the SDA that Progressive entered into the SDA after making independent investigations of ADQSR's "Systems and operations," and not in reliance upon any representation by ADQSR as to profits which Progressive in particular might be expected to realize.  Without in any way conceding that the Defendants could use a contractual requirement of independent investigation to disclaim statements regarding their

36

respective businesses contained in the 2004 or 2005 UFOC, the foregoing acknowledgement provides only that Progressive *entered into the SDA* (as opposed to entering into a lease for the Mentor Site or the Euclid Site with Third Dunkin' Realty, causing Progressive Chardon Real Estate to enter into the Progressive Chardon Site Purchase Agreement with Third Dunkin' Realty, entering into a lease for the Chardon Site with Progressive Chardon Real Estate, entering into the NCB Loan Documents to which Progressive is a party, or causing Progressive Chardon Real Estate to enter into the NCB Loan Documents to which it is a party) after an independent investigation of the *Systems and operations* of ADQSR (as opposed to an investigation of the sites selected by Defendants, not Progressive), and not in reliance on any representation or warranty by ADQSR (as opposed to Third Dunkin' Realty) *as to profits* which Progressive in particular might be expected to realize (as opposed to a representation or warranty by the Defendants regarding the suitability of the sites that they, and not Progressive, identified). Progressive further acknowledged that no one made any other representations not set forth in the SDA to induce Progressive to accept its license to develop sites under the SDA or to execute the SDA (as opposed to any representations made to induce Progressive to enter into the Leases, cause Progressive Chardon Real Estate to enter into the Progressive Chardon Site Purchase Agreement or loan documents with or for the benefit NCB, or enter into loan documents with or for the benefit of NCB).

Defendants have taken considerable liberty in their statement, on page 4 of the Motion for Summary Judgment, that "[o]n the signature page for the SDA, Progressive's owners were asked to identify any representations that Dunkin' may have made that were not expressly set forth in the Agreement. . . . . They handwrote 'None.'"  What the signature page of the SDA actually required Progressive to describe was all the promises and representations made by Defendants Baskin-Robbins and Dunkin' Donuts that were not expressly contained in the SDA or the UFOC but which "influenced Developer to sign" the SDA.  The SDA's signature page contains no disclaimers of any promises or representations made by any of the Defendants to influence Progressive to sign the Leases, sign loan documents with or for the benefit of NCB, or cause Progressive Chardon Real Estate to sign the Progressive Chardon Site Purchase Agreement

or loan documents with or for the benefit of NCB.

Contrary to Defendants' assertion that "[t]he Franchise Agreements all contained multiple provisions in which Dunkin' disclaimed any responsibility for the success of the sites *chosen* for the stores,"[71] none of the Franchise Agreements contain any disclaimers whatsoever regarding sites chosen by Defendants.  This is likely because the disclaimers in each of the Franchise Agreements, like those in the SDA, are predicated on a hypothetical allocation of rights and responsibilities under which Progressive would identify all of the locations for units to be developed within the Store Development Area and the Franchisor would only have a right of approval.  Section 18.0 of each of the Franchise Agreements provides as follows:

> **18.0  Independent Investigation.**  THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S (PROGRESSIVE'S) CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, *AS WELL AS OTHER FACTORS*.  *FRANCHISOR* [Defendants Baskin-Robbins and Dunkin' Donuts, in the case of the Mentor Franchise Agreement and the Chardon Franchise Agreement, and Defendant Dunkin' Donuts alone, in the case of the Euclid Franchise Agreement] MAKES *NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY*.  FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS *OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE*.  FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT *FRANCHISOR AND ITS* REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE *TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT* WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.[72]

The foregoing Section 18.0 is essentially the same as Section 19 of the SDA, adapted to fit a Franchise Agreement:  it acknowledges that the success of the business venture undertaken by Progressive by virtue of the Franchise Agreement depends to a material extent on factors other than Progressive's capability; it allocates no more of the risk of the venture to Progressive than to the Franchisor; it disclaims any representations or warranties by the Franchisor as to the potential success of the venture; Progressive represents that it has entered into the Franchise Agreement

---

[71]   Motion for Summary Judgment, at 7.
[72]   Emphasis added.

after making an independent investigation of the Franchisor's business, and not in reliance on any representation by the Franchisor as to sales or profits that Progressive might be expected to realize; and Progressive represented that none of the Franchisor or its representatives made any representations to induce Progressive to acquire the franchise (that is, the right and license to use the Franchisor's marks and proprietary system) or execute the Franchise Agreement, except any representations not expressly set forth in the Franchise Agreement or in the disclosure materials provided to Progressive prior to entering into the Franchise Agreement.

None of the disclaimers referred to by Defendants in the Motion for Summary Judgment disclaim any site selection obligations of any of the Defendants, any representations or warranties of any of the Defendants relating thereto, or any other obligations or other matters forming the basis of Progressive's claims, or any representations or warranties relating thereto. And none of the disclaimers referred to by Defendants in the Motion for Summary Judgment disclaim any design, construction, development, or support obligations of any of the Defendants, any representations or warranties of any of the Defendants relating thereto, any other obligations or other matters forming the basis of Progressive's claims, or any representations or warranties relating thereto.

Defendants concede that "[w]here there is no ambiguity in the words of a contract — as here — they must be given their natural and ordinary meaning and be fully enforced."[73]  It is Defendants, however, that urge the Court to depart from this principle by reading complete absolution for Defendants' site selection activities into a disclaimer in the Franchise Agreements that has nothing to do with site selection, and into a disclaimer in the SDA that, by its plain language, limits site *approval* by Baskin-Robbins and Dunkin's Donuts to a representation that such Defendants have a bona fide belief that "the proposed territory appears to be suitable for development of a unit of the brand(s), form of distribution and type approved."  Defendants also concede that they prepared the SDA and the Franchise Agreements.[74]  If the Defendants had wished to cover site selection and other matters, in addition to site approval, in the disclaimers of

---

[73]  Motion for Summary Judgment, at 11 (citing *Rezendes v. Prudential Ins. Co.*, 189 N.E. 826, 828 (Mass. 1934)).

[74]  Motion for Summary Judgment, at 11 ("Finally, Progressive cannot use the fact that the SDA and Franchise Agreements were drafted by Dunkin' [defined in the Motion for Summary Judgment to include, collectively, all of the Defendants] as a basis to escape the plain language of the contracts.").

the SDA and the Franchise Agreements, Defendants had every opportunity to include broader disclaimers prior to the time when such agreements were signed.  They did not do so, and they cannot ask the Court to redraft their contracts now.  The Defendants cannot avoid trial on the merits for breach of their site selection and other obligations by invoking a disclaimer intended to benefit only two of the Defendants, and intended to relate solely to the passive act of site approval by the same two Defendants.

###    C.    No Contractual Disclaimers Exist for the Benefit of Defendant Third Dunkin' Realty

The term "ADQSR" as defined in the SDA, and as used in all of the provisions thereof (including, but not limited to, the purported disclaimers set forth in Section 22 and the other sections thereof) includes only Defendants Baskin-Robbins and Dunkin' Donuts.  Likewise, the "Franchisor" referred to in each of the Franchise Agreements includes only Defendants Baskin-Robbins and Dunkin' Donuts, except for the Euclid Franchise Agreement, under which Dunkin' Donuts is the sole Franchisor.  None of the disclaimers relied upon by Defendants disclaim any agreements, representations or warranties by Defendant Third Dunkin' Realty, which, as Defendants openly admit, participated along with the other Defendants in the site selection process.[75]  Significant evidence in the record supports Defendants' admission.  Dalpiaz, admitted by Defendants to be a Construction Manager for all of the Defendants, including, but not limited to, Third Dunkin' Realty,[76] and who, with full knowledge of Defendants, acted in his capacity as agent of Third Dunkin' Realty, signing both the Mentor Site Nyman Subcontract and the Mentor Site Wagner Subcontract on behalf Third Dunkin' Realty in such capacity, was actively involved in the selection of the Mentor Site, as evidenced by the November 5, 2003 message attached as **Exhibit C** hereto, the Chardon Site, as evidenced by the November 5, 2003 message attached as

---

[75]   Defendants' Answer ¶ 17, at 4 :  "Defendants admit that they participated in the site selection and construction for the Progressive opened stores located in Mentor, Chardon, and Euclid Ohio."  The term "Defendants" is defined in Defendants' Answer so as to include, collectively, "Defendants Dunkin' Donuts Franchised Restaurants LLC, successor-in-interest to Dunkin' Donuts Incorporated, Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA, Co., and DB Real Estate Assets I LLC and DB Real Estate Assets II LLC, successors-in-interest to Third Dunkin' Donuts Realty, LLC and Third Dunkin' Donuts, Inc."

[76]   *See supra* note 18 (explaining that Defendants' Supplemental Disclosure identified Dalpiaz as Construction Manager for all of the Defendants).

**Exhibit HHH** hereto, and the Euclid Site, as evidenced by the August 26, 2004 message attached as **Exhibit III** hereto.

Defendants cannot seriously be heard to argue that Progressive's civil conspiracy claim fails as a matter of law because "[w]hile Third Dunkin' [Realty] and Dunkin' [Donuts] were separate legal entities, Third Dunkin' [Realty] acted only through the employees of Dunkin' [Donuts]. Thus, Third Dunkin' [Realty] could not, as a matter of law, have entered into any conspiracy with Dunkin' [Donuts] to do anything"[77] and then assert that that Dalpiaz, when identifying sites, was acting solely on behalf of Defendants Baskin-Robbins and Dunkin' Donuts, but not on behalf of Defendant Third Dunkin' Realty (which is the beneficiary of none of the disclaimers relied upon by Defendants and which ultimately acquired a fee interest or a leasehold interest in each of the sites in question). Any such argument would amount to more sophistry than the Court should tolerate.  It is equally disingenuous for Defendants to argue that they acted as a collective entity (albeit separate legal entities), but that Third Dunkin' Realty did not act at all.[78]  In any event, the issue of whether Dalpiaz was acting as an agent on behalf of all of the Defendants (as Progressive hereby asserts) or was acting only on behalf of Defendants Baskin-Robbins and Dunkin' Donuts is a factual issue which, together with all inferences drawn therefrom, must, for purposes of the Motion for Summary Judgment, be viewed in the light most favorable to Progressive.

Defendant Third Dunkin' Realty is not an intended or third-party beneficiary of any of the disclaimers or other provisions in the SDA or the Franchise Agreements.  Under Massachusetts law, "[a] contract is intended for a third party's benefit 'when one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act ...'" *Honey Farms, Inc. v. Exxon Mobil Corp*, 26 Mass.L.Rptr. 105, 2009 WL 3085798 (Mass. Super. 2009), at *2 (quoting *Rae v. Air-Speed, Inc.,* 435 N.E.2d 628 (Mass. 1982)), and adopting Restatement (Second) of Contracts § 302 which provides:

---

[77]    Motion for Summary Judgment, at 16.
[78]    *Id.*, at 15-16, (*citing* Amadisu v. The Christ Hospital, 514 F.3d 504, 507 (6th Cir. 2008) (*quoting* Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ., 926 F. 2d 505, 510 (6th Cir. 1991))).

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.[79]

A person asserting that it is an intended or third-party beneficiary of a contract has the burden to show that the contracting parties intended to give the person so asserting the benefit of the contract.  *Anderson v. Fox Hill Village Homeowners Corp.*, 676 N.E.2d 821, 822 (Mass. 1997). Massachusetts courts look at the language and circumstances of the contract for indicia of intention, from which "the intent must be clear and definite." *Id*.  There is no evidence that the parties to the SDA or the Franchise Agreements ever intended to benefit Third Dunkin' Realty, and even if there were such evidence (and Progressive contends there is not), its existence would serve only to present a genuine material issue of fact as to whether the parties to the SDA and the Franchise Agreements intended Third Dunkin' Realty to benefit from the disclaimers contained therein.  Defendant Third Dunkin' Realty is not entitled to summary judgment based on any contractual provisions – it is not a party to, or an intended or third-party beneficiary of, the SDA or any of the Franchise Agreements, and neither any of the Third Dunkin' Leases nor the Progressive Chardon Real Estate Purchase Agreement contain any of the purported disclaimers which Defendants have invoked in the Motion for Summary Judgment.

### D. Defendants are Equitably Estopped, by their Own Conduct, from Relying on the SDA's Provisions Relating to Identification and from Denying Their Obligation to Identify Suitable Sites for Units in the Store Development Area

Defendants assert that "[n]othing in the parties' contracts required Dunkin' [the Defendants] to provide successful sites or profitable locations for the franchises."[80]  Indeed, Section 6 of the SDA purports to impose sole responsibility on Progressive for identifying locations within the Store Development Area for all units, acquiring control of the locations for all units, and for constructing and equipping a unit at each such location in accordance with the then-current standards procedures, plans and specifications utilized by ADQSR for each brand,

---

[79]   Restatement (Second) of Contracts § 302.

[80]   Motion for Summary Judgment, at 3.

form of distribution, type of unit and the location.[81]  Defendants are, however, notwithstanding the express provisions of Section 6 of the SDA, equitably estopped by their own conduct from relying on such provisions to evade responsibility for the Defendants' identification of sites, and from denying an enforceable agreement to identify sites for the Specified Units contemplated by the SDA.  Under Massachusetts law, a party may be equitably estopped from relying on an express provision of a written contract or denying the existence of an unwritten contract where the following circumstances are present:

> (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) and detriment to such person as a consequence of the act or omission.

*Boylston Development Group, Inc.* v. 22 *Boylston Street Corp.*, 591 N.E.2d 157, 163 (Mass. 1992) (quoting *Cellucci v. Sun Oil Co.*, 320 N.E.2d 919, 923 (Mass. App. 1974).  Moreover, Massachusetts courts have held that "[t]he doctrine of estoppel does not, however, required [sic] evidence of 'deceit, bad faith or actual fraud. Facts falling short of these elements may constitute conduct contrary to general principles of fair dealing and to the good conscience…'" *Edwards v. Sullivan and Cogliano Companies, Inc.*, 2002 WL 441968 (Mass.App.Div. March 15, 2002), at *3 (quoting *MacKeen v. Kasinskas*, 132 N.E.2d 732 (1956).

Ohio recognizes the doctrine of equitable estoppel as well: "equitable estoppel is not an independent cause of action, but rather is a device by which courts bind parties to presentments made upon which an opposing party relies to his detriment for the formation of a contract." *Smith v. Safe Auto Ins. Co.*, 901 N.E.2d 298, 304 (Ohio App. 6 Dist. 2008) (quoting *Cleveland v. Marblehead*, 2001 WL 279763 (Ohio App. 6 Dist. Mar. 23, 2001), at *2); "[t]he purpose of equitable estoppel is to prevent actual or constructive fraud and to promote the ends of justice." *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E.2d 630, 633 (1990); "[t]o show a prima facie case for application of equitable estoppel, a plaintiff must show that (1) the defendant made a factual misrepresentation, (2) that is misleading, (3) that induces actual reliance that is reasonable and in good faith, and (4) that causes detriment to the relying party." *Walworth v. BP*

---

[81]    SDA § 6, at 3.

*Oil Co.*, 678 N.E.2d 959, 963 (Ohio App. 8 Dist. 1996).  The representation need not be written or oral, but can arise by action or silence.  As the court stated in *Columbus Trade Exchange, Inc. v. AMCA International Corp.*:

> 1. There must be something in the nature of representation by words, acts, or silence and the representation must be a factual one known to the party at the time he makes it, or at least the circumstances must be such that he is chargeable with knowledge of them;
> 2. The representation must communicate some fact or state of affairs in a misleading way;
> 3. The representation must induce reliance by the second party, and such reliance must be reasonable under the circumstances and made in good faith;
> 4. The relying party would suffer prejudice or pecuniary disadvantage if the party whose representation was relied upon were not estopped or precluded from asserting an otherwise valid right in contradiction to his earlier representation.

*Columbus Trade Exchange, Inc. v. AMCA International Corp.*, 763 F.Supp. 946, 957. (S.D.Ohio 1991) (citing *First Federal Savings & Loan Association v. Perry's Landing, Inc.*, 463 N.E.2d 636, 646 (1983)).  And "[t]his court recognizes that nothing prevents it from exercising its equitable powers to estop a party from raising a particular claim or defense." *Anderson v. Wellman Products Group*, 812 N.E.2d 995, 1000 (Ohio App. 9 Dist. 2004).

The Defendants had identified each of the Progressive Sites no later than November of 2003, well before the date of the SDA.  The Mentor Site was selected for Progressive by Defendants' agents prior to the date of the SDA.[82]  This explains why the Mentor Site Franchise Purchase Agreement, pursuant to which Progressive agreed to purchase the franchise for the Mentor Site, is dated of even date as the SDA – it is not because Progressive ran out and identified the Mentor Site as the ink dried on the SDA.  Likewise, each of the Chardon Site and the Euclid Site were identified to Progressive by Defendants prior to the date on which Progressive agreed to acquire an interest in these sites (or cause Progressive Chardon Real Estate to do so) by lease or by purchase.[83]

The Defendants' conduct in selecting the Progressive Sites amounted to a representation by the Defendants that the Progressive Sites were "suitable," meaning that, for purposes hereof, at the time Defendants selected the Progressive Sites, the Progressive Sites were comparable to other sites selected by Defendants in the Cleveland-area market and other markets in terms of

---

[82]  Flank Affidavit ¶ 9.
[83]  *Id.*

objective criteria customarily employed by Defendants in evaluating sites on which there are to be operated combination Baskin-Robbins/Dunkin' Donuts franchises (for purposes of evaluating the suitability of the Mentor Site and the Euclid Site) and Dunkin' Donuts franchises (for purposes of evaluating the suitability of the Euclid Site) of a design similar to the Progressive Sites.[84]  These objective criteria would be expected to include, among others, with respect to a prospective site, physical characteristics thereof (soil, drainage, etc.); existing improvements thereon (and whether such improvements are reasonably adaptable for use as a franchise of the relevant brand or should be demolished, and the economic feasibility of either such alternative); available space for development and operation of a physical plant conforming to Defendants' standards and adequate parking, pedestrian traffic, and seating in accordance therewith; density and distribution of population; volume and direction of vehicular traffic, and ingress and egress therefor; applicable zoning and other land-use restrictions and the economic feasibility of compliance therewith; and proximity to other Baskin-Robbins and/or Dunkin' Donuts franchises that could reasonably be expected to compete for the same customers.

To say that the Defendants represented that the sites they selected for Progressive were suitable is not to say, in and of itself, that Defendants Baskin-Robbins and Dunkin' Donuts guaranteed or warranted profitability or success.  The parties to the SDA and each Franchise Agreement all acknowledged that success of the venture contemplated depended on a number of factors, one of which was Progressive's capability as an independent business person.  But the same parties acknowledged that profitability and success depended on other factors as well, and Progressive asserts that one of those other factors was the suitability of each of the Progressive Sites selected by Defendants.  To be clear, Defendants' representation that the Progressive Sites were suitable induced actions on the part of Progressive that materially and adversely affected Progressive's profitability and chances of success, which actions (collectively, the "***Induced Actions***") included, among others (a) entering into each of the Third Dunkin' Realty Leases and

---

[84] Progressive is not unmindful of the fact that the criteria that would be employed to evaluate the suitability of a prospective site for a Dunkin' Donuts franchise to be located in a hospital food court, for example, might differ from the criteria used to evaluate the suitability of a stand-alone unit to erected along a thoroughfare for vehicular traffic.  These differences, however, should not preclude analysis of whether the Progressive Sites compared favorably or unfavorably, on the basis of objective criteria customarily employed by Defendants for the purpose of selecting sites for units of a type similar to those that were ultimately constructed upon the Progressive Sites.

thereby agreeing to lease, from Defendant Third Dunkin' Realty, the Mentor Site and the Euclid Site, (b) entering into each of the NCB Loan Documents to which Progressive is a party and thereby borrowing money, guaranteeing the repayment of loans obtained by Progressive Chardon Real Estate, and securing the repayment of loans obtained by both Progressive and Progressive Chardon Real Estate, (c) causing Progressive Chardon Real Estate to enter into the Progressive Chardon Site Purchase Agreement and thereby agree to purchase the Chardon Site from Defendant Third Dunkin' Realty, allowing Third Dunkin' Realty to recoup its entire investment in the Chardon Site,[85] (d) entering into the Chardon Lease and thereby agreeing to lease, from Progressive Chardon Real Estate, the Chardon Site purchased from Defendant Third Dunkin' Realty, (e) causing Progressive Chardon Real Estate to enter into each of the NCB Loan Documents to which is a party and thereby borrowing money, guaranteeing the repayment of loans obtained by Progressive, and securing the repayment of loans obtained by both Progressive and Progressive Chardon Real Estate, and (f) devoting money, time, and effort to develop Defendants' brands at each of the Progressive Sites.   To allow a general disclaimer as to profitability or success to be interpreted as a disclaimer of liability for every covenant, representation, or warranty the breach of which might adversely affect profitability or success would be to allow the Defendants to breach their agreements with impunity on the very ground that the breach was detrimental.   Defendants have cited no precedent for such an approach, and, as discussed below, courts have consistently rejected it.

Defendants' representation as to the suitability of each of the Progressive Sites was a representation as to a present fact (the fact that such Progressive Site, at the time of its selection, was suitable, i.e., then met the Defendants' objective criteria) of which the Defendants had actual knowledge.   And the representation communicated the suitability of the Progressive Sites to Progressive in a misleading way.   Defendants never disclosed the adverse information in their possession about the selection of the sites in question.   At the very least, a genuine issue of material fact exists as to whether Defendants withheld information regarding the suitability of

---

[85]   See the Chardon RAR ("We [the Defendants] will sell the property [the Chardon Site] and development costs for $387,400 dollar for dollar for what we have into the project."   Pursuant to the Progressive Chardon Site Purchase Agreement, Third Dunkin'  Realty sold the Chardon Site to Progressive Chardon Real Estate for $387,400.

the sites that they selected; information that could reasonably be expected to influence Progressive to act in reliance thereon to its detriment.

In the course of her May 7, 2009 deposition, Lynne M Schroeder, a Field Marketing Manager of Defendants who was personally involved in making arrangements for the grand opening of Progressive's Euclid, Ohio store,[86] testified under oath that she had concerns about the suitability of the locations selected by Defendants for both Progressive's Mentor and Euclid stores: "[f]or Mentor and Euclid, my concern was the fact that they were so close to the lake and that you didn't have rooftops to the north.  So it's hard to market to fish." Ms. Schroeder further testified, regarding the Euclid Site, "I did not think it was right for a prototype store, given the demographics."  A copy of the relevant page of the transcript of Ms. Schroeder's testimony is attached hereto as **Exhibit JJJ**.  Evidently, Ms. Schroeder's concerns about Euclid were not enough to deter Defendants from selecting for Progressive.  On November 16, 2005, Dalpiaz sent an electronic-mail message to Tony D'Amico (identified by Defendants as an Operations Manager for all of the Defendants),[87] among others, describing a meeting of that day among Dalpiaz, Mairella, and two of Progressive's principals, Messrs. Eitan Flank and Joel Sausen.  The message, a copy of which is attached hereto as **Exhibit KKK**, explains that when Mr. Flank expressed "angst and hesitation to enter into a long term agreement with [respect to the] Euclid [Site,] Andrea [Mairella] spoke at length about initiatives that are happening[,] some success stories of other F/ee's [sic], and the positive effects for the F/ee of the organizational changes that are currently happening[.]"  Dalpiaz went on to say that "I think Joel and Eitan still have legitimate concerns . . . I look for them to take on Euclid."  The precise nature of the concerns to which Dalpiaz was referring, and the information he possessed which caused him to characterize Progressive's concerns as "legitimate," were not revealed.  Nor were Ms. Schroeder's concerns, until her testimony was obtained by Progressive in the course of this proceeding.

When the Defendants identified the Chardon Site to Progressive, the Defendants did not disclose to Progressive information that had been in their possession since no later than January,

---

[86]  The transcript of Ms. Schroeder's testimony indicates, at pages 48-49 thereof, that she personally arranged to have a traffic helicopter present at the opening of Progressive's Euclid, Ohio store, and arranged for coverage by Fox 8 News.

[87]  Defendants' Supplemental Disclosure, at 7.

2004, indicating that the Chardon Site's population density and daily traffic count were astonishingly low when compared to other sites identified by the Defendants in the Cleveland-area market.   A series of draft Resource Appropriation Requests, or "RARs" prepared by Defendants no later than January of 2004, copies of which are attached hereto as **Exhibit LLL** (such Resource Appropriation Requests, collectively, the "***Due Diligence Appropriation Requests***"), set forth population data and daily traffic counts for sites identified by Defendants in Mentor, Ohio (on Mentor Avenue, not to be confused with the Lakeshore Boulevard site on which the store operated by Progressive is situated), Warrensville, Ohio, North Olmsted, Ohio, Fairview Park, Ohio, and last, for the Chardon Site that Third Dunkin' Realty sold to Progressive Chardon Real Estate in order that Progressive could operate of a combination Baskin-Robbins/Dunkin' Donuts store thereon.   The attached RARs reveal the following comparative three-minute drive time population, daytime employment population, and daily traffic counts:

|  | Mentor Avenue | Warrensville | North Olmstead | Fairview Park | Chardon Site |
|---|---|---|---|---|---|
| Three-Minute Drive Time Population | 8,167 | 12,475 | 23,897 | 22,478 | 6,281 |
|  |  |  |  |  |  |
| Daytime Employment Population | 13,754 | 39,094 | 40,311 | 38,179 | 10,462 |
|  |  |  |  |  |  |
| Daily Traffic Count | Exceeds 36,000 | Exceeds 30,000 | Exceeds 45,000 | Exceeds 34,000 | At 17,000 |

Progressive did not receive this comparative data until after the present case was commenced.  Defendants' withholding of their own Field Marketing Manager's concerns about the Mentor Site and the Euclid Site, and the materially adverse population and traffic flow data for the Chardon Site satisfies any applicable requirement that the Defendants communicated a fact or state of affairs in a misleading way.   And Progressive has discovered evidence, in the form of a brief history of Progressive's franchises, a copy of which is attached hereto as **Exhibit MMM**, that no later than February 16, 2006 (less than a year after the unit at the Mentor Site had opened for business, and about five months after the unit at Chardon had opened), that Defendants' then Development Manager for the Cleveland-area market would not have approved of either the Mentor Site or the Chardon Site.   Whether the facts that would have caused this

Development Manager to withhold approval for the Mentor Site and the Chardon Site were known to Defendants at the time they selected these sites for Progressive is an issue of material fact that must be resolved at trial.

Evidence supports a finding that Defendants' representation as to the suitability of the sites they selected for Progressive was intended to induce, and did in fact induce, reliance on the part of Progressive.  Defendants' representation as to the suitability of the Mentor Site was intended to induce, and did in fact induce, Progressive to, among other things, execute and deliver each of the Third Dunkin' Realty Leases, the Chardon Lease (the Chardon Lease, together with the Third Dunkin' Realty Leases, collectively, the "***Leases***")  and each of the NCB Loan Documents to which Progressive is a party,  to cause Progressive Chardon Real Estate to, among other things, execute and deliver the Progressive Chardon Site Purchase Agreement and each of the NCB Loan Documents to which Progressive Chardon Real Estate is a party, and to devote money, time, and effort to operate each of the Progressive Sites on and after the date of such representation, and to continue to make payments to the Defendants on and after such date. Defendants' representation as to the suitability the Chardon Site was intended to induce, and did in fact induce, Progressive to, among other things, execute and deliver each of the Chardon Lease, the Euclid Lease,  and each of the NCB Loan Documents to which Progressive is a party, to cause Progressive Chardon Real Estate to, among other things, execute and deliver the Progressive Chardon Site Purchase Agreement and each of the NCB Loan Documents to which Progressive Chardon Real Estate is a party, and to devote money, time, and effort to operate each of the Progressive Sites on and after the date of such representation, and to continue to make payments to the Defendants on and after such date.  Defendants' representation as to the suitability of the Euclid Site was intended to induce, and did in fact induce, Progressive to, among other things, execute and deliver the Euclid Lease, and to devote money, time, and effort to operate each of the Progressive Sites on and after the date of such representation, and to continue to make payments to the Defendants on and after such date.

Progressive's reliance on the Defendants' representation was reasonable and in good faith.  Each of the 2004 and 2005 UFOCs disseminated by Defendants stated that "[w]e (the

Defendants) have acquired *experience and skill in developing and operating stores* which produce, merchandise and sell Baskin-Robbins ice cream, frozen yogurt, and other frozen products, [and] Dunkin' Donuts coffee, donuts, bagels, muffins, and related products . . . ."[88]  It was not until well after the present case had been commenced that Defendants revealed that they did not operate any stores themselves and, therefore, had no experience in store operations.[89]  The disclaimers in the SDA and the Franchise Agreements did not cover site selection.  And none of the Third Dunkin' Realty Leases and the Progressive Chardon Site Purchase Agreement contained any disclaimers as to site selection.

Progressive's reliance on the Defendants' representation regarding the suitability of the Progressive Sites was not, and is not, rendered unreasonable as a matter of law by the integration clause in the SDA, which provides, in relevant part, as follows:

> This Agreement and the documents referred to herein shall be the entire, full and complete agreement between ADQSR and Developer concerning the subject matter hereof and supersede all prior agreements, no other representation having induced Developer to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force and effect with reference to this Agreement or otherwise.[90]

Defendants concede that Massachusetts law applies to any claims arising out of the SDA,[91] and under the same principles, Massachusetts law governs any claims arising out of the Franchise Agreements.[92]  Under Massachusetts law, "a document is not integrated merely because it says so."  *Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 43 (1st Cir. 2008) (citing the Restatement (Second) of Contracts § 209 cmt. b (1981) ("Written contracts, signed by both parties, may include an explicit declaration that there are no other agreements between the parties, but such a declaration may not be conclusive.")).

---

[88] 2004 UFOC (Item 8 (captioned "Restrictions on Sources of Products and Services)),), at 1; 2005 UFOC (Item 8 (captioned "Restrictions on Sources of Products and Services)),), at 1. (emphasis added).

[89] *See* Defendants' letter of September 8, 2009, filed with the Court on the same date, at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model if fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

[90] SDA § 19, at 9.

[91] Motion for Summary Judgment, at p. 7, note 1.

[92] Each of the Franchise Agreements provides, at Section 11.4 thereof, that, except as to arbitration matters, which shall be governed by the Federal Arbitration Act and related federal judicial procedure, "[t]he resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles." Section 19 of the SDA is virtually identical.

In *Marcoux*, the plaintiffs, franchisees and operators of Shell-branded service stations commenced an action alleging the franchisor's breach of an agreement whereby the monthly rent due under the franchisee's respective real-property leases would be reduced based on the quantity, or gallonage, of gasoline sold during the immediately preceding month.  The rent subsidy was set forth in an annual notice sent to the franchisees, which provided that the subsidy could be cancelled by the franchisor on thirty days' notice.  When the defendant franchisor gave notice cancelling the rent subsidy, thereby effectively increasing the franchisees' rent, the franchisees sued, alleging representations by the franchisor that the subsidy or something like it would always exist, that the contract rent was to be disregarded, and that the cancellation provision would only be invoked in a situation such as a war or an oil embargo.  The leases, however, contained no provision with respect to the rent subsidy, and "indisputably represented that they were integrated agreements."  *Marcoux*, 524 F.3d at 43.  Applying Massachusetts law, the First Circuit Court of Appeals upheld the finding of the district court, based on parol evidence, that the leases were not integrated:

> There was evidence that the defendants said that the Subsidy was intended to be permanent, that the 30-day notice provision was only in place for cases of war or embargo, and that the Dealers could rely on the continuation of the Subsidy or something like it.   The district court therefore had ample evidence before it to determine that the lease was not an integrated agreement.

*Marcoux*, 524 F.3d at 44.  See also *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 436 n.7 (1992) ("the question of integration is one of **fact** reserved for the trial judge, whose resolution of that issue will not be reversed unless clearly erroneous." (emphasis added.)); *Antonellis v. Northgate Constr. Corp.*, 362 Mass. 847, 850-51 (1973) (even absent specific evaluation of evidence by trial judge, finding of non-integration upheld as not clearly erroneous); *Alexander v. Snell*, 424 N.E.2d 262, 264 (Mass. App. Ct. 1981); accord *Brennan v. Carvel Corp.*, 929 F.2d 801, 807 (1st Cir. 1991) ("[U]nder Massachusetts law, the determination of whether a contract is completely or partially integrated, or whether a second contract is collateral to an integrated agreement, is a question of **fact** to be decided in the first instance by the trial judge." (emphasis added.)).

None of the written agreements to which Defendant Third Dunkin' Realty is a party (specifically, the Third Dunkin' Realty Leases and the Progressive Chardon Site Purchase Agreement) contain an integration clause.  Even if the SDA did integrate the entire agreement of Defendants Baskin-Robbins and Dunkin' Donuts on the subject matter of site identification (and Progressive contends that it did not), Third Dunkin' Realty was not an intended or third-party beneficiary of any of the provisions in the SDA (or the Franchise Agreements, for that matter) and could not invoke the integration clause of the SDA to establish that Progressive's reliance on Third Dunkin' Realty's representation regarding the suitability of the Progressive Sites was unreasonable.  The express language of the SDA's integration clause bears this out; it only purports to integrate, together with the documents referred to therein the entire, full and complete agreement "between ADQSR and Developer" concerning the subject matter of the SDA.  The term "ADQSR" as defined in the SDA does not include Defendant Third Dunkin' Realty.

As the Defendants concede, in deciding whether or not to grant a motion for summary judgment, "[t]he Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmovant."[93] And the Defendants' identification of the Progressive Sites no later than November of 2003, the Defendants' selection of the Mentor Site for Progressive's first Specified Unit before the SDA was signed, and the Defendants' selection of the Chardon and Euclid Sites for Progressive after the date of the SDA, create compelling evidence that the SDA is not integrated on the subject of site identification, the entire process of which occurred, consistent with the parties' expectations, contrary to the express provisions of the written SDA.

The Defendants' actions in identifying the Progressive Sites, and their withholding of part of what they believed or knew about these sites, was intended to induce Progressive to take the Induced Actions.  Progressive so acted to its detriment. Progressive will suffer prejudice and pecuniary disadvantage if Defendants were not estopped or precluded from asserting the provisions of the SDA that purport to impose on Progressive the sole responsibility for identifying sites for units within the Store Development Area in contradiction to Defendants' representation, arising from their own conduct in selecting the Progressive Sites, that the sites

---

[93]    Motion for Summary Judgment, at 6 (citing Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

selected by Defendants were suitable. Unlike Defendants, which by their own admission do not operate any Baskin-Robbins/Dunkin Donuts Stores, Progressive has been operating the Baskin-Robbins/Dunkin' Donuts franchise at the Mentor Site since its opening in February of 2005; Progressive has operated a like franchise at the Chardon Site since August of 2005, and has operated a Dunkin' Donuts franchise at the Euclid Site since February 2006.  By the time the Amended Complaint was filed in October of 2007, it had become apparent to Progressive's management that poor location in terms of population density and traffic flow, as opposed to the manner in which Progressive operated its franchises, would indefinitely impair the profitability of these locations that the Defendants had identified for Progressive.

Regardless of whether Massachusetts or Ohio law were to be applied, the facts of the present case equitably estop Defendants from relying on the provisions of the SDA that purport to impose responsibility for site selection solely on Progressive, and further estop Defendants from denying an obligation to identify sites within the Store Development Area.  Although application of the doctrine of equitable estoppel, as applied by Massachusetts and Ohio courts, does not require a showing of "motive" on the part of the party whose conduct, or silence, as the case may be, gives rise to a representation that estops that party from asserting an otherwise valid right, it is nevertheless useful to understand why the Defendants undertook to identify the Progressive Sites notwithstanding the SDA's provisions to the contrary.  A press release issued in February, 2006, announcing the introduction of Defendants' new store design and menu at the Euclid Site, is instructive. A copy of the press release is attached hereto as **Exhibit NNN**.  The release explains that Progressive's Euclid store, with its contemporary features and modernized appearance, will provide an image of what future Dunkin' Donuts store will look like "[a]s we (the Defendants) continue our aggressive expansion plans in existing and new markets ultimately tripling the number of Dunkin Donuts stores nationwide to 15,000 by 2025."  The release goes on to explain that "[i]n Cleveland, *we have already opened close to 40 new stores and our expansion continues*."  (Emphasis added.)

Exactly when the Defendants began to implement their expansion plan in Cleveland is not clear from the press release.  Even if the forty stores referred to therein include the fourteen

stores opened by Circle K,[94] which is not clear, the number is still substantial.  As evidenced by the May 4, 2006 message of Ryan Humphrey, a then Franchise Services Manager of Defendants, to certain Cleveland-area franchisees, a copy of which message is attached hereto as **Exhibit OOO**, even after Circle K stopped developing Defendants' stores in Cleveland,[95] the Defendants still planned on opening fifteen stores per year beginning in 2008.  Such an aggressive growth plan could not be accomplished on schedule if franchisees, especially new franchisees such as Progressive, identified trade areas, collected their own demographic data thereon, independently analyzed the data, identified sites, negotiated the terms of sales or leases to acquire control of the sites, lined up necessary contractors, obtained necessary certifications and approvals, arranged for financing, and then submitted the whole package to Defendants for approval.  So the Defendants did it themselves while their standard-form SDA, perhaps an artifact from an earlier period when growth was allowed to occur at a more tempered pace, continued to pretend otherwise.  By December, 2003, the Defendants had identified and were simultaneously working on no less than a dozen store locations in the Cleveland-area market, as evidenced by **Exhibit PPP** hereto.  As evidenced by the Due Diligence Appropriation Requests, the Defendants' investment of $75,000 per site in due diligence alone in the sites that they identified was too significant to allow Defendants to pass the opportunity to lease (in the case of the Mentor Site and the Euclid Site) or sell (in the case of the Chardon Site) the Progressive Sties to Progressive and Progressive Chardon Real Estate.

### E.      Defendants Baskin-Robbins and Dunkin' Donuts Agreed, by their Own Conduct, to Modify the SDA so as to Assume, together with Defendant Third Dunkin' Realty, Sole Responsibility for Site Identification

Written contracts may be modified orally or by conduct (2-7 Corbin on Contracts § 7.14). In the words of Mr. Justice Cardozo, "whenever two men contract, no limitation self-imposed can destroy their power to contract again" *Beatty v. Geggenheim Exploration Co*. (119) 225 N.Y. 380, 122 N.E. 378, 381.  These words are echoed in the Restatement (Second) of Contracts,

---

[94]    Circle K opened a total fourteen stores in Cleveland, out of an initially planned sixty.  Of these fourteen, only two were stand-alone units; the balance were located within Circle K convenience stores or were attached to gas stations.  See Defendants' Response to Plaintiff's List of Circle K Documents and Brief in Support, filed with the Court by Defendants on October 9, 2009, at 3.

[95]    Circle K entered into its development agreement with one or more of the Defendants in 2004, and had pulled out of the agreement by 2006.  *Id*., at 3,4.

which states that "contracting parties cannot today restrict their power to contract with each other tomorrow." Restatement (Second) of Contracts § 283 comment b.

At common law, even a fully-integrated contract can be modified by subsequent agreement. As a leading authority has put it:

> Because the parol evidence rule applies only to precontractual negotiations, it does not bar evidence of subsequent negotiations to show modification of the contract. Even a completely integrated agreement can therefore be modified or rescinded orally.

*E. Allan Farnsworth, Contracts* 7.6 (2d ed. 1990). The common law of Massachusetts, which governs the SDA, incorporates this principle. Thus, "[t]he parol evidence rule has no application to the situation . . . where it could be found that a new oral contract was entered into between the parties which superseded the original contract." *L.W. Severance & Sons, Inc. v. Angley*, 125 N.E.2d 415, 420 (Mass. 1955). Even a fully integrated contract containing a clause stating that subsequent modifications must be in writing may, under appropriate circumstances and with appropriate proof, be modified by a subsequent oral agreement. See *Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017, 1022 (Mass. 1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract."); cf. *Farnsworth*, *supra*, 7.6 ("Can the parties, by inserting a no-oral-modification clause, effectively permit only written modifications? The common-law answer has been that they cannot."); *Wagner v. Graziano Const. Co.*, 136 A.2d 82, 83 (Pa. 1957) ("The most ironclad written contract can always be cut into by the acetylene torch of parol modification supported by adequate proof. . . . The hand that pens a writing may not gag the mouths of the assenting parties."); *Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41, 47 (1991) ("where the parties' conduct after signing the written agreement conforms with a previous oral modification, rather than with the terms of the written agreement, it may reasonably be inferred that the parties have agreed after the signing to be bound by the or- al modification of the written contract, ratifying it, in effect, by their conduct.").

As explained above, the SDA is neither fully-integrated nor ironclad on the subject matter of site identification. Even by its express terms, the SDA's integration clause only purports to supersede "prior agreements" as opposed to those which are contemporaneous or subsequent.

And the SDA's stipulation that "[n]o amendment, change, or other variance from this Agreement shall be binding on either party unless executed in writing,"[96] relied upon by Defendants in the Motion for Summary Judgment[97] is ineffective as a matter of law.  Under Massachusetts law, modification of a written contract is not limited to oral modification – modification may occur by conduct as well: "Mutual agreement on modification of the requirement of a writing may . . . 'be inferred from the conduct of the parties and from the attendant circumstances' of the instant [particular] case" *Boersner*, 597 N.E.2d at 1022 (citing *First Pa. Mortgage Trust v. Dorchester Sav. Bank,* 395 Mass. 614, 626, 481 N.E.2d 1132 (1985); and quoting *Flynn v. Wallace, 359 Mass.* 711, 715 (1971)).

It is also worth noting that, under Massachusetts law, the doctrine of consideration does not necessarily bar enforcement of a subsequent oral contract modification. "Modifications . . . have long been recognized in law as valid, without additional consideration, even when based on oral agreements modifying executory written contracts." *Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co.*, 452 N.E.2d 308, 314 (Mass. App. Ct.), rev. denied, 454 N.E.2d 1276 (1983). "The contract, when modified by the subsequent oral agreement, is substituted for the contract as originally made, and the original consideration attaches to and supports the modified contract." *Thomas v. Barnes*, 31 N.E. 683, 684 (Mass. 1892).

The Defendants' self-identification of all of the Progressive Sites is well documented in the record.  The record also contains evidence (see, for example, **Exhibit GG** hereto) of the understanding and agreement of the parties that the Defendants, having identified all of the Progressive Sites prior to the date of the SDA, would continue, on and after the date of the SDA, to select in good faith those sites within the Store Development Area for which Progressive in particular would be granted franchises.  At the very least, a genuine issue of material fact exists as to whether the SDA was modified by the conduct of the parties thereto so as to impose on Defendants Baskin-Robbins' and Dunkin' Donuts the obligation to identify suitable sites within the Store Development Area.  Because Defendant Dunkin' Donuts is not a party to the SDA, its

---

[96]    SDA, at p. 9, § 18.
[97]    Motion for Summary Judgment, at 2.

obligation to identify suitable sites within the Store Development Area arises wholly outside of the SDA.

**F.  Judicial Precedent Does Not Support the Granting of Defendants' Motion for Summary Judgment**

In an effort to find some support for their argument that they are entitled to summary judgment as a matter of law, Defendants point to several cases in which courts have addressed franchisee claims that they were promised profits in the face of franchise agreements that expressly disclaimed any franchisor representation as to profits and that were integrated as to the subject matter of representations regarding profitability.[98]  On the premise of these cases, the Defendants then conclude: "the disclaimer provisions and integration clauses in the SDA bar such claims [by a franchisee that it was promised a profitable business] even if the record showed (and it does not) that Dunkin' had made promises to Progressive concerning the success of the shops."[99]

The Defendants' argument appears to be that if a contract sets forth a general disclaimer of any representations by a party as to profitability or success of a business venture, then no cause of action may be maintained against such party (or any of its affiliates, whether or not such affiliates are intended or third-party beneficiaries of the contract) for any breach of any obligation by such party (or by any of its affiliates) arising under that contract or any other contracts between such party (or any of its affiliates) and a plaintiff who would otherwise be entitled to assert such claims, as long as the breaches in question adversely affect the plaintiff's profits or chances of success.  This is not the law in Massachusetts.

*Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y. 1989), cited by Defendants in the Motion for Summary Judgment,[100] sets forth the longstanding rule established by Massachusetts courts "that a party may not contract out of fraud in cases involving the use of *general* or *ambiguous* disclaimers and integration clauses."  (Emphasis in original.)  *Rosenberg*, at 1153 (citing *Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941), and *Connelly v.*

---

[98]  Motion for Summary Judgment, at 7 ("Indeed, courts have consistently dismissed claims by franchisees who allege they were promised profitable business by franchisors in the face of contractual language that disclaimed any guarantee of success.") (citing." Citing Mecham v. United Consumers Club Franchising Corp., 312 F.3d 909, 912 (8th Cir. 2002)).

[99]  Motion for Summary Judgment, at 7.

[100]  Motion for Summary Judgment, at 7.

*Fellsway Motor Mart, Inc.*, 270 Mass. 386, 170 N.E. 467 (1930)).  Thus, in *Rosenberg*, the United States District Court for the Southern District of New York recognized that, under Massachusetts law, it is only where "a disclaimer or integration clause is specific and clear, [that] communications outside the four corners of the contract may not provide the basis for a fraud claim." *Id.*

*Rosenberg* involved a claim by a franchisee that the defendant franchisor had fraudulently induced the franchisee to enter into a franchise agreement for a Haagen-Dazs ice cream shop by, among other things, stating in a letter that the average gross sales of Haagen-Dazs Shops was $220,000-260,000, and that the average gross pre-tax profit was 29-35%, after writing another franchisee, only nine months earlier, that the average gross sales of Haagen-Dazs Shops was only $200,000-250,000, and that the average net pre-tax profit was only 20-30%. *Rosenberg*, at 1152.  The plaintiff further alleged that the defendant franchisor had assured the plaintiff that a number of flavors of ice cream would be marketed exclusively through the franchised shops, without disclosing that the defendant planned to sell virtually every flavor in prepackaged pints through supermarkets and convenience stores.  *Id.*  The franchise agreement in *Rosenberg* contained the following provision:

> Franchisee agrees that no claims of success or failure have been made to him prior to signing this Franchise; and that he understands all the terms and conditions of this Franchise. This Franchise contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any other previous contracts are hereby cancelled and terminated, and no representations or warranties are made or implied, except as specifically set forth herein. This Franchise cannot be changed or terminated orally.

Before executing either franchise agreement, the plaintiff in *Rosenberg* received and carefully reviewed an offering circular which the plaintiff acknowledged in his affidavit to have been "a major factor in the plaintiffs' decision to enter into a franchise agreement . . . we relied on the provisions of the disclosure statement . . . in making our determination to enter into said franchise agreement." *Id.*  The offering circular contained the following language:

> No representations or statements of actual, or average, or projected, or forecasted *sales, profits or earnings*, (nor representations of actual or average, or projected, or forecasted *sales, profits or earnings*) are made to franchisees with respect to Haagen-Dazs Shoppes. Neither franchisor's sales personnel nor any employee or officer of the franchisor is authorized to make any claims or statements as to the

> *earnings, sales, or profits* or prospects or *chances of success* that any franchisee can expect or that present or past franchisees have had. The franchisor specifically instructs its sales personnel, agents, employees and officers that they are not permitted to make such claims or statements as to the *earnings, sales, or profits* or the prospects or chances of success, *nor are they authorized to represent or estimate dollar figures* as to given Haagen-Dazs Shoppe operations. The franchisor recommends that applicants for Haagen-Dazs Franchises make their own investigation and determine whether or not the Shoppes are profitable. The franchisor will not be bound by allegations of any unauthorized representations as to *earnings, sales, profits* or prospects or chances of success.

*Rosenberg*, 1152-53. (Emphasis Added.) Based on the detailed, explicit disclaimers set forth in the franchise agreement and the offering circular, the court in *Rosenberg* found that the plaintiff's fraud claim, based on the defendant franchisor's alleged misrepresentations regarding sales and profits, could not survive the defendant's motion for summary judgment. And the plaintiff's admission in his deposition that he knew, before opening his store, that pints were being sold in places other than franchise shops, coupled with a provision in the franchise agreement that expressly permitted the franchisor to distribute all products identified by the Haagen-Dazs trademark through not only franchise stores, but also through supermarkets and convenience stores, proved fatal to the franchisee's claim that that it had been assured by the franchisor that a number of flavors of ice cream would be marketed exclusively through the franchised shops. *Rosenberg* at 1157. Although the court made no specific finding as to whether the franchise agreement in *Rosenberg* was integrated in whole or in part, it is apparent from the court's references to "integration clauses and disclaimers" that the court found the franchise agreement to be integrated, at least as to the subject matter of the franchisor's representations regarding earnings, profits, and sales. *Rosenberg*, at 1153.

*Rosenberg* is readily distinguished from the case at bar. The plaintiffs in Rosenberg claimed that they were mislead by representations of the Defendant franchisor as to sales and profits; something that was explicitly disclaimed by the franchisor. As explained above, the SDA only disclaimed certain representations and warranties by Baskin-Robbins and Dunkin' Donuts with respect to the suitability or potential of locations which they approved, and not those which the Defendants selected.[101] The Defendants' conduct in selecting the Progressive Sites amounted to a representation by the Defendants that the sites that they selected were suitable

---

[101]   SDA § 22, at 10.

based on the objective criteria customarily employed by Defendants in evaluating sites.  This representation was intended to induce, and did in fact induce, Progressive to, among other things, take the Induced Actions.

Although the SDA contains an acknowledgement by Progressive that it did not enter into the SDA in reliance on any representation as to profits which Progressive in particular might be expected to realize, and that no one had made any other representation not expressly set forth in the SDA to induce Progressive to execute the SDA and accept the license thereby conferred,[102] none of the SDA, the Franchise Purchase Agreements, the Franchise Agreements, the Leases, and the Progressive Chardon Site Purchase Agreement  disclaim any representations or warranties by Defendants as to profits, sales, success, or anything else to induce Progressive to enter, or cause Progressive Chardon Real Estate to enter, any one or more of the Leases, the Progressive Chardon Site Purchase Agreement, and the NCB Loan Documents.  And unlike the franchise agreement as issue in *Rosenberg*, the SDA is not integrated, at least as to the matter of site selection.

Defendants also rely on *Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327 (table), 1996 WL 346607, at *4 (10th Cir. June 25, 1996) to support their assertion that "courts have consistently dismissed claims by franchisees who allege they were promised profitable business by franchisors in the face of contractual language that disclaimed any guarantee of success."[103]  The claims of the plaintiff in *Konold* were, in fact, not dismissed at all – the case was fully tried on its merits.  In *Konold*, a diversity case governed by Colorado law, the plaintiff sought rescission of a franchise agreement into which he allegedly was fraudulently induced to enter by defendants' concealment of material facts.  After a bench trial, the district court concluded that the plaintiff had failed to prove the essential elements of his fraudulent concealment claim and entered judgment in favor of defendants.  On appeal, the Tenth Circuit Court of Appeals considered the plaintiff's argument that, under Colorado law, the district court should not have even considered the disclaimers in the offering circular and the franchise agreement in determining whether the

---

102   SDA § 19, at 9-10.
103   Motion for Summary Judgment, at 6.

plaintiff would reasonably expect disclosure of the allegedly omitted information.  *Konold*, at *3.
The court of appeals stated:

> The district court did not suggest that the disclaimers barred plaintiff from brining a claim, only that they were relevant in determining the reasonableness of plaintiff's expectations.  Plaintiff has cited no cases, and we have found none, suggesting that, under Colorado law, a trier of fact cannot consider the existence of written and oral disclaimers in determining whether a party's conduct or expectations were reasonable.  Other courts have considered similar disclaimers in franchise materials in determining whether a party's reliance on a representation was reasonable.

*Konold*, at *4( citing *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir.1994)).  Reviewing the district court's findings of fact for clear error, the appellate court in *Konold* could not conclude from the facts and circumstances presented in the record that the district court had so erred.  The court of appeals appears to have been nevertheless troubled by the conduct of the defendants (including, among others, Baskin-Robbins USA, Inc.), whose provision of information the court characterized as "certainly less than forthcoming."  *Id.*

In fact, with one exception, all of the cases relied upon by Defendants in support of their assertion (that courts consistently dismiss franchisee suits based on franchisor promises of success) involve claims by franchisees that they were induced to invest in franchises in reliance on a franchisor's representations as to profits notwithstanding *specific and clear* disclaimers, set forth in fully integrated agreements, of any representations as to profits by the franchisor.  In such cases, courts found reliance on the alleged representations to be unreasonable under the facts and circumstances.  See *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*, 31 F.3d 573, 576 (7th Cir.1994) (reliance unreasonable where plaintiff had signed a release acknowledging that the defendant franchisor "has not made any statements regarding the profitability of any restaurant to be operated by franchisee."); See *Hall v. Burger King Corp.*, 912 F. Supp. 1509, 1529 (S.D. Fla. 1995) (plaintiffs could not have justifiably relied on alleged misrepresentations by franchisor where franchise agreement unambiguously provided that plaintiffs were not entering into the same in reliance upon any representation as to the profits and/or sale volume which the franchisee might be expected to realize); *Mecham v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 912 (8th Cir. 2002) (reliance unreasonable

where franchise agreement required the franchisee to affirm he had not received or relied on any express or implied warranty or guaranty about the revenue, profit or success of the franchise).

The exception is *Morrison v. Back Yard Burgers, Inc.*, 91 F.3d 1184, 1185-86 (8th Cir. 1996), which stands for the general proposition that, under Arkansas law, an action for fraud or deceit may not be predicated on representations relating solely to future events because such representations are considered to be mere opinion, rather than matters of accurate knowledge as would be a statement of fact.   Thus, the plaintiff franchisee's claim that he was fraudulent induced to enter into a franchise agreement by another franchisee's representations as to sales failed to state a cause of action under Arkansas fraud theories because the representation was considered to have been opinion, rather than fact.   *Id*.   The *Morrison* court enunciated an exception to the general proposition: "a statement of future events may constitute fraud if the statement is false and the person making the representation or prediction knows it to be false at the time it is made" *Morrison*, at 1187 (citing *Delta School of Commerce, Inc. v. Wood,* 298 Ark. at 199-201, 766 S.W.2d 424, 426-27 (1989).

Given the facts of the case at bar, in particular the failure of the agreements among the parties to disclaim the Defendants' representations related to the suitability of the sites they selected, the absence of any disclaimers whatsoever for the benefit of Defendant Third Dunkin' Realty, the failure of the agreements among the parties to disclaim the Defendants' representations for the purpose of inducing Progressive to, among other things, execute and deliver each of the Leases and each of the NCB Loan Documents to which Progressive is a party, and to cause Progressive Chardon Real Estate to, among other things, execute and deliver the Progressive Chardon Site Purchase Agreement and each of the NCB Loan Documents to which Progressive Chardon Real Estate is a party, and the failure of the SDA to integrate the agreement of the parties thereto as to site selection, the cases cited by Defendants do not support the Defendants' request to grant the Motion for Summary Judgment.

### G.    The Provisions of the SDA do Not Support the Granting of Defendants' Motion for Summary Judgment

Section 1A of the SDA entitled and required, Progressive to develop six Specified Units. Under the Development Schedule, one Specified Unit was to be opened on or before April 25,

2005, and one additional Specified Unit was to be opened on or before the first day of each January and June thereafter until June 1, 2008.  The SDA also entitled, but did not obligate, Progressive to develop, following timely completion of the Development Schedule and during the remainder of the four-year term of the SDA, such Additional Units as Progressive deemed advisable.  Progressive's right[104] and license to develop Specified Units and Additional Units within the Store Development Area constitutes that primary benefit conferred upon Progressive by the SDA.  Notwithstanding this, Defendants assert that they "had no obligation under the SDA to allow Progressive to develop more stores and therefore no liability for preventing that from happening."[105]

The only conceivable basis that Defendants would have for taking such a position is that the SDA had been terminated in accordance with its terms, and absent default by Progressive under the SDA, Defendants Baskin-Robbins and Dunkin' Donuts would have no right to terminate the SDA.[106]  And Progressive denies that it has ever defaulted under the SDA.

Defendants set forth, in the Motion for Summary Judgment, two conclusory statements to support their argument that they were entitled to prevent Progressive from developing Specified Units and Additional Units under the SDA without liability on the part of Defendants for having done so.  The first is that, at some unspecified time, Defendants placed Progressive on "development hold," that is, suspended Progressive's right to develop Specified Units and Additional Units under the SDA.  Defendants argue that they were entitled to suspend Progressive's rights because, Defendants allege, Progressive failed to pay amounts owing under the SDA and the Franchise Agreements, and failed to comply with operational requirements

---

[104]    SDA § 1 ("Subject to the terms and conditions contained herein, ADQSR [Defendants Baskin-Robbins and Dunkin' Donuts] hereby grants to Developer [Progressive] and Developer hereby accepts the *right* and obligation to develop within the Store Development Area a specified number of units during the term of this Agreement." (emphasis[Emphasis added]..]  *See also* Motion for Summary Judgment, at 1-2 ("On September 1, 2004, Progressive signed a Multiple Unit Store Development Agreement (SDA) under which it was granted the right to develop and open six stores on the east side of Cleveland between April 2005.").

[105]    Motion for Summary Judgment, at 8.

[106]    Except for the provisions of § 11 of the SDA, which expressly condition the right of Defendants Baskin-Robbins and Dunkin' Donuts to terminate the SDA upon default by Progressive and compliance by such Defendants with the notice provisions thereof, Defendants have failed to identify any right arising by contract, operation of law or otherwise that would entitle any one or more of the Defendants to prevent Progressive from developing Specified Units and Additional Units pursuant to the SDA even if Progressive were to be in default thereunder (which it is not).  Because none of the insolvency-related events described in § 10 of the SDA have occurred, no termination of the SDA would have occurred thereunder, even if such § 10 were to be enforceable as written. And Defendant Third Dunkin' Realty has no rights at all under the SDA, whether or not Progressive were to default thereunder.

under the Franchise Agreements.[107]   The second is that the Defendants terminated the SDA. Defendants again assert that they were entitled to terminate the SDA by reason of Progressive's alleged failure to make payments under the SDA.[108]   Interestingly, Defendants assert no operational non-compliance as a basis for termination of the SDA, apparently recanting their earlier position that Progressive had failed to comply with operational requirements under the Franchise Agreements.

Putting aside for the moment the fact that the Defendants have failed to point to any provision of the SDA, the Franchise Agreements, any other agreements, or any applicable law, statutory or common, that would entitle any one or more of the Defendants to suspend Progressive's rights under the SDA prior to its termination, Progressive disputes that it was ever in default of the SDA or the Franchise Agreements, whether for non-payment, operational failures, or otherwise.

The record contains substantial evidence of Progressive's compliance with operational requirements.  When asked during her May 20, 2009 deposition whether Progressive was, at the time Progressive's Euclid, Ohio store opened, meeting minimum standards at its Mentor and Euclid Stores, Mairella testified, under oath, that Progressive was "meeting minimum standards."[109]  A copy of the relevant page of the transcript of Ms. Marcella's testimony is attached hereto as **Exhibit QQQ**.  And during his May 7, 2009 deposition, Thomas J. Stratton, an Operations Manager of Defendants, when asked how he would rate Progressive as an operator compared with other Baskin-Robbins and Dunkin' Donuts franchisees, testified under oath, "[r]ight now, today, probably middle of the pack."[110]   At the same time, Mr. Stratton testified

---

[107]   Motion for Summary Judgment, at 2 ("The fourth store was scheduled to open by January 1, 2007; however, it was never opened because Dunkin' [defined, for purposes of the Motion for Summary Judgment, as all of the Defendants] placed Progressive on development hold due to Progressive's frequent failures to pay royalties, advertising, and rent fees and its other operational problems.)".  *See also id*. at 8 ("Dunkin' was free to prevent Progressive from opening any other stores until it solved its operating issues and became current on its payment obligations.").

[108]   Motion for Summary Judgment, at 5 ("Progressive failed to make payments totaling $100,000 that were due to Dunkin' Donuts under the SDA.").  *See also id*. at 8, ("Nor was it a breach for Dunkin' to terminate the SDA for nonpayment of the remaining portion of fees it owed under that agreement. As explained above, Progressive was obligated to make these payments regardless of whether it opened any the locations identified by the SDA. Thus, when Progressive failed to pay all of the fees it owed, Dunkin' was within its rights to issue a notice of default and to terminate the SDA after the cure period expired.").

[109]   Transcript of the May 20, 2009 deposition of Andrea D. Mairella, at 44, lines 18, 19.

[110]   Transcript of the May 7, 2009 deposition of Thomas J. Stratton, at 14, line 2.

regarding Progressive: "they've been doing a lot of good work, constantly improving,"[111] and, "my experience with them (Progressive) has been they've been constantly trying to improve and have been improving.  Recently they even – in the service end of things, recently they won a trophy for having the best service in the market."[112]  A copy of the relevant page of the transcript of Mr. Stratton's testimony is attached hereto as **Exhibit RRR**.  Defendants have failed to demonstrate that Progressive failed to comply with operational requirements of the Franchise Agreements.

The same can be said of Defendants' argument that they were entitled to suspend Progressive's right to develop Specified Units and Additional Units under the SDA, and to terminate the SDA outright by reason of Progressive's non-payment of amounts owing under the SDA.  As explained above, Massachusetts law, which governs the SDA, allows for modification of a contract orally and by conduct, notwithstanding any provision in the contract to the effect that the contract integrates the entire agreement of the parties and can be modified only in writing.  The parties to the SDA modified the SDA by their conduct on a number of occasions and on a number of matters.

In addition to modifying the SDA to place responsibility for site identification thereunder on Defendants Baskin-Robbins and Dunkin' Donuts as described above,[113] the parties modified the SDA by conduct in other respects as well.  The Development Schedule, for example, unambiguously provides that all six (6) of the Specified Units that Progressive is required to develop must be combination Baskin-Robbins/Dunkin' Donuts franchises.  Yet, the Euclid Store is only a Dunkin' Donuts franchise.  Although Progressive and Defendant Dunkin' Donuts agreed in Section 13 of the Euclid Franchise Purchase Agreement that this single-franchise unit would count toward the units Progressive was required to develop under the SDA, the SDA was never modified in writing to reflect the elimination of a combination Baskin/Robbins/Dunkin' Donuts unit.  Defendant Baskin-Robbins, which did not sign, and is not a party to or a beneficiary of the Euclid Franchise Purchase Agreement, never complained, but rather

---

[111]   *Id*., at 13, lines 2-,3.
[112]   *Id*., at 15, lines 7–12.
[113]   Because Defendant Third Dunkin' Realty is neither a party to nor a beneficiary of the SDA, its assumption of responsibility for site identification was achieved other than by modification of the SDA.

acquiesced and thereby assented to exclusion of its franchise from one of the Specified Units to be developed pursuant to the SDA.

The parties to the SDA also modified its provisions for the payment of initial franchise fees by conduct as well.  Defendants admit as much.  On or about September 10, 2007, Defendants, through their counsel, Nancy L. Sponseller, Esq., sent a Notice of Default & Notice to Cure (such notice, the "**SDA Cure Notice**") stating "[t]he amount of money you (Progressive) owe pursuant to the SDA but have failed to pay is $100,000.00.  This amount consists of three payments: $40,000 owed on July 1, 2005; $35,000 owed on July 1, 2006; and $25,000 also owed on July 1, 2006."  The amounts owing, and the respective due dates thereof, set forth in SDA Cure Notice, a copy of which is attached hereto as **Exhibit SSS**, conflict with the amounts and due dates set forth on Exhibit B of the SDA, which required, prior to modification by the parties thereto, payment of $120,000 on the date of execution of the SDA, and $60,000 on each of July 1, 2005 and July 1, 2006.  Yet the record contains no evidence of any written modification of the SDA that would amend the payment schedule set forth on Exhibit B thereto.

The SDA was, in fact, modified to suspend payment of the balance, if any, owing by Progressive thereunder pending discussion by the parties of a possible resolution of Progressive's complaints regarding the sites selected by Defendants.  That these discussions were in progress in January of 2007, and that payments under the SDA were suspended by agreement in connection with the same, is evidenced by a January 30, 2007 letter, a copy of which is attached hereto as **Exhibit TTT**, addressed by Daniel A. Cord, Esq. Progressive's General Counsel, to Nancy L. Sponseller, Esq., counsel to Defendants.  Neither Ms. Sponseller, nor any of Defendants' representatives, a number of which (including Ms. Donna Szegda, Mr. Richard Reuter, and Mr. Ryan Humphrey) received copies of Mr. Cord's letter, ever disputed his statement that "Dunkin' Donuts would suspend Progressive's payment obligations under the SDA until the discussions between the parties had been completed."  By message of June 14, 2007, a copy of which is attached hereto as **Exhibit UUU**, Larry Harris, Defendants' then Development Manager for the Cleveland-area market, confirmed that these discussions were

ongoing as of that date, and that these discussions involved, in particular, modification of the Store Development Area.

Defendants' statement that "[t]he fee provisions contained in the SDA are unambiguous"[114] is true only if the fee provisions of Section 2.A (which provides, in relevant part that "Initial Franchise Fees shall be paid to ADQSR in full and without reduction or offset even if Developer, for any reason, fails to open any or all of the Specified Units to which the Initial Franchise Fees relate") are read so as to be consistent with Section 3.C, which provides that "Developer's liability to ADQSR for failure to open units in accordance with the Development Schedule shall be limited" as set forth therein.    Section 3.C.(1) of the SDA provides, in relevant part, that if Progressive fails to open Specified Units in accordance with the Development Schedule, and if Progressive "*has not, in the opinion of ADQSR, used best efforts to diligently pursue development of the Specified Units in accordance with the Development Schedule*," (emphasis added) then "ADQSR shall have the right to terminate this Agreement by thirty (30) days written notice to Developer, to retain all payments made by Developer to ADQSR and to recover from Developer all payments due through the date of termination, if any, as liquidated damages."

Section 3.C.(2) of the SDA provides, in relevant part, however, that if "*in ADQSR's opinion, [Developer] has used best efforts to diligently pursue development of the Specified Units in accordance with the Development Schedule*, and if Developer is otherwise in compliance with this Agreement and the Franchise and Ancillary Agreements for each unit[,]" (emphasis added) then

> ADQSR will offer Developer one or more alternatives with respect to this Agreement.    Such alternatives may include extending the term of the Development Schedule, changing the number or mix of Specified Units, modifying the Required Opening Dates, altering the size of the Store Development Area, or such other alternative as ADQSR, in its sole and absolute discretion, determines to be appropriate under the circumstances.

The June 14, 2007 message of Mr. Harris evidences the fact that the parties to the SDA were proceeding under Section 3.C.(2) of the SDA, not Section 3.C.(1).    This is because, as Defendants admit, Defendants had placed Progressive on development hold.    It was Defendants'

---

[114]    Motion for Summary Judgment, at 9.

development hold, and not a lack of Progressive's best efforts, that prevented Progressive from opening its fourth Specified Unit by January 1, 2007 as required by the Development Schedule of the SDA.  Progressive had contended, and still contends, that there was no basis, by contract, operation of law, or otherwise for the development hold, and that Progressive was in full compliance with the SDA, the Franchise Agreements, and the Ancillary Agreements (within the meaning of the SDA).  Thus, the discussions among the parties to the SDA that were taking place in January of 2007, and that continued through June of 2007, focused on lifting the development hold, having Progressive take over identification of sites, and implementing one or more of the alternatives described in Section 3.C.(2) of the SDA, which, significantly, *contains no provision for liquidated damages or other payment of Initial Franchise Fees*.  It is also noteworthy that Section 3.C.(2) of the SDA, unlike Section 3.C.(1), contains no provision permitting Defendants party to the SDA to terminate the SDA.  And Section 3.C of the SDA, by its express terms, *limits* Progressive's liability, under Section 2.A and otherwise, for failure to open units in accordance with the Development Schedule.  In June of 2004, Progressive fully expected the development hold to be lifted for once and for all.

At the time the SDA was terminated, Progressive did not owe any Initial Franchise Fees under the SDA.  To read Section 2A so as to permit recover Initial Franchise Fees related to unopened Specified Units when no Initial Franchisees Fees related to such units would be recoverable under Section 3.C would create a patent ambiguity in the SDA.  And in that event, Massachusetts law would require the ambiguity to be construed against the Defendants.  "As a general rule, a writing is construed against the author of the doubtful language, if the circumstances surrounding its use and the ordinary meaning of the words do not indicate the intended meaning of the language." *Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977)(internal citations omitted).  "The author of the ambiguous term is held to any reasonable interpretation attributed to that term which is relied on by the other party." *Id.* at 690-91.  Because Defendants Baskin-Robbins and Dunkin' Donuts breached the SDA by suspending Progressive's development rights thereunder, and this breach prevented Progressive from developing additional stores in accordance with the SDA, no Initial Franchise Fees were

thereafter owed by Progressive unless and until Defendants' breach was cured to Progressive's satisfaction.

Progressive also questions Defendants' claim that the unpaid balance of Initial Development Fees that would have been owing under the SDA, in the absence of Defendants' breach, is $100,000.  It is undisputed that Progressive timely paid $120,000 of Initial Franchise Fees on execution of the SDA and an additional $20,000 of Initial Franchise Fees thereafter. Progressive also timely paid Defendants Baskin-Robbins and Dunkin' Donuts $312,060 pursuant to the Mentor Franchise Purchase Agreement for "the *franchise* located at 7742 Lakeshore Boulevard, Mentor, Ohio  44060  (PC #340982)  (the "Franchise") including all of the Transferor's right, title and interest in the signage and equipment at said premises, . . . ."[115] Although the $312,060 paid by Progressive under the Mentor Franchise Purchase Agreement clearly included payment for the franchise at the Mentor Site, none of the $312,060 paid by Progressive was ever credited to the Initial Franchise Fee payable for Progressive's purchase of that franchise.  Progressive anticipates that Defendants will point to paragraph 4 on the first page of Mentor RAR which states that the amount of $312,060 represents "the cost [to Third Dunkin' Realty] of the equipment package plus $53,060, the uncapitalized portion of the purchase price of the land and building."  But Progressive never purchased any interest in the land and building at the Mentor Site – Progressive leased Mentor Site from Third Dunkin' Realty under the Mentor Lease.   And, in any event, the Mentor RAR is not a contract between Progressive and the Defendants; it is an internal document prepared by Defendants and discovered by Progressive in the course of the present litigation.

The Mentor Franchise Purchase Agreement expressly provided that the $312,060 paid by Progressive to Defendants Baskin-Robbins and Third Dunkin' Realty included the Baskin-Robbins/Dunkin' Donuts franchise for the Mentor Site, and, therefore, Progressive should have received $32,000 of additional credit toward payment of the Initial Franchise Fee for such franchise by reason of the $312,060 paid to such Defendants (who had no interest in the realty at the Mentor Site) for the franchise, equipment, and signage under the Mentor Franchise Purchase

---

[115]  Mentor Franchise Purchase Agreement § 1, at 1, § 1. (emphasis added).

Agreement.  The same can be said of the Euclid Franchise Purchase Agreement, under which Progressive paid Defendant Dunkin' Donuts $283,000 for "the *franchise* which is being developed as a prototype test store at the corner of Lake Shore Boulevard and East 222nd Street, Shore Center Shopping Center, Euclid, Ohio (PC #340547) (the "Premises") including all of the Transferor's right, title and interest in the signage and equipment at said Premises, . . . ."[116]  Upon payment of $283,000 to Defendant Dunkin' Donuts pursuant to the Euclid Franchise Purchase Agreement, Progressive should have received an additional credit of $40,000 toward payment of the Initial Franchise Fee for the Dunkin' Donuts franchise at the Euclid Site.  Progressive asserts that it actually overpaid the amount of Initial Franchise Fees that were owed up to the date of the Defendants' breach by imposition of the development hold, and, as explained below, seeks to recover from the Defendants the amount by which the Defendants were unjustly enriched as a consequence of such overpayment.

In support of their statement that Defendants were entitled to prevent Progressive from developing Specified Units and Additional Units under the SDA without liability for having done so, Defendants offer no admissible evidence whatsoever.  The only things to which Defendants do refer is a June 4, 2009 Certification of Jack Laudermilk (the "**Laudermilk Certification**") and Certification of Gary Zullig of the same date (the "**Zullig Certification**" and, together with the Laudermilk Certification, the "**Certifications**"), each of which must, as discussed below, be stricken from the record entirely for failure to comply with the requirements of FED. R. CIV. P. 56(e).

Each of the Certifications must be stricken from the record in its entirety.  To be admissible as summary judgment evidence, testimony must be *sworn* and made under penalty of perjury.  *Hayes v. Marriott*, 70 F.3d 1144, 1147-48 (10th Cir.1995); *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985).  Neither the Laudermilk Certification nor the Zullig Certification was sworn before a notary or any other official authorized to take oaths.  And even if it were sworn, the statements made therein cannot be used as evidence in support of the Motion for Summary Judgment.

---

[116]    Euclid Franchise Purchase Agreement § 1, at 1, § 1. (emphasis added).

FED. R. CIV. P. 56(e) sets forth three distinct requirements for affidavits or declarations offered in support of a motion for summary judgment.  The first requirement is that the affidavit or declaration must show affirmatively that the affiant or declarant is competent to testify as to the matters in the affidavit.  This means that the affiant or declarant must describe his or her relationship to the facts in the affidavit or declaration.  *Davis v. Portline Transportes Maritime Int'l*, 16 F.3d 532, 537 n.6 (3d Cir.1994).  An affiant may not testify about inadmissible hearsay or opinion.  *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir.1996); *Pfeil*, 757 F.2d at 860-61.   The Laudermilk Certification sets forth no description of Laudermilk's relationship to the alleged facts set forth therein.

This leads directly to the second requirement of FED. R. CIV. P. 56(e): that the facts stated in the affidavit or declaration must be based on the affiant's or declarant's personal knowledge. *Evans*, 80 F.3d at 962; *Sellers v. M.C. Floor Crafters, Inc.* 842 F.2d 639, 643 (2d Cir. 1988).  It is not sufficient for an affidavit or declaration offered in support of a motion for summary judgment to merely state that the affiant or declarant has personal knowledge of all of the facts stated in the affidavit.[117]  Laudermilk's personal knowledge cannot merely be assumed.

Defendants rely on paragraph 9 of the Laudermilk Certification in support of their statement that "Dunkin' built and sold to Progressive the buildings at Mentor and Euclid; Progressive built Chardon itself."[118] Did Laudermilk personally witness the construction of the improvements at the Chardon Site?  If not, his statement is inadmissible.  Likewise as to Defendant's reliance on Laudermilk's statement, in the same paragraph 9, for Defendant's statement that "[t]he fourth store was scheduled to open by January 1, 2007; however, it was never opened because Dunkin' placed Progressive on development hold due to Progressive's frequent failures to pay royalties, advertising, and rent fees and its other operational problems."[119] Did Laudermilk personally witness the operational problems as to which he has certified under penalty of perjury? Did Laudermilk, purportedly an Assistant Secretary of

---

[117]   On the signature page of the Laudermilk Certification, Laudermilk certified to the Court "under penalty of perjury" that the statements made therein were "true and correct."   Among these statements is Laudermilk's statement, in paragraph 1 of the Laudermilk Certification, that the statements made therein were "based on personal knowledge ([as opposed to any knowledge that might be imputed to Laudermilk under any applicable legal theory)] and in support of Defendants' Motion for Summary Judgment."

[118]   Motion for Summary Judgment, at 1-,2 (citing the Laudermilk Certification ¶ 9)..

[119]   *Id*. at 2.

Defendants, personally exercise line authority on behalf of Defendants and decide to place Progressive on development hold, thereby enabling him to have personal knowledge for the reasons for the development hold?  Or did another officer or employee of the Defendants tell Mr. Laudermilk why Progressive was placed on development hold, in which case the statement in paragraph 9 of the Laudermilk Certification would constitute inadmissible hearsay.

Defendants claim, citing paragraph 13 of the Laudermilk Certification, that "Progressive received a Uniform Franchise Offering Circular (UFOC) in both 2004 and 2005."[120]  Progressive disputes any assertion that Laudermilk witnessed or has personal knowledge of Progressive's receipt of any UFOC at any time.  Defendants rely on paragraph 15 of the Laudermilk Certification to support their statement that Progressive failed to make payments totaling $100,000 which Defendants claim they were owed under the SDA (a claim that Progressive disputes), and that after a year of attempting to secure payment, Defendants counsel sent Progressive a Notice of Default and Notice to Cure.[121]  Progressive disputes that Laudermilk witnessed or has personal knowledge of any such failure to pay, of any such efforts to secure payment, or of the sending of a Notice of Default and Notice to Cure.  Likewise, Progressive disputes that Laudermilk witnessed or has personal knowledge of the alleged failure to make payment referred to in paragraph 16 of the Laudermilk Certification or of the sending of the Notice of Termination referred to therein, on which Defendants rely to support their claims to the same effect in the Motion for Summary Judgment.[122]  Progressive disputes that Laudermilk witnessed or has personal knowledge of the alleged facts underlying the statements set forth in paragraphs 17, 18, and 19 of the Laudermilk Certification, all of which statements are relied upon by Defendants as evidence of such facts in the Motion for Summary Judgment.[123]

The third requirement under FED. R. CIV. P. 56(e) is that the affidavit or declaration must state admissible facts.  The facts stated in the affidavit must be specific and constitute admissible evidence.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990); Evans, 830, F.3d at 962.  Bare allegations of fact, ultimate or conclusory facts, and legal

---

[120]  *Id*. at 3 (citing the Laudermilk Certification ¶ 13)..
[121]  *Id*. at 5-,6 (citing the Laudermilk Certification ¶ 15)..
[122]  *Id*. at 6 (citing the Laudermilk Certification ¶ 16)..
[123]  *Id*. at 6 (citing the Laudermilk Certification ¶¶ 17-,19)..

conclusions do not satisfy these requirements.  See, e.g. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 324 (5th Cir. 1988); *BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603,   615   (2d   Cir.   1996).   Thusly,   the   statements   made   in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, and  18 of the Laudermilk Certification must be stricken from the record in that they all state ultimate and conclusory facts and legal conclusions.   The same is true for paragraph 7 of the Zullig Certification, which states that Progressive failed to pay $100,000 that it owed to Defendants.  Whether or not Progressive owed $100,000 to any one or more of the Defendants (and Progressive asserts that it did not) is a legal conclusion.  Thus, Defendants have failed to support with admissible evidence their assertion in the Motion for Summary Judgment that Progressive failed to pay $100,000 that it owed to Defendants,[124] and Defendants' assertion is their sole basis for summary judgment on Progressive's breach of contract claim for Defendants' suspension of Progressive' development rights under the SDA and termination thereof.

Defendants misplace reliance on *Donoghue v. IBC USA (Publications), Inc.*, 886 F.Supp. 947, 955 (D.Mass. 1995) (citing *S &R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 376 (3d Cir. 1992), *aff'd*, 70 F.3d 206 (1st Cir. 1995) for the proposition that "under no circumstances may  the  non-breaching  party  [to  a  contract]  stop  performance  *and*  [sic]  continue  to  take advantage of the contract's benefits."[125] The undisputed facts here show that, Progressive, as the non-breaching party under the SDA, has received no benefit whatsoever under the SDA since its development  of  the  store  at  the  Euclid  Site.   Defendants  admit  that"[t]he  fourth  store  was scheduled  to  open  by  January  1,  2007;  however,  it  was  never  opened  because  Dunkin'  (the Defendants) placed Progressive on development hold . . . ."[126]  Under the rule of *Donoghue* as articulated by Defendants, material breach of the SDA by Defendants Baskin-Robbins and Dunkin' Donuts entitled Progressive to, *inter alia*, stop its performance under the SDA so as to, among other things, withhold payment of those amounts, if any, to which such Defendants would have otherwise been entitled under the SDA had they entered into the same and performed their

---

[124]    Motion for Summary Judgment, at 5 (citing the Zullig Certification ¶ 7)..
[125]    *Id*. at 10.
[126]    *Id*. at 2.

obligations thereunder in good faith.  Defendants' mischaracterization of Progressive's unambiguous prayer for damages set forth in the Amended Complaint as an unstated claim for rescission[127] is but an attempt to evade the consequences of Defendants breach of the SDA following the opening of Progressive's store at the Euclid Site by refusing to honor Progressive's development rights under the SDA.

### H.  Progressive's Claims Are Not Barred by the Temporal Limitations for Commencement of Actions under the SDA and Franchise Agreements

Defendants' assert that "[t]he SDA's two-year contractual limitations provision . . . bars most of Progressive's claims."[128]  Actually, there is no two-year limitation period in the SDA. What the SDA actually provides regarding the time in which an action must be commenced is as follows:

> ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF DEVELOPER [Progressive] AND ADQSR [Defendants Baskin-Robbins and Dunkin' Donuts] OR DEVELOPER'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF DEVELOPER.[129]

It is important to note at the outset that the foregoing limitation, by its own express terms, applies to claims and actions arising out of "this Agreement," that is, the SDA, the relationship of Progressive and Defendants Baskin-Robbins and Dunkin' Donuts, or Progressive's operation of the "unit."  The limitation would not, by its express terms, therefore, apply to any of Progressive's claims against Defendant Third Dunkin' Realty, which is neither a party to,  nor an intended or third-party beneficiary of, the SDA and is, therefore, not entitled to invoke, or rely upon, or assert as a defense any of its provisions.

Nor would the limitation apply to any of Progressive's claims relating to Defendants' breach of their respective design, construction, development, and support obligations regardless of how long Progressive waited to commence suit.  Such claims do not arise out of or relate to a

---

[127]  *Id*. at 10.
[128]  *Id*. at 12.
[129]  SDA § 18.F.(5),, at 93.

breach of "this Agreement" within the meaning of the SDA, and bear no relation, in any event, to the relationship of Progressive and Baskin-Robbins and Dunkin' Donuts (regardless of whether such relationship is characterized as an arms'-length contractual relationship, a fiduciary or other special relationship, or otherwise) or Progressive's operation of any units.

The obligation to furnish a design for each such Specified Units arises from a representation in the 2004 and 2005 UFOC furnished by Defendants that that "[w]e will provide you with a copy of our standard plans and specifications for the brand(s) and type of store" and "[w]e will make available to you [Progressive] the standards for designing, constructing, equipping and operating your Store."[130]  Progressive's claims relating to Defendants' breach of their respective construction and development obligations all arise out of one or more of agreements that are independent of the SDA, and that neither contain nor incorporate by reference from the SDA any provisions addressing when a cause of action may be commenced; specifically: the Mentor Site Franchise Purchase Agreement (the obligation of Baskin-Robbins and Dunkin' Donuts to construct and equip the Specified Unit on the Mentor Site), Mentor Lease (the obligation of Third Dunkin' Realty to substantially complete construction of the Specified Unit on the Mentor Site), the Euclid Site Franchise Purchase Agreement (the obligation of Dunkin' Donuts to construct and equip the Specified Unit on the Euclid Site), and the Euclid Lease (the obligation of Third Dunkin' Realty substantially complete construction of the Specified Unit on the Euclid Site), as well as the Defendants' agreement to construct, and develop the Chardon Site, which agreement Defendants are, by reason of their conduct, estopped from denying.  The Defendants' obligation to furnish support is taken from the 2004 UFOC and the 2005 UFOC, each of which sets forth a detailed description of the continuing services to be provided as well as the obligations of Defendants Baskin-Robbins and Dunkin' Donuts with respect to the administration and development of the advertising and promotional funds for their respective brands.

---

[130]  2004 UFOC, unpainted (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3, and 2005 UFOC, at 88 (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3.

None of Progressive's other claims, whether for unjust enrichment, fraud, or otherwise arise under or relate to the SDA or the Franchise Agreements, the relationship of the parties to the SDA or the Franchise Agreements, or Progressive's operation of any unit or units.  Thus, none of such other claims are subject to operation of the temporal limits for commencing actions under the SDA or the Franchise Agreements.  And Defendant Third Dunkin' Realty, as explained above, is neither a party to, nor and intended or third-party beneficiary of, the SDA or the Franchise Agreements and, therefore, is not entitled to invoke, or rely upon, or assert as a defense any of its provisions.

Assuming arguendo that the SDA's limitation on the time in which to bring an action applies to Progressive's claims, few, if any, of Progressive's claims would be barred by operation of such limitation.  The limitation, by its express terms, provides that it is the claimant's actual discovery, or *actual knowledge* of the facts giving rise to a claim or action that actuates the temporal period in which such claim or action must be commenced.  A genuine issue of material fact exists as to when Plaintiff acquired actual knowledge of the facts giving rise to the claims made in the Amended Complaint.  Progressive's store at the Mentor Site could not have opened prior to the date on which Progressive acquired a lease for the Mentor Site, which occurred on or about February 23, 2005, the date of the Mentor Lease.  Progressive Chardon Real Estate, which leased the Chardon Site to Progressive under the Chardon Lease, acquired the Chardon Site from Third Dunkin' Realty by the Third Dunkin' Realty Chardon Site Deed sometime in July, 2005.  Progressive's store at the Chardon Site could not have opened prior to that time.  And Third Dunkin' Realty and Progressive entered into the Euclid Sublease on or about February 23, 2006; Progressive's store at the Euclid Site would not have opened before Progressive had acquired a lease for the property.

Defendants' breach of their obligations relating to site selection could not possibly have been known on the dates when the Specified Units at Mentor, Chardon, and Euclid opened.  Defendants themselves assert that "[f]rankly, there is no way for Progressive to know whether the stores will be successful or not at this point."[131]  In the same vein, "[w]hile Circle K's stores

---

[131]   Motion for Summary Judgment, at 11.

76

were not profitable during the first two years of operations (which is typical for these kinds of start-up networks) all of its locations are currently operating on a profitable basis."[132] The immediately preceding quotations from Defendants' own filings with the Court demonstrate that it would require Progressive *at least* two years after opening a unit to acquire knowledge of the fact that regardless of how much time, effort, and money Progressive were to spend on advertising, building brand awareness through promotions and other activities, training employees to work efficiently, and providing excellent customer service, units developed at the sites selected by Defendants could never generate a profit in large part due to the location of such units.

To the extent that Progressive's claims (including, but not limited to, Progressive's breach of contract claims and Progressive's fraud claims) arise out of Defendants' willful non-disclosure of material facts, of the Defendants' non-disclosure of certain facts was, as discussed above, not discovered by Progressive unit well after the present action had been commenced.

### I. Progressive's Claim for Unjust Enrichment is Not Barred Because it Relates to Progressive's Overpayment of Initial Franchise Fees under the SDA

Defendants' argument that Progressive's claim for unjust enrichment is barred on legal grounds rests on the erroneous assumption that the refers solely to "$140,000 [Progressive] paid to Dunkin' under the SDA along with royalty fees on its gross sales paid under the Franchise Agreements."  As explained hereinbefore, however, Progressive actually paid more than $140,000 in Initial Development Fees under the SDA.  Other than the Initial Franchise Fees described in the SDA, nothing was to have been paid under any of the contracts among Progressive or any one or more of the Defendants for Progressive's purchase of the franchises granted under the Franchise Agreements.  While Progressive paid other amounts under the Franchise Agreements, these other amounts were not paid for the initial purchase of the franchises thereby conferred.  Rather, the other amounts were in the way of marketing start-up fees, continuing franchise fees based on gross sales, and advertising fees.

---

[132]  Defendants' Response to Plaintiff's List of Circle K Documents and Brief in Support, filed with the Court on October 9, 2009, at 4.

It is undisputed that Progressive timely paid $120,000 of Initial Franchise Fees on execution of the SDA and an additional $20,000 of Initial Franchise Fees thereafter.  By express written agreement of the parties to the SDA, the Initial Franchise Fee for the combined Baskin-Robbins/Dunkin' Donuts franchise for the Mentor Site was modified so as to be reduced from $40,000 to $32,000.  The modification, duly initialed by the parties, appears on the first page of the Mentor Franchise Agreement.  Progressive paid a $40,000 Initial Franchise Fee for the combined Baskin-Robbins/Dunkin' Donuts franchise for the Chardon Site, as duly noted by the words "paid under SDA #341534" appearing on the first page of the Chardon Franchise Agreement.  And Progressive paid $40,000 for the Dunkin' Donuts only franchise for the Euclid Site.

As explained above, after Defendants Baskin-Robbins and Dunkin' Donuts breached the SDA by suspending Progressive's development rights thereunder, Section 3.C.(2) of the SDA eliminated any further obligation of Progressive to pay Initial Franchisee Fees unless and until the breach by those Defendants was cured to Progressive's satisfaction.  Thus, without more, as of the time of the development hold, Progressive had paid $140,000 in Initial Franchise Fees, but had only owed $112,000.  And this overpayment does not take into account that the $312,060 paid by Progressive under the Mentor Franchise Purchase Agreement, by the express terms of that agreement, included a component for the Mentor Franchise, or that the $283,000 paid by Progressive under the Euclid Franchise Purchase Agreement, by the express terms of that agreement, included a component for the Euclid Franchise.

The excess of the Initial Franchise Fees paid by Progressive over the amount of the Initial Franchise Fees actually owed by Progressive cannot be determined precisely without knowing more about how much of the $312,060 Progressive paid under the Mentor Franchise Purchase Agreement and the $283,000 paid by Progressive under the Euclid Franchise Purchase Agreement should fairly be allocated to signage equipment purchased under those agreements, respectively.  It is clear, however, that Progressive overpaid, and that no agreement among Progressive or any one or more of the Defendants governs disgorgement of such overpayment.

As Defendants concede, a claim for unjust enrichment "arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain . . . ."[133] *Hambleton v. R. G. Barry Corp*., 465 N.E. 2d 1298, 1302 (Ohio 1984) (citing *Hummel v. Hummel*, 14 N.E. 2d 923, 925-26 (Ohio 1938)).  The same results under Massachusetts law. See *Verderber v. Perry*, No. 98-1625, 1999 WL 525953 at *5 (D. Mass. March 8, 1999); *Ullmann v. May*, 72 N.E. 2d 63, 66 (Ohio 1947).  One or more of the Defendants have been unjustly enriched by the amount by Progressive's overpayment and have not disgorged the same.  Accordingly, Progressive is entitled to recover from such Defendants the amount of the overpayment that they received.  Defendants are not entitled to summary judgment on Progressive' claim for unjust enrichment.

### J.     Defendants are not Entitled to Summary Judgment on Progressive's Fraud Claims

In an unbroken line of cases beginning with the seminal case of *Bates v. Southgate*, 31 N.E. 2d 551 (Mass. 1941), Massachusetts courts have held to the principle that "the same public policy that in general sanctions the avoidance of a promise obtained by deceit strikes down all attempts to circumvent that policy by means of contractual devices."  *Bates,* at 558. Even Defendants concur that "[a] claim of fraudulent inducement of a contract requires proof that the deceived party was led to believe and understand that the agreement was substantially different from what it really was,"[134] and that *"[a]bsent* such fraudulent inducement, a party will be bound to agreements signed voluntarily, even if not read."[135]  Ohio courts are of like mind. Thus, in *Galmish v. Cicchini*, 90 Ohio St. 3d 22 (Ohio 2000), the Ohio Supreme Court stated that "the parol evidence rule does not prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement." *Galmish*, at 28 (citing *Drew v. Christopher Constr. Co., Inc.* (1942), 41 N.E.2d 1018, and *Union Mut. Ins. Co. of Maine v. Wilkinson* (1871), 80 U.S. (13 Wall.) 222, 231-232).

---

[133]   Motion for Summary Judgment, at 13.
[134]   Motion for Summary Judgment, at 14, (citing McEvoy Travel Bureau, Inc. v. Norton Co., 563 N.E. 2d 188, 192-95 (Mass. 1990)).).
[135]   *Id*., (citing Commerce Bank & Trust Co. v. Hayek, 709 N.E. 2d 1122, 1127 (Mass. Ct. App. 1999)).) (emphasis added).

In *Galmish*, the plaintiff sold a commercial property to the defendant for $765,000 pursuant to an agreement whereby the defendant promised that if the property were sold within one year after the defendant's purchase thereof, the plaintiff would receive fifty percent (50%) of the proceeds in excess of $765,000. *Id*. at 23. The agreement imposed no obligation on the defendant to sell, or apply his efforts to sell, the property within one year. The defendant did successfully negotiate the sale of the property to a developer for $1,750,000, but deliberately delayed closing of the sale until more than one year after the date on which the defendant had purchased the property from the plaintiff. *Id*. A jury trial resulted in an award of damages for the plaintiff on her fraud claim, but the court of appeals reversed, holding that the trial court had erred in admitting parol evidence of representations that were not included in her agreement with the defendant, which contained an integration clause. *Id*. at 26.

The Ohio Supreme Court reversed quoting with approval *Annotation, Parol-evidence Rule; Right to Show Fraud in Inducement or Execution of Written Contract* (1928), 56 A.L.R. 13, 34-36:

> The principle which prohibits the application of the parol-evidence rule in cases of fraud inducing the execution of a written contract . . . has been regarded as being as important and as resting on as sound a policy as the parol-evidence rule itself. It has been said that if the courts were to hold, in an action on a written contract, that parol evidence should not be received as to false representations of fact made by the plaintiff, which induced the defendant to execute the contract, they would in effect hold that the maxim that fraud vitiates every transaction is no longer the rule; and such a principle would in a short time break down every barrier which the law has erected against fraudulent dealing.

> Fraud cannot be merged; hence the doctrine, which is merely only another form of expression of the parol-evidence rule, that prior negotiations and conversations leading up to the formation of a written contract are merged therein, is not applicable to preclude the admission of parol or extrinsic evidence to prove that a written contract was induced by fraud.

*Galmish*, at 28. In *Galmish*, the Ohio Supreme Court went on to imply, into a fully-integrated contract, a promise, never expressed in the contract, that one party (the "*implied promisor*") to the contract, under no obligation to fulfill or endeavor to fulfill a condition the satisfaction of which would entitle the other party to the contract to benefit therefrom, will not act so as to preclude fulfillment of the condition. *Galmish*, at 31. The *Galmish* court further held that, if the implied promisor intends, from the inception of the contract, to prevent fulfillment of the

condition and succeeds in doing so, then the other party may recover compensatory and punitive damages from the implied promisor in an action for fraud in the inducement.  *Id*.

The theory of the *Galmish* case is readily applicable to the case at bar.  Identification of sites with sufficient access to customers within the Store Development Area was not a promise or assurance of profits or success, but a condition the satisfaction of which was a necessary precursor to any chance of profits or success.  If the Defendants were going to undertake to select Progressive's sites, as they did, then they were obligated to at least select sites in accordance with the objective standards customarily employed by Defendants to select sites for Baskin-Robbins/Dunkin' Donuts franchises.  Defendants did not do this.  Rather, they selected for Progressive the sites into which they had already made a significant investment of money for due diligence, purchase, or lease, regardless of whether or not the diligence indicated that the sites in question complied with the objective standards customarily employed by Defendants.

As described above, Defendants did not disclose to Progressive information in their possession that indicated that the Progressive Sites did not comply with such standards.  This induced (and was intended to induce) Progressive to sign the Leases, cause Progressive Chardon Real Estate to buy the Chardon Site, and sign the NCB Loan Documents to finance the transactions contemplated by the SDA, the Franchise Purchase Agreements, the Franchise Agreements, and the Leases, and expend money, time and effort.  It was intended to induce the same to enable Defendants to recoup their investment in the Progressive Sites.  If the venture proved unsuccessful for Progressive, to the point where Progressive was no longer able to pay royalties under the Franchise Agreements (and Progressive's principals were no longer willing to infuse more of their personal funds), Defendants, or so they may have reasoned, could place Progressive on development hold, delay termination of the SDA until all of the Initial Franchise Fees had accrued thereunder, then terminate the SDA, invoke the liquidated damages provisions of Section 3C thereof (under which the liquidated damages would include all fees accrued through termination), and reached into the pockets of Progressive's principals, as guarantors, to collect; terminate the Franchise Agreements and remove all signage and trade dress from the Progressive Sites, enforce payment of rent under the Third Dunkin' Realty Leases against

81

Progressive and its principals (as guarantors), refrain from exercising the July 11, 2005 Lease Option that was granted to Defendants Baskin-Robbins and Dunkin's Donuts on the Chardon Site (as indicated above, the Defendants' current Development Manager for the Cleveland-area market would not have approved of the Mentor Site and the Chardon Site anyway, so why exercise the Lease Option on the Chardon Site?), while leaving Progressive Chardon Real Estate, Progressive, and its principals (as guarantors) to pay off the NCB Loans used to pay for improvement the Progressive Sites and acquisition of the Chardon Site, sell the whole Store Development Area to a new franchisee and start all over, identifying sites for the new franchisee.

Under Ohio law, therefore, Progressive's fraudulent inducement claim need not "contradict or vary the terms of the written agreement (the SDA)" or "rest on any prior agreements or promises at all" (*Galmish*, at 30), but can rest on breach by Defendants Baskin-Robins and Dunkin' Donuts of their "promise implied in the writing (the SDA)" that they would not connive to prevent fulfillment of such a condition by identifying sites that did not comport with the objective standards customarily employed by Defendants in order to recover their investments in those sites, while withholding information Defendants possessed about the sites. Thus, while the court in *Galmish* acknowledged that the parol evidence rule may not be avoided by a fraudulent inducement claim which alleges that the inducement to sign the writing was a promise the terms of which are directly contradicted by the signed writing (*Galmish*, at 29), Progressive's fraudulent inducement claim is not dependent on any such contradiction.

Even if Progressive's fraudulent inducement claim were dependent on a promise the terms of which were directly contradicted by the SDA, Defendants would not be entitled to summary judgment as a matter of law unless they could establish, among other things, that the SDA is, *as matter of law*, fully integrated on the subject matter of the promise in question.  As explained above, under Massachusetts law, which governs the SDA, "the question of integration is one of fact reserved for the trial judge, whose resolution of that issue will not be reversed unless clearly erroneous." *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 436 n.7 (1992); *Antonellis v. Northgate Constr. Corp.*, 362 Mass. 847, 850-51 (1973; *Alexander v. Snell*, 424 N.E.2d 262, 264 (Mass. App. Ct. 1981); accord *Brennan v. Carvel Corp.*, 929 F.2d 801, 807 (1st

Cir. 1991) ("[U]nder Massachusetts law, the determination of whether a contract is completely or partially integrated, or whether a second contract is collateral to an integrated agreement, is a question of fact to be decided in the first instance by the trial judge.").  In determining whether a contract is completely or partially integrated, the trial judge may consider parol evidence. *Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 44 (1st Cir. 2008).   And for the purposes of the Motion for Summary Judgment, "[t]he Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmovant."[136]

Also explained above is that the purported disclaimers in the SDA and the Franchise Agreements do not cover site selection, as opposed to site approval, which the agreements and each of the 2004 UFOC and 2005 UFOC clearly distinguish.  To the extent that the SDA and the Franchise Agreements do contain disclaimers, such disclaimers only disclaim certain representations made to induce Progressive to accept the licenses granted by those agreements, not representations made to induce Progressive to sign the Leases, cause Progressive Chardon Real Estate to purchase the Chardon Site from Defendant Third Dunkin' Realty, enter into the NCB Loan Documents to which Progressive is a party, cause Progressive Chardon Real Estate to enter into the NCB Loan Documents to which it is a party, and devote time, money, and effort to the development of Defendants' brands.  And, as explained above, Defendant Third Dunkin' Realty is not a beneficiary of any of the disclaimers that are contained in the SDA, the Franchisee Agreements, or any of the other agreements between Progressive, on the one hand, and Defendants Baskin-Robbins and Dunkin' Donuts on the other.  None of the Third Dunkin' Realty Leases or the Progressive Chardon Site Purchase Agreement contains any disclaimers. Defendants' reliance on *Cottman Transmission Systems, LLC v. Kershner*, 536 F. Supp. 2d 543, 551 (E.D. Pa., 2008); and *Hoover Universal, Inc. v. BrockwayImco, Inc.*, 809 F.2d 1039, 1044 (4th Cir. 1987) assertion that "[c]ourts uniformly dismiss claims for fraudulent inducement where the franchise agreement has an integration clause stating that the parties were not induced to enter into the contract based on prior representations" is, therefore, misplaced.[137]

---

[136]    Motion for Summary Judgment, at 6 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).).
[137]    Motion for Summary Judgment, at 14.at14.

Similarly misplaced is Defendants' reliance on the purported absence of a fiduciary duty as an excuse for Defendants' partial disclosure regarding the sites that Defendants selected for Progressive.[138]  It is well settled under Massachusetts law that a duty of disclosure may arise in the absence of a fiduciary relationship: "[A]lthough '[t]he rule of nonliabilty for bare nondisclosure has been stated and followed' for years, see *Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 679, 42 N.E.2d 808 (1942), that rule has long been tempered with an exception for 'the uttering of a half truth which may be tantamount to a falsehood.'" *Gossels v. Fleet Nat. Bank*, 876 N.E.2d 872, 881-82 (Mass. App. Ct. 2007), *rev'd on other grounds*, 902 N.E.2d 370 (Mass. 2009).  And further:

> Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies.'

*Gossels v. Fleet Nat. Bank*, at 882.   Likewise, Massachusetts law imposes a duty to disclose in arm's-length transactions as to facts basic to the transaction that a party knows the other party is mistaken and about which the mistaken party would reasonably expect a disclosure. Accordingly, in *Wolf v. Prudential-Bache Securities, Inc.*, 672 N.E.2d 10, 12-13 (Mass. App. Ct. 1996), the court acknowledged that nondisclosure can be actionable where there is a duty to disclose. *Prudential* at 476.  Thus:

> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated, . . .
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

*Prudential*, 12, quoting the Restatement (Second) of Torts § 551(2)(e).  The *Prudential* court noted that:

> A basic fact is a fact that is assumed by the parties as a basis for the transaction itself.  It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts

---

[138]  *Id*. ("In Massachusetts, a business fiduciary may have an affirmative duty to speak if he fails to speak about a material fact.". Kannavos v. Annino, 356 Mass. 42-47, 50 (1969); Nota Construction Corp. v. Keyes Associates, Inc., 45 Mass.App.Ct. 15, 19 (1990). However, franchisors do not have a fiduciary relationship with their franchisees., O'Neal v. Burger Chef Sys, Inc., 860 F.2d 1341, 1346 (6th Cir. 1988).),    Progressive acknowledged this in its Franchise Agreements.).

> may serve as important and persuasive inducements to enter into the transaction,
> but not go to its essence. These facts may be material, but they are not basic.

*Id*. (quoting comment j to the Restatement (Second) of Torts § 551(2)(e)).  *Prudential* went on to hold that the conviction for embezzlement and mail fraud of the general partner of a limited partnership in which the plaintiffs purchased units was not a fact basic to the transaction, where the conviction had occurred fourteen years prior to the investment.  *Id*.

Ohio law comports with Massachusetts law in imposing a duty to disclose in arms-length transactions.  Thus, in Ohio, "[A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak."  *Starinki v. Pace* (1987), 535 N.E.2d 328, 331.  "The duty to speak will not necessarily depend on the existence of a fiduciary relationship."  *Textron Fin. Corp. v. Nationwide Mut. Ins. Co*., 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (citing *Starinki v. Pace*, 535 N.E.2d 328, 331(1987)).  Rather, the duty "'may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence.'"  *Textron*, at 1270, citing *Starinki* at 331, quoting *Cent. States Stamping Co. v. Terminal Equip. Co*. 727 F.2d 1405, 1409 (6th Cir. 1984),.  Likewise, " 'a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party [sic] to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.'"  *Textron*, at 1270 (quoting *Cent. States Stamping Co*., at 1408 (quoting *Miles v. Perpetual S. & L. Co*., 338 N.E.2d 1367, 1369 (1979))).

As explained above, Defendants identified all of the Progressive Sites themselves prior to the SDA, and selected the Progressive Sites as those at which Progressive in particular would be granted franchises to use the proprietary system and marks of Defendants Baskin-Robbins and Dunkin' Donuts.  Testimony in the record indicates that in the course of selecting the Progressive Sites for Progressive, Defendants agents engaged in conduct and made affirmative statements designed to create the impression that that the Progressive Sites were comparable to other sites

selected by Defendants in terms of objective criteria customarily employed by Defendants in evaluating sites.  Thus, in the course of his May 28, 2009 deposition, Mr. Eitan Flank, one of Progressive's members, testified that:

> We drove the market with – I believe it's Ed Peppers [Defendants' then Development Manager for the Cleveland-area market] if I'm not making a mistake. There's so much turnover with Dunkin' Donuts.  People kept on coming and going all the time. . . . . But I think it was Ed Peppers at the time that drove us around the market to show us what is available in the SDA and, you know, what they [the Defendants] suggest, et cetera.[139]

Mr. Flank further testified in the same deposition that "[Ed Peppers] showed us corners where Dunkin' was involved with . . . through Dunkin's process selecting the areas"[140] and "[p]retty much the area where the stores would be were pretty much shown to us by Ed Peppers, meaning he was in the market before us and he was doing all the due diligence on it[141]… and [w]e relied on what Dunkin' Donuts was telling us."[142]  A copy of the relevant page of the transcript of Mr. Flank's testimony is attached hereto as **Exhibit VVV**.

The focus on population distribution and traffic flow in the Due Diligence Appropriation Requests reflect Defendants belief that these were key ingredients in determining whether or not a prospective site would have sufficient customers to survive if operated in accordance with the standards established by Baskin-Robbins and Dunkin' Donuts.  It is difficult to imagine facts more basic to the transactions contemplated by the SDA and the Leases than the suitability of the sites upon which Progressive would be granted franchises.  And Mr. Flank's above testimony makes clear that Progressive had imposed confidence in the Defendants by reason of their stated position as experienced identifiers of suitable sites, and that Defendants knew of Progressive's confidence.  Mr. Flank further testified that Mr. Peppers "showed us where all the good stores are, was giving us the basics in how – how, you know – what methodology is a good area to select various Dunkin' Donuts [sites]."[143]   Under these circumstances, Progressive was entitled to expect full and honest disclosure of all information Defendants possessed regarding the Progressive Sites.

---

[139]   Transcript of the May 28, 2009 deposition of Eitan Flank, at 49-50.
[140]   *Id*. at 51.
[141]   *Id*.
[142]   *Id*. at 52.
[143]   *Id*. at 51.

Such disclosure was not forthcoming, however.  Among the things that the Defendants were not telling Progressive or its principals were that, at the least, serious differences of opinion existed within the Defendants' respective organizations as to the suitability of the Mentor Site and the Euclid Site, as evidenced by the above-referenced testimony of Defendant's Field Marketing Manager, Lynne Schroeder, whose testimony reveals concern regarding the absence of population to the north of these sites.  Nor were Defendants disclosing the relatively poor population and traffic count data Defendants had accumulated for the Chardon Site compared to other sites.

### K.    Defendants are not Entitled to Summary Judgment on Progressive's Claims for Civil Conspiracy and Intentional Interference with Contract

Any conspiracy among Defendants would have occurred in Massachusetts. In *Stathos v. Bowden*, 728 F.2d 15 (1st Cir. 1984), the First Circuit Court of Appeals declined to apply the intra-corporate conspiracy doctrine where the plaintiff raised a claim under 42 U.S.C. § 1985(3) (conspiracy to interfere with civil rights).  The plaintiff alleged that her employer, a municipal utility provider, had deliberately discriminated against her on the basis of sex in a series of decisions regarding her title and pay grade.  728 F.2d at 17-18.  The court noted that the intra-corporate conspiracy doctrine had developed in the context of antitrust law, and found that the considerations that supported the exception in that field were different from those arising in a civil rights claim.  *Id*. at 20-21.  The court stated:

> The evil at which the "conspiracy" section of the Sherman Act, 15 U.S.C. § 1, is aimed is an evil that exists only when two different business enterprises join to make a decision, such as fixing a price, that in a competitive world each would take separately. Moreover, an individual decision to do the same thing is not only legitimately socially useful but also may often require joint decision-making by managers within a single enterprise. Where "equal protection" is at issue, however, one cannot readily distinguish in terms of harm between the individual conduct of one enterprise and the joint conduct of several. Nor can one readily identify desirable social conduct as typically engaged in jointly by the officers of a single enterprise. Thus, the boundaries of an "intracorporate" exception to the § 1985(3) conspiracy provision should be narrower than in antitrust. Indeed, we do not see why they should extend — if at all — beyond the ministerial acts of several executives needed to carry out a single discretionary decision.

Although the First Circuit's analysis in *Stathos* was limited to the civil rights context, the same reasoning may be applied to civil conspiracies in general.  Like a civil rights violation, the harm from a wrongful act on which a civil conspiracy may be based is the same whether the act

is carried out by a single actor or several actors.  And since the justifications for the exception (fostering the corporation's ability to engage in desirable social conduct by allowing it to act autonomously within the free market) do not exist outside of antitrust law, the intra-corporate conspiracy doctrine would only serve in the present case to shield the Defendants and their agents from liability for harmful conduct without encouraging desirable social conduct.

Defendants' argument that Progressive's intentional interference with contract claim must fail is premised entirely on a finding of fact that Defendant Third Dunkin' Realty "had no employees of its own (and acted only through Dunkin's employees), it could not interfere with any contract at all."[144]   This fact, which Progressive disputes based on Defendants' own admissions,[145] is not supported by any admissible evidence (inasmuch as the Laudermilk Certification must be stricken), and must, for purposes of the Motion for Summary Judgment, be viewed, together with all inferences therefrom, in the light most favorable to Progressive.

Factual findings aside, *Schinkle v. Maxi-Holding, Inc*., 30 Mass. App. Ct. 41, 50 (1991), the sole authority cited by Defendants to support their argument that Progressive's tortious interference with contract claim fails s a matter of law, does not support Defendants' argument. *Schinkle* involved a claim that a chief executive officer of a corporation had conspired to cause the corporation to breach a contract "implicitly (and correctly) recognizing that [a corporation] cannot be guilty of tortious interference with its own contract."  *Id*.  The court in *Schinkle* recognized the possibility of an argument that a chief executive officer of a corporation might be so closely identified with the corporation itself, and with its policies, that he should not be treated as a third person in relation to corporate contracts, susceptible a to charge of tortious interference when he causes the corporation to breach its contractual obligations.  However, the point was not argued and, therefore, the court did not consider it.  *Id*. The present case involves a legal entity, Third Dunkin' Realty, that acts (as all corporations must) through human agents that may happen to be employees of the other Defendants as well.  Even if Massachusetts law were to govern Progressive's intentional interference claim, *Schinkle* would be inapposite.

### L.    Progressive's Claim for Injunctive Relief Is Not Moot

---

[144]   Motion for Summary Judgment, at 16.
[145]   See *supra*, note 18.

Defendants concede that Progressive's claim for injunctive relief is moot "[i]f the Court finds that Dunkin' had the right to terminate the SDA."[146]   As explained above, Progressive disputes that it was in default of the SDA for either operational reasons or for non-payment of amounts which Defendants allege were owing under the SDA notwithstanding a first material breach thereof on the part of Defendants Baskin-Robbins and Dunkin' Donuts by reason of the suspension of Progressive's development rights thereunder and termination of the SDA.  A genuine issue of material fact exists as to whether Defendants were entitled to suspend Progressive's development rights under the SDA and terminate the SDA. Because Defendants are not entitled to summary judgment on the issue of whether Defendants Baskin-Robbins and Dunkin' Donuts breached the SDA, Progressive's claim for injunctive relief is not moot. And, as Defendants further concede that "the claim for injunctive relief need not be specifically addressed as a part of the determination of [the Motion for Summary Judgment]."[147]

### M.    Defendants are not Entitled to Summary Judgment on their Counterclaim

Even if Progressive had defaulted under the SDA, which Progressive denies, Defendants would not be entitled to summary judgment on their counterclaim for payments in the amount of $100,000 allegedly owed under the SDA, and which Progressive disputes.  Defendants do not deny that they terminated the SDA.  Section 3C of the SDA provides, in relevant part, that if Progressive fails to open Specified Units in accordance with the Development Schedule, and if Progressive has not, in the opinion of Defendants Baskin-Robbins and Dunkin' Donuts, used best efforts to diligently pursue development of the Specified Units in accordance with the Development Schedule, then "ADQSR shall have the right to terminate this Agreement by thirty (30) days written notice to Developer, to retain all payments made by Developer to ADQSR and to recover from Developer all payments due through the date of termination, if any, as *liquidated damages*."  (Emphasis added.)

Putting aside the factual issues of whether Progressive failed to develop Specified Units under the Development Schedule, or whether it was prevented from doing so by Defendants' wrongful suspension of Progressive's development rights and wrongful termination of the SDA,

---

[146]   Motion for Summary Judgment, at 17.
[147]*Id.*

of whether Defendants failed to comply with the thirty (30)-day notice requirement of Section 3C of the SDA,  of whether and how much, if any, in payments were due through the date of termination of the SDA,  and of whether Third Dunkin' Realty, a non-party to and a non-beneficiary of the SDA could possibly have any claim arising therefrom, summary judgment on Defendants' counterclaim must be denied as a matter of law.

In Massachusetts, "whether a liquidated damages clause is valid and enforceable is a question of law." *NPS LLC v. Minihane*, 451 Mass. 417, 419 (Mass. 2008) (citations omitted). In determining the validity of a liquidated damages clause, the Massachusetts courts usually engage in a "fact-specific exercise." *Honey Dew Associates, Inc. v. M & K Food Corp.*, 241 F.3d 23, 28 (1st Cir. 2001) (applying Massachusetts law to a franchise agreement with a liquidated damages clause).

Under Massachusetts law, "[i]t is well settled that a contract provision clearly and *reasonably* establishing liquidated damages should be enforced so long as it is not so *disproportionate to anticipated damages as to constitute a penalty*." *Cummings Property, LLC v. National Communications Corp.*, 449 Mass. 490, 494 (2007) (citing *TAL Fin. Corp. v. CSC Consulting, Inc.*, 446 Mass. 422, 431 (2006))emphasis added).  Whether a term of an agreement constitutes a penalty depends on the nature of the agreement and its accompanying circumstances. *AZ Servicenter Inc. v. Segall*, 334 Mass. 672, 675 (1956). Thus, "[i]f from the nature of the transaction and the attending circumstances it appears that the contract is a cloak to hide a sum of money out of proportion to and differing greatly from the actual damages ordinarily arising from a breach, then the sum named as in the case at bar is a penalty." *Id*. Labeling the stipulated sum "liquidated damages" is not dispositive. *Id*.

A contract provision establishing liquidated damages will be enforced when "*at the time the contract was made*, actual damages were difficult to ascertain *and* the sum agreed on by the parties as liquidated damages represents a reasonable forecast of damages expected to occur in the event of a breach." *Id*. (citing *TAL Fin. Corp.*, 446 Mass. at 431-432) (emphasis added). Thus, only the circumstances present at contract formation are relevant in determining the enforceability of a liquidated damages clause. This approach "will most accurately reflect the

expectations of the parties when they contracted for liquidated damages." *TAL Fin*. *Corp*., 446 Mass. at 432; see *Kelly v*. *Marx*, 428 Mass. 877, 879 (1999) (Supreme Judicial Court of Massachusetts rejecting the "second look" approach, where actual damages resulting from breach are used to determine the validity of a liquidated damages clause).

On the other hand, "[l]iquidated damages will not be enforced if the sum is 'grossly disproportionate to a reasonable estimate of actual damages' made at the time of contract formation," which is consistent with the rejection of the "second look" approach. *TAL Fin*. *Corp*., 446 Mass. at 432 (quoting *Kelly*, 428 Mass. at 880 (quoting *Lynch v*. *Andrew*, 20 Mass. App. Ct. 623, 628 (1985)).  Furthermore, "where the actual damages are easily ascertainable and the stipulated sum is unreasonably and grossly disproportionate to the real damages from a breach, or is unconscionably excessive, the court will award the aggrieved party no more than his actual damages." *AZ Servicenter Inc*. *v*. *Segall*, 334 Mass. at 675 (citations omitted).

In the present case, a genuine issue of material fact exists as to whether Section 3C of the SDA represents a reasonable forecast by the parties to the SDA, made at the time the SDA was entered into, of the damages that Defendants Baskin-Robbins and Dunkin' Donuts would be expected to occur in the event that Progressive failed to develop Specified Units in accordance with the Development Schedule, under circumstances which would have made actual damages difficult to ascertain, or whether Section 3.C is but "a cloak to hide a sum of money out of proportion to and differing greatly from the actual damages ordinarily arising from a breach" and, therefore, a penalty. *AZ Servicenter Inc*. *v*. *Segall*, 334 Mass. at 675.  Progressive contends that Section 3.C is the latter, a boilerplate provision taken verbatim from the standard form attached to Defendants' 2004 UFOC, in the absence of any attempt to reasonably forecast actual damages otherwise difficult to ascertain.   The fact that Section 3.C of the SDA gives consideration to only one factor, the amount owed by the Developer through the date of termination, without regard to even the most basic of other factors that would bear on actual damages suffered by Baskin-Robbins and Dunkin' Donuts by reason of the Developer's failure to open the Specified Units (such as, by way of non-exclusive example, Defendants' imposition of a "development hold" that would prevent the opening of Specified Units in accordance with

the Development Schedule, in the absence of any formal termination of the SDA, thereby allowing more Initial Franchise Fees to become due prior to the date of termination) bears this out.

## CONCLUSION

Defendants assert that their motion for summary judgment is "based on a simple and straightforward principle: that when a party enters into an agreement in which it specifically accepts the risk of a business venture, it should be required to adhere to the bargain it made."[148] If such a principle is applied to the facts and circumstances of the present case, however, the Motion for Summary Judgment must be denied.  Nothing in the agreements among Progressive or any one or more of the Defendants evidences any acceptance by Progressive of the risk, unknown to Progressive at the time of contracting, that the Defendants would withhold from Progressive material information regarding the sites Defendants identified and held out to Progressive as suitable – information that Defendants were under a duty to disclose.  Nor did any such agreements impose upon Progressive the risk that any one or more of Defendants would breach covenants relating to the design, construction, and equipping, of the improvements physical plants to be developed on such sites, or the risk that any one or more of the Defendants would breach the obligations of support described in the Defendants' own disclosure materials.  Although the parties to SDA and the Franchise Agreements jointly acknowledge the speculative nature of the venture to be undertaken by Progressive under those agreements, nothing in those agreements allocates to Progressive the risks arising from the Defendants' own acts.  Defendants have failed to meet their burden of proof.  Accordingly, for the foregoing reasons, Progressive respectfully requests that:

      (a)      the Motion for Summary Judgment be denied in its entirety;

      (b)      the Laudermilk Certification be stricken from the record; and

      (c)      the Zullig Certification be stricken from the record.

                    Respectfully submitted,

                    /s/  Thomas R. Brule
                    Thomas R. Brule (0060146)

---

[148]    Motion for Summary Judgment, at 1, Introduction.

BRULE LAW FIRM, LLC
80 Berkshire Park Drive
Chagrin Falls, Ohio 44022
Telephone:  (216)789-4229
Email:  brulet@gmail.com

December 31, 2009                      *Attorney for Plaintiff*

## CERTIFICATE OF  SERVICE

I hereby certify that a copy of the foregoing was filed electronically on this 31st day of December, 2009 using the Court's electronic filing system.  Parties may access this filing through the Court's system.


    s  /Thomas R. Brule