# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC, | ) | Case No. 1:07 CV 3424 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| DUNKIN' DONUTS | ) | |
| INCORPORATED, BASKIN-ROBBINS | ) | |
| USA, CO., and THIRD DUNKIN' | ) | |
| DONUTS REALTY, INC., | ) | |
| | ) | **DEFENDANTS' AND** |
| Defendants and Plaintiffs- | ) | **PLAINTIFFS-IN-COUNTERCLAIM'S** |
| in-Counterclaim and | ) | **REPLY BRIEF IN SUPPORT OF THEIR** |
| Third Party Complaint, | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| v. | ) | |
| | ) | |
| EITAN FLANK, MIKE FLANK, | ) | |
| SHAUL FLANK, JOEL SAUSEN, and | ) | |
| KEVIN DAUBENMIRE, | ) | |
| | ) | |
| Third Party Defendants. | ) | |

Robert. L. Zisk
Eric L. Yaffe
Jeffrey L. Karlin
Ashley M. Ewald
GRAY, PLANT, MOOTY, MOOTY
  & BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC 20037
Telephone:    (202) 295-2200
Facsimile:    (202) 295-2250

Robert D. Anderle, Esq. (0064582)
Daniel F. Gourash, Esq. (0032413)
SEELEY, SAVIDGE, EBERT
  & GOURASH CO.
26600 Detroit Road
Cleveland, Ohio 44145-2397
Telephone:    (216) 566-8200
Facsimile:    (216) 566-0213
dfgourash@sseg-law.com

Dated: February 5, 2010

*Attorneys for Defendants and*
*Plaintiffs-in-Counterclaim*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ..............................................................................................................1

I. THE DISCLAIMERS SET FORTH IN THE CONTRACTS BAR ALL CLAIMS RAISED BY PROGRESSIVE IN THIS ACTION ..........................................................1

II. THE DISCLAIMERS HAVE NOT BEEN MODIFIED EITHER ORALLY OR BY CONDUCT ..............................................................................................................9

III. PROGRESSIVE CANNOT MEET THE ELEMENTS OF EQUITABLE ESTOPPEL OR FRAUD IN THE INDUCEMENT ........................................................12

IV. THE SDA'S BROADLY WORDED CONTRACTUAL LIMITATIONS BAR PROGRESSIVE'S CLAIMS ...........................................................................................16

V. THIRD DUNKIN' REALTY IS NOT LIABLE FOR ANY CLAIMS RELATED TO THE DEVELOPMENT OR OPERATION OF THE SHOPS....................................17

VI. PROGRESSIVE'S UNJUST ENRICHMENT CLAIM FAILS PER THE PLAIN LANGUAGE OF THE SDA, AND FOR THE SAME REASON, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DUNKIN' ON ITS COUNTERCLAIM ..........................................................................................................20

VII. PROGRESSIVE HAS WAIVED ITS UNFAIR COMPETITION AND FRUSTRATION OF COMMERCIAL PURPOSES CLAIMS ......................................21

CONCLUSION.....................................................................................................................22

## <u>TABLE OF AUTHORITIES</u>

### Federal Cases

*Ciphertrust, Inc. v. Trusecure Corp.*, No. 1:04cv1232,
2005 U.S. Dist. LEXIS 46322 (E.D. Va., Nov. 28, 2005) ...................................................... 21

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) ............................................................. 18

*Konold v. Baskin-Robbins, Inc.*, No. 95-1251,
1996 WL 346607 (10th Cir. June 25, 1996) ....................................................................... 8

*Law v. Ernst & Young*, 956 F.2d 364 (1st Cir. 1992) ............................................................ 12

*Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33 (1st Cir. 2008) .................................. 9, 10

*Mauser v. Raytheon Co. Pension Plan for Salaried Employees*,
239 F.3d 51 (1st Cir. 2001) .................................................................................................. 12

*Neff v. American Dairy Queen Corp.*, 58 F.3d 1063 (5th Cir. 1995) ...................................... 6

*Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002) .................................................... 19

*Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146 (S.D.N.Y. 1989) ........................................... 8

*Schoch v. First Fidelity Bancorporation*, 912 F.2d 654 (3d Cir. 1990) ............................... 16

*Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061,
2005 WL 2045807 (N.D. Cal. Aug. 25, 2005) ................................................................... 21

*Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535 (1st Cir. 2009) ........................... 9

*Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96 (3d Cir. 1976) ....................... 18

*Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 87 (E.D.N.Y. 2000) .................................. 6

### State

*ABM Farms v. Woods*, 81 Ohio St. 3d 498 (Ohio 1998) ....................................................... 12

*Acushnet Fed. Credit Union v. Roderick*, 530 N.E.2d 1243 (Mass. App. Ct. 1988) .............. 14

*Amerada Hess Corp. v. Garabedian*, 617 N.E.2d 630 (Mass. 1993) .................................... 10

*Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017 (Mass. 1992) ............................... 11

*Chatham Furnace Co. v. Moffatt*, 18 N.E. 168 (Mass. 1888) ................................................. 14

*Commerce Bank & Trust Co. v. Hayeck*, 709 N.E.2d 1122 (Mass. App. Ct. 1999)............... 12

*Doe v. Blue Cross/Blue Shield of Ohio*, 607 N.E. 2d 491 (Ohio Ct. App. 1992) ................... 12

*First Pennsylvania Mortg. Trust v. Dorchester Sav. Bank*,
481 NE.2d 1132 (Mass. 1985)................................................................................................ 11

*Forbes v. Janisch*, No. 07-P-1784,
2009 Mass. App. LEXIS 126 (Mass. App. Ct. Mar. 19, 2009) ............................................. 14

*Kondrat v. Morris*, 692 N.E. 246 (Ohio Ct. App. 1997) ...................................................... 14

*McCartin v. Westlake*, 630 N.E.2d 283 (Mass. App. Ct. 1994) ........................................... 10

*Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E. 2d 630 (Ohio 1990)) ............................... 12

*Powell v. Rasmussen*, 243 N.E.2d 167 (Mass. 1969)............................................................ 12

*Roddy v. McNulty Ins. Agency, Inc.*, 452 N.E.2d 308 (Mass. App. Ct. 1983) ...................... 11

*Sabbatis v. Burkey*, 853 N.E.2d 329 (Ohio Ct. App. 2006) ................................................... 8

*Sherman v. Koufman*, 211 N.E.2d 220 (Mass. 1965).......................................................... 14

*Walworth v. BP Oil Co.*, 678 N.E. 2d 959 (Ohio Ct. App. 1996) ......................................... 12

*Wausau v. George*, 41 Mass. App. Ct. 719 (1996) ............................................................... 10

*Wesley v. Marsman,* 471 N.E.2d 51 (Mass. 1984)................................................................ 11

*Yorke v. Taylor*, 124 N.E.2d 912 (Mass. App. Ct. 1955) ..................................................... 14

**Statute**

28 U.S.C. § 1746.................................................................................................................... 19

**Miscellaneous**

BLACKS LAW DICTIONARY, 2004 Ed............................................................................... 21

Merriam-Webster's Collegiate Dictionary, 10th ed................................................................ 3

## INTRODUCTION

As Dunkin' has informed the Court on many occasions, the legal arguments in support of its Motion for Summary Judgment are straightforward because they are based on broadly written and clear-cut disclaimers and contractual limitations provisions.  The aim of these provisions was to protect Dunkin' from claims from franchisees who were disappointed in the return on their investments in their franchises – circumstances where they were entirely responsible for the day-to-day operations of their stores and where they acknowledged that the risk of the ventures was their own.  In the face of these provisions, Progressive has engaged in a lengthy exercise in line-drawing and word-smithing designed to obscure the plain language of the agreements.  We have deliberately chosen not to file a brief that is anywhere close to the length of Progressive's because it is not necessary to do so.  The provisions at issue are clear on their face and do not require a great deal of interpretation to discern their commonplace meaning.  Our brief, therefore, is an effort to clear up misimpressions presented by Progressive and once again place the relevant contractual provisions squarely before the Court for its consideration.

## I.  THE DISCLAIMERS SET FORTH IN THE CONTRACTS BAR ALL CLAIMS RAISED BY PROGRESSIVE IN THIS ACTION

The essence of Progressive's argument is that the disclaimers in the Multiple Unit Store Development Agreement ("SDA") do not apply because the contract contemplates that the franchisee will choose the sites for the shops itself, and in this circumstance it was Dunkin' that selected the locations.  (Op. Br. at 31-35.)  This contention ignores both the letter of the contract in general and the disclaimers in particular.  The SDA specifically states, among other things, that Dunkin' "makes no representation or warranties with respect to the suitability or potential of locations *which it approves.*"  SDA at 10, ¶ 22 (emphasis added).  Simply put, the fact that Dunkin' has chosen the sites at issue can have no other meaning than that it also has approved

1

these locations.  And having approved the sites, the disclaimers apply in full to any claims based on those decisions.  Therefore the distinction that Progressive tries to draw between "site selection" and "site approval" makes no difference with respect to the application of the disclaimers.  Since *all* locations had to be approved by Dunkin' regardless of which party identified the sites, the disclaimers bar claims against Dunkin' regarding site location.  Reading the SDA's disclaimers, as Progressive does, to cull away claims based on Dunkin's selection of sites rewrites the unambiguous language of this provision in its entirety.

In fact, under the SDA, it was Progressive's responsibility to evaluate the sites, regardless of what role Dunkin' played.  The agreement states, for example, that although Dunkin' might provide Progressive with information about the territory within which it would open its shops, that it was "*critical* that [Progressive] . . . rely only on its own information and analysis relating to all aspects of developing a Unit within the Store Development Area." *Id.* (emphasis added).  The disclaimer could not be plainer on its face: Progressive was responsible for getting its own information and doing its own analysis with respect to the potential of the sites as locations for ongoing businesses as well as every other facet of opening the franchises.  The one thing the SDA did not allow Progressive to do was to rely entirely on Dunkin's site selection and approval efforts and then sue Dunkin' for its operating losses and lost profits when things did not turn out as well as it had expected.  As sophisticated businesspeople, the executive team at Progressive (who also run a string of successful nursing homes in the Cleveland area) was obligated under the SDA to make its own evaluation of the territory and conduct its own in-depth due diligence regarding the particular sites.  Progressive did not have to enter into agreements with Dunkin'.  Through this lawsuit, Progressive is now trying to evade the bargain that it made in signing the SDA and the Franchise Agreements.

Similarly, Progressive's contention that the "suitability" language of the disclaimers applies only to claims based on the "development" of a site and not to its claims for operating losses and lost profits after the shops opened is based on a tortured and inaccurate interpretation of these provisions. As noted above, the SDA states that Dunkin' "makes no representation or warranties with respect to the *suitability or potential* of the locations which it approves." *Id.* at 9, ¶ 19 (emphasis added). Progressive deliberately ignores the term "potential" completely and focuses entirely on the term "suitability." The term "potential" can have no meaning in this context other than the potential success, i.e., profitability, of any shops opened by Progressive under the SDA.[1] Therefore, the disclaimers specifically bar claims based on representations made by Dunkin' concerning the profitability of the shops.

Even if the disclaimer had only used the term "suitability," judged by the context within which it was used, that term is far broader than Progressive would have it. Progressive asserts that the term "suitability" only applies to the appropriateness of the site as a place to construct a shop without any regard for how successful the site would be as an operating business. (Op. Br. at 36.) However, the whole point of identifying the site and constructing something on it was for it to be used to *operate* a business. Moreover, Progressive's claims for monetary relief focus entirely on Dunkin's alleged failures to identify sites at which it could make a profit. These claims are barred under the SDA.

The SDA's disclaimers also clearly speak to claims based on the success of the shops as operating enterprises. The SDA's integration clause, for example, warns that the "business

---

[1] For example, the dictionary definition of the noun "potential" is "something that can develop . . . ." Merriam-Webster's Collegiate Dictionary, 10th ed. at 912. The dictionary also associates the word with the noun "promise," which is defined as a "ground for expectation of success, improvement, or excellence." *Id.* at 933.

3

venture" that Progressive was about to embark on was "speculative" and its "success . . .

depends, to a large extent, upon the ability of [Progressive] as an independent businessman, as

well as other factors." SDA at 9, ¶ 19.[2]  The same clause also provides that Dunkin' did not

make any representations that "induced [Progressive] to execute the [SDA]" and that no one

from Dunkin' had made any promises "as to profits which [Progressive] in particular might be

expected to realize . . . . " *Id.*  Therefore, Progressive's contention that the disclaimers only

applied to the development phase of these shops ignores the plain language of the agreement and

should be rejected in full.  The whole point of such disclaimers was to protect Dunkin' from

claims by franchisees whose businesses lose money and then seek to sue Dunkin' for Dunkin's

supposed failures in approving sites that did not make a profit.  Since there is no dispute that

Dunkin' approved the sites, the disclaimers apply in full and bar Progressive from seeking

recovery for its operating losses and lost profits.[3]

 Progressive's reliance on statements concerning the development process made by

Dunkin' in its Uniform Offering Circular ("UFOC") – the disclosure document that Dunkin'

provides to prospective franchisees before they sign their Franchise Agreements – also gets it

---

[2]  Progressive's argument on pages ix and 35-36 of its Opposition that the term "other factors" in
the disclaimer only means things that Dunkin' did or did not do makes no difference.  On its
face, all this clause means is that Progressive's success depends on its own effort and factors
*beyond its control*, which could also include the economy and competition from other
businesses.  And the fact that these other factors might include acts or omissions by Dunkin' just
adds support to the conclusion that the disclaimers were aimed at preventing Dunkin' from being
sued on the basis of such assertions.

[3]  At several points in its argument with respect to the SDA's disclaimers, Progressive contends
that even if the contract barred claims arising out of the parties' performance of the SDA, it does
not bar claims for fraudulently inducing it into entering into the leases, the franchise purchase
agreements for the shops, or the loan documents Progressive signed with NCB.  (See, e.g., Op.
Br. at 37, 49, and 60.)  However, as discussed below, there is no actionable claim here for fraud
because (for one thing) there are no facts in the record to support such a claim.  Additionally,
there is nothing to support Progressive's contention that it should recover its operating losses and
lost profits during the operation of the shops.

nowhere.  Progressive's contention is that the UFOC draws a distinction between site selection and site approval.  (Op. Br. at 35.)  However, consistent with the SDA, the UFOC states that "[a]ll sites must be approved by us" and that the franchisee "cannot develop a site not approved by us."  (Ex. HH to Op. Br., 2004 UFOC, Item 11, Part C; 2005 UFOC, Item 11, at 95-96.)  Thus, in the UFOC, Dunkin' clearly identified that the key aspect of the development phase was the approval of the sites.  The UFOC also states Dunkin' is not responsible for the success of the franchise and that the burden of the risk of the investment is on the franchisee.  (Ex. 1F to SJ Br., 2005 UFOC, Item 19.)  Therefore, Progressive's reliance on the UFOC as support for its contention that Dunkin' has exposed itself to claims of the kind that it faces in this action is unfounded.

As a matter of general policy, the fact that the SDA disclaims actions against Dunkin' for a franchisee's operating losses and lost profits makes sense and is fair.  First, trying to determine the proximate cause for why a business does not do well is virtually impossible.  There are a variety of factors that can impact profits, including the general health of the economy, the often-related growth or loss in population in a market, the efforts of competitors, and the skill of the business owner.  The location of a business is only one such factor, and it is also the factor that was the easiest for Progressive to evaluate accurately on its own because its members were already operating businesses at several locations in the Cleveland market.  In addition, the disclaimers in the SDA accurately reflect the relationship between franchisors and franchisees.  Although franchisors such as Dunkin' provide franchisees with a business model and require them to operate strictly within their standards, franchisees bear the *entire* legal responsibility for their own day-to-day operations.  The courts have widely recognized, for example, that a franchisee's employees are not the franchisor's employees, a franchisor is not a tortfeasor with

5

respect to any harm that comes to customers on franchisees' premises for matters under the franchisee's control and a franchisor is not a party to a contract entered into by a franchisee.[4]  In short, the franchisee shoulders the legal responsibility for the day-to-day operations of the franchised business.  The disclaimers in the SDA with respect to the financial consequences of the investment made by the franchisees merely reflect this broader aspect of franchise law, i.e., that franchisees are responsible for their own financial success.  And, not surprisingly, that is why Progressive has failed to cite to a single case in which a franchisor has been held legally responsible for the operating losses or lost profits of a franchised business.  Thus, even if there were no disclaimers in the SDA, Dunkin' would be able to successfully argue that it is not responsible for Progressive's failure to earn profits from these locations.

It should also be noted that the SDA was not the only contract between the parties that contained these kinds of disclaimers.  The SDA was the initial agreement between Dunkin' and Progressive and governed the development of the shops, i.e., the establishment of an exclusive territory for Progressive, the selection of sites for the franchises, the construction of the individual units and the payment of fees for the rights to develop each location.  However, once the shops were ready to be opened, Progressive entered into individual twenty-year Franchise Agreements for each location.  All of Progressive's claims for operational losses and lost profits were incurred *after* its shops were open and operating under the Franchise Agreements.

---

[4]  *See, e.g., Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066 (5th Cir. 1995) (finding that franchisor was not vicariously liable for franchisee's conduct and that relevant inquiry in a vicarious liability action is whether franchisor specifically controls the activity that gives rise to liability); *Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 87 (E.D.N.Y. 2000) ("In deciding whether a franchisor may be held vicariously liable for acts of its franchisees, courts determine whether the franchisor controls the day-to-day operations of the franchisee, and more specifically whether the franchisor exercises a considerable degree of control over the instrumentality at issue in a given case.")

Nonetheless, the striking aspect of this lawsuit is that Progressive has not sued Dunkin' for *any* breach of the Franchise Agreements. Instead, all of the claims are based entirely on the SDA and the leases between Progressive and Third Dunkin' Realty, the real estate development arm of Dunkin' (of which more will be discussed below). That may not be surprising, given that there is no general principle of contract law which makes Dunkin' the guarantor of Progressive's profits.

Moreover, the Franchise Agreements themselves contain their own set of disclaimers which specifically eschew any liability on the part of Dunkin' for the success of the shops. Paragraph 18 of the Franchise Agreements states that the franchise was a "speculative" venture, that there were no representations made to the franchisees by Dunkin' about profits or sales, and that Dunkin' employees were not authorized to make such representations. An addendum to the Franchise Agreements states that Dunkin's approval of a site was "not a representation or warranty that the Unit [would] be profitable or that [the Franchisee would] achieve any particular level of sales at the Unit." (Exs. 1.A-1.C, Special Terms and Conditions ¶ 1.3.). Progressive's failure to sue under the Franchise Agreements for its operating losses and lost profits is a tacit acknowledgment that it had no right to do so.

Progressive's claims for its start-up costs (including the costs of constructing the one shop it completed and the cost of purchasing all three of the Franchise Agreements) are also barred. Progressive's efforts to seek all of its costs for entering into the contracts between the parties is tantamount to a claim to rescind the contracts altogether. Progressive failed to raise a recession claim on a timely basis and instead performed under both the SDA and the Franchise Agreements. Moreover, Progressive has entirely ignored the fact that the SDA clearly states that Progressive was "solely responsible" for any construction or start-up costs it incurred. SDA at 3,

§ 6.  As such, all claims for Progressive's start-up costs cannot be raised in this action.  Even if the claims were not barred, Progressive would not be able to recover both its start-up costs *and* lost profits and operating losses.  Instead, the general rule in rescission cases is that the complaining party must elect its remedy; either rescinding the contract or suing for damages, but not both.  *See Sabbatis v. Burkey*, 853 N.E.2d 329 (Ohio Ct. App. 2006) (holding that the election of remedies is required in rescission cases because it is inconsistent to allow the party to rescind the contract and yet, at the same time, receive its benefits).

Finally, Progressive's attempt to distinguish the cases cited by Dunkin' in it opening brief falls well short of the mark.  Progressive has not challenged the fact that courts have consistently enforced franchise contracts that disclaim recoveries for operating losses and profits.  Instead, Progressive tries to draw distinctions on the basis of its argument that the SDA only disclaimed representations and warranties when Dunkin' approved the sites, but not when Dunkin' selected the sites.  *See* Opp. Br. at 59-60.  As explained above, since Dunkin' had to approve all sites regardless of who selected them, the disclaimers apply in full to the shops at issue here.  Thus, the distinction that Progressive is trying to make between the disclaimers that have been enforced in cases such as *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146 (S.D.N.Y. 1989) and *Konold v. Baskin-Robbins, Inc.*, No. 95-1251, 1996 WL 346607 (10th Cir. June 25, 1996) is entirely artificial.  Again, in discussing these cases, Progressive only focuses in on representations as to the "suitability" of the sites, while ignoring the fact that the disclaimer also specifically and clearly applies to representations as to their "potential."  The cases cited by Dunkin' fully support the conclusion that Progressive is barred from seeking its operating losses and lost profits in this action.

## II.   THE DISCLAIMERS HAVE NOT BEEN MODIFIED EITHER ORALLY OR BY CONDUCT

Progressive also argues that the disclaimers in the SDA, UFOC, and Franchise Agreements are of no effect or were somehow modified because of Dunkin's conduct before and after signing the agreements. (Opp. Br. at 50-52.) This argument fails on multiple grounds: first, as a matter of law, the contracts were fully integrated and constitute the final and complete agreement between the parties; second, the parties' conduct did not conflict with the contracts; third, well-established precedent supports the fact that disclaimers such as the ones as issue here effectively quash franchisees' attempts to pin their economic losses on franchisors; and finally, Progressive did not provide any consideration for any purported modifications to the contracts.

The SDA and Franchise Agreements each contain an unambiguous "merger/integration clause" (SDA ¶ 19, FA ¶ 15), a "no oral modification clause" (*id.*), and a "non-waiver clause" (SDA ¶ 15, FA ¶ 13). These clauses provide that the contracts reflect the full and complete agreement between the parties, that no other representations were made that induced the parties to sign the agreements, that no modifications to the agreements would be valid unless made in writing, and that any failure by Dunkin' to insist upon strict compliance with a term of the contract would be deemed a waiver on Dunkin's part to later insist on such compliance. (*Id.*) Whether a contract is fully integrated is a question of law to be decided by the court. *Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 44 n. 10 (1st Cir. 2008). Where the contract is unambiguous and contains an integration clause, it will be deemed fully integrated and not subject to modification. *See, e.g., Sonoran Scanners, Inc. v. Perkinelmer, Inc.*, 585 F.3d 535, 541 n. 2 (1st Cir. 2009) (citing *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998) ("[U]nder Massachusetts law, an integrated contract, 'if unambiguous, cannot be modified by evidence of earlier or contemporaneous discussions.'"))

Because they contain unambiguous integration clauses, the SDA and Franchise Agreements constitute the final and complete agreement between the parties, and any parol evidence should be disregarded. *Amerada Hess Corp. v. Garabedian*, 617 N.E.2d 630, 634 (Mass. 1993) (disregarding parol evidence of negotiations surrounding contract where contract was understood to be the final and unambiguous agreement between the parties); *McCartin v. Westlake*, 630 N.E.2d 283, 289-290 (Mass. App. Ct. 1994) ("[W]here [a] writing warns the buyers that what they sign, and no more, is binding, and the buyers acknowledge that to be so and that they understand what they are signing, a firm case is made, as matter of law, to enforce what was signed and not what was said during negotiations."). Similarly, any alleged waiver, failure to act, or failure to demand strict compliance with the terms of the Franchise Agreements is unavailing, given the non-waiver clause contained in the SDA and Franchise Agreements. *See Wausau v. George*, 41 Mass. App. Ct. 719, 728-29 (1996) (holding that nonwaiver agreements entered into by the parties were unambiguous and, as a matter of law, enforceable).

Progressive relies heavily upon a case in which the First Circuit upheld a trial court's ruling that lease documents were not fully integrated where they contained no provision with respect to rent subsidies and then the subsidies were later canceled and became the subject of dispute. (Opp. Br. at 50-51, citing *Marcoux*, 524 F.3d at 43). The case is distinguishable, however, because the crux of the issue there was that the subsidies were not discussed in the contract, even though they were an essential part of the business agreement. Here, however, the lost profits and damages that Progressive claims were specifically discussed in detail and disclaimed in the SDA and Franchise Agreements. (Dunkin' SJ Br. § II.A.) Moreover, as Dunkin' noted in its opening brief and discussed above, numerous courts have upheld

disclaimers similar to the ones at issue here when franchisees have tried to pin their lost profit damages on a franchisor.

Progressive also argues that the contracts were orally modified or modified by Dunkin's conduct. (Opp. Br. at 54.) However, under Massachusetts law, any such purported modification would be ineffective for lack of new consideration. The parties to a written contract may waive or modify the agreement only where sufficient consideration has been provided. *Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017, 1021 (Mass. 1992) ("It is a settled principle of law that '[t]he mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration.'") (citing *Siegel v. Knott*, 55 N.E.2d 889, 890 (Mass. 1944)); *see also First Pennsylvania Mortg. Trust v. Dorchester Sav. Bank*, 481 NE.2d 1132, 1138-39 (Mass. 1985) (same); *Wesley v. Marsman,* 471 N.E.2d 51, 52-53 (Mass. 1984) (same).[5]

Since there is no evidence in the record that Progressive provided adequate or valid consideration for an alleged modification to the SDA under which Dunkin's was to guarantee Progressive's profits for its shops, there is no basis for the Court to recognize any modification to the SDA.

Moreover, even if consideration was not needed to modify the contract, Progressive has failed to meet its burden to provide evidence from the record to show that any sort of modification of the SDA took place, either orally or through Dunkin's conduct. Massachusetts law imposes a heavy burden on the party seeking to modify an integrated written contract by a

---

[5] *Roddy v. McNulty Ins. Agency, Inc.*, 452 N.E.2d 308 (Mass. App. Ct. 1983), relied on by Progressive for the proposition that an oral modification of a contract is valid without additional consideration, actually does not involve an oral modification at all. Instead, the modification of the written contract in that case was accomplished through a *written addendum* which was the subject of the court's opinion. 452 N.E.2d at 313. The more recent cases from the Massachusetts Supreme Judicial Court cited here confirm that oral modifications must be supported by additional consideration, of which there is no evidence in the record.

subsequent oral agreement: "The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties" that the written agreement rather than any alleged subsequent oral modification should govern. *Boersner*, 597 N.E.2d at 1022 n. 10. Progressive has not begun to meet this burden given that it has not cited to a single oral statement by Dunkin' modifying the SDA's disclaimer. There are no statements by Dunkin' that it would guarantee the success of the shops or that Progressive would not incur losses. (In fact, common sense dictates that it was overly optimistic for Progressive to expect its shops to be immediately profitable given that they were start-up businesses in a market that Dunkin' was entering for the first time.) In addition, the only conduct by Dunkin' that Progressive relies on is the selection of the sites. How selecting the site translates into a modification of the SDA to guarantee profits is anyone's guess – certainly Progressive does not explain it, and this argument should be rejected in full. There is no evidence to support Progressive's assertion that the SDA has in any way been modified.

### III.  PROGRESSIVE CANNOT MEET THE ELEMENTS OF EQUITABLE ESTOPPEL OR FRAUD IN THE INDUCEMENT

Progressive further argues that Dunkin' is equitably estopped from relying on the disclaimers in the SDA, Franchise Agreements, and UFOC because of its conduct in selecting the sites for the stores. (Opp. Br. at 43.) Later, in a similar argument, it contends that Dunkin's conduct amounted to fraud. (Opp. Br. at 81.) But Progressive's argument is circular – that Dunkin' cannot rely on the disclaimers in the contracts because its conduct falls within the purview of the disclaimers – and does not withstand scrutiny.

In reviewing the elements of equitable estoppel and fraud, which are almost identical, it is clear that Progressive cannot meet a single one. For equitable estoppel to take effect under

Massachusetts law, Progressive would need to show that Dunkin' made a "definite misrepresentation of fact" to it "with reason to believe [that Progressive] would rely on it" and that Progressive did in fact "rely reasonably on the misrepresentation to [its] detriment." *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 239 F.3d 51, 57 (1st Cir. 2001); *see also Law v. Ernst & Young*, 956 F.2d 364, 368 (1st Cir. 1992). Under Ohio law, the representation must be "misleading." *Ohio State Bd. of Pharmacy v. Frantz*, 555 N.E. 2d 630, 633 (Ohio 1990); *Walworth v. BP Oil Co.*, 678 N.E. 2d 959, 963 (Ohio Ct. App. 1996); *Doe v. Blue Cross/Blue Shield of Ohio*, 607 N.E. 2d 491, 498 (Ohio Ct. App. 1992) (noting equitable estoppel requires that the proponent prove four elements: (1) that the adverse party made a factual misrepresentation; (2) that the misrepresentation was misleading; (3) that the misrepresentation induced actual reliance, which was reasonable and in good faith; and (4) the proponent suffered detriment due to the reliance.).

Similarly, under Ohio law, "[i]n order to prove fraud in the inducement, a plaintiff must prove that the defendant made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms v. Woods*, 81 Ohio St. 3d 498, 502 (Ohio 1998). The standard is the same in Massachusetts, where a plaintiff must prove the elements of common law deceit which include "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." *Commerce Bank & Trust Co. v. Hayeck*, 709 N.E.2d 1122, 1126 (Mass. App. Ct. 1999), quoting from *Hogan v. Riemer*, 619 N.E.2d 984 (Mass. App. Ct. 1993).

To constitute a misrepresentation, an assertion must be one of fact, not of expectation, estimate, opinion, or judgment. *Powell v. Rasmussen*, 243 N.E.2d 167 (Mass. 1969). A fact is

something "susceptible of knowledge." *See, e.g.*, *Chatham Furnace Co. v. Moffatt*, 18 N.E. 168, 169 (Mass. 1888); *Yorke v. Taylor*, 124 N.E.2d 912, 914 (Mass App. Ct. 1955); *Acushnet Fed. Credit Union v. Roderick*, 530 N.E.2d 1243, 1244 (Mass. App. Ct. 1988). "Promissory statements are not representations of fact." *Forbes v. Janisch*, No. 07-P-1784, 2009 Mass. App. LEXIS 126 *3 (Mass. App. Ct. Mar. 19, 2009); *Sherman v. Koufman*, 211 N.E.2d 220, 223 (Mass. 1965). Similarly, "[m]ere predictions about the future are not actionable misrepresentations." *Kondrat v. Morris*, 692 N.E. 2d 246, 251 (Ohio Ct. App. 1997). "A statement of opinion or belief such as occurs in 'puffing' generally cannot constitute a misrepresentation." *Id.* at 252 (citing W. Prosser, The Law of Torts, § 10.9, at 726 (4 ed. 1971)).

Progressive's fraud claim fails as a matter of law because even if Dunkin' made the alleged misrepresentation that the sites were suitable (in spite of the disclaimers stating that Dunkin's approval of a site did not amount to a warranty of suitability), which Dunkin' denies, such a representation would have only been a promissory statement/statement of opinion or belief and not one of fact which can be proven false.

Further, the scheme that Progressive alleges Dunkin' undertook with regard to it is ludicrous. (Op. Br. at 81-92.) It asks this Court to accept, without any evidence, that at the time the Mentor, Chardon, and Euclid sites were selected, the decision-makers at Dunkin' knew that the sites were not suitable, decided to enter into agreements with the property owners to gain access to the land anyway, then misrepresented to Progressive that the sites would earn a profit, and purposely led Progressive into developing stores that Dunkin' knew would never succeed over the course of the twenty-year term of the Franchise Agreements. It also asks the Court to accept that Dunkin' would undertake this scheme to purposely develop unsuccessful sites, even while Dunkin' was trying to establish its brand in the Cleveland market. Finally, it asks the

14

Court to accept that Dunkin' would purposely choose and recommend unsuitable sites even though Dunkin', as a franchisor, makes its money through royalties that its franchisees pay on sales and therefore has an incentive to assist its franchisees in developing the most profitable sites possible.  There is no evidence in the record to support any of this.

The only evidence Progressive can point to after reviewing tens of thousands of pages of documents and over a dozen depositions, however, is the testimony of a marketing representative, *who by her own admission had no involvement in site selection*, who stated she had some concerns about the sites from a marketing perspective after the sites were already selected, as well as the notation in a 2006 overview of the stores' performance (made long after the SDA and Mentor Franchise Agreement was signed) that the "Current DM would not have approved [the Mentor] site."  (Ex. JJJ and MMM to Opp. Br.)  This evidence does not meet Progressive's burden of showing that *at the time* the sites were selected and offered to Progressive, Dunkin' knew they were unsuitable yet purposely misrepresented them as suitable to Progressive.

Further, as discussed above, Progressive cannot show that even if Dunkin' did have a scheme to purposely recommend sites it knew would fail, Progressive could not have reasonably relied on the recommendation.  This is where the numerous disclaimers are so crucial – they specifically cautioned Progressive against relying on the fact that Dunkin' approved of a site and noted that Progressive had to do its own due diligence on each site.  With sophisticated and experienced businesspersons as its members, Progressive should have expected nothing less.

15

## IV.    THE SDA'S BROADLY WORDED CONTRACTUAL LIMITATIONS BAR PROGRESSIVE'S CLAIMS

As Dunkin' explained in its opening brief, most of Progressive's claims are also barred by the broadly written contractual limitations provisions contained in the SDA.  The relevant portion of this provision states (in all capital letters) that

> ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF [PROGRESSIVE] AND [DUNKIN'] OR [PROGRESSIVE'S] OPERATION OF THE UNIT . . .  MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM WILL BE BARRED . . . ."

SDA at 9, § 18(F)(5).  This provision could not be broader or plainer on its face.  By its very terms, the provision not only applies to any breaches of the SDA, but to any claims arising out of "the relationship" between Progressive and Dunkin'.  It also unambiguously applies to the "operation of the" shops.

In response, however, Progressive unabashedly claims that "there is no two-year limitation period in the SDA."  (Opp. Br. at 74.)  That is clearly untrue and evident from the fact that Progressive quotes the entire provision immediately thereafter.  Also untrue is Progressive's assertion that the limitation provision does not apply to any of Dunkin's site selection or development activities because "[s]uch claims do not arise out of or relate to a breach of the [SDA]."  After spending dozens of pages arguing that the SDA's disclaimers do not apply because Dunkin' breached (and modified) the agreement by engaging in site selection and development activities, Progressive's assertion in connection with the limitations provision that such activities do not relate to the SDA should be rejected in full.  All of Dunkin's site selection activities arise out of the SDA since they were conducted because of and pursuant to the contract.  And, even if they did not relate directly to the SDA, all of these activities arose out of

the relationship between Dunkin' and Progressive and are barred on that ground as well.  The same is true with respect to the UFOC, the leases, and the franchise purchase agreements for the individual stores, which Progressive asserted were the true source of liability here.  Since all of these agreements arose out of the relationship between Progressive and Dunkin', all claims based on those agreements are subject to the SDA's limitations provision and are barred.

## V.     THIRD DUNKIN' REALTY IS NOT LIABLE FOR ANY CLAIMS RELATED TO THE DEVELOPMENT OR OPERATION OF THE SHOPS

Faced with the fact that the disclaimers bar its claims against Dunkin', Progressive attempts to get around them by focusing on Third Dunkin' Realty which was not a party to either the SDA or the Franchise Agreements.  Progressive has presented no evidence from the record that Third Dunkin' engaged in the site selection and approval actions that are at the heart of its claims here.  Indeed, that is not Third Dunkin's function – it is Dunkin's function.  Progressive's contention that Third Dunkin' is legally responsible for its damages in this case also ignores the fact that Third Dunkin' is merely the landlord at the three locations that it has opened and is only a party to the leases that the parties signed.  Thus, if it is true, as Progressive contends, that Third Dunkin' cannot shield itself from any claims with the disclaimers in the SDA or Franchise Agreements because it was not a party to these contracts, it is also true that Third Dunkin' is also not legally responsible to Progressive for any breaches of the SDA or Franchise Agreements.[6] Therefore, Third Dunkin's acts or omissions cannot be the source of liability here – there is no privity of contract with respect to the SDA and the Franchise Agreements between Third Dunkin' and Progressive.  Moreover, Progressive does not identify any employees of Third Dunkin' (since none exist) who engaged in fraud.

---

[6]  Although Progressive points to various contracts to which Third Dunkin' is a party, it does not claim that the entity beached any of them, but merely brings them up in order to support its allegation that Third Dunkin' took an active role in the development of the shops.

From a broader perspective, Progressive points to no provisions in the leases that would attach liability to Third Dunkin' for its claims for operating loses and lost profits.  In fact, Progressive has cited to no provisions of the leases which Third Dunkin' breached at all.  And there are no general principles of law that would make the landlord of a commercial business liable for Progressive's operating losses and lost profits without a specific provision of the lease saying so.  Therefore, Progressive cannot use Third Dunkin' as the vehicle for obtaining its recovery here.

Progressive's civil conspiracy and intentional interference with contract claims are also based on the false idea that Third Dunkin' was an independent and bad actor that conspired with the other Dunkin' parties against Progressive and intentionally caused Dunkin' to terminate its SDA with Progressive.  However, because there are no facts that support its theories, these claim fail as well.  *See, e.g., Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194-95 (1st Cir. 1996) (holding that conclusory statements are insufficient to satisfy the pleading requirements); *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) ("unsupported allegations" in pleadings "are insufficient to repel summary judgment."); *Sound Ship Bldg. Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 100 (3d Cir. 1976) ("The mere presence in the complaint of the allegation that [the defendant] caused [the plaintiff's] damages is no longer sufficient by itself for [the plaintiff] to avoid summary judgment.")

The only evidence in the record regarding Third Dunkin' is the Declaration of Dunkin' Brand, Inc.'s Associate General Counsel, Jack Laudermilk.  Progressive's repeated contention that Mr. Laudermilk's certification was required to be sworn before a notary is incorrect.  Under 28 U.S.C. § 1746, unsworn statements are considered as evidence as long as they include the statement that the declarant was making the statement "under the penalty of perjury."  *Peters v.*

18

*Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (commenting that courts "are generally consistent in validating documents that were sworn to under penalty of perjury, notwithstanding that they were not notarized."). Furthermore, Progressive's assertion that Mr. Laudermilk had no personal knowledge of the facts related to Third Dunkin' that he certified to is untrue. As Associate General Counsel for Dunkin' Brands, Inc., Mr. Laudermilk is in a position to know the facts to which he stated. Laudermilk Cert. at ¶ 2. Therefore, the fact that Third Dunkin' had no employees and was only a legal entity must be taken as true.

In addition, Progressive incorrectly asserts that Dunkin' admitted that "*all* of the Defendants, Baskin-Robbins, Dunkin' Donuts, and Third Dunkin' Realty, participated in the process of site identification." (Opp. Br. at 17.) In making this assertion, Progressive relies on Dunkin's Answer to Progressive's First Amended Complaint in which it admitted that the "Defendants participated in the site selection and construction for the Progressive opened stores located in Mentor, Chardon and Euclid, Ohio." (Answer at ¶ 17.) At most, however, this response is ambiguous as to what roles which Defendant had with respect to site selection and construction and was not intended to state that each Defendant was involved in every manner with respect to these activities. In response to specific allegations concerning Third Dunkin's role, Dunkin' denied that it was involved in site selection activities. For example, it denied that Third Dunkin' was "a party to the events and acts underlying the within action . . . ." (Answer at ¶ 7.) In addition, Dunkin' also denied that Third Dunkin' had "development and construction responsibilities with respect to the real estates development at issue . . . ." (*Id.* at ¶13.) Finally, Dunkin' also denied that Third Dunkin' "was an active intermeddler with respect to the rights and entitlements of Progressive under the SDA as to all site selection, development, construction and support." *Id.* To the extent that it is necessary for Dunkin' to clear up this ambiguity, it will

seek leave to file an Amended Answer in which it would make clear in its responses that Third

Dunkin' was not responsible nor did it approve any of the sites at issue here.

VI.     **PROGRESSIVE'S UNJUST ENRICHMENT CLAIM FAILS PER THE PLAIN LANGUAGE OF THE SDA, AND FOR THE SAME REASON, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DUNKIN' ON ITS COUNTERCLAIM**

Progressive takes the position that although it paid Dunkin' only $140,000 of the

$240,000 owed pursuant to the SDA, Dunkin' was somehow unjustly enriched.  (Opp. Br. at 78.)

This is nonsensical.  Progressive asserts that it did not owe Dunkin' the SDA fee after the SDA

was terminated.  That argument is contradicted by the plain language of the SDA, which

provides that the "Initial Franchise Fees shall be paid to [Dunkin'] in full and without reduction

or offset even if Developer, *for any reason*, fails to open any or all Specified Units to which the

Initial Franchise Fees relate."  (SDA Paragraph 2.A.)

Progressive's argument regarding the Purchase Agreements for the Mentor and Euclid

stores are also unavailing, since the fees under those agreements are unrelated to the $240,000

Initial Franchise Fees owed Dunkin' under the SDA.   In addition, in its opening brief, Dunkin'

pointed out that Progressive's unjust enrichment claim fails as a matter of law because under

both Massachusetts and Ohio law, this claim applies only where there is no contract that controls

the relationship between the parties.  (SJ Br. at 13.)  Because the SDA controls the relationship

between the parties and the fees paid under its auspices, the unjust enrichment claim fails as a

matter of law.  Progressive does not address this argument in its opposition.

On a related point, summary judgment on Dunkin's counterclaim for breach of contract

should be granted.  Progressive owed $240,000 pursuant to the terms of the SDA (or $232,000 if

the Mentor Franchise Agreement modified that figure) regardless of whether it opened one store

or six.  When Progressive signed the SDA, Dunkin' set aside a certain territory for Progressive's

exclusive development.  Dunkin' has not allowed any other stores to open in the territory pending the resolution of this lawsuit.  Yet Progressive has greatly underpaid what it owed Dunkin'.  Its failure to pay is a breach of contract, plain and simple, and Dunkin' had the right to terminate the SDA.

Progressive's argument regarding liquidated damages fails because Dunkin' is not seeking liquidated damages.  Black's Law Dictionary defines liquidated damages as "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches."  BLACKS LAW DICTIONARY, 2004 Ed.  Dunkin' is not seeking a penalty payment or a payment stipulated to in the event of a breach.  Rather, it is seeking what it is owed pursuant to the express terms of the contract.  Summary judgment should be granted in its favor on the counterclaim.

## VII.  PROGRESSIVE HAS WAIVED ITS UNFAIR COMPETITION AND FRUSTRATION OF COMMERCIAL PURPOSES CLAIMS

Finally, Progressive did not respond to Dunkin's arguments regarding Progressive's claims for unfair competition and frustration of commercial purpose.  A party who does not address legal arguments in an opposition to a motion for summary judgment concedes those issues in their entirety.  *Ciphertrust, Inc. v. Trusecure Corp.,* No. 1:04cv1232, 2005 U.S. Dist. LEXIS 46322 (E.D. Va., Nov. 28, 2005) (defendant who failed to respond to an argument in plaintiff's motion for summary judgment held to have "conceded the argument . . . ."); *Scognamillo v. Credit Suisse First Boston LLC*, No. C03-2061, 2005 WL 2045807 at *13 (N.D. Cal. Aug. 25, 2005) (a party's "utter failure to respond" to arguments raised in a dispositive motion "essentially concedes them").

21

# CONCLUSION

For the foregoing reasons, Dunkin's motion should be granted, and summary judgment should be entered in its favor on each of Progressive's claims and on Dunkin's counterclaim.

Respectfully submitted,

  /s/ Jeffrey L. Karlin
Robert. L. Zisk
Eric L. Yaffe
Jeffrey L. Karlin
Ashley M. Ewald
GRAY, PLANT, MOOTY, MOOTY
  & BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC 20037
Telephone:     (202) 295-2200
Facsimile:     (202) 295-2250

Robert D. Anderle, Esq. (0064582)
Daniel F. Gourash, Esq. (0032413)
SEELEY, SAVIDGE, EBERT & GOURASH CO.
26600 Detroit Road
Cleveland, Ohio 44145-2397
Telephone:     (216) 566-8200
Facsimile:     (216) 566-0213
dfgourash@sseg-law.com

Dated: February 5, 2010          *Attorneys for Defendants and Plaintiffs-in-Counterclaim*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 5th day of February, 2010, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


*/s/ Jeffrey L. Karlin* _____