**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROGRESSIVE FOODS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DUNKIN' DONUTS INCORPORATED, BASKIN-ROBBINS USA, CO., and THIRD DUNKIN' DONUTS REALTY, INC.,<br><br>Defendants and Plaintiffs-in-Counterclaim and Third Party Complaint,<br><br>v.<br><br>EITAN FLANK, MIKE FLANK, SHAUL FLANK, JOEL SAUSEN, and KEVIN DAUBENMIRE,<br><br>Third Party Defendants. | ) | Case No. 1:07 CV 3424<br><br>JUDGE DAVID D. DOWD, JR.<br><br>**PLAINTIFF'S SURREPLY TO THE DEFENDANTS' AND PLAINTIFFS IN COUNTERCLAIM'S REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |

Plaintiff and Counterclaim Defendant, Progressive Foods, LLC, an Ohio limited liability company ("***Progressive***"), respectively submits this surreply to the Defendants' and Plaintiffs in Counterclaim's Reply Brief in Support of their Motion for Summary Judgment (the "***Defendants' Reply Brief***" or "***DRB***") filed with the Court by Defendants on February 5, 2010 in response to the Plaintiff's Response to Defendants' Motion for Summary Judgment (the "***Opposition Brief***" or "***Op. Br.***") filed with the Court by Progressive on December 31, 2009.

Respectfully submitted,

/s/ Thomas R. Brule
Thomas R. Brule, Esq. (0060146)
BRULE LAW FIRM, LLC
80 Berkshire Park Drive
Chagrin Falls, Ohio 44022
Telephone: (216) 789-4229
Facsimile: (216) 916-4744
E-mail: brulet@gmail.com

*Attorney for Plaintiff and Defendant-in Counterclaim*

Dated: February 19, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of February, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Thomas R. Brule

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

I. PROGRESSIVE'S CLAIMS ARE NOT BARRED BY DISCLAIMERS ..... 2

II. PROGRESSIVE HAS MET ALL OF THE NECESSARY ELEMENTS OF EQUITABLE ESTOPPEL AND FRAUD IN THE INDUCEMENT ..... 9

III. THE SDA WAS AMENDED BY THE FRANCHISORS' POST-SDA CONDUCT .. 16

IV. PROGRESSIVE'S CLAIMS ARE NOT TIME-BARRED ..... 20

V. DEFENDANT THIRD DUNKIN' REALTY IS LIABLE ON PROGRESSIVE'S CLAIMS ..... 22

VI. ALTHOUGH NO CONTRACTUAL RELATIONSHIP GOVERNS PROGRESSIVE'S UNJUST ENRICHMENT CLAIM, THE EXPRESS LANGUAGE OF THE SDA GOVERNS, AND PRECLUDES DEFENDANTS' COUNTERCLAIM ..... 25

VII. SUMMARY JUDGMENT CANNOT BE AWARDED FOR A FAILURE TO RESPOND ..... 27

CONCLUSION ..... 28

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420 (1st Cir. 1998) .................. 19

*Brennan v. Carvel Corp.*, 929 F.2d 801 (1st Cir. 1991) .................. 18, 20

*Byrd v. Blue Ridge Rural Elec. Coop.*, 356 U.S. 525, 78 S. Ct. 893, 2 L. Ed. 2d 953 (1958) .. 18

*Cent. States Stamping Co. v. Terminal Equip. Co.* 727 F.2d 1405 (6th Cir. 1984) ............ 13, 14

*Cross v. Northwest Airlines*, 998 F. Supp. 803 (N.D. Ohio 1998) .................. 27

*Gaines v. Farese*, 798 F.2d 1414, No. 85-5324, 1986 WL 17303, at (6th Cir. July 11, 1986) 28

*Guarino v. Brookfield Township Trustees*, 980 F.2d 399 (6th Cir. 1992) .................. 27

*Hardee's of Maumelle, Ark,, Inc. v. Hardee 's Food Sys., Inc.*, 31 F.3d 573 (7th Cir. 1994).................. 8

*Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327, 1996 WL 346607 (10th Cir. June 25, 1996) .... 8

*Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33 (1st Cir. 2008) .................. 17, 18

*Merk v. Jewel Food Stores*, 945 F.2d 889 (7th Cir. 1991).................. 18

*Neff v. American Dairy Queen Corp.* 58F.3d 1063 (5th Cir. 1995) .................. 6

*Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y. 1989) .................. 8

*Sonoran Scanners, Inc. v Perkinelmer, Inc.*, 585 F3d 535 (1st Cir. 2009).................. 19

*Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) ... 18

### STATE CASES

*Alexander v. Snell*, 424 N.E.2d 262 (Mass. App. Ct. 1981) .................. 18

*Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451 (1991) .................. 19

*Antonellis v. Northgate Constr. Corp.*, 362 Mass. 847 (1973) .................. 18

*Bates v. Southgate*, 308 Mass. 170, 31 N.E.2d 551 (1941) ) .................. 8

*Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432 (1992) .................. 16, 18

*Chatham Furnace Co. v. Moffatt*, 18 N.E. 168 (Mass. 1888).................. 13

*Columbus Trade Exchange, Inc. v. AMCA International Corp.*, 763 F.Supp. 946 (S.D.Ohio 1991) .................. 10

*Connelly v. Fellsway Motor Mart, Inc.*, 270 Mass. 386, 170 N.E. 467 (1930) .................. 8

*Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146 (6th Cir. 1995) .......... 15

*Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App.3d 42 (Ohio 1996) .......... 15

*Doyle v. Fairfield Machine Co., Inc.*, 120 Ohio App.3d 192 (Ohio 1997) .......... 12

*Edwards v. Sullivan and Cogliano Companies, Inc.*, 2002 WL 441968 (Mass.App.Div. March 15, 2002) .......... 10

*First Federal Savings & Loan Association v. Perry's Landing, Inc.*, 463 N.E.2d 636 (1983) . 10

*Galmish v. Cicchini*, 90 Ohio St. 3d 22 (Ohio 2000) .......... 14

*L.W. Severance & Sons, Inc. v. Angley*, 125 N.E.2d 415 (Mass. 1955) .......... 17

*MacKeen v. Kasinskas*, 132 N.E.2d 732 (1956) .......... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) .......... 12

*Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688 .......... 26

*Miles v. Perpetual S. & L. Co.*, 338 N.E.2d 1367 (1979) .......... 14

*Piantes v. Pepperidge Farm, Inc.*, 875 F. Supp. 929 (D. Mass. 1995) .......... 19

*Powell v. Rasmussen*, 243 N.E. 167 (Mass. 1969) .......... 13

*Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co.*, 452 N.E.2d 308 (Mass. App. Ct.) 19

*Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41(1991) .......... 16

*Starinki v. Pace* 535 N.E.2d 328 (1987) ) .......... 13

*TAL Fin. Corp. v. CSC Consulting, Inc.*, 446 Mass. 422 (2006) ) .......... 90, 91

*Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261 (Ohio Ct. App. 1996) ) 13, 14

*Thomas v. Barnes*, 31 N.E. 683, 684 (Mass. 1892) .......... 19

*Wagner v. Graziano Const. Co.*, 136 A.2d 82 (Pa. 1957) ) .......... 16

*Wu v. Dunkin' Donuts, Inc.*, 105 F.Supp. 2d 83 (E.D.N.Y. 2000) .......... 6

**MISCELLANEOUS**

Corbin on Contracts .......... 16

E. Allan Farnsworth, Contracts (2d ed. 1990) ) .......... 16, 17

## INTRODUCTION

Neither the September 1, 2004 Multiple Unit Store Development Agreement (the "***SDA***") among defendants Baskin-Robbins and Dunkin' Donuts (such defendants, collectively, the "***Franchisors***") and Progressive nor any of the other agreements among any one or more of the parties to the present litigation shield Defendants from the consequences of their respective acts and omissions. This is because both the SDA and the Franchise Agreements contemplated a process whereby Progressive would identify and evaluate its own store sites and the Franchisors would approve them. It was against the backdrop of this process to that SDA, as written, provided that the Franchisors made no representations or warranties with respect to the suitability or potential of the sites that they approved. When the Defendants went beyond that which was contemplated by the SDA, as written, and selected, based solely and exclusively on their own investigation, the sites for the units to be operated by Progressive, the Defendants went beyond the intended scope of the disclaimers in the SDA and the Franchise Agreements.

Before Progressive had entered into leases of any of the sites selected by Defendants, Defendants had delivered to Progressive a Uniform Offering Circular, or "UFOC", that set forth, among other things, that Defendants had acquired experience and skill in the development and operation of stores in which their products were sold. The UFOC also set forth the criteria generally employed by Defendants to evaluate the suitability of prospective sites. Testimony in the record indicates that Defendants agents discussed Defendants' methodology for identifying suitable sites with Progressive's officers. Thus, when Defendants selected sites for Progressive, Progressive relied on the Defendants' judgment. Progressive has placed into the record of this proceeding, however, both testimony and evidence which make clear that the Defendants possessed, at the time Defendants selected sites for Progressive, actual knowledge, undisclosed to Progressive, that sites so selected for Progressive were unsuitable when evaluated on the basis of the factors described in Defendants' UFOC. The testimony and evidence in the record is sufficient, under the standards applicable to a motion for summary judgment, to enable Progressive's breach of contract, fraud, and other claims proceed to trial on the merits.

## I. PROGRESSIVE'S CLAIMS ARE NOT BARRED BY DISCLAIMERS

Defendants do not even attempt to contest that they identified, long before the SDA was signed, the sites in Mentor, Chardon, and Euclid, Ohio upon which Progressive operates stores (such sites, collectively, the "***Progressive Sites***"). Nor do Defendants contest that, in so identifying the Progressive Sites, they deviated far and wide from what the SDA contemplated by its express terms. Rather, Defendants argue that, because they identified all of the Progressive Sites, the Court should infer that the Defendants must have "approved" of them within the meaning of Sections 6 and 22 of the SDA. Then, Defendants ask the Court to infer further that, "[s]ince *all* locations had to be approved by Dunkin' regardless of which party identified the sites, the disclaimers bar clams against Dunkin' regarding site location." (Defendants' Reply, at 2, emphasis in original).

The flaw in Defendants' argument is that the SDA, as written, never contemplated that the Defendants would identify *any* locations. Section 6 of the SDA, as written, contemplated that Progressive would identify the locations at which units would be developed thereunder, and that each such location would be "submitted in writing in advance to ADQSR for approval." (SDA at 3, § 6). Thus, a statement in Section 22 of the SDA that "ADQSR [Defendants Baskin-Robbins and Dunkin' Donuts] makes no representations or warranties with respect to the suitability of potential of the locations which it *approves*" (emphasis added) could not have contemplated a disclaimer of representations or warranties with respect to the suitability or potential of the locations that the Defendants identified. Frankly, it is absurd for Defendants to suggest that the parties to the SDA contemplated that the Defendants would obtain their own approval of the sites that they identified, and thereby make the SDA's disclaimers applicable with respect to such sites.

The same is true of the language, quoted (in part) by Defendants (DRB, at 2), that "it is critical that Developer [Progressive] conduct its own investigation *of the trade areas under consideration*, and that Developer rely only on its own information and analysis relating to all aspects of developing a Unit within the Store Development Area." (SDA at 10, § 22, emphasis added). Progressive's reliance on its "own investigation and analysis of the trade areas under

consideration" would be critical if, and only if, Progressive had borne the responsibility for identifying the locations at which it was to have developed units. The last sentence of Section 22 makes this clear: "Developer agrees that it is Developer's responsibility to fully analyze the Store Development Area, to remain aware of changes in it, *and to seek a location that is most advantageous for Dunkin' Donuts [an/or] Baskin-Robbins . . . units*, as the case may be." (*Id*., emphasis added). As the evidence in the record bears out, however, Progressive did not need to, and, in fact, did not, seek locations -- the Defendants assumed responsibility for identifying, based on *their own* investigation, locations within the Store Development Area and selecting those that Progressive would develop. Thus, the Defendants never requested, as contemplated by the SDA, and Progressive never provided, any information in connection with Progressive's evaluation of any of the Progressive Sites. (SDA at 3, § 6).

Defendants prove too much with their argument that "Progressive deliberately ignores the term 'potential' completely and focuses entirely on the term 'suitability'" (DRB at 3), and that "the term 'potential' can have no meaning . . . other than the potential success, i.e., profitability, of any shops opened by Progressive under the SDA". (*Id*.) Defendants have finally conceded what Progressive has argued all along: "To say that the Defendants represented that the sites they selected for Progressive were suitable is not to say, in and of itself, that Defendants Baskin-Robbins and Dunkin' Donuts guaranteed or warranted profitability or success." (Op. BR at 45-6). As the drafters of the SDA, Defendants clearly recognized that "suitability" and "potential" were two different things. Otherwise, Defendants would not have expressly included a separate and distinct reference to each in their disclaimer. (SDA at 10, § 22). The point of Progressive's argument is that the disclaimer in question, is by its plain language and by context in which it is used was intended to apply only to sites identified by Progressive and approved by Defendants. When the Defendants, in an effort to expand quickly, went beyond their role as contemplated by the SDA as written, and undertook to identify the locations for the Progressive stores based on their own investigation, and not any information supplied by Progressive, they knowingly and voluntarily assumed greater responsibility to Progressive and went beyond the intended scope and coverage of the disclaimers. Although the

foregoing disclaimer from Section 22 of the SDA disclaims representations and warranties with respect to *neither the suitability nor the potential* of sites identified by Defendants, Progressive's claims have focused on "suitability" by reason of the facts of this case -- Defendants' misrepresentations (discussed below) concerned the suitability of the locations identified by Defendants based on their own stated criteria.[1]

Defendants have pointed to nothing in the SDA to support their contention that the reference to "other factors" in the SDA's integration clause[2] "only means that things that Dunkin' did or did not do makes [*sic*] no difference." (DRB at 4, n 2). Nor does anything in the SDA (or applicable rules of contract interpretation, for that matter) support Defendants' argument that if the words "other factors" as used in the integration clause are read include the Franchisors' acts and omissions, then the word "approves" as used in the SDA's disclaimer[3] must be construed so as to preclude any action against Defendants for such acts or omissions. (*Id*.). The integration clause means what it says -- the success of the business venture contemplated by the SDA depends to a large extent on (a) Progressive's ability as an independent business person *and* (b) other factors apart from Progressive's ability as an independent business person. If Defendants knowingly selected unsuitable sites for the stores to be operated by Progressive, and then misled Progressive about the suitability of the sites, this would no doubt have a material adverse effect on the likelihood of the contemplated venture's success, even in the absence of any "guarantee" of success.

The language from Defendants' 2004 Uniform Franchise Offering Circular (the "***2004 UFOC***") and 2005 Uniform Franchise Offering Circular (the "***2005 UFOC***", and, together with the 2004 UFOC, the "***UFOCs***") does not support Defendants' position that the process of site

---

1 The distinction between suitability and potential, or profitability, is nevertheless significant for the purpose of addressing Defendants' statement that "courts have consistently dismissed claims by franchisees who allege they were promised *profitable* businesses by franchisors in the face of contractual language that disclaimed any guarantee of success" (Defendants' Motion for Summary Judgment at 7, emphasis added). This statement, even if accurate, would have no applicability to the present case. Progressive does not claim that it was promised a profitable business, or that the Defendants guaranteed or represented that Progressive's business would be profitable. Defendants did, however, represent that the Progressive Sites were suitable based on the criteria customarily employed by Defendants in evaluating sites.

2 See the SDA at 9, § 19 ("[t]he success of the venture contemplated to be undertaken by Developer by virtue of this Agreement is speculative and depends, to a large extent, upon the ability of Developer as an independent businessman, as well as other factors.").

3 See the SDA at 10, § 22 ("ADQSR makes no representations or warranties with respect to the suitability or potential of locations which it approves.").

"identification" is subsumed in the act of "approval." The language in the UFOCs that addresses the Franchisors' approval of all sites occurs in the context of a discussion regarding sites identified by the franchisee under a Store Development Agreement:

> In order to develop a new store, you may be required to sign an SDA. *Under these agreements, you are responsible for locating and securing sites within boundaries specified by us.* All sites must be approved by us, and must be developed by you in accordance with our requirements. You cannot develop a site not approved by us. We will not reimburse you for any costs you incur with respect to any location not approved by us. While we try to promptly review nominated sites, there is no specified time period in which we must respond to your approval request.

2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection"), and 2005 UFOC, at 95-96 (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection").") (emphasis added). In short, the both the express language of the SDA and the UFOCs and the context in which such language was used serve to undermine Defendants' argument that broad disclaimers insulate Defendants against any liability for anything they might have done.

Having failed to demonstrate that the language of the SDA bars Progressive's claims against, Defendants resort to "matter[s] of general policy" and "fair[ness]". (DRB at 5). Initially, Defendants took the position that it was too early to tell whether the stores operated at the Progressive Sites would be successful.[4] Now Defendants ask the Court to believe that the present case should not proceed to trial because it is too hard to figure out why these stores are not succeeding: "First, trying to determine the proximate cause for why a business does not do well is virtually impossible." (*Id.*). Even if Progressive agreed (and it does not) with Defendants' position, it is certainly no basis for depriving Progressive of its day in court. Rather, it only demonstrates that a genuine issue of material fact exists as to whether Defendants acts and omissions caused Progressive's loss. Defendants fail to cite a single authority granting a franchisor's motion for summary judgment on such a basis, and to do so would constitute error.

Likewise, the fact that a franchisee's employees *might* not, depending on the facts and circumstances of a particular case, also be an employee of the franchisor for purposes of a

[4] Motion for Summary Judgment at 3 ("[f]rankly, there is no way for Progressive to know whether the stores will be successful or not at this point.").

personal injury claim brought by a customer (*Id.* at 5, 6)[5] bears no relevance as to whether summary judgment is warranted in the case at bar. Defendants' ostensible point is that a franchisee is responsible for the day-to-day operation of its stores. Even if this were completely uncontested in the present case,[6] it would not entitle Defendants to summary judgment as a matter of law.

Defendants' argument that they would, in the absence of any contractual disclaimers, be entitled to summary judgment (DRB at 6) is, quite simply, wrong. If the Court finds, as a matter of fact (and as Progressive urges the Court to do), that the SDA is not integrated on the subject site identification by the Defendants and that the Defendants are equitably estopped from denying an enforceable contract to select suitable sites for Progressive, and if the trier of fact find that Defendants breached that contract and that Progressive suffered loss as a result of Defendants' breach, then the Defendants would be liable just as would any other party to a contract that breaches the contract and thereby causes loss to the other party. The fact that there happens to be a franchisor/franchisee relationship between the Franchisors and Progressive would not change this. The same is true for Progressive's fraud claim and its other claims as well.

The disclaimers in the Franchise Agreements to which Progressive is a party fail to support the Defendants case for summary judgment as well. These disclaimers, analyzed at length in Progressive's response ( Op. Br. at 38-9), are virtually identical to those set forth which are set forth in Section 19 of the SDA, adapted, however, for use in a Franchise Agreement. The Defendants' observation that "the striking aspect of this lawsuit is that Progressive has not sued

---

[5] Neither of the cases cited by Defendants, *Neff v. American Dairy Queen Corp.* 58F.3d 1063 (5th Cir. 1995), nor *Wu v. Dunkin' Donuts, Inc.*, 105 F.Supp. 2d 83 (E.D.N.Y. 2000) held that a franchisor *never* controls the day-to-day operations of a franchisee. Rather, the court in each case looked to the degree of control exercised by the franchisor in order to determine whether the franchisor would be held vicariously liable.

[6] Progressive expects to adduce evidence at trial to support its claim that Defendants' actions and omissions did, in fact (and, in some cases, still do), inhibit Progressive's ability to properly operate the stores at the Progressive Sites. These actions and omissions include, among others, selection of sites for Progressive that were known to be unsuitable, failure to properly design, configure, construct, and equip stores, and, in the case of the store at Euclid, Ohio, conduct by members of Defendants' so-called "Menu and Concepts Team" that was so inappropriate in an employment setting that some of Progressive's employees (that Progressive had spent time and money to train) quit with virtually no notice. If all that were not enough, Defendants then went on to blame Progressive for operational difficulties at the Euclid store and cite these very same operational difficulties as a reason for the "development hold" whereby Defendants suspended Progressive's right to develop additional units under the SDA, notwithstanding that the operational difficulties were corrected promptly after the Defendants' team left the Euclid store.

Dunkin' for *any* breach of the Franchise Agreements" (DRB at 7, emphasis in original) cannot be explained. Even a cursory examination of Progressive's Amended Complaint reveals that Progressive has sued for breach of *all* of the Franchise Agreements. Progressive's breach of contract claims arise out of the "The Agreements" which, by definition, include, collectively, the SDA, the Leases, and the Facilitation Representations. (Amended Complaint at 9, ¶ 53). The "Facilitation Representations" are defined as "[a]dditional representations and promises outside of the SDA and the Leases" (Amended Complaint at 8, 9, ¶ 52). All of the representations and promises contained in the Franchise Agreements are outside of the SDA and the Leases. Thus, by way of non-exclusive example, Progressive's complaint that Defendants interfered with operations at the Euclid, Ohio store asserts a breach of the Euclid Franchise Agreement by reason of the fact that Defendants interference prevented Progressive from operating the Euclid store in conformity with the Euclid Franchise Agreement and thereby breached an implied promise that Defendants would not prevent Progressive from performing. (Amended Complaint at 10, ¶ 58). Contrary to Defendants' assertion (DRB at 7), there is no "tacit acknowledgement" by Progressive that it cannot sue under the Franchise Agreements.

Applicable jurisprudence likewise fails to support Defendants' proposition that, if a contract sets forth a general disclaimer of any representations by a party as to profitability or success of a business venture, then no cause of action may be maintained against such party (or any of its affiliates, whether or not such affiliates are intended or third-party beneficiaries of the contract) under any legal theory (whether in contract, tort, or otherwise) for any acts or omissions of such party (or any of its affiliates), as long as the acts or omissions in question adversely affect the plaintiff's profits or chances of success.

The case of *Konold v. Baskin-Robbins, Inc.*, 87 F.3d 1327 (table), 1996 WL 346607, at *4 (10th Cir. June 25, 1996), relied on by Defendants in support of their proposition,[7] held that the disclaimers at issue in that case did not bar the plaintiff from bringing a claim. The disclaimers were only relevant for determining whether the plaintiff's expectations were reasonable. *Konold*, at *4 ( citing *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Sys., Inc.*,

---

[7] Motion for Summary Judgment at 6.

31 F.3d 573, 576 (7th Cir.1994)). In *Rosenberg v. Pillsbury Co.*, 718 F.Supp. 1146 (S.D.N.Y. 1989), also cited by Defendants in the Motion for Summary Judgment,[8] the court expressly eschewed Defendant's proposition, stating that "that a party may not contract out of fraud in cases involving the use of *general* or *ambiguous* disclaimers and integration clauses." (Emphasis in original.) *Rosenberg*, at 1153 (citing *Bates v. Southgate,* 308 Mass. 170, 31 N.E.2d 551 (1941), and *Connelly v. Fellsway Motor Mart, Inc.,* 270 Mass. 386, 170 N.E. 467 (1930)). Thus, in *Rosenberg*, the United States District Court for the Southern District of New York recognized that it is only where "a disclaimer or integration clause is specific and clear, [that] communications outside the four corners of the contract may not provide the basis for a fraud claim." *Id.* Because the general disclaimers of profitability and success relied upon by Defendants do not clearly and unambiguously disclaim representations or warranties regarding the suitability of the sites identified by the Defendants, such disclaimers are ineffective to bar Progressive's claims.

Other than to repeat its contention that Progressive has no actionable claim for fraud (DRB at 4, n 3), a contention that Progressive disputes, Defendants have not replied to Progressive's argument that Defendant Third Dunkin' Realty is neither a party to, nor a beneficiary of, any of the disclaimers in, or other provisions of, any one or more of the SDA and the Franchises Agreements. Nor have Defendants replied to the evidence presented by Progressive that Third Dunkin' Realty was an active business enterprise that identified (together with Baskin-Robbins and Dunkin' Donuts) the Progressive Sites (Op. Br., Ex. B, Ex. HHH, and Ex. III), and agreed to act as general contractor for the construction and equipping of the stores at the Progressive Sites and, in connection therewith, entered into subcontracts for labor, materials, and equipment (Op. Br. 21-4, Ex. JJ-SS), and breached is contracts with Progressive as set forth in Count I of Progressive's Amended Complaint. Because none of Progressive's leases or other agreements with Third Dunkin' Realty contain disclaimers or (as discussed below) contractual limitations on the period of time in which to bring an action, Progressive is entitled to have its claims against Third Dunkin' Realty tried on the merits.

---

[8] Motion for Summary Judgment, at 7.

## II. PROGRESSIVE HAS MET ALL OF THE NECESSARY ELEMENTS OF EQUITABLE ESTOPPEL AND FRAUD IN THE INDUCEMENT

A review of the evidence and testimony in the record makes clear that Progressive has satisfied all of the necessary elements, under applicable law, to establish that Defendants are estopped from denying the existence of an enforceable agreement to select sites for Progressive that comported with the criteria customarily employed by Defendants to evaluate sites, and to establish that Defendants fraudulently induced Progressive to take actions (collectively, the "***Induced Actions***"), including, among others (a) entering into leases with Third Dunkin' Realty for the Mentor Site and the Euclid Site, (b) entering into each of the NCB Loan Documents to which Progressive is a party and thereby borrow money, guarantee the repayment of loans obtained by Progressive Chardon Real Estate, and securing the repayment of loans obtained by both Progressive and Progressive Chardon Real Estate, (c) causing Progressive Chardon Real Estate to enter into the Progressive Chardon Site Purchase Agreement and thereby agree to purchase the Chardon Site from Defendant Third Dunkin' Realty, (d) entering into the Chardon Lease and thereby agreeing to lease, from Progressive Chardon Real Estate, the Chardon Site purchased from Defendant Third Dunkin' Realty, (e) causing Progressive Chardon Real Estate to enter into each of the NCB Loan Documents to which is a party and thereby borrow money, guarantee the repayment of loans obtained by Progressive, and securing the repayment of loans obtained by both Progressive and Progressive Chardon Real Estate, and (f) devoting money, time, and effort to develop Defendants' brands at each of the Progressive Sites.

From the outset, it is important to qualify Defendants' statement that "the elements of equitable estoppel and fraud . . . are almost identical". (DRB at 12). Such authority that has specifically addressed the issue has taken a contrary view, holding that "[t]he doctrine of estoppel does not, however, required [sic] evidence of 'deceit, bad faith or actual fraud. Facts falling short of these elements may constitute conduct contrary to general principles of fair dealing and to the good conscience…'" *Edwards v. Sullivan and Cogliano Companies, Inc.*, 2002 WL 441968 (Mass.App.Div. March 15, 2002), at *3 (quoting *MacKeen v. Kasinskas*, 132 N.E.2d 732 (1956). That said, Progressive has met all of elements identified in the Defendants

Reply Brief, regardless of whether Massachusetts or Ohio law is applied. Both jurisdictions require a representation or "something in the nature of representation *by words, acts, or silence* and the representation must be a factual one known to the party at the time he makes it, or at least the circumstances must be such that he is chargeable with knowledge of them." *Columbus Trade Exchange, Inc. v. AMCA International Corp.*, 763 F.Supp. 946, 957. (S.D.Ohio 1991) (citing *First Federal Savings & Loan Association v. Perry's Landing, Inc.*, 463 N.E.2d 636, 646 (1983)). Thus, the representation can, but need not, be verbal (whether oral or written).

Each of the Defendants' 2004 UFOC, received by Progressive on December 22, 2004, (prior to taking of the Induced Actions) and 2005 UFOC contain the representations regarding the objective criteria customarily employed by Defendants in evaluating prospective store locations that the Defendants identify and select on their own, as in the present case, or in evaluating any prospective store locations that a franchisee might identify and submit for approval. Specifically, each UFOC states:

> For new stores, we may select the site, or we may approve a site that you select and bring to us. Factors affecting our decision generally include location, occupancy costs, proximity to major retail activity, traffic volume and speed, density of nearby population (resident or daytime), competition and potential for encroachment on other units of the same brand, site configuration, parking, accessibility, visibility, signage permitted by the landlord and local government authorities and other factors. Each site is considered individually, as no two sites are the same. Factors other than those listed above may be considered in evaluating a particular site. We do not guarantee that any site will be successful.[9]

From the outset, Progressive reiterates that this case is not about a guarantee by the Defendants that the Progressive Sites would be profitable. As Defendants concede, and as the disclaimers relied upon by Defendants make clear, site suitability and site potential (which Defendants admit to be synonymous with profitability) are two different things.

Having held out to Progressive in the UFOCs that the factors that Defendants employ in evaluating sites which they select generally include location, occupancy costs, proximity to major retail activity, traffic volume and speed, density of nearby population (resident or daytime), Progressive would be entitled, absent some indication by Defendants that factors other

[9] 2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection"), and 2005 UFOC, at 95-96 (Item 11 (captioned "Franchisor's Obligations"), Part C (captioned "Site Selection").") (emphasis added).

than those generally employed were used to evaluate a particular site, to believe that a site selected by Defendants for Progressive was suitable when evaluated on the basis of the criteria generally employed. Progressive is not unmindful of the reference to "other factors" in the above language from the UFOCs, or of the statement that no two sites are the same. The record, however, is devoid of any evidence that Defendants employed, or indicated that they had employed, any factors other than those generally applicable in evaluating the suitability of the Progressive Sites, or that some unique characteristic of one or more of the Progressive Sites warranted utilization of other factors. Thus, Defendants' *act* of selecting the Progressive Sites amounted to a representation that the Progressive Sites were suitable on the basis of Defendants' customary criteria known to Defendants at the time of selection.

The representation however, was misleading. Evidence in the record shows that Defendants employed customary factors such as occupancy costs, proximity to major retail activity, traffic volume and speed, density of nearby population (resident and daytime). (See Op. Br. Ex. G and Ex. LLL, indicating that Defendants were evaluating sites on the basis of one or more of the generally-used criteria described in the UFOCs). Evidence in the record also shows, however, that when the Defendants employed their customarily-utilized criteria, Defendants found the Progressive Sites to be below par.

Defendant's Field Marketing Manager, who was directly involved in the opening of the Euclid Store, testified under oath that the population in the area of the Progressive Sites at Mentor and Euclid was insufficient due to their proximity to Lake Erie. (Op. Br. Ex. JJJ). Even if the record supported Defendants claim that Ms. Schroder's was not involved in site selection,[10] it would not matter. The trier of fact is still entitled to hear her testimony and decide how much weight to afford it. Progressive placed the transcript of Ms. Schroeder's testimony in the record not to demonstrate that she was involved in site selection, but in order to demonstrate that Defendants had actual knowledge of an absence of population to the North of the Progressive

[10] Defendants claim, with emphasis, that Exhibit JJJ to the Opposition Brief contains an admission by Ms. Schroeder that she had no involvement in site selection. (DRB at 15). Progressive is unable to find any such admission in Exhibit JJJ to the Opposition Brief.

Sties in Mentor and Euclid. Defendants would have the Court infer from their claim that Ms. Schroeder had no involvement in site selection and that none of the Defendants' other agents had knowledge of the population deficiencies of the Mentor and Euclid sites. Such an inference is not permissible under the standards applicable to a motion for summary judgment, which require that the facts all and inferences therefrom be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). See also *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party).

Progressive has placed in the record an entire series of Defendants' Resource Appropriation Requests, or "RARs" (collectively, the "***Due Diligence Resource Appropriation Requests***"), dated no later than January of 2004 (months before the date of the SDA) evidencing Defendants' actual knowledge, at that time, of deficient population and traffic counts at the Chardon, Ohio site (Op. Br. Ex. LLL). And the record contains a report prepared by Defendants, less than twelve months after the opening of the Mentor store, and about five months after the opening of the Chardon Store, that, had these sites been submitted for approval to Defendants' then incumbent Development Manager, such approval would have been denied. The record contains no evidence of a material change in the population, traffic counts, or other generally-applicable factors relating to the suitability of these stores during the period from their respective opening dates to the date of such report (which might have been prepared sometime after the Development Manager's statement). Given the brevity of this period, it is a fair inference that Defendants knew these sites were unsuitable at the time Defendants selected them for Progressive.

And Defendants certainly knew what their own criteria, as published in their own UFOCs, were, at the time that Defendants selected the Progressive Sites. Thus, Defendants misrepresentations as to the compliance of the Progressive Sites, based on population data and traffic counts, at the time the Progressive Sites were selected, were statements "of fact, not of expectation, estimate, opinion, or judgment" (DRB at 13, citing *Powell v. Rasmussen*, 243 N.E.

167 (Mass. 1969), not only "susceptible of knowledge" (DRB at 13-4, citing *Chatham Furnace Co. v. Moffatt*, 18 N.E. 168, 169 (Mass. 1888), but actually known by Defendants. If suitability of sites, based on Defendants' criteria, were not susceptible of knowledge at the time of selection, the population and traffic data used by Defendants in determining whether or not to select a particular site would not exist.

As noted above, for purposes of the doctrine of equitable estoppel, a misrepresentation need not be verbal – it can arise by conduct, or even silence. In Ohio, "[A]n action for fraud and deceit is maintainable not only as a result of affirmative misrepresentations, but also for negative ones, such as the failure of a party to a transaction to fully disclose facts of a material nature where there exists a duty to speak." *Starinki v. Pace* (1987), 535 N.E.2d 328, 331. "The duty to speak will not necessarily depend on the existence of a fiduciary relationship." *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) (citing *Starinki v. Pace*, 535 N.E.2d 328, 331(1987)). Rather, the duty "'may arise in any situation where one party imposes confidence in the other because of that person's position, and the other party knows of this confidence."' *Textron*, at 1270, citing *Starinki* at 331, quoting *Cent. States Stamping Co. v. Terminal Equip. Co.* 727 F.2d 1405, 1409 (6th Cir. 1984). Likewise, " 'a party is under a duty to speak, and therefore liable for non-disclosure, if the party fails to exercise reasonable care to disclose a material fact which may justifiably induce another party [sic] to act or refrain from acting, and the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading.'" *Textron*, at 1270 (quoting *Cent. States Stamping Co.*, at 1408 (quoting *Miles v. Perpetual S. & L. Co.*, 338 N.E.2d 1367, 1369 (1979))). Testimony makes clear that Progressive had imposed confidence in the Defendants by reason of their stated position as experienced identifiers of suitable sites, and that Defendants knew of Progressive's confidence. (Op. Br. 84-6). Under such circumstances, Progressive was entitled to expect full and honest disclosure of all information Defendants possessed regarding the Progressive Sites.

Ohio's highest court has held that the "[the] essence of [a] fraudulent inducement claim is that [the fraudfeasor] harbored this intent [to not perform a contract] at the time he executed the

written contract and, therefore, made a promise with intent not to perform." *Galmish v. Cicchini*, 734 N.E.2d 782, 791 (Ohio 2000). Such is the nature of Defendants' misrepresentation that induced Progressive to enter into the SDA. The misrepresentation lies in the act of making the contract with an intention of not performing it. Progressive's claim does not "seek to contradict or vary the terms of the written agreement . . . " and does not "rest on any prior agreements or promises at all." *Galmish* at 791. Progressive's claim that Defendants fraudulently induced it to enter into the SDA is based on the fact that Defendants never had any intention of performing the SDA as written. Even before the SDA was signed, and at all times thereafter, it was the Defendants' intention to select those sites within the Store Development Area for which Progressive in particular would be granted franchises. Defendants knew which sites they would select for Progressive, or at least knew that the first three would be Mentor, Chardon, and Euclid, whether or not suitable.

The Defendants admit that they do not operate stores.[11] Defendants, therefore, must have intended, from the time, no later than November, 2003, when they first began to identify sites within the Cleveland-area market, that each franchisee that acquired an exclusive license to develop stores within a territory in that market would develop stores on the very sites that Defendants had identified within such market. Otherwise, because Defendants do not operate stores, the sites identified by Defendants would remain unused. Defendants would be unable to recoup their expenses for the fees and disbursements of Defendants' local real estate counsel and their due diligence expenses. And Defendants' plan to open at least fifteen stores per year (discussed below) in the Cleveland-area market would be delayed as franchisees identified their own sites and submitted them for approval as contemplated by the SDA. Ohio courts have recognized that intent to mislead is rarely proven by direct evidence and usually can be inferred or presumed from the facts and circumstances of the case. *Doyle v. Fairfield Machine Co., Inc.*,

---

[11] *See* Defendants' letter of September 8, 2009, filed with the Court on the same date, at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model if fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

120 Ohio App.3d 192, 208 (Ohio 1997); *Davis v. Sun Ref. & Mktg. Co.*, 109 Ohio App.3d 42, 56. (Ohio 1996).[12]

Defendants ask the Court, perhaps rhetorically, to consider why a franchisor that makes money from royalties on franchisee sales would purposely select unsuitable sites (DRB at 14-5). The short answer is that Defendants had ambitious expansion goals (Op. Br. at 53-4) and had economically incentivized their Development Managers to achieve them. It also bears mention that the royalties described by Defendants are, under the terms of the Franchise Agreements, based on gross revenues, as opposed to net revenues (gross revenues less the cost of goods sold and general, salary and administrative expenses). (Franchise Agreements at 3, § 4.3) If things did not work out at one or more of the sites that Defendants had selected for Progressive, then Defendants had planned, as they have in this very case, to argue that the entire risk of the venture was on Progressive and walk away, leaving the Progressive with, among other responsibilities, the responsibility to pay off the loans it had obtained from National Cooperative Bank under the Defendants' financing program. (Op. Br. 81-2). Given the substantial amount of evidence adduced by Progressive up to this point, the absence of any contractual disclaimers with respect to sites selected by Defendants, and the absence of any evidence to refute that adduced by Progressive, Defendants have failed to meet their burden of proof on the Motion for Summary Judgment, and Progressive is entitled to trial on the merits.

## III. THE SDA WAS AMENDED BY THE FRANCHISORS' POST-SDA CONDUCT

The Defendants' self-identification of all of the Progressive Sites is well documented in the record. (Op. Br. 7-18). The site at which Progressive operates in Mentor, Ohio, was almost certainly selected by Defendants for Progressive, in particular, prior to the date of the SDA, as evidenced by the September 1, 2004 Mentor Franchise Purchase Agreement (Op. Br., Ex. H), dated of even date as the SDA, under which Progressive agreed to buy a franchise for the Mentor store, and the associated equipment and signage. However, Progressive has produced written evidence (see, for example, Op. Br. at 85-6, Ex. GG, Ex. VVV) from which finder of fact could

[12] Progressive's fraud claim is governed by Ohio, not Massachusetts, law.

reasonably conclude that the parties to the SDA understood that the Defendants would, *after the date of the SDA*, select those locations sites for which Progressive would be granted franchises, and that the Defendants did in fact select the Progressive Sites at Chardon and Euclid, Ohio.

Written contracts may be modified orally or by conduct (2-7 Corbin on Contracts § 7.14). A provision in a contract to the effect that the contract can be amended only in writing (SDA at 9, § 19) is ineffective to prevent such an amendment because the parties to a contract can, by their assent, amend that provision orally or by conduct as well. See *Cambridgeport Sav. Bank v. Boersner*, 597 N.E.2d 1017, 1022 (Mass. 1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract."); cf. *E. Allan Farnsworth, Contracts* 7.6 (2d ed. 1990) ("Can the parties, by inserting a no-oral-modification clause, effectively permit only written modifications? The common-law answer has been that they cannot."); *Wagner v. Graziano Const. Co.*, 136 A.2d 82, 83 (Pa. 1957); *Schinkle v. Maxi-Holding, Inc.*, 30 Mass. App. Ct. 41, 47 (1991) ("where the parties' conduct after signing the written agreement conforms with a previous oral modification, rather than with the terms of the written agreement, it may reasonably be inferred that the parties have agreed after the signing to be bound by the oral modification of the written contract, ratifying it, in effect, by their conduct.").

Nor would the SDA' integration clause preclude an amendment subsequent to the date of the SDA. The integration clause, by its express terms, "supersedes all *prior* agreements" (SDA at 9, § 19, emphasis added) as opposed to subsequent agreements. Nor would the parol evidence rule, because such rule "does not bar evidence of subsequent negotiations to show modification of the contract. Even a completely integrated agreement can therefore be modified or rescinded orally." *Farnsworth*, *infra*, 7.6. See also *L.W. Severance & Sons, Inc. v. Angley*, 125 N.E.2d 415, 420 (Mass. 1955) (The parol evidence rule has no application to the situation . . . where it could be found that a new oral contract was entered into between the parties which superseded the original contract.").

Defendants attempt to distinguish *Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 43 (1st Cir. 2008) (relied upon by Progressive for the well-settled principle of Massachusetts law

that whether a contract is integrated is a question of fact for the trial judge (Op. Br. at 51-2)) on the grounds that the lease subsidies at issue in that case were set forth in an annual notice to franchisees (providing that the subsidy could be cancelled on thirty days' notice) and not in the leases. (DRB at 10-1) Contrary to Defendants assertion that "the crux of the issue there was that the subsidies were not discussed in the contract, even though they were an essential part of the business agreement" (*Id.*), the issue in *Marcoux* was whether parol evidence, in the form of the franchisor's statements, embodied in *neither the notice nor the leases*, that the subsidy would be cancelled only in situations such as war or embargo, were sufficient evidence allow the trial court to conclude, as a matter of fact, that the leases, which contained airtight integration clauses, were not integrated. Applying Massachusetts law, the First Circuit Court of Appeals upheld the finding of the district court, based such evidence, that the leases were not integrated. *Marcoux*, 524 F.3d at 44.

The point is that because Defendants knew from the outset that they, and not Progressive, were going to select, on the basis of their own investigation, all of the sites under the SDA, notwithstanding any provisions of the SDA to the contrary (and the fact that the Defendants did select all of the Progressive Sites), the SDA is not integrated on the subject of site selection, and therefore, its integration clause is not effective under Massachusetts law to render unreasonable Progressive's reliance on Defendants' representations regarding the suitability of the sites they selected.

Defendants err with their statement that "[whether a contract is integrated is a question of *law* to be decided by the court" (emphasis added) citing *Marcoux* at note 10. What note 10 of the *Marcoux* case actually says is as follows:

> We are not governed by state practice as to the division of labor between judge and jury, even in diversity cases, *see Byrd v. Blue Ridge Rural Elec. Coop., 356 U.S. 525, 538, 78 S. Ct. 893, 2 L. Ed. 2d 953 (1958)*, but in all events federal practice likewise lets judges determine whether an agreement is integrated, *Merk v. Jewel Food Stores Div. of Jewel Cos., 945 F.2d 889, 893 (7th Cir. 1991)*(applying federal common law of contracts and holding that "[w]hether a writing is fully integrated is generally a question of law to be resolved by a court").

*Marcoux*, 524 F.3d 33, 44 n. 10. The point being made by the *Marcoux* court in note 10 was that "judges determine whether an agreement is integrated" (*Id.*) regardless of whether federal practice or state practice is followed. As an example of a case in which a court, following federal practice, decided whether a contract was integrated, the *Marcoux* court looked to *Merk v. Jewel Food Stores Div. of Jewel Cos.,* 945 F.2d 889 (7th Cir. 1991). In deciding whether a collective bargaining agreement was integrated, the court in *Merk v. Jewel Food Stores* applied federal common law, as opposed to state law, because "Congress has accorded labor contracts a special status, authorizing the courts to fashion a body of federal common law governing their enforcement." *Merk v. Jewel Food Stores*, 945 F.2d 889, 892, citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 456, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957).

The SDA is not a labor contract, Congress has accorded it no special status, and, as Defendants concede, it is governed by Massachusetts law. (Motion for Summary Judgment, at 7, n.1). And it is well settled, under Massachusetts law, that whether a contract is integrated is a question of fact for the court. See *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 436 n.7 (1992) ("the question of integration is one of **fact** reserved for the trial judge, whose resolution of that issue will not be reversed unless clearly erroneous." (emphasis added.)); *Antonellis v. Northgate Constr. Corp.*, 362 Mass. 847, 850-51 (1973) (even absent specific evaluation of evidence by trial judge, finding of non-integration upheld as not clearly erroneous); *Alexander v. Snell*, 424 N.E.2d 262, 264 (Mass. App. Ct. 1981); accord *Brennan v. Carvel Corp.*, 929 F.2d 801, 807 (1st Cir. 1991) ("[U]nder Massachusetts law, the determination of whether a contract is completely or partially integrated, or whether a second contract is collateral to an integrated agreement, is a question of **fact** to be decided in the first instance by the trial judge." (emphasis added.)).

Even if consideration were required, and it is not,[13] to support an amendment to the SDA, Progressive did give consideration. Progressive agreed to forgo its right under Section 6 of the

---

[13] See *Roddy & McNulty Ins. Agency, Inc. v. A.A. Proctor & Co.*, 452 N.E.2d 308, 314 (Mass. subsequent App. Ct.), rev. denied, 454 N.E.2d 1276 (1983), "Modifications . . . have long been recognized in law as valid, without additional consideration, even when based on oral agreements modifying executory written contracts."; see also *Thomas v. Barnes*, 31 N.E. 683, 684 (Mass. 1892) ("The contract, when modified by the oral

SDA to identify the sites for itself, having been induced to give up its right by Defendants claims of "experience and skill" in developing and operating stores",[14] and leaving Progressive dependent upon Defendants' selection of sites. The surrender of such a right constituted consideration that was good, valuable, and present. Even if the Court were to construe Defendants approval right as entitling Defendants to exercise their sole discretion in approving sites (which the SDA does not provide), the right to identify and select sites is not illusory consideration. Massachusetts law, which governs the SDA, imposes a duty of good faith and fair dealing on the exercise of a party's discretionary rights under a contract.[15]

Defendants post-SDA conduct, in selecting the sites for the Chardon and Euclid, Ohio stores, would have amended the SDA, and would also render inapposite the authority cited by Defendants that "[u]nder Massachusetts law, an integrated contract, 'if unambiguous, cannot be modified by evidence of *earlier or contemporaneous discussions*.'" (DRB at 9, citing *Sonoran Scanners, Inc. v Perkinelmer, Inc.*, 585 F3d 535, 541 n. 2 (1st Cir. 2009), citing *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420, 424 (1st Cir. 1998)). (emphasis added). Absent either an agreement separate and collateral to the SDA, under which the Defendants agreed to select the Progressive sites and which the Defendants are equitably estopped from denying, or an amendment to the SDA under which the Defendants agreed to select sites for Progressive, Defendants have afforded the Court no explanation whatsoever for why Defendants were selecting any sites in the Store Development Area.

---

agreement, is substituted for the contract as originally made, and the original consideration attaches to and supports the modified contract.").

[14] 2004 UFOC (Item 8 (captioned "Restrictions on Sources of Products and Services)),), at 1; 2005 UFOC (Item 8 (captioned "Restrictions on Sources of Products and Services)),), at 1. (emphasis added). By way of contrast, see Defendants' letter of September 8, 2009, filed with the Court on the same date, at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model is fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

[15] See *Piantes v. Pepperidge Farm, Inc.*, 875 F. Supp. 929, 938 (D. Mass. 1995) ("[w]here one party has the right to exercise discretion under the contract, it is bad faith to use that discretion to 'recapture opportunities foregone on contracting as determined by the other party's reasonable expectations.'" (quoting *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 473 (1991).

## IV. PROGRESSIVE'S CLAIMS ARE NOT TIME-BARRED

Progressive's statement that the SDA contains no two-year limitation period is accurate.[16] The period of two years referred to in subsection 18.5(F) of the SDA (SDA at 9) does not commence until discovery of the facts giving rise to a claim or action. Thus, the provision can shorten or *lengthen* the period of time in which an action must be commenced under applicable statute. Of no less importance is that the provision, by its own terms, applies to only to claims and actions arising out of "this Agreement," that is, the SDA, the relationship of Progressive and Defendants Baskin-Robbins and Dunkin' Donuts, or Progressive's operation of the "unit."

While it is certainly true that Progressive has alleged, and adduced evidence proving, that Defendants selected the sites, it does not necessarily follow that Defendants' site selection occurred under the SDA, which, as Progressive has stated repeatedly, contains no provisions relating to Defendants' selection of any sites. Under Massachusetts law, "the determination of whether a contract is completely or partially integrated, **or whether a second contract is collateral to an integrated agreement**, is a question of **fact** to be decided in the first instance by the trial judge." *Brennan v. Carvel Corp.*, 929 F.2d 801, 807 (1st Cir. 1991) (emphasis added). The SDA's integration clause provides that [this Agreement and the documents referred to herein shall be the entire, full and complete agreement between ADQSR and Developer *concerning the subject matter hereof* . . . ." (SDA at 9 § 19, emphasis added.). If the Court were to find, as Progressive urges, that Defendants are equitably estopped from denying the existence of an enforceable contract to identify suitable sites in good faith, based on the criteria customarily employed by Defendants, that contract would fall entirely outside of the SDA, the subject matter of which does not concern site selection by Defendants. Under such circumstances, no amendment to the SDA would be necessary, and the provisions of subsection subsection 18.5(F) of the SDA would have no application to Defendants breach of their contract to so identify suitable sites.

---

[16] Op. Br. at 74. Defendants' mischaracterize of the period in the Motion for Summary Judgment at 12 ("[t]he SDA's two-year contractual limitations provision . . . bars most of Progressive's claims.")

In any event, Progressive's fraud claims do not arise "out of" the SDA, the "relationship" of the parties to the SDA, or Progressive's "operation of the unit" – such claims arise out of Defendants pre-SDA contrivance to meet their expansion goals by inducing Progressive to enter into the SDA and take the Induced Actions without disclosing to Progressive that the Progressive Sites were known by Defendants to be unsuitable based on Defendants' customary standards for suitability as described in the UFOCs. Progressive did not have any reason to suspect the facts giving rise to its claim that the Defendants entered the SDA without any intention of performing it as written until the development hold had occurred. Progressive learned of the development hold after the site at Euclid, Ohio was opened in late February of 2006, and first obtained concrete evidence of and testimony regarding Defendants' willful non-disclosure of facts (indicating that the Progressive Sites were unsuitable) after the present case was commenced in October of 2007. The same can be said of Progressive's claims that Defendants fraudulently induced Progressive to undertake the Induced Actions. Even if subsection 18.5(F) were applicable to Progressive's fraud claims, it would not bar them.

None of Progressive's other claims, whether for breach of contract, unjust enrichment, or otherwise arise out of or relate to the SDA or the Franchise Agreements, the relationship of the parties to the SDA or the Franchise Agreements, or Progressive's operation of any unit or units. They all arise out of entirely separate documents (Op. Br. 74-6), and have nothing to do with the relationship of Progressive to "ADQSR" (Baskin-Robbins and Dunkin' Donuts), described in the SDA as that of an independent contractor. (SDA at 7, § 14). Thus, none of such other claims are subject to operation of the temporal limits for commencing actions under the SDA or the Franchise Agreements. Defendant Third Dunkin' Realty does not fall within the definition of "ADQSR" as used in the SDA, or within the definition of "Franchisor" as used in any of the Franchise Agreements. Progressive's claims against Third Dunkin' Realty are not, therefore, barred by any of the disclaimers or limitations in the SDA or the Franchise Agreements. And, as explained above, Third Dunkin' Realty is not, in any event, a party to or an intended or third-party beneficiary of, any one or more of the SDA and the Franchise Agreements and is not, therefore, entitled to invoke, rely upon, or assert as a defense, any of their respective provisions.

## V. DEFENDANT THIRD DUNKIN' REALTY IS LIABLE ON PROGRESSIVE'S CLAIMS

Defendants do not even attempt to dispute that Third Dunkin' Realty has no disclaimers. Rather, Defendants try to keep Third Dunkin' Realty out of the Court's reach by arguing that "if it is true . . . that Third Dunkin' [Realty] cannot shield itself from any claims with the disclaimers in the SDA or Franchise Agreements . . . it is also true that Third Dunkin' [Realty] is also not legally responsible to Progressive for any breaches of the SDA or Franchise Agreements." (DRB at 17). The essential failing of Defendants argument is that none of Progressive's claims against Third Dunkin' Realty are claims for breach of the SDA or the Franchise Agreements.[17] Progressive's fraud claims against Third Dunkin' Realty arise from the role that Third Dunkin' Realty's agents took in identifying the Progressive Sites and selecting such sites for Progressive in particular.

One such agent, by way of non-exclusive example, was Defendants' Construction Manager, Mr. Kevin Dalpiaz. Mr. Dalpiaz signed subcontracts on behalf of Third Dunkin' Realty in his capacity as "Agent" or "Construction Manager" (Op. Br. at 25-6 and Ex. RR, Ex. SS ). Third Dunkin' Realty has never sought to deny the validity of these subcontracts on the ground that Mr. Dalpiaz was not authorized to execute and deliver the same on Third Dunkin' Realty's behalf, thereby evidencing that he was an authorized agent of Third Dunkin' Realty. Mr. Dalpiaz also took part in the identification of the Progressive Sites. (Op. Br. 40-41 and Ex. B, Ex. HHH, and Ex. III). Mr. Dalpiaz also took part in selecting the Progressive Sites for Progressive in particular. Mr. Dalpiaz, for example, visited the Progressive Sites with principals of Progressive, among them, Mr. Joel Sausen, whose testimony of regarding such a visit is attached as **Exhibit A** hereto. Mr. Dalpiaz also took part in overcoming concerns

---

[17] See Op. Br. at 56-7, stating "Because Defendant Dunkin' Donuts is not a party to the SDA, its obligation to identify suitable sites within the Store Development Area arises wholly outside of the SDA." The reference to "Dunkin' Donuts'" should have been a reference to "Third Dunkin' Realty". Defendants are in no way prejudiced by this correction given that Defendants knew anyway that Dunkin' Donuts is, and that Third Dunkin' Realty is not, a party to the SDA. See the Answer of Dunkin' Donuts, Inc. and Other Defendants to First Amended and Verified Complaint and Defendants' and Defendants' and Third Party Complaint, with Attachments, filed with the Court on March 11, 2008, at 4, ¶ 14 ("Defendants admit that Defendant '3rd D' [Third Dunkin' Realty] was not a party to the SDA.").

expressed by Progressive regarding at least one of the sites that Defendants selected. (Op. Br. 47 and Ex. KKK).

The foregoing acts of Third Dunkin' Realty, undertaken on its behalf by its agent, Mr. Dalpiaz, and others, also give rise to Progressive's breach of contract claim against Third Dunkin' Realty for failure to select suitable sites. But the contract that Third Dunkin' Realty breached was not the SDA, or any of the Franchise Agreements, for that matter. None of the SDA and the Franchise Agreements contain any provision whereby Third Dunkin' Realty, or any of the Defendants, are obligated to select sites for the stores to be operated by Progressive. The contract that Third Dunkin' Realty breached by knowingly selecting sites that did not meet Defendants' criteria was a contract entirely separate and apart from the SDA, the existence of which Defendants are equitably estopped from denying.

Defendants attempt to obfuscate the fact that individuals such as Messrs. Edward J. Peppers and Kevin Dalpiaz acted as agents of Third Dunkin' Realty by arguing that "Progressive does not identify any *employees* of Third Dunkin' Realty (since none exist) who engaged in fraud." (DRB at 17, emphasis added). The fact that an individual might not be an "employee" for purposes of withholding taxes, state-law workers' compensation claims, employment discrimination claims, or some other purpose does not preclude the individual from acting as an agent of his or her principal. Defendants admit that employees of Dunkin Brands, Inc. worked on behalf of Third Dunkin' Realty. (Motion for Summary Judgment at 3). And the evidence adduced by Progressive establishes that certain individuals, among them, Mr. Dalpiaz, acted as agents of Third Dunkin' Realty and the other Defendants, and, in so acting, selected sites for Progressive. These very same Defendants had knowledge that the sites they selected for Progressive, through their agents, did not meet the Defendants' customary criteria. It is not necessary for the success of any of Progressive's claims to establish that Third Dunkin' Realty was required to treat any one or more of its agents as "employees" for purposes of applicable U.S. Treasury Regulations or otherwise.

Contrary to Defendants' assertion that "Progressive has cited no provisions of the leases which Third Dunkin' [Realty] breached at all" (DRB at 18), Progressive has, in fact, cited

several. Third Dunkin' Realty, as general contractor under the Third Dunkin' Realty Leases, breached its obligation to complete, or cause completion, in accordance with Section 10(a) of the Mentor Lease, of any work required to substantially complete the Mentor Site (Op. Br. at 21, Amended Complaint at ¶ 19); breached its obligation to assign, in accordance with Section 10(b) of the Mentor Lease, warranties and guaranties obtained from contractors, suppliers, and others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site, and to use reasonable diligence in assisting Progressive in the enforcement of such warranties and guaranties (Op. Br. at 21); breached its obligation to complete, or cause completion, in accordance with Section 10(a) of the Euclid Sublease, of any work required to substantially complete the Euclid Site (Op. Br. at 21-2, Amended Complaint at ¶ 21); and breached its obligation to assign, in accordance with Section 10(b) of the Euclid Sublease, warranties and guaranties obtained from contractors, suppliers, and others with respect to the performance, work and materials and equipment used in the construction and development of the Euclid Site, and to use reasonable diligence in assisting Progressive in the enforcement of such warranties and guaranties (Op. Br. at 22).

In short, viewing the facts and all inferences therefrom in the light most favorable to Progressive, Progressive's claims against Third Dunkin' Realty cannot be summarily disposed of. As to the June 4, 2009 Certification of Jack Laudermilk (the "***Laudermilk Certification***") and the Certification of Gary Zullig of the same date (together with the Laudermilk Certification, the "***Certifications***"), if Defendants intend to dispute Progressive's contention that Laudermilk's statements should be stricken from the record as inadmissible hearsay (DRB at 19), Progressive suggests that Laudermilk be ordered to appear before the Court and testify, under oath, as to *exactly how and from whom* he came to know of the matters that he certified, under penalty of perjury, he knew from personal knowledge. Even if Laudermilk's statements were based on his personal knowledge (and Progressive disputes that they were), there is no support for Defendants statement that the statements in the Laudermilk certification "must be taken as true" (DRB at 19). Defendants do not even attempt to dispute that each of the Certifications is loaded with legal conclusions and should, for that reason alone, be stricken. (Op. Br. at 72-3). And, even if

the Defendants were to now attempt to recant their unambiguous admissions, in the record, that all of the Defendants participated in site selection,[18] there is sufficient evidence in the record to enable a reasonable jury to find that the Defendants' Construction Manager, Mr. Kevin Dalpiaz, was an agent of Third Dunkin' Realty that signed subcontracts on behalf of Third Dunkin' Realty and otherwise acted on its behalf (as well as on behalf of the other Defendants) in selecting the Progressive Sites.[19] Defendants have also argued, in response to Progressive's civil conspiracy claims, the Third Dunkin' Realty and the other Defendants acted as collective enterprise (Motion for Summary Judgment at 15-6; Op. Br. at 41), which is at odds with Defendants' argument that Third Dunkin' Realty is an inactive real-estate holding company (Motion for Summary Judgment at 3; DRB at 17).

## VI. ALTHOUGH NO CONTRACTUAL RELATIONSHIP GOVERNS PROGRESSIVE'S UNJUST ENRICHMENT CLAIM, THE EXPRESS LANGUAGE OF THE SDA GOVERNS, AND PRECLUDES DEFENDANTS' COUNTERCLAIM

Defendants' argument for summary judgment on Progressive's unjust enrichment claim rests on the existence of a contractual relationship under the SDA. Defendants are unable to point to any provision of the SDA, however, that governs the recovery of Progressive's overpayment of Initial Franchise Fees thereunder. Nor are Defendants able to point to any other contracts that govern recovery of such overpayments. Thus, while a goodly number of contractual relationships exist between Progressive and one or more of the Defendants (including, but not limited to, those arising under the SDA, three Franchise Agreements, the Franchise Purchase Agreements, the Euclid Franchise Purchase Agreement, and the Third Dunkin' Realty Leases, as well as the Defendants' contract to select suitable sites) none contain

---

[18] See Defendants' Answer, at 4, ¶ 17: "Defendants admit that they participated in the site selection and construction for the Progressive opened stores located in Mentor, Chardon, and Euclid Ohio." The term "Defendants" is defined in Defendants' Answer so as to include, collectively, "Defendants Dunkin' Donuts Franchised Restaurants, LLC, successor-in-interest to Dunkin' Donuts Incorporated, Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA, Co., and DB Real Estate Assets I, LLC and DB Real Estate Assets II, LLC, successors-in-interest to Third Dunkin' Donuts Realty, LLC and Third Dunkin' Donuts, Inc."

[19] See Defendants' Supplemental Disclosure Statement filed with the Court on March 5, 2009 in which Defendants stated that "Mr. [Kevin] Dalpiaz, a Construction Manager for Dunkin' Donuts, is likely to have discoverable information relating to . . . Plaintiff's claims regarding construction of their shops." For purposes of such Supplemental Disclosure Statement, the term "Dunkin' Donuts" is defined as follows: "Dunkin' Donuts Incorporated, Baskin-Robbins USA, Co., and Third Dunkin' Donuts Realty, Inc. and their respective affiliates, successors, subsidiaries and parents (all such entities taken together, 'Dunkin' Donuts') . . . ." Thus, Defendants have identified Mr. Dalpiaz as a Construction Manager for all of the Defendants.

any clause that Progressive can invoke to recover overpayments made for the Mentor and Euclid franchises by reason of Progressive's payment of therefor under both the SDA and Mentor and Euclid Franchise Purchase Agreements, respectively. Progressive is, therefore, entitled to recover under theory of unjust enrichment, and Defendants' motion for summary judgment thereon must be denied.

The express language of the SDA does, however, govern, and preclude, Defendants' counterclaim for $100,000 in additional Initial Franchise Fees. In relying in Section 2A of the SDA (DRB at 20), Defendants ignore completely Section 3C which provides that "Developer's Progressive's] liability to ADQSR [the Franchisors] for failure to open units in accordance with the Development Schedule shall be limited to the following: . . . ." (SDA at 3, § 3C) Section 3C, therefore, operates to limit any liability Progressive would have to pay the Initial Franchise Fees referred to in Section 2A. To interpret Sections 2A and 3C otherwise would create a patent ambiguity in the SDA., which would, in any event, have to be construed against Defendants, as the drafters of the SDA. *Merrimack Valley Nat. Bank v. Baird*, 363 N.E.2d 688, 690 (Mass. 1977). (Op. Br. at 68).

Section 3C provides two, and only two, alternatives for determining Progressive's liability in the event of failure to develop units on schedule. The first alternative, set forth in subsection 3.C.(1), applies if, in the Franchisors' opinion, Progressive has not used best efforts to diligently pursue development of units in accordance with the Development Schedule. If subsection 3.C.(1) were to apply to the facts of the present case (and Progressive disputes that it does), it would purportedly entitled Defendants to terminate the SDA on thirty (30) days' written notice to Progressive "and to recover from [Progressive] *all payments* due through the date of termination, if any, as *liquidated damages*." (SDA at 2, § 3.C.(1), emphasis added). "All payments" would certainly include any Initial Franchise Fees that would have been owing under Section 2.A of the SDA as of the date of its termination. Under Massachusetts law, however, subsection 3.C.(1) of the SDA is not enforceable because the amount of damages that would be payable thereunder is, arbitrarily, the entire balance owing under the SDA, as opposed to a reasonable estimate of actual damages made as the time the SDA was entered into. (Op. Br.

at 91, citing *TAL Fin. Corp.*, 446 Mass. at 432 (quoting *Kelly*, 428 Mass. at 880). Thus, even if subsection 3.C.(1) were to apply in this case, and it does not, Defendants' counterclaim for $100,000 of Initial Franchise Fees allegedly owing under the SDA would fails as a matter of law.

The other alternative is set forth in subsection 3.C.(2) of the SDA, which applies in the present case. Subsection3.C(2) provides that if, in the Franchisors' opinion, Progressive has used best efforts to diligently pursue development of the required units and is otherwise in compliance with the SDA, the Franchise Agreements, and the Ancillary Agreements for each unit, then the Franchisors must offer Progressive one or more alternatives with respect to the SDA, such as altering the size of, or otherwise modifying the Store Development Area. Subsection3.C(2) contains no requirement for the payment of additional fees.

Defendants admit that "the fourth store was scheduled to open by January 1, 2007; however, it was never opened because Dunkin' placed Progressive on development hold due to Progressive's frequent failures to pay royalties, advertising, and rent fees and its other operational problems." (Motion for Summary Judgment, at 2). Progressive disputes that alleged failures to pay and operational problems had anything to do with Defendants' unilateral imposition of the development hold (Op. Br. 64-7), which is authorized nowhere in the SDA. The only evidence that Defendants have produced in support of these alleged failures and operational problems are the Certifications, which, as explained above, must be stricken from the record. The point to be made with respect to Defendants' counterclaim, however, is that it was Defendants' unwarranted development hold, and not a lack of best efforts to diligently pursue development on Progressive's part, that thwarted Progressive's efforts to develop the three additional "Specified Units" required by the SDA (SDA at 1, § 1.A), or any of the "Additional Units" that Progressive was entitled to develop (SDA at 1, § 1.B).

Defendants initially conceded as much. During the first half of 2007, before the present case was commenced, Defendants proceeded under Section3.C(2) of the SDA, engaging in discussions with Progressive regarding modification of the Store Development Area, having Progressive take over identification of sites, and lifting the unilateral and unsanctioned development hold. These discussions are evidenced by the then communications among the

parties (Op. Br. at 66-7, Ex. TTT, Ex. UUU), which would not make any sense unless Defendants were of the opinion that Progressive had used best efforts to diligently pursue development and was otherwise in full compliance. Accordingly, under applicable law, as well as the facts of this case, Defendants are entitled to no additional sums under the SDA.

## VII. SUMMARY JUDGMENT CANNOT BE AWARDED FOR A FAILURE TO RESPOND

It is well-settled in the Sixth Circuit that absence of a response to a summary judgment motion does not lessen the burden of a moving party to demonstrate the appropriateness of summary judgment. *See Cross v. Northwest Airlines*, 998 F. Supp. 803, 805 (N.D. Ohio 1998), *citing Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 410 (6th Cir. 1992). The failure of the non-moving party to oppose a summary judgment motion does not automatically entitle the moving party to a grant of summary judgment. *See Gaines v. Farese*, 798 F.2d 1414, 7*6 (6th Cir. 1986). Rather, a court must carefully examine the submissions of the moving party to determine whether that party is entitled to judgment as a matter of law. As the Sixth Circuit Court of Appeals has stated:

> In the absence of a response, the court must review carefully those portions of the submitted evidence designated by the moving party. Neither the trial nor appellate court, however, will *sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party. Rather, in the reasoned exercise of its judgment the court may rely on the moving party's unrebutted recitation of the evidence, or pertinent portions thereof, in reaching a conclusion that certain evidence and inferences from evidence demonstrate facts which are 'uncontroverted.'

*Guarino*, 980 F.2d at 410. It also bears mention that, pursuant to the Court's order of January 5, 2010, Progressive has filed, on the date hereof, a list of material facts which Progressive believes to be in dispute regarding, inter alia, Progressive's claims for unfair competition and frustration of commercial purpose which the Court may consider as well.

## CONCLUSION

For the reasons hereinabove set forth, Defendants have failed to carry their burden to demonstrate the appropriateness of their Motion for Summary Judgment and, therefore, such motion should be denied on all of Progressive's claims and on Defendants' counterclaim.

Respectfully submitted,

/s/ Thomas R. Brule
Thomas R. Brule (0060146)
BRULE LAW FIRM, LLC
80 Berkshire Park Drive
Chagrin Falls, Ohio 44022
Telephone: (216)789-4229
Email: brulet@gmail.com
*Attorney for Plaintiff*

February 19, 2010

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on this 19th day of February, 2010 using the Court's electronic filing system. Parties may access this filing through the Court's system.

s /Thomas R. Brule

45

Agreement, did you look at the area to try to determine where you would want to build sites?
A. **Perhaps. I know we certainly drove through and studied the map as to what -- where we were allowed to have stores and where we weren't.**
Q. Who did you drive around with?
A. **I recall at least a number of times with Eitan and certainly Kevin Dalpiaz. There might have been someone else from Dunkin' Corporate as well. I don't recall who.**
Q. Did you look at the territory before you signed the Agreement among yourselves or was it always with someone from Dunkin' Donuts Corporate?
A. **I don't recall.**
Q. Did anyone from Progressive Foods, L.L.C. look at the Mentor Dunkin' Donuts site for viability before construction began?
A. **Not that I recall.**
Q. Did you or anyone from Progressive Foods, L.L.C. do any kind of due diligence on the site before construction began?
A. **Due diligence meaning?**
Q. To determine the viability of the

46

site; whether this would make money for Progressive Foods, L.L.C., that sort of thing.
A. **For me personally, other than our conversations with Dunkin', based on their due diligence, as I remember it, I would say no.**
Q. Is Eitan Flank originally from Cleveland, do you know?
A. **Meaning what was he --**
Q. Was he born here?
A. **I don't know.**
Q. Do you know if he grew up here?
A. **I -- part of his childhood he spent here.**
Q. Do you know what part of Cleveland he grew up in?
A. **Beachwood area.**
Q. Where is Beachwood relative to Mentor?
A. **It's west about 15 miles.**
Q. Did your wife grow up in the Cleveland area?
A. **She did.**
Q. Beachwood area also?
A. **Correct.**
Q. What about Kevin Daubenmire, did he

47

grow up in the Cleveland area?
A. **Northeast Ohio, to the best of my knowledge.**
Q. And how long had Dunkin' Donuts been in the Cleveland market when you started working with them in 2004?
A. **I don't.**
Q. Do you know if it had been more than two years?
A. **I believe so.**
Q. Do you know which was the first shop that opened up of Dunkin' Donuts in the Cleveland market?
A. **I don't.**
Q. When -- at the time Mentor opened up, what were your responsibilities as managing director for Progressive Foods, L.L.C.?
A. **Well, number one was to become "Dunkin' certified". That was a laborious process that had gone on months prior with training in Boston, passing numerous tests, and then the onsite training in conjunction with other potential franchisees and a trainer in Middleburg Heights. From that point, the responsibilities included, but were not limited**

48

**to, bringing all of the other staff, including managers, shift workers, up to speed on the Dunkin' way. That involved significant amounts of time and online training. And there was also some cross-training with other franchisees of our staff members as well.**
Q. So before Mentor opened -- first of all, you had extensive training; is that fair to say?
A. **Through -- through Dunkin's process, yes.**
Q. That included first you went to Boston and you received training there?
A. **Correct.**
Q. How long was the training in Boston?
A. **I believe the training in Boston was two weeks.**
Q. Anyone else besides you get trained in Boston?
A. **Yes.**
Q. Who else?
A. **Kevin Daubenmire.**
Q. Anyone else?
A. **Yes. Naftali Feig.**