DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Progressive Foods LLC, | ) | |
| | ) | CASE NO. 1:07 CV 3424 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| Dunkin' Donuts, Incorporated, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I.  Introduction

        This case, which originated with the removal of the plaintiff's complaint from the

Common Pleas Court of Cuyahoga County to the United States District Court on November 2,

2007, reflects the inability of major business entities to find a way to resolve their differences

without resort to the judicial process.

        The plaintiff, entitled Progressive Foods, LLC, operates a series of businesses in

Cuyahoga County in several fields.  The defendants, Dunkin' Donuts, Inc., Baskin-Robbins, and

Third Dunkin' Donuts Inc., are engaged in the fast-food business which depends upon franchise

agreements and operations.

        The plaintiff and the defendants entered into business arrangements prior to the filing of

this lawsuit and at the time of the lengthy bench trial in 2010, the parties were still engaged in

business operations with each other.[1]  However, the parties have found it impracticable to resolve

_____

[1]The defendants filed a motion to strike the plaintiff's jury demand on May 6, 2009.
Doc. 42.  Based on the fact that Progressive waived its right to trial by jury when it
signed the three franchise agreements and a Multiple Unit Store Agreement (SDA), all of

(1:07 CV 3424)

their differences by a settlement process, but rather look to the Federal judiciary as the final

arbitrator of their business disputes.  The docket in this case now numbers 216 entries.  The

transcript of the bench trial conducted by the Court and concluded with testimony on September

22, 2010 numbers 1,239 pages.

The first amended complaint filed by the plaintiff seeks money damages based on a

number of different causes of action including breach of contract, unjust enrichment, unfair

competition, frustration of commercial purpose, intentional interference with contract, civil

conspiracy, fraud and a request for money damages in seven figures, plus injunctive relief.

The defendants filed an answer and a counterclaim/third-party complaint seeking money

damages.  Efforts to mediate the case proved unsuccessful as apparently the parties preferred

judicial litigation rather than attempting to resolve their difficulties based upon their ongoing

business relationship.

After lengthy discovery efforts which required supervision by the assigned Magistrate

Judge, the defendants moved for summary judgment which was opposed by the plaintiff.  The

plaintiff's opposition to the defendants' motion for summary judgment included multiple

exhibits as reflected in Docs. 102 through 152.

In summary fashion, the Court denied the defendants' motion for summary judgment and

began the bench trial placing the parties on the clock with each side having 1,000 minutes to

present their separate cases and defenses.

_____

which contained multiple jury trial and punitive damages waivers.  As a consequence,
this case proceeded as a bench trial.

(1:07 CV 3424)

Following the trial, the Court ordered the parties to file Proposed Findings of Fact and

Conclusions of Law.  Those responses have now been filed and the case is before the Court for

resolution.[2]

## II.   Brief Explanation of the Court's Verdict

The defendants decided to enlarge their combined business involving the sale of

franchises for Baskin-Robbins and Dunkin' Doughnuts in the greater Cleveland area and in the

process engaged in an ongoing business relationship with the plaintiff Progressive Foods, LLC.

The parties entered into a contractual relationship that gave the plaintiff the opportunity to

embark on a new business, i.e. the fast food franchise business.  In the process, the defendants

persuaded the plaintiff to buy from them three separate developed tracts of land in Mentor,

Chardon and Euclid on which to locate three separate fast-food franchises.  As it developed, each

of the three sites sold to the plaintiff were less than ideal for a successful fast food business, and

the defendants were aware of the shortcomings of the sites, but did not share the information

with the plaintiffs because, as the Court finds, sale of the sites to the plaintiff was more

important to the defendants than the potential success of the plaintiff in operating the sites as a

fast-food franchise.   After the primary contract was signed by the parties and the plaintiff began

its operation of the first and then the second franchise business, the defendants placed the

plaintiff on a "development hold" absent any contractual right to impose such a "development

hold."

---

[2]Consistent with the complexity of the fact situations in this case, the post-trial
documents filed with the Court as reflected in a series of appendices in Doc. 215 and 216
number 391 pages.

(1:07 CV 3424)

After the plaintiff agreed to purchase the second site, the development hold was withdrawn temporarily until the defendants elected to encourage the plaintiff to buy the third site, i.e., the Euclid store, which was used by the defendants as an experimental site to assist the defendants in further developing their franchise business.

After the plaintiff, having difficulty operating the three sites and turning a profit in each of the three stores, the defendants terminated the contractual relationship with the plaintiff at a time when the plaintiff owed the defendants the sum of $100,000 on its obligation to the defendants.

After reviewing the lengthy transcript of 1,239 pages and the multiple exhibits admitted during the trial, plus the proposed findings of fact and conclusions of law, the Court has decided that the plaintiff is entitled to develop three remaining sites of its choosing in the greater Cleveland area in the next three years as franchisees with the defendants and within the framework of the initial contract.

The assessment of damages presents a difficult issue for the Court.  The Court will not adopt the findings of plaintiff's expert on damages, Dr. Burke.  The Court finds that a total allocation of damages for the three stores is $336,000, but with a set-off of $100,000 for unpaid fees, resulting in a total award of $236,000 plus the injunctive relief previously described.

### III.  The Court's Findings of Fact and Conclusions of Law

Each of the Court's findings of fact and conclusions of law represent the Court's consideration of all of the evidence in light of the pertinent law and the Court's consideration and evaluation of the witnesses's qualifications, demeanor and credibility.  *See Reznick v.*

4

(1:07 CV 3424)

*Provident Life and Accident Insurance Co.,* 364 F. Supp. 2d 635, 636 (E.D. Mich. 2005).

Further, any conclusion of law that may be construed to include a finding of fact is hereby

adopted as a finding of fact. *Id.*

The Court's use of subheadings is for convenience only.  In some cases, the same or

similar fact findings may be repeated under different headings.  However, if a finding of fact or

conclusion of law is pertinent to any other finding of fact or conclusion of law contained herein

other than that indicated by the heading under which it appears, that finding or conclusion is

adopted as a finding or conclusion applicable to such other determinations as may be

appropriate.  *Id.*

Various references are cited in support of the Findings of Fact.  However, the Court's

findings are fact are not limited by those references, but are a result of the Court's consideration

of all of the evidence before it.

The Court's findings of fact and conclusions of law follow.

1.      Plaintiff Progressive Foods, LLC ("***Progressive***") is an Ohio limited liability

company with its principal place of business at 5553 Broadview Road, Parma, OH 44134.

(ECF 187, Joint Stipulation of Undisputed Facts, at ¶ 1)

1.1     Defendant Dunkin' Donuts Franchised Restaurants LLC ("***Dunkin'***"),

successor-in-interest to Defendant Dunkin' Donuts, Incorporated, is a Delaware limited liability

company with its principal place of business at 130 Royall Street, Canton, Massachusetts 02021.

(Joint Stipulation of Undisputed Facts, at ¶ 2, ECF 21, Defendants' Answer, at ¶ 4)  Dunkin' has

succeeded to all of the rights and obligations of Dunkin' Donuts, Incorporated (ECF 185,

5

(1:07 CV 3424)

Defendants' Trial Brief, at 3, n.1)

        1.2    No later than November, 2003, and perhaps earlier, the Franchisors embarked on an expansion program whereby the Franchisors intended, by the year 2025, to triple the number of franchises they had sold nationwide.  As a part of this expansion program, the Franchisors intended to sell no less than twelve to fifteen franchises  per year in the greater-Cleveland, Ohio area.  (Pltf.'s Exhibit 2; Exhibit 3)

        2.    Defendant Baskin-Robbins Franchised Shops LLC ("***Baskin***"), successor-in-interest to Baskin-Robbins USA, Co, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts  02021. (Joint Stipulation of Undisputed Facts, at ¶ 3; ECF 21, Defendants' Answer, at ¶ 2).  Baskin has succeeded to all of the rights and obligations of Baskin-Robbins USA, Co.  (ECF 185, Defendants' Trial Brief, at 3, n.1)

        3.    Defendants DB Real Estate Assets I LLC and DB Real Estate Assets II LLC (collectively, "***Third Dunkin'***"), successors-in-interest to Third Dunkin' Donuts Realty, Inc., are a Delaware limited liability companies with their principal places of business at 130 Royall Street, Canton, Massachusetts  02021.  (ECF 21, Defendants' Answer, at ¶ 6).  Third Dunkin' has succeeded to all of the rights and obligations of Third Dunkin' Realty, Inc. (ECF 185, Defendants' Trial Brief, at 3, n.1)

        4.    Third Party Defendant Eitan Flank is a natural person.  Eitan Flank is the managing member of Progressive.  (Joint Stipulation of Undisputed Facts, at ¶ 5).

        4.1.    Third Party Defendant Mike Flank is a natural person.  Mike Flank is a

6

(1:07 CV 3424)

member of Progressive.  (Joint Stipulation of Undisputed Facts, at ¶ 6).

    4.2. Third Party Defendant Shaul Flank is a natural person.  Shaul Flank is a member of Progressive.  (Joint Stipulation of Undisputed Facts, at ¶ 7).

    4.3. Third Party Defendant Joel Sausen is a natural person.  Joel Sausen is a member of Progressive. (Joint Stipulation of Undisputed Facts, at ¶ 8).

    4.4. Defendants Dunkin' and Baskin (collectively, the "***Franchisors***") are in the business of selling franchises to franchisees whereby the franchisees acquire, pursuant to a franchise agreement, the right to use the Franchisors' system for operating quick service restaurants ("***QSR***s") that serve baked goods, ice cream, and beverages using the Franchisors' proprietary operating system and trademarks.

    5. Defendant Third Dunkin' is in the business of acquiring control of real properties by lease or by purchase, acting as a general contractor for the purpose of constructing QSRs on such properties, and then leasing such real properties to franchises to whom either or both of the Franchisors have sold or agreed to sell franchises to use the Franchisors' system for QSRs that serve baked goods, ice cream, and beverages using the Franchisors' proprietary operating system and trademarks.

    6. None of the Defendants operate QSRs themselves.[3]

    7. On or about September 1, 2004, the Franchisors and Progressive entered into a

---

[3]*See* ECF 64, Defendants' September 8, 2009 letter to the Court  at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model is fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

(1:07 CV 3424)

contract captioned "Multiple Unit Store Development Agreement," and dated September 1, 2004

(hereafter the "***SDA***"). (Joint Stipulation of Undisputed Facts, at ¶ 15).

       7.1.     The SDA was drafted solely by Defendants, and is in the form and

substance of Defendants' standard-form of Multiple Unit Store Development Agreement

attached as an exhibit to Defendants' 2004 Uniform Franchise Offering Circular.  (Pltf.'s

Exhibit 30).

       7.2.     Pursuant to Subsection 1.A of the SDA, Progressive was required, and

entitled, to develop and open the number and mix of QSRs specified in Exhibit B thereto in

accordance with the schedule set forth in Exhibit C thereto (the "***Development Schedule***").

Exhibit B to the SDA specifies six (6) units, each a combination Baskin-Robbins/ Dunkin'

Donuts unit (such units, collectively, the "*Specified Units*", and each of the Specified Units,

individually, a "***Specified Unit***").  The Development Schedule sets forth that one Specified Unit

must open on or before April 25, 2005, and one additional Specified Unit must open on or before

the first day of each January and June thereafter until June 1, 2008, the date by which all six (6)

such Specified Units were to have been opened.[4]

       7.3.     Defendants' terminated the SDA by notice to Progressive on or about

September 22, 2007.  (Joint Stipulation of Undisputed Facts, at ¶ 49).  Thus, the SDA was in

effect for a period of about thirty-seven months.

       7.4.     Defendant Third Dunkin' purchased the Mentor Site from Sky Bank on or

---

[4]SDA, Exhibit B, Part I (captioned "Specified Units"), Subpart A (captioned "Number
and Mix").

8

(1:07 CV 3424)

about October 26, 2004 for the sum of $350,000 (Plaintiff's Exhibits 13 and 14), about four months before Progressive agreed to lease the Mentor Site from Third Dunkin' pursuant to a lease (the "***Mentor Lease***") dated February 23, 2005. (Plaintiff's Exhibit 29; Joint Stipulation of Undisputed Facts, at ¶ 49).

      7.5    The Mentor Store opened for business on or about February 28, 2005. Within *four days* after the opening of the Mentor Store, and perhaps even earlier, the Defendants had put Progressive on development hold, that is, suspended Progressive's right to develop Specified Units under Subsection 1.A of the SDA.

      7.6.    Andrea Mairella ("***Mairella***"), an individual identified by Defendants as a former Operations Manager of Dunkin' Brands, Inc., whose duties included coaching, counseling, and evaluating franchisees on operational and business issues,[5] notified Progressive of the development hold by e-mail dated March 4, 2005. (*See* Defs.' Exhibit I5 at I-1, 2). In her message regarding the development hold, Mairella outlined no less than seven conditions, none of which is mentioned anywhere in Subsection 1.A of the SDA, that Progressive would have to satisfy before "begin[ning] this process at a later date." *Id*. at I-1.

      8.    Third Party Defendants Eitan Flank, Mike Flank, Shaul Flank and Joel Sausen are members of Progressive Foods, LLC and personally guaranteed Progressive Foods, LLC's obligations pursuant to executed personal guarantees contained within the SDA. (Stip. Facts ¶¶ 5, 6, 7 & 8; Exhibits C at C-31, J at J-31 & P at P-28).

---

[5]Defendants' Answers to Progressive Foods, LLC's First Set of Interrogatories, submitted to the Court on March 5, 2009, at 4.

(1:07 CV 3424)

9.      Progressive's members are long-time Cleveland area residents and experienced businessmen.  In addition to their Dunkin' and Baskin franchises, they have owned and operated several nursing homes and shoe stores in the Cleveland area, an international food import and export business, and a real estate company.  (Tr. 149:2-13; 152:1-19).  By 2005, Progressive Quality Care, their nursing home business, had over 1,000 employees and approximately $50 million in annual revenue.  (Tr. 149:14-17).  In addition, Flank testified that he had previous experience selecting locations for businesses through his work for Progressive Quality Care.

Pursuant to Section 1. of the SDA,  the Franchisors  granted Progressive an exclusive license to develop and open QSRs within the "Store Development Area" utilizing the Franchisors' systems and proprietary marks.

10.      Pursuant to Subsection 1.B of the SDA, Progressive was entitled to develop, following timely completion of the Development Schedule and during the remainder of the four-year[6]  term of the SDA, additional units (such units, collectively, the "***Additional Units***", and each of the Additional Units, individually, an "***Additional Unit***") within the Store Development Area.  Progressive's right to develop Additional Units under Subsection 1.B of the SDA is subject to five conditions enumerated in Subsection 1.B.

11.      However, none of the conditions applicable to Progressive's right to develop Additional Units under Subsection 1.B apply to or limit Progressive's right to develop Specified Units pursuant to Subsection 1.A.

---

[6]The SDA provides, at Exhibit B, Part III, Subpart A, that the term of the SDA shall expire on September 1, 2008.

10

(1:07 CV 3424)

12.     During almost all of the thirty-seven month period for which the SDA was in effect, however, the Defendants' kept Progressive on so-called "development hold," whereby the Defendants unilaterally suspended Progressive's right to develop and open Specified Units.  In fact, during the SDA's truncated effective term, there were only two periods when Progressive was clearly not on "development hold" as follows:

(1)  The period beginning on the date of the SDA and ending four days after the opening of the QSR at 7742 Lakeshore Boulevard, Mentor Ohio 44060 (the "***Mentor Site***", and the QSR threat, the "***Mentor Store***"), and

(2)  a period of uncertain duration beginning on June 1, 2005 and ending no later than November 1, 2005.

13.     Any lifting by the Defendants of their unilateral suspension of Progressive's right to develop Specified Units under Section 1.A of the SDA invariably coincided with the Defendants' desire to sell or lease one of two sites (hereinafter described) in which they had invested a significant sum of money for investigation, design, and construction or outright purchase prior to the date of the SDA:

(1)  The site at 370 Center Street, Chardon, Ohio  44024 (the "***Chardon Site***," and the QSR threat, the "***Chardon Store***") and

(2) The site at 22200 Lakeshore Boulevard, Euclid, Ohio (the "***Euclid Site***," the store threat, the ***"Euclid Store***,"  and the Euclid Site, together with the Mentor Site and the Chardon Site, collectively, the "***Progressive Sites***").

The Court concludes that one who fails to disclose to another a fact that he knows may

11

(1:07 CV 3424)

justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

14.     In addition to the SDA, Progressive entered into contracts for the sale of the Mentor and Euclid stores.  (Stip. Facts ¶¶ 18, 35).  These are the contracts through which Progressive purchased the franchises from Dunkin', which in most cases took place significantly before the date the businesses actually opened.  For example, the Mentor Franchise Sale Contract was executed on September 1, 2004 (the same day the SDA was signed), while the Franchise Agreement for that location was signed in January 2005, the lease in February 2005, and the business opened in February of that year.  (Exhibits A, C & D; Stip. Facts ¶ 24).  The franchise sale contracts included a purchase price for the franchise and set forth the terms and conditions that would govern the relationship between the parties up through the grand opening. Progressive specifically acknowledged in the Contracts for Sale for Mentor and Euclid that although the franchise was being built in a territory and trade area covered by its SDA, it agreed to Dunkin's development of the location.  (Exhibits A-5 & N-6) ("Transferee consents to the development").  The franchise sale contracts also stated the franchise in question was to be "credited to satisfy one of [Progressive's] obligations to develop a Dunkin' Donuts/Baskin-Robbins Unit under the SDA."  (*Id.*)  Both franchise sale contracts included a merger clause stating that the agreement and "the documents referred to herein, and the Uniform Franchise Offering Circular" constitute the "entire, full and complete agreement" between the parties and

12

(1:07 CV 3424)

that there were no other "representations, inducements, promises or agreements" that had any

force or effect on the parties. (Exhibits A-6 & N-7).  Thus, the UFOCs are incorporated by

reference as a part of the agreements between the parties.

      15.      In addition to the provisions described immediately above, the franchise sale

contract for the Euclid location had other elements.  The Euclid franchise was a "prototype test"

store, based on a new design for Dunkin' stores that was being tried out for the first time in

several markets across the country.  (Exhibit N; Tr. 1024:3-25).

      16.      The Euclid franchise sale contract also included a disclaimer that stated that

Dunkin' made "no representation or warranties as to the sales or other benefits, if any, that may

result from the Test" and that Dunkin' was "not liable for any decline in sales or increase in

[Progressive's] costs that may result from the Test."  (*Id.* ¶ 4.E).

      17.      Progressive signed Franchise Agreements for each of its stores.  These are long-

term contracts that allow it to operate under Dunkin's trademarks for twenty years.[7]  (Exhibits C,

J, & P).  The Franchise Agreements required Progressive to adhere to Dunkin's standards for

food safety, appearance, and other aspects of its operations, and gave Dunkin' the right to make

periodic unannounced visits to the stores to determine if Progressive is complying with those

standards.  (Exhibit C ¶¶ 5.0, 6.0).  They also required Progressive to ensure that its employees

are fully trained in accordance with "Dunkin's training procedures" and that its management

attends required follow-up training.  (*Id.* ¶ 5.1.8.2).  The Franchise Agreements further required

---

[7]Aside from minor differences, Progressive's Franchise Agreements for the Mentor,
Chardon, and Euclid stores are identical in form and substance.

13

(1:07 CV 3424)

Progressive to pay Dunkin' a percentage of all weekly gross sales (ranging roughly from 9 to

10%) in continuing royalty and advertising fees.  (*Id.* ¶ 4.3, 4.4, Contract Schedule Items E & F).

If Progressive defaulted on any of these obligations, Dunkin' could issue a notice to cure the

breach within a set period of time and terminate the contracts if the breach is not cured.  (*Id.* ¶¶

9.0.5, 9.1, 9.1.1, 9.4).

       18.    The Franchise Agreements also contained disclaimers stating that Dunkin' did not

warrant that the businesses would be successful.  For example, the following disclaimer was

included in the Franchise Agreement addendum containing special terms and conditions for

newly developed locations:  "Because unit development is not a precise science, FRANCHISEE

agrees that FRANCHISOR's development and leasing of the Site *shall not impose any liability*

*or obligation on FRANCHISOR or the Landlord with respect to sales or profits of the Unit*."

(See Exhibit C ¶ 3). (emphasis added).  In addition, each Franchise Agreement provided:

Independent Investigation.  THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE
UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE
AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN
INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER
FACTORS.  FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO
THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY
FRANCHISEE HEREBY.

(*Id.* at C-22 ¶ 18).  That same provision stated that the franchisee's decision to enter into the

Franchise Agreement was made "after making independent investigations of Franchisor's

business" and was not based "upon any representation by Franchisor as to sales or profits which

Franchisee in particular might be expected to realize."  (*Id.*) (original in all capital letters).

14

(1:07 CV 3424)

19.     The Franchise Agreements also contained disclaimers with respect to Progressive's use of a centralized food production and delivery facility (referred to as a Co-operative Production Location or "CPL").  (Exhibit C-2).  The CPL serves the Cleveland market and is wholly owned by franchisees (including Progressive), although it works with Dunkin' to ensure that the doughnuts and other products it produces conform to product standards.  (Tr. 145:11-16).

20.     Progressive received significant financial assistance from Dunkin' with respect to all three locations.  (Exhibits R2, T2, U2, & Y2).  Progressive borrowed money from the National Cooperative Bank through Dunkin's New Market Entry Program.  (*Id.*)

21.     Dunkin' purchased the Chardon parcel for $300,000 from a third party on February 16, 2004.  (Exhibit G-1).  It thereafter incurred approximately $87,000 in "soft" costs to prepare the parcel for construction, including asbestos removal, construction permits, and architectural costs.  (Exhibit U2-2).  On March 3, 2005, Dunkin' sold the Chardon parcel to Progressive for $387,000, which reflected the cost of the land purchase plus the soft costs. (Exhibit H).  In addition, Progressive experienced some unanticipated additional costs, some of which were paid for by Dunkin', even though it was not required to do so.  (Tr. 227:15-20).

21.1.   Dunkin gave Progressive substantial operating assistance.  Among other things, it assigned an operations manager and a marketing manager to help Progressive increase sales, improve local advertising efforts, reach profitability, and adhere to Dunkin's operational standards.  (Tr. 330:8-14; 331:13-19; 334:9-17; 524:13-20; 526:8-12; 528:10-22; 667:2-7; 668:2-13).  These employees worked closely with Progressive on operational issues, providing

15

(1:07 CV 3424)

information on many aspects of the business, inspecting the stores periodically, and advising on local marketing issues.  (*Id.*)  Andrea Mairella, a former Dunkin' employee who was Progressive's Operations Manager for a time, stated that her main goal was to help Progressive become profitable and that Dunkin' was not just concerned with Progressive's gross sales.  (Tr. 299:16-301:15; 330:12-14).  Joel Sausen acknowledged during his testimony that Mairella was helpful to Progressive during the pre-opening of the Mentor store.  (Tr. 414:9-415:18). Similarly, Progressive's current Director of Operations Karen Domonkos testified that Dunkin' Operations Manager Tom Stratton had been helpful to her in carrying out her duties.  (Tr. 776:16-21).

21.2.    Before opening its first store, Progressive sent three representatives to Dunkin's training center in Massachusetts, Dunkin' Donuts University, where they received intense instruction on all aspects of the operations and business for both the Dunkin' and Baskin brands.  (Tr. 331:20-332:4; 378:20-379:4; 413:6-414:2).  Dunkin' also gave Progressive a lengthy operations manual, which detailed every aspect of franchise operations.  (Tr. 517:20-518:14).

22.    Even assuming, arguendo, that operational deficiencies had existed at the Mentor Site, nothing under the SDA, including, without limitation, Subsection 1.A thereof, which governed Progressive's right to develop Specified Units, entitled the Franchisors to place Progressive on "development hold" for operational deficiencies.

22.1.    Even termination of a Franchise Agreement, however, would not entitle the Defendants to suspend Progressive's right to develop more Specified Units under

16

(1:07 CV 3424)

Section 1.A of the SDA.  Termination of the Franchise Agreement for a particular QSR would only impact that QSR.  Nor would termination of a Franchise Agreement entitle to the Defendants to terminate the SDA, inasmuch as Section 9 (captioned "Default") addresses only two kinds of defaults – non-monetary defaults under the SDA and monetary defaults under the SDA.  The SDA contains no remedies for defaults under the Franchise Agreements, even if any were to have occurred.

      22.2.   The Defendants' initial suspension of Progressive's right to develop Specified Units under Subsection 1.A of the SDA constituted a material breach of the SDA by the Franchisors.

      23.   Third Dunkin' purchased the Chardon Site from JMRWLR, LLC for $300,00 on or about July 13, 2004, about fourteen months before the SDA was signed.  (Joint Stipulation of Undisputed Facts, at ¶ 26).

      24.   The Defendants embarked on a plan to recover their investment in the Chardon Site to Progressive, assuring Progressive that completion of the Chardon Store would be "a fairly simple task" (Pltf.'s Exhibit 18) and that the Chardon Store would be ready to open when the Defendants turned possession over to Progressive.  (Pltf.'s Exhibit 119).

      24.1.   The Defendants continued to work on completion of the Chardon Store, and on or about March 3, 2005, Third Dunkin' and Progressive's members entered into an "Agreement for Sale" pursuant to which Third Dunkin' agreed to sell the Chardon Site to Progressive's members for $387,500.00.  (Pltf.'s Exhibit 34; Joint Stipulation of Undisputed Facts at ¶ 27).

17

(1:07 CV 3424)

24.2.    On or about March 10, 2005, Progressive Chardon Real Estate, LLC

("**PCRE**") was created as an Ohio limited liability company by Michael J. Haas, Esq., then with

Roetzel & Andress, LPA, a law firm then acting as Defendants' local Ohio counsel. (Pltf.'s

Exhibit 35; Joint Stipulation of Undisputed Facts at ¶ 28).

24.3.    On or about March 22, 2005, PCRE and Progressive entered into a

Ground Lease (the "**Chardon Lease**") whereby Progressive agreed to lease the Chardon Site

from PCRE with respect to the Chardon Site. (Pltf.'s Exhibit 36; Joint Stipulation of Undisputed

Facts at ¶ 29).

24.4.    On or about April 25, 2005, Progressive's members assigned their rights

under the Agreement for Sale for the Chardon Site to PCRE by means of an Assignment of

Purchase Agreement.  Third Dunkin' consented to the assignment pursuant to a First

Amendment to Real Estate Purchase Agreement dated April 28, 2005 (Pltf.'s Exhibit 37, 38;

Joint Stipulation of Undisputed Fact at ¶ 30), and in July, 2005, Third Dunkin' Realty conveyed

the Chardon Site to PCRE pursuant to a Limited Warranty Deed. (Pltf.'s Exhibit 39; Joint

Stipulation of Undisputed Facts at ¶ 31).

24.5.    On or about July 11, 2005, the Franchisors and Progressive entered into a

Franchise Agreement (the "**Chardon Franchise Agreement**") for the Chardon Store. (Pltf.'s

Exhibit 40; Joint Stipulation of Undisputed Fact at ¶ 32).  The Defendants had not yet completed

construction of the Chardon Store, however.  The Chardon Store would not open, therefore, until

on or about August 26, 2005.  (Joint Stipulation of Undisputed Facts at ¶ 33).

25.    On or about July 27, 2005, Catherine Carter d/b/a Shore Center Shopping Center

18

(1:07 CV 3424)

("**Shore Center Shopping Center**") and Third Dunkin' Realty entered into a Ground Lease, pursuant to which Third Dunkin' agreed to lease the Euclid Site from Shore Center Shopping Center (such Ground Lease, the "**Euclid Prime Lease**").  (Pltf.'s Exhibit 22; Joint Stipulation of Undisputed Facts at ¶ 34).

       25.1.   Because none of the Defendants operate QSRs, and the because the Euclid Site was situated within Progressive's exclusive SDA territory, Third Dunkin' would have no means to recover the lease payments under the Euclid Prime Lease unless Progressive agreed to sublease the Euclid Site from Third Dunkin'.

       25.2.   Progressive was reluctant to enter into a long-term lease for the Euclid Site.  However, during an October 15, 2005 conversation with Mairella and Mr. Kevin Dalpiaz ("**Dalpiaz**"), the Defendants' Construction Manager for the Cleveland-area market,[8] Progressive's chief executive, Mr. Eitan Flank, expressed "angst and hesitation" when asked to sign a long-term sublease therefore."  (Pltf.'s Exhibit 68).

       25.3.   The Defendants acting by and through their Construction Manager, Mr. Kevin Dalpiaz ("**Dalpiaz**") and Mairella, attempted to persuade Progressive to sublease the Euclid Site from Third Dunkin', describing at length new initiatives that the Defendants were

---

[8]In Defendants' March 5, 2009 Supplemental Disclosure Statement, Pltf.'s Exhibit 6 ("**Defendants' Supplemental Disclosure**"), Defendants stated that "Mr. [Kevin] Dalpiaz, a Construction Manager for Dunkin' Donuts, is likely to have discoverable information relating to . . . Plaintiff's claims regarding construction of their shops."  For purposes of such Supplemental Disclosure Statement, the term "Dunkin' Donuts" is defined as follows:  "Dunkin' Donuts Incorporated, Baskin-Robbins USA, Co., and Third Dunkin' Donuts Realty, Inc. and their respective affiliates, successors, subsidiaries and parents (all such entities taken together, 'Dunkin' Donuts') . . . ."  Thus, Defendants have identified Mr. Dalpiaz as a Construction Manager for all of the Defendants.

19

(1:07 CV 3424)

undertaking, franchisee success stories, and organizational changes that were underway, while

acknowledging privately, without disclosure to Progressive, that Progressive's concerns about

the Euclid Site were "legitimate.  (Pltf.'s Exhibit 68).  Mairella's immediate superior, Tony

D'Amico, condoned and ratified this action.  *Id.*

       25.4.   On or about October 31, 2005,  Defendant Dunkin' and Progressive

entered into an agreement titled "Contract for the Sale Prototype Test Store," by and among

Defendant Dunkin' Donuts and Progressive (such agreement, the "***Euclid Franchise Purchase***

***Agreement***" and, together with the Mentor Franchise Purchase Agreement, the "***Franchise***

***Purchase Agreements***"), under which Progressive timely paid Dunkin' $278,000.00 for a

Dunkin's franchise for the Euclid Store, together all rights of Dunkin' to the signage and

equipment at the Euclid Site.[9]  Progressive also agreed to pay Dunkin' a Marketing Start-Up Fee

of $5,000.00 for marketing services in connection with the opening of the Euclid Store, which

was then under construction by Third Dunkin' Realty.  (Pltf.'s Exhibit 44 at 1; Joint Stipulation

of Undisputed Facts at ¶ 35).

       25.5.   On or about November 1, 2005, *just one day after Progressive and Dunkin*

*had signed the Euclid Franchise Purchase Agreement*, Dunkin' and Baskin conducted a

"Franchise Business Review" of Progressive's Mentor and Chardon franchises (the "2005 FBR")

and Progressive was designated therein as "Not Approved for Growth."  (Joint Stipulation of

Undisputed Facts at ¶ 41).  The 2005 FBR was not disclosed to Progressive.  Unbeknownst to

Progressive at the time, within one day after the Defendants had managed to get Progressive to

---

[9]Euclid Franchise Purchase Agreement § 1, at 1.

(1:07 CV 3424)

agree to open a store at the Euclid Site, the Defendants had put Progressive back on development

hold as to any other locations. This development hold, yet another material breach of the SDA

by the Defendants, remained in effect until the Defendants' termination of the SDA. (Joint

Stipulation of Undisputed Facts at ¶¶ 42, 43).

       25.6.   There was no event, condition, or circumstance that could reasonably have

led Dunkin' and Baskin to conclude that within the period of twenty-four hours after Dunkin's

signing the Euclid Franchise Purchase Agreement, a material adverse change had occurred at the

Mentor and Chardon Stores that rendered Progressive unable to perform its obligation to open

Specified Units under Section 1.A of the SDA.

       25.7.   The 2005 FBR (Defs' Exhibit O3) set forth, under the caption "Franchise

Business Review Form," criteria in seven separate categories, each of which calls for a "Yes" or

"No" response: (1) People Planning: Talent Management; (2) Guest Satisfaction; (3) QSC –

Operational Standards; (4) Market Share; (5) Franchisee Involvement; (6) Financial;

and (7) Capital Investment. It also states that all restaurants in a franchisee's network must be

considered when completing the FBR. It also indicates that all criteria must be answered "Yes"

in order for the franchisee to be "Approved for Growth." Set forth under each of the criteria is a

series of sub-components. It states that all sub-components listed under a given criteria must

receive a "Yes" in order for the criteria to be a "Yes." But the 2005 FBR contains no space to

furnish an answer for any of the sub-components. Thus, it is not possible to tell why a particular

criteria was answered "Yes" or "No", or even which of the Defendants' agents answered it, or

whether the agent that did answer did so from personal knowledge.

21

(1:07 CV 3424)

25.8.    The questions therein, coupled with their respective "Yes" or "No"
answers, amount to nothing more than a series of conclusory statements.  At trial, Mairella
admitted that the criteria set forth in Defendants' Franchise Business Reviews were subjective in
nature.  (Transcript of Proceedings, Vol. II, at 4-11).

25.9.    On or about February 23, 2006, Third Dunkin' and Progressive entered
into a Lease of Dunkin' Donuts/Baskin-Robbins Shop, dated February 23, 2006, pursuant to
which Progressive agreed to lease the Euclid Site from Third Dunkin' Realty (such Lease of
Dunkin' Donuts/Baskin-Robbins Shop, the "*Euclid Sublease*" and, the Euclid Lease, together
with the Mentor Lease, the "*Third Dunkin' Realty Leases*").  (Pltf.'s Exhibit 45; Joint
Stipulation of Undisputed Facts at ¶ 36).

25.10.  On or about February 23, 2006, Dunkin' Donuts and Progressive entered
into a Franchise Agreement, also dated February 23, 2006 (such agreement, the "*Euclid
Franchise Agreement,*" and the Euclid Franchise Agreement, together with the Mentor
Franchise Agreement and the Chardon Franchise Agreement, collectively, the "*Franchise
Agreements*").  (Pltf.'s Exhibit 46; Joint Stipulation of Undisputed Facts at ¶ 37).

25.11.  The Euclid Store opened for business on or about February 24, 2006.
(Pltf.'s Exhibit 46; Joint Stipulation of Undisputed Facts at ¶ 37).

26.    The Franchisors conducted a review of Progressive's Mentor, Chardon, and
Euclid franchises in May of 2006 (such review, the "*2006 FBR*").  The  2006 FBR resulted in
Progressive receiving the same designation that it had received one day after signing the Euclid
Franchise Purchase Agreement –  Not Approved for Growth."  (ECF 187, Joint Stipulation of

22

(1:07 CV 3424)

Undisputed Facts, ¶ 41).

26.1.    By e-mail of July 10, 2006, the Defendants, acting by and through Mairella, offered to remove the development hold imposed the day after signing of the Euclid Franchise Purchase Agreement, subject to the condition that Progressive would immediately pay all amounts identified in that e-mail as owing to the Defendants by Progressive.  (Pltf.'s Exhibit 110).  Defendants' unilaterally-imposed development holds had consumed a portion of the SDA's four-year term during which Progressive was entitled to develop QSRs, and the Defendants had not agreed to modify the Development Schedule attached to the SDA so as to give Progressive additional time to open the three more Specified Units required thereby.

26.2.    And, in fact, that is exactly what the Defendants did.  Mairella removed the development hold, and Ryan Humphrey, Defendants' then Franchise Business Manager for the Cleveland market, immediately reimposed it.  (Transcript of Proceedings, Vol. I, at 117:1-2).

27.    The Defendants used their unilateral development holds, in violation of the SDA, as a carrot to induce Progressive to the Chardon Site, and as a stick to persuade Progressive to lease the Euclid Site.  After the Euclid Store had opened, the Defendants also used their development holds to thwart efforts by Progressive to develop sites that Progressive itself had identified at Willoughby, Ohio, and along Chagrin Boulevard near Beachwood, Ohio, within Progressive's SDA territory.  (Transcript of Proceedings, Vol. I, at 108:13-.111:2; 112:22-113:12).

28.    The Franchisors conducted a review of Progressive's Mentor, Chardon, and Euclid franchises on or about February 12, 2007 (such review, the "*2007 FBR*").  The 2007 FBR

(1:07 CV 3424)

resulted in Progressive receiving the same designation "Not Approved for Growth."  (ECF 187, Joint Stipulation of Undisputed Facts, ¶ 43).

29.     Counsel for Dunkin', Baskin, and Third Dunkin' issued to Progressive a Notice of Termination, dated May 10, 2007, of the Mentor Franchise Agreement and the Mentor Lease. (Joint Stipulation of Undisputed Facts at 44).

30.     Counsel for Dunkin' and Baskin issued to Progressive a Notice of Termination, dated May 10, 2007, of the Chardon Franchise Agreement.  (Joint Stipulation of Undisputed Facts at 45).

31.     Counsel for Dunkin' and Baskin issued to Progressive a Notice of Termination, dated May 10, 2007, of the Euclid Franchise Agreement.  (Joint Stipulation of Undisputed Facts at 46).

32.     On May 16, 2007, Progressive paid $20,000.00 in initial franchise fees under the SDA to Dunkin' and Baskin.  (Joint Stipulation of Undisputed Facts at 47).

32.1     By a May 22, 2007 e-mail to Progressive's counsel, counsel for Dunkin', Baskin, and Third Dunkin' acknowledged receipt of verification from Dunkin', Baskin, and Third Dunkin' that Progressive had paid what was due *and was then current*, and that such Defendants were withdrawing all three of their letters, dated May 10, 2007, constituting notice of termination of the franchises for the Mentor, Chardon, and Euclid Stores.  (Pltf.'s Exhibit 74).

33.     Counsel for Dunkin' and Baskin issued to Progressive a Notice of Default and Cure, dated September 10, 2007, with respect to the SDA.  (Joint Stipulation of Undisputed Facts at 48).

24

(1:07 CV 3424)

34.     Counsel for Dunkin' and Baskin issued to Progressive a Notice of Termination, dated September 22, 2007,with respect to the SDA.  (Joint Stipulation of Undisputed Facts at 49).

35.     Section 6 of the SDA contemplated a site identification process whereby Progressive would conduct an investigation of trade areas within its exclusive Store Development Area under the SDA and thereby obtain its own information regarding population density and traffic-flow patterns in such trade areas.  Section 6 further contemplated that Progressive, relying solely on the information so obtained (and disregarding any information furnished by the Defendants) would perform a suitability analysis of prospective sites within such trade areas, and rely solely on its own analysis to identify those sites within the Store Development Area that would be suitable for the development and successful operation of combination Baskin-Robbins/Dunkin' Donuts QSRs.

35.1.   The SDA further contemplated at Section 6 that Progressive, having identified suitable sites within the Store Development Area, would, in the case of each such site that Progressive proposed to acquire, submit such location in writing to Baskin and Dunkin' for approval, and would provide such Defendants with such information and data as they reasonably requested in connection with their evaluation of the site.  If and when the location was approved by such Defendants, the SDA contemplated that Progressive would acquire control of the site by purchase or lease, obtain all required certifications and approvals, and construct and equip a QSR thereon in accordance with the design standards established by Baskin and Dunkin'.

35.2.   Each of Baskin, Dunkin', and Third Dunkin' has admitted to participating

25

(1:07 CV 3424)

in the process of selecting and developing the Progressive Sites.  (*See* Pltf.'s Exhibit 5, Answer

of Dunkin' Donuts, Inc. and other Defendants to First Amended Verified Complaint and

Defendants' and Counterclaim/Third Party Complaint, with Attachments (the "***Defendants'***

***Answer***"), at 4, ¶ 17).

        35.3    Defendants had already identified each of the Progressive Sites in advance

of the SDA; the Defendants involvement in site identification went beyond mere participation.

There was no involvement by Progressive in site selection.  Progressive opened units at three

different sites in the Store Development Area, but  Progressive did not submit any writing to any

of the Defendants seeking approval as a condition to Progressive's acquisition of an interest in

any of the Progressive Sites.

        35.4    Negotiations between Third Dunkin' and Sky Bank for the purchase of the

Mentor Site had begun on or before November 3, 2003 (Joint Stipulation of Undisputed Facts

at ¶ 20).   In July 2004, Dunkin's Finance Committee approved a Resource Appropriation

Request (Pltf.'s Exhibit 11, the ("***Mentor RAR***") related to the Mentor Site.  The Mentor RAR

specifically states the Mentor Site was identified by the Defendants' so-called New Market Entry

Team and further states that the Mentor Site will be sold to *an as yet-to-be-determined*

*franchisee* for $312,060.  The Defendants had identified the Mentor Site with no involvement by

Progressive over ten months prior to the SDA.

        35.5.   On or about October 19, 2004, Third Dunkin' entered into an agreement

with Sky Bank for the purchase of the Mentor Site.  Third Dunkin's purchase of the Mentor Site

from Sky Bank closed on or about October 26, 2004.  (Pltf.'s Exhibit 13, 14).

(1:07 CV 3424)

36.     The Defendants identified the Chardon Site no later than November of 2003, at least twenty months prior to the date on which Progressive signed a Franchise Agreement for the Chardon Site, and about ten months, if not more, prior to the September 1, 2004 SDA.  Thus, on November 28, 2003, GPD Group ("***GPD***"), a firm providing the Defendants with architectural, engineering and construction administration services in the greater Cleveland, Ohio area, rendered an invoice to Defendants for services rendered in connection with  the Chardon Site from November 1, 2003 to November 28, 2003.  (Pltf.'s Exhibit 15).

36.1.    The Defendants' local Ohio counsel was engaged in negotiations for Third Dunkin' Realty's purchase of the Chardon Site no later than early February, 2004, as evidenced by counsel's  invoice for counsel's fees and disbursements from February 3, 2004 to February 29, 2004.  (Pltf.'s Exhibit 16) .  On February 16, 2004, JMRWLR, LLC ("***JMRWLR***") and Third Dunkin' Realty entered into a Purchase and Sale Agreement pursuant to which Third Dunkin' Realty agreed to buy the Chardon Site from JMRWLR for $300,000 (Pltf.'s Exhibit 17), and the Defendants' finance committee approved of the purchase on or about March 9, 2004 pursuant to a supplemental RAPID Resource Appropriation Request (Pltf.'s Exhibit 18, the "***Chardon RAR***").  On or before July 13, 2004, Third Dunkin' purchased the Chardon Site from JMRWLR.  (Joint Stipulation of Undisputed Facts at ¶ 26).

37.     GPD rendered an invoice to the Defendants for services rendered in connection with the Euclid Site from November 1, 2003 to November 28, 2003.  (Pltf.'s Exhibit 20).  The Defendants' local Ohio counsel rendered an invoice for services rendered in connection with the negotiation of the Euclid Prime Lease in early February, 2004, and perhaps earlier.  (Pltf.'s

27

(1:07 CV 3424)

Exhibit 21).

             37.1.   Section 6 of the SDA required Progressive to provide Baskin and Dunkin'

with such information and data as the reasonably requested in connection with their evaluation of

each prospective location identified by Progressive for a QSR, including, without limitation, the

cost of acquisition, development and construction, and, if the property was to be leased by

Progressive, a copy of the lease.  None of the Defendants ever requested, and Progressive never

provided to any one or more of the Defendants, any information regarding any of the Progressive

Sites prior to the Defendants' selection thereof or prior to Third Dunkin's acquisition of a fee (in

the case of Mentor and Chardon) or leasehold interest (in the case of Euclid) interest therein.

The Defendants, without any involvement by Progressive, acquired all of the information they

relied upon in connection with Third Dunkin's acquisition of an interest in the Progressive Sties.

(Pltf.'s Exhibit 23 (the "*Due Diligence Appropriation Requests*"); see also the Mentor RAR,

the Chardon RAR, and the Joint Stipulation of Undisputed Facts at ¶ 12).

             37.2.   Section 6 required Progressive, prior to the opening of each Specified

Unit, to furnish to Baskin and Dunkin' all approvals and certifications required under the

Franchise and ancillary agreements for that unit.  The Defendants however, either themselves or

through GPD, obtained all such certifications and approvals on their own, without any

involvement by Progressive.  (Pltf.'s Exhibit 76, 77, and 78).

        38.   Prior to September 1, 2004, one or more of Progressive's members submitted to

the Defendants a "Proposal to Franchise" in the form of a PowerPoint presentation.  (Joint

Stipulation of Undisputed Facts at ¶ 17).  The proposal outlined the business experience of

(1:07 CV 3424)

Progressive's members, in particular, their experience and success in operating nursing homes and skilled nursing facilities.  The proposal made evident, however, that none of Progressive's members had experience in the development or operation of quick-service restaurants.  (Pltf.'s Exhibit 24).

39.    Notwithstanding that Section 6 of the SDA, as written, imposed sole responsibility on Progressive for identifying sites within the Store Development Area, prior to September 1, 2004, the Defendants' Development Manager, Edward Peppers, the Defendants' Franchise Licensing Manager Patty Halpin, and the Defendants' Construction Manager,  Kevin Dalpiaz, took Progressive members Eitan Flank and Joel Sausen to visit possible sites for Baskin/Dunkin' QSRs within the Store Development Area (Joint Stipulation of Undisputed Facts at ¶ 13).

39.1.    Among the sites visited in the course of one such tour conducted by Mr. Peppers and Ms. Halpin were the Mentor Site, the Chardon Site, and the Euclid Site, as evidenced by Pltf.'s Exhibit 94, a June 6, 2004 e-mail from Ms. Halpin to the Defendants' Strategic Asset Manager, Ralph Gravellier.  During his trial testimony, Mr. Flank specifically recalled a tour of prospective sites guided by Mr. Peppers and Ms. Halpin.  (Transcript of Proceedings, Vol. 1 at 129:4-8).  He also recalled a second trip to visit prospective sites during which Ms. Halpin was not present.  *Id*.  Mr. Flank testified that Peppers "gave us an indication of how he locates sites." *Id*. at 129:21.  Mr. Peppers advised Progressive that traffic count was the most important factor.  *Id*. at 129:22-23.  Peppers further advised Progressive that, in general, population density was among the other factors upon which the Defendants based their

29

(1:07 CV 3424)

evaluation of prospective sites.  *Id*. at 130:4-5.

      39.2    Peppers and Halpin drove Progressive's members about the Store

Development Area, explaining the factors that the Defendants utilized to identify and evaluate

sites.  Mr. Flank specifically recalled being taken to the Mentor Site, and being advised by

Peppers that the traffic count for the Mentor Site as adequate and that the Mentor Site was a

suitable site.  *Id*. at 129:16-24.

      39.3.   Mr. Sausen recalled Dalpiaz being present during visits to the Chardon

Site *after* the SDA had been signed.  *Id*. at 386:10-16.  Dalpiaz's post-SDA visits to the Chardon

Site with Progressive's members could not have been for purposes of evaluating whether or not

the Chardon Site was suitable for construction of a quick-service restaurant as the Defendants'

evaluation of all three Progressive Sites, Mentor, Chardon, and Euclid had been done prior to the

execution of the SDA.  (ECF 187, Joint Stipulation of Undisputed Facts, at ¶ 12).  And Third

Dunkin' Realty had purchased the Chardon Site for $300,000 on or before July 13, 2004, well

before the SDA had been signed.  *Id*. at ¶ 26.  Dalpiaz's purpose was to sell the Chardon Site to

Progressive.

      39.4    The Defendants held out that they had acquired expertise in the

development and operation of QSRs.  On or about December 20, 2004, prior to Progressive's

signing of the February 23, 2005 Mentor Lease, Progressive received the Defendants' December

2004 Uniform Franchise Offering Circular (the "***2004 UFOC***").  Therein, the Defendants stated

that "[w]e have acquired *experience and skill in developing and operating stores which produce,*

*merchandise and sell Baskin-Robbins ice cream, frozen yogurt, and other frozen products, [and]*

(1:07 CV 3424)

*Dunkin' Donuts coffee, donuts, bagels, muffins, and related products . . . . "* (*See* Pltf.'s

Exhibit 30,  at 1, Item 8; see also Pltf.'s Exhibit 31, the Defendants' December 31, 2005 Uniform

Franchise Offering Circular (the "***2005 UFOC***") at 1, Item 8, stating the same).

        39.5.    The Defendants represented to Progressive in their 2004 and 2005 UFOCs

that the factors that Defendants employ in evaluating sites which they select generally include

location, occupancy costs, proximity to major retail activity, traffic volume and speed, density of

nearby population (resident or daytime).  *(See* the 2004 UFOC, Item 11 (captioned "Franchisor's

Obligations"), Part C (captioned "Site Selection"), and 2005 UFOC, at 95-96, Item 11 (captioned

"Franchisor's Obligations"), Part C (captioned "Site Selection")).

        39.6.    Progressive was entitled, absent some indication by Defendants that

factors other than those generally employed were used to evaluate a particular site, to believe

that a site selected  by Defendants for Progressive was suitable when evaluated on the basis of

the factors  generally employed by Defendants.

        Because the Defendants held themselves out as experts in the selection of sites,

Progressive relied on the Defendants to select suitable sites for Progressive.  Asked if he had any

concerns about the Defendants' evaluation of the Mentor Site, Mr. Flank testified "Not too

much, because we mostly relied on Dunkin' being an expert in the field.  We were told, you

know, that to have 4,000 stores, they are the experts.  We had no reason to doubt what they tell

us.  That's what they do."  (Transcript of Proceedings, Vol. I, at 130:6-13).  When asked why

Progressive had relied on the Defendants to select sites for Progressive, even though the

Defendants had an investment in the sites and Progressive lacked experience in the quick-service

31

(1:07 CV 3424)

restaurant industry, Joel Sausen of Progressive answered: "it was more from the understanding that these were the experts, these were the individuals who had been in the field for many years, these were the individuals who had the system and the model set up, which was one of the components that attracted us to this to begin with."  (Transcript of Proceedings, Vol. II, at 381:18-24).

       39.7.    Progressive lacked experience in the quick-service restaurant business and placed  trust in Edward Peppers, Patty Halpin, and Dalpiaz when they identified the Progressive Sites as suitable based on the Defendants' standards.

       39.8.    The Defendants knew that Progressive was reposing trust and confidence in the Defendants' knowledge of site selection.  The Defendants intended to induce this reliance and Progressive was entitled to rely on Defendants' statements in their 2004 and 2005 UFOC.

       39.9.    The Defendants' *act* of selecting the Progressive Sites, and the oral representations of their agents regarding the methodology used, amounted to a representation that the Progressive Sites were suitable on the basis of the generally-used criteria described in the Defendants' 2004 and 2005 UFOCs.  The representation however, was misleading.

       39.10.  Defendants did not furnish Progressive with the then-current edition of their franchisee Site Development Guide, the Defendants' Exhibit O18, at any time before or during the term of the SDA.  (Transcript of Proceedings, Vol. VI, at 1138:7-20).  The Site Development Guide is dated November, 2004.  (Defendants' Exhibit O18 at O18-6).

       39.11.  The Defendants never disclosed the adverse information in their possession about the selection of the sites in question.  The Defendants UFOCs clearly state that

(1:07 CV 3424)

"competition and potential for encroachment on other units of the same brand" was a factor to be considered by Defendants in connection with their selection of a site.  And the Defendants did, indeed, consider it in connection with their selection of the Mentor Site.  What the Defendants did not disclose to Progressive is that when they considered this factor, the Defendants concluded that, in order for the Mentor Site to be suitable on the basis of this factor, a Dunkin' Donuts/Baskin-Robbins franchise operated by a competing franchisee would have to be moved away from the Mentor Site.  (Pltf.'s Exhibit 94).

39.12.  Likewise, the Defendants did not disclose that the Mentor Site was located on the "p.m." side of the street.  (Transcript of Proceedings, Vol. I at 133:1-4; 133:22).  The location of a site on the a.m. or p.m. side of the street is among the factors routinely used by Defendants in evaluating the suitability of a site for a QSR.  "Morning drive side of roadway" is thus among the very first criteria listed for a Dunkin' Donuts shop in the Defendants' Site Development Guide, first delivered to Progressive during the discovery in this proceeding.  (*See* Exhibit O18, at O18-3).  The Defendants never gave Progressive copies of the traffic and population counts they had done.  (Transcript of Proceedings, Vol. I at 163:15-167:6). Progressive relied on what Peppers had told Progressive's members about the adequacy of the traffic count at the Mentor Site.  It was only after Progressive had operated the Mentor store for several years that it observed a consistent pattern of morning and evening traffic jams that Progressive conclusively determined that the Mentor Site was on the wrong side of the street.  *Id*. 133:21-24.

39.13.  The Defendants also failed to disclose that they had little, if any,

33

(1:07 CV 3424)

experience in retrofitting former banks into Dunkin' Donuts/Baskin-Robbins QSRs.  At trial, Ms. Mairella testified that it was not standard practice to retrofit banks.  (Transcript of Proceedings, Vol. II at 326:15-20).  She also testified that it she was not able to explain why the Defendants attempted to reconfigure a former bank branch into a QSR.  *Id*. at 21-24.  But Ms. Mairella was able to confirm that Progressive's Mentor store was the only one to have a storage shed, and that was the third of three Dunkin' Donuts/Baskin-Robbins franchises to open in close proximity in Mentor.  (Transcript of Proceedings, Vol. II, at 362:8-9; 307:19-21; 368:14-23).

        39.14.   Karen Domonkos, Progressive's director of operations, testified as to the reason for the shed:  "There's not much storage at Mentor.  It's a very, very small back room. It's a hallway.  It's not even a room."  *Id*., Vol. III., at 730:24-731:2.

        40.   The Defendants' Site Development Guide identifies a minimum residential population of 15,000 within a 3-minute drive-time of a suburban Dunkin' Donuts franchise. (Exhibit O18 at O18-3).  The minimum residential 3-minute drive-time population for a Baskin-Robbins franchise is the same.  *Id*. at O18-5.  The Defendants' Due Diligence Resource Appropriation Request for the Chardon Site is dated January 19, 2004 about nine months before the SDA had been signed.  (Pltf.'s Exhibit 23 at 23-28).  On that date, the Defendants had actual knowledge that the fact that the three-minute drive-time population for the Chardon Site was but 6,281, well under half of the Defendants' suggested minimum.  This was not disclosed to Progressive prior to discovery in this case, long after Progressive Chardon Real Estate had agreed to purchase, and Progressive agreed to lease, the Chardon Site.

        40.1.   The Defendants' due Diligence Appropriation requests, reveal that the

(1:07 CV 3424)

Chardon Site's three-minute drive-time population, daytime employment population, and daily traffic count were all materially adverse when compared with other Cleveland-area sites evaluated by the Defendants.

        40.2.    According to the Defendants, ease of ingress and egress is an important factor to consider when evaluating the suitability of a site for a Dunkin' Donuts or Baskin-Robbins QSR.  *See* the Defendants' Site Development Guide at O18-13, O18-16.  In particular, the Defendants state that there should be "no more than 2 turns in and out".  *Id*. The Site Development Guide also stipulates that all Dunkin' Donuts and Baskin-Robbins shops should have a drive-thru.  *Id*.  At trial, Eitan Flank testified that, at the Chardon Site, customers trying to exit the drive-thru intersect with customers trying to enter the drive-thru because of how the building has been laid out.  (Transcript of Proceedings, Vol. 1, at 137:12-16).  As a matter of elementary geometry, such an intersection would not be possible in a rectangle or other simple quadrilateral without at least three turns.  While Progressive was capable of determining the number of turns necessary to exit a drive-thru without disclosure thereof by the Defendants, because the Defendants' Site Development Guide was never furnished to Progressive, Progressive was never made aware that one turn too many in a drive-thru would, based on the Defendants' experience, deter customers from patronizing a QSR.  There can be no other explanation as to why the Defendants' would say  that a site should have a drive-thru and no more than two turns in their Site Development Guide.

        41.    While purporting to select sites based on the factors of traffic volume and population orally described by Ed Peppers, and the other factors described in their UFOCs, the

35

(1:07 CV 3424)

Defendants declined to disclose to Progressive their actual knowledge, prior to the time Progressive agreed to lease the Euclid Site from Third Dunkin' Realty, that the Euclid Site was not suitable on the basis of a number of factors traditionally employed by the Defendants to evaluate sites for suitability.

      41.1.   The Defendants did not disclose to Progressive that the Defendants' pre-SDA diligence with respect to the Euclid Site had revealed that the Euclid Site (a) failed to comply with the Defendants' three-mile radius daytime population requirements because of its proximity to Lake Erie; (b) suffered from poor ingress and egress; (c) was on the "p.m.," as opposed to the "a.m." side of the street; and (d) would have to be supported solely by the local resident population because it was too far away from Interstate 90 to benefit from interstate traffic.  (Pltf.'s Exhibit 101 at 1).

      41.2.   The Defendants did not disclose to Progressive that the Defendants' pre-SDA diligence with respect to the Euclid Site had revealed that the surrounding area suffered from low household income, smaller households, lower home values, a declining population, low median home values, and a high percentage of apartment values relative to the Defendants' Cleveland-area market as a whole. (Pltf.'s Exhibit 99 at 99-16).

      41.3.   Nor did the Defendants inform Progressive that the Euclid store was originally designed to be larger and to have more seats and more storage space.  In early January of 2004, long before the SDA was signed, Ms. Tori Rendano, a real estate consultant with Colliers International, whom the Defendants engaged in connection with the Euclid Site, reminded both Edward Peppers, the Defendants' then Development Manager, and Dalpiaz, the

36

(1:07 CV 3424)

Defendants' Construction Manager, that pursuant to the letter of intent under which Third

Dunkin' Realty had agreed to lease the Euclid Site from Shore Center Shopping Center, the

Euclid Store would have to be less than 2,000 square feet because a contractual restriction

imposed by CVS, the anchor tenant in the shopping center in which the Euclid Store is situated.

(Exhibit 79 at 79-2).  Dalpiaz responded:  "We *need* to have this requirement re-defined so that

we can use our standard building.  Our building, less the walk-in, is 2,000 sf.  All of our

submittals to the city have used our 30 x 72 building."  *Id*. at 79-2.  (emphasis added).  Ms.

Rendano replied that the restriction had been disclosed to the Defendants up front.  *Id*. at 79-1.

       41.4.    When Dalpiaz learned that CVS would not relax the restriction, however,

he simply referred to CVS's unwillingness to do so as unfortunate, revised the site plan

(essentially chopping down the size of the Euclid Store to fit within the CVS restriction), and

requested Andrea Mairella and her immediate superior Tony D'Amico, to review the revised

plan in late August 2004, still before the SDA was signed.  (Exhibit 81 at 81-2).  While

indicating that plan looked okay, Mr. D'Amico requested Dalpiaz to address three

concerns:  (1) seating – Mr. D'Amico requested a patio for outdoor seating, noting that outdoor

seating was a high priority; (2) insufficient shelving for dry storage;  Mr. D'Amico suggested

outdoor dry storage, such as another shed; and (3) the presence of two restrooms; acknowledging

that the local building code required at lease two, Mr. D'Amico suggested what he described as a

"dual-use" restroom to free up additional building space, especially in the back room.  *Id*. at 81-

1. Mr. D'Amico recognized the implications of Dalpiaz's revised site plan immediately:  "We

need to get this right or we will not be able to maximize the site sales & f'ee profitability

(1:07 CV 3424)

potential." *Id.*

41.5.   On September 16, 2005, Dalpiaz sent an electronic-mail message to Tony

D'Amico among others, describing a meeting of that day among Dalpiaz, Mairella, and two of

Progressive's principals, Messrs. Eitan Flank and Joel Sausen.  The message, Pltf.'s Exhibit 68,

explains that when Mr. Flank expressed "angst and hesitation to enter into a long-term

agreement with [respect to the] Euclid [Site,] Andrea [Mairella] spoke at length about initiatives

that are happening[,] some success stories of other F/ee's [sic], and the positive effects for the

F/ee of the organizational changes that are currently happening[.]"  Dalpiaz went on to say that I

think Joel and Eitan still have legitimate concerns . . . I look for them to take on Euclid.  The

precise nature of the concerns to which Dalpiaz was referring, and the information he possessed

which caused him to characterize Progressive's concerns as "legitimate, were not revealed.  Nor

did the Defendants reveal to Progressive that the Euclid Store had been downsized to meet

CVS's outlot restrictions.  Nor was there any revelation regarding Mr. D'Amico's concerns

about seating and storage, or the failure of the Euclid Site to comply with the Defendants' then

undisclosed Site Development Guide.

41.6.   Nor did Defendants disclose the belief of their own Field Marketing

Manager for the Cleveland market, Ms. Lynne M. Schroeder, that there were better places to

locate a prototype in the nature of the Euclid Store. (Transcript of Proceedings, Vol. III at 542:5-

6).  Had Ms. Schroeder's views been disclosed to Progressive, Progressive could have decided

for itself whether to lease the Euclid Site or conduct diligence on one of the better places that

Ms. Schroeder had in mind.  Assuming, of course, that Progressive could have managed to get

38

(1:07 CV 3424)

off development hold for purposes of developing a site in which the Defendants had not invested.

41.7.    The Defendants did not disclose to Progressive the extent of the Defendants' financial investment in the Progressive Sites, or that, because the Defendants do not operate QSRs, the Defendants would loose their entire investment unless Progressive would buy or lease the Progressive Sites.

41.8.    Defendants' representation as to the suitability of each of the Progressive Sites was a representation as to a present fact - the fact that such Progressive Site, at the time of its selection, was suitable, i.e., then met the Defendants' objective criteria.  The Defendants certainly knew what their own criteria, as published in their own 2004 and 2005 UFOCs, were, at the time that Defendants selected the Progressive Sites.  Thus, Defendants' misrepresentations as to the compliance of the Progressive Sites, based on population data and traffic counts, at the time the Progressive Sites were selected, were statements of fact, not of expectation, estimate, opinion, or judgment.

41.9.    Progressive's reliance on the Defendants' representation was reasonable and in good faith.  Each of the 2004 and 2005 UFOCs disseminated by Defendants stated that "[w]e (the Defendants) have acquired *experience and skill in developing and operating stores* which produce, merchandise and sell Baskin-Robbins ice cream, frozen yogurt, and other frozen products, [and] Dunkin' Donuts coffee, donuts, bagels, muffins, and related products . . . . "  It was not until well after the present case had been commenced that Defendants revealed that they

(1:07 CV 3424)

did not operate any stores themselves and, therefore, had no experience in store operations.[10]

The disclaimers in the SDA and the Franchise Agreements did not cover site selection by the

Defendants themselves, but contemplated an entirely different site selection process **than** which

gave rise to the present case.  And none of the agreements to which Third Dunkin' is a party,

specifically the Third Dunkin' Realty Leases and the Agreement of Sale whereby Third Dunkin'

sold the Chardon Site to PCRE, contain any disclaimers as to site selection at all.

       41.10.  In conclusion, Progressive's reliance on the Defendants' representation

regarding the suitability of the Progressive Sites was not, and is not, rendered unreasonable as a

matter of law by the integration clause in the SDA, which is governed by Massachusetts law.

Under Massachusetts law, "a document is not integrated merely because it says so."

*Marcoux v. Shell Oil Prods. Co. LLC*, 524 F.3d 33, 43 (1st Cir. 2008) (upholding trial court's

finding, based on parol evidence, that a lease, fully-integrated by its terms, was not integrated on

the subject the lessor's right to terminate a rent subsidy that was not even contained in the lease);

*see* also *Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 436 n.7 (1992) ("the question of

integration is one of **fact** reserved for the trial judge . . . ."  (emphasis added.)); *Antonellis v.*

*Northgate Constr. Corp.*, 362 Mass. 847, 850-51 (1973) (even absent specific evaluation of

evidence by trial judge, finding of non-integration upheld as not clearly erroneous); *Alexander v.*

*Snell*, 424 N.E.2d 262, 264 (Mass. App. Ct. 1981); accord *Brennan v. Carvel Corp.*, 929 F.2d

---

[10]*See* Defendants' letter of September 8, 2009, filed with the Court on the same date, at 4.
("The fact that Dunkin' does not run any stores itself means nothing with respect to whether
its business model is fundamentally flawed or whether it has the ability to assist franchisees
with their operations.").

(1:07 CV 3424)

801, 807 (1st Cir. 1991) ("[U]nder Massachusetts law, the determination of whether a contract is completely or partially integrated, or whether a second contract is collateral to an integrated agreement, is a question of fact to be decided in the first instance by the trial judge").

41.11.  The Defendants' identification of the Progressive Sites no later than November of 2003, the Defendants' selection of the Mentor Site for Progressive's first Specified Unit before the SDA was signed, and the Defendants' selection of the Chardon and Euclid Sites for Progressive after the date of the SDA, supports the conclusion that the SDA is not integrated on the subject of site identification, the entire process of which occurred, consistent with the parties' expectations, contrary to the express provisions of the written SDA.

41.12.  In conclusion, none of the written agreements to which Defendant Third Dunkin' Realty is a party (specifically, the Third Dunkin' Realty Leases and the Agreement of Sale whereby Third Dunkin's sold the Chardon Site to PCRE) contain an integration clause.  The express language of the SDA's integration clause, at Section 19 thereof, bears this out; it only purports to integrate, together with the documents referred to therein, the entire, full and complete agreement "between ADQSR and Developer" concerning the subject matter of the SDA.  The term "ADQSR" as defined in the SDA does not include Defendant Third Dunkin'.

42.  The Defendants' misrepresentation that the Progressive Sites were suitable induced actions on the part of Progressive, which actions (collectively, the "*Induced Actions*) included, among others (a) entering into each of the Third Dunkin' Realty Leases and the Chardon Lease (the Chardon Lease, together with the Third Dunkin' Realty Leases, collectively, the "*Leases*")  and thereby agreeing to lease, from Defendant Third Dunkin' Realty, the Mentor,

(1:07 CV 3424)

Chardon and Euclid Sites; (b) participating in the Defendants' financing program and, thereunder, entering into each of the NCB Loan Documents (Pltf.'s Exhibit 55-66) to which Progressive is a party and thereby borrowing money, guaranteeing the repayment of loans obtained by PCRE, and securing the repayment of loans obtained by both Progressive and PCRE; (c) causing PCRE to purchase the Chardon Site from Third Dunkin', allowing Third Dunkin' to recoup its entire investment in the Chardon Site[11]; (d) entering into the Chardon Lease and thereby agreeing to lease, from PCRE C, the Chardon Site purchased from Third Dunkin'; (e)causing PCRE to enter into each of the NCB Loan Documents to which it is a party and thereby borrowing money, guaranteeing the repayment of loans obtained by Progressive, and securing the repayment of loans obtained by both Progressive and PCRE and (f)devoting money, time, and effort to develop Defendants' brands at each of the Progressive Sites and to continue to make payments to the Defendants on and after such date.

    43.    The Defendants' actions in identifying the Progressive Sites, and their withholding of part of what they believed or knew about these sites, was intended to induce Progressive to take the Induced Actions.  Progressive so acted to its detriment.  Progressive will suffer prejudice and pecuniary disadvantage if the Defendants were not estopped or precluded from asserting the provisions of the SDA that purport to impose on Progressive the sole responsibility for identifying sites for units within the Store Development Area that contradict

---

[11]*See* the Chardon RAR ("We [the Defendants] will sell the property [the Chardon Site] and development costs for $387,400 dollar for dollar for what we have into the project." Pursuant to the Progressive Chardon Site Purchase Agreement, Third Dunkin' Realty sold the Chardon Site to Progressive Chardon Real Estate for $387,400.

(1:07 CV 3424)

the Defendants' representation, arising from their own conduct in selecting the Progressive Sites and language purporting to be an expert, that the sites selected by Defendants were suitable.

43.1.    Unlike the Defendants, which by their own admission do not operate any Baskin-Robbins/Dunkin' Donuts Stores, Progressive has been operating the Baskin-Robbins/Dunkin' Donuts franchise at the Mentor Site since its opening in February of 2005; Progressive has operated a like franchise at the Chardon Site since August of 2005, and has operated a Dunkin' Donuts franchise at the Euclid Site since February 2006.  By the time the Amended Complaint was filed in October of 2007, it had become apparent to Progressive that poor location in terms of population density and traffic flow, as opposed to the manner in which Progressive operated its franchises, would indefinitely impair the profitability of these locations that the Defendants had identified for Progressive.

43.2.    In conclusion, regardless of whether Massachusetts or Ohio law were to be applied, the Defendants' departure from the terms of the SDA equitably estop Defendants from denying an agreement, completely outside of the SDA and its provisions, to identify suitable sites for Progressive within the Store Development Area.

44.    Section 6 of the SDA, as written, required Progressive to construct and equip its units in accordance with the then-current standards procedures, plans and specifications utilized by Defendants Baskin-Robbins and Dunkin' Donuts for their respective brands.  Each of Defendants' 2004 UFOC and 2005 UFOC (collectively, the "*UFOCs*") stated that "[w]e [Defendants Baskin-Robbins and Dunkin' Donuts] will provide you with a copy of our standard plans and specifications for the brand(s) and type of store" and "[w]e will make available to you

43

(1:07 CV 3424)

[Progressive] the standards for designing, constructing, equipping and operating your Store."[12]

       44.1.   On or about February 20, 2004, one or more of the Defendants entered into a Master Agreement, dated of like date, with GPD, under which GPD agreed to provide Defendants with architectural, engineering and construction administration services throughout the Cleveland, Ohio market.  (Pltf.'s Exhibit 44, the "***Master Services Agreement***", or "***MSA***"). The purpose of the MSA was to memorialize an agreement under which GPD would, among other things, prepare site plans and specifications to Defendants.

       44.2.   Contrary to the representations made in the UFOCs, the Defendants did not furnish Progressive with any standards for constructing, designing, or equipping any stores. In pursuit of their aggressive expansion plans, the Defendants kept to themselves the plans and specifications for the development of the Progressive Sites, and contrary to Section 6 of the SDA assumed sole and exclusive responsibility for the construction and equipping of the stores at the Progressive Sites.

       44.3.   The Franchisors, Baskin and Dunkin', agreed, pursuant to Section 5 of the Mentor Franchise Purchase Agreement, to develop and equip the Mentor Site as a Dunkin' Donuts/Baskin-Robbins satellite shop in accordance with the Franchisors' then-current standards and specifications.  The Franchisors breached this agreement.  Rather than developing and equipping the Mentor Site in accordance with their then-current standards and specifications, the Defendants developed and equipped the Mentor Site by reconfiguring an existing bank building

---

[12]2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3, and 2005 UFOC, at 88 (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3.

(1:07 CV 3424)

into a QSR.

44.4.    The Mentor Store lacked sufficient storage space. The trial testimony of Karen Domonkos, Progressive's director of operations, demonstrated that this adversely effected the profitability and efficiency of the Mentor Store.  The Defendants placed the doughnut case and the drive-thru on opposite sides of store, connected by a narrow hallway.  (Transcript of Proceedings, Vol. III, at 729:24-730:4).  This causes congestion and collisions as Progressive's employees, attempting to meet the Franchisors' standards for drive-thru service time, must move through the hallway quickly in opposite directions, some en route from the doughnut case to the drive-thru window, and others en route from the drive-thru window to the doughnut case.  *Id*. at 730:2-4.  And, due to the configuration of the bank building, the drive thru, a critical aspect of any Dunkin' Donuts/Baskin-Robbins store according to the Defendants Site Development Guide, was designed and constructed by the Defendants' so as to allow for only three cars.  If more than three cars attempt to enter the drive-thru at Mentor, the cars back up into the street.  *Id*. at 730:4-7.

44.5.    Defendant Third Dunkin' agreed, pursuant to Section 10(a) of the Mentor Lease, to act as general contractor to complete, or to cause completion of, any work required to substantially complete the Mentor Site in accordance with Franchisor's plans and specifications with reasonable dispatch after commencement of the term of the Mentor Lease.

44.6.    The Mentor Lease contemplated that, as general contractor for the construction and equipping of the store at the Mentor Site, Third Dunkin' Realty would select subcontractors and contract with the same for labor and materials to be furnished at the Mentor

45

(1:07 CV 3424)

Site.  Thus, Third Dunkin' agreed, pursuant to Section 10(b) of the Mentor Lease, to assign to

Progressive all warranties and guaranties obtained from contractors, suppliers or others with

respect to the performance, work and materials and equipment used in the construction and

development of the Mentor Site and to use reasonable diligence in assisting Tenant in the

enforcement of such warranties and guaranties.  Third Dunkin' breached the agreement as no

assignments were made.

       45.     The Defendants likewise assumed sole and exclusive responsibility for the

construction and equipping of the Chardon Site, as evidenced by the Allied Domecq Global

Development Tracking form (Pltf.'s Exhibit 45), making specific reference to the Chardon Site,

and setting forth, among the roles of various officers, employees, or agents of Defendants,

"Dalpiaz, Kevin," as "CM," or Construction Manager.  Having Dalpiaz act as a Construction

Manager for the Chardon Site makes no sense if Progressive were constructing a unit at the

Chardon Site itself.  None of the roles referred to in such Global Development Tracking form are

assigned to Progressive officers, employees, or agents.  Larry Harris, one of Defendants' several

Development Managers, or "DMs" for the Cleveland-area market, refers to the Chardon Site as

"the corporately developed DD/BR located in Chardon Ohio" in his March 21, 2005 message to

Ms. Colleen Roberts and Dalpiaz.  (Pltf.'s Exhibit 46)

       46.     Dunkin' agreed, pursuant to Section 5 of the Euclid Franchise Purchase

Agreement, to develop and equip the Euclid Site as a Dunkin' Donuts satellite shop in

accordance with Dunkin's then current standards and specifications.  Dunkin' breached the

agreement.  The outlot restrictions imposed by CVS, the anchor tenant in the strip mall in which

46

(1:07 CV 3424)

the Euclid Site was located, required Dunkin' to chop down the size of the Euclid Store to less

than the 2,000 square feet required of Dunkin's then standard building.  (Exhibit 79 at 79-2; 81

at 81-2).  As a consequence, the Euclid Store has insufficient storage space and must order

doughnuts at least twice daily, inevitably increasing Progressive's direct labor costs and cost of

goods sold.  (Transcript of Proceedings, Vol. II, at 448:2-13; 467:2-25).

   46.1. Under Section 10(a) of the Euclid Sublease, Defendant Third Dunkin'

agreed to complete, or cause completion of, with reasonable dispatch before commencement of

the term of the Euclid Sublease, the Specified Unit at the Euclid Site in accordance with

Dunkin's plans and specifications and applicable governmental codes and regulations.

   46.2. As general contractor for the construction and equipping of the Specified

Unit at the Euclid Site, Third Dunkin agreed, under Section 10(b) of the Euclid Sublease, to

assign to Progressive all warranties and guaranties obtained from contractors, suppliers or others

with respect to the performance, work and materials and equipment used in the construction and

development of the Euclid Site and to use reasonable diligence in assisting Progressive in the

enforcement of such warranties and guaranties. Third Dunkin' breached the agreement as no

assignments were made.

   47. Each of the Mentor Lease and the Euclid Sublease expressly contemplated that

Third Dunkin' Realty, as general contractor, would cause completion of the Specified Units at

the Mentor Site and Euclid Site, respectively, by selecting and contracting for labor, materials,

and equipment for such Specified Units with one or more subcontractors.  Otherwise, the

assignment provisions of Section 10(b) of each of the Mentor Lease and the Euclid Sublease

(1:07 CV 3424)

would be of no effect.

47.1.   Third Dunkin' Realty did, in fact, select subcontractors and contract with them for labor, materials, and equipment for the Specified Units at the Mentor Site, the Chardon Site, and the Euclid Site.

47.2.   Using a sealed-bid process, the Defendants, including Third Dunkin', selected Paramount to furnish equipment for all new stores in the Cleveland-area market.  (Pltf.'s Exhibit 48).  Progressive was not involved in the choice of Paramount, and was not even copied on the letter notifying Paramount that it had been selected by an unnamed franchisee to furnish equipment at the Mentor Site.  (Pltf.'s Exhibit 49)

47.3.   The Defendants engaged in a practice of selecting subcontractors and then notifying the subcontractors that they had been chosen by a  "franchisee" is evidenced by the October 7, 2004 e-mail from Dalpiaz to a Mr. Ferry ("Go ahead and award the signs to Everbrite. Wagner signs will be the installer.") (Pltf.'s Exhibit50) and Mr. Ferry's letter of the following day (Pltf.'s Exhibit 51), addressed to Mr. Gary Steen at Everbrite, Inc. ("This letter will serve as notification that Everbrite has been chosen by the franchisee to deliver and install the equipment at [the Mentor Site])."

47.4.   Even in the case of the Chardon Site, which was sold by Third Dunkin' Realty to Progressive Chardon Real Estate in July, 2005, the Defendants appear to have selected subcontractors for labor, materials, and equipment, as evidenced, in part, by the July 26, 2005 e-mail of Mr. Gary Steen, on which Mr. David O'Leary of Dunkin' Brands, Inc. was copied ("[Mr. Steen] received my info on the variance issue directly from Dan Beeman of Wagner Signs who is

48

(1:07 CV 3424)

the local installer Kevin Dalpiaz chose to handle the install on this project.").  (Pltf.'s Exhibit 52)

> 47.5.    Third Dunkin' Realty was an active business enterprise that undertook, as general contractor, to complete the construction and equipping of the Specified Sites developed under the SDA, and that, in connection with Third Dunkin' Realty's role as general contractor, selected numerous subcontractors and entered into contracts with these subcontractors for the furnishing of labor, materials, and equipment.

> 47.6.    On September 28, 2004, Defendant Third Dunkin' Realty entered into a subcontract (the "***Mentor Site Nyman Subcontract***") with Nyman Construction ("***Nyman***"). (Pltf.'s Exhibit 53).  Under the Mentor Site Nyman Subcontract, Third Dunkin' Realty promised to pay Nyman the sum of $295,997.00, subject to additions and deductions as specified therein, in consideration of Nyman's promise to perform work at the Mentor Site.  The Nyman Mentor Site Contract was signed on behalf of Third Dunkin' Realty by Dalpiaz, who, with full knowledge of Defendants, signed in his capacity as "Agent."  (Pltf.'s Exhibit 53-7).

> 47.7.    On or about October 18, 2004, Third Dunkin' entered into a contract with Wagner Electric Sign Co. of Elyria, Ohio (the "***Mentor Site Wagner Subcontract***").  (Pltf.'s Exhibit 54).  Thereunder, Third Dunkin' promised to pay the sum of $12,920.49 to Wagner in consideration of Wagner's promise to manufacture and install signage, awnings and related components at the Mentor Site.  Although the Mentor Site Wagner Subcontract is addressed to "Allied Domecq QSR", it clear from the reference "Owner/Customer" on the second page thereof (under the caption "Permit(s) Fees are charged a cost") that Third Dunkin', which became the owner of the Mentor Site, signed the contract.  It may also be fairly inferred that

49

(1:07 CV 3424)

Third Dunkin' Realty, as general contractor, selected Wagner as one of the subcontractors to furnish labor, materials, and equipment at the Mentor Site - the Mentor Site Wagner Subcontract, which is addressed to "Kevin Dalpiaz" at "Allied Domecq QSR", states on its very first page of the Mentor Site Wagner Subcontract: "Thank you for allowing The Wagner Electric Sign Company the opportunity to  work with [the general contractor] on this sign project."  Again, Dalpiaz signed on behalf of Owner Third Dunkin' in his capacity as Construction Manager.

47.8.    The obligations incurred by Third Dunkin' Realty to complete work under the Mentor Lease and the Euclid Lease, and the substantial monetary obligations incurred by Third Dunkin's under the Mentor Site Nyman Subcontract,[13]  the Mentor Site Wagner Subcontract, and numerous other subcontracts for the furnishing of labor, materials, and equipment at the Progressive Sites are hardly representative of a passive real estate holding company.  The fact that Dalpiaz, or any other person, who signed subcontracts on behalf of Third Dunkin' Realty as "Agent," "Construction Manager," or otherwise might also have been an employee of Dunkin' Brands, Inc.[14] is a matter of irrelevance; Third Dunkin' was nevertheless

_____

[13]To place Defendant Third Dunkin's monetary obligations under subcontracts in perspective, Progressive the $295,997.00 that third Dunkin' obligated itself to pay under the Mentor Site Nyman Subcontract alone exceeded the entire $240,000 in Initial Franchise Fees under the SDA.  If Third Dunkin' monetary obligations under subcontracts related to other sites in the Cleveland-area market were equivalent to those incurred by Third Dunkin for the Mentor Site, Third Dunkin' monetary obligations under subcontracts for the Cleveland-area market alone would reach into the millions of dollars.

[14]Defendants' Motion for Summary Judgment, at 3.  In fact, as Defendants have admitted in their Supplemental Disclosure Statement filed with the Court on March 5, 2009, Dalpiaz is a Construction Manager for each of Baskin, Dunkin', Third Dunkin', and their respective affiliates, successors, subsidiaries and parents, all of which are referred to collectively for  purposes of such Supplemental Disclosure Statement as "Dunkin' Donuts."

(1:07 CV 3424)

bound by the acts of its agents to satisfy its significant obligations under subcontracts.

47.9.    The Franchisors breached their respective obligations to develop and equip the Progressive Sites under the Franchise Purchase Agreements.

48.    The Defendants breached the obligations they had assumed with respect to the development and equipping of the Chardon Site.

48.1.    Third Dunkin' breached its agreement under Section 10(b) of each of the Mentor Lease and the Euclid Sublease by failing to assign to Progressive the warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site and the Euclid Site, respectively.  As a consequence, when the subcontractors retained by Third Dunkin' failed to perform under their subcontracts for performance, labor, materials, and equipment at the Mentor Site and the Euclid Site, Progressive was not in privity of contract with these subcontractors, and had no means to sue on their respective subcontracts.  And Third Dunkin' did virtually nothing to enforce warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site and the Euclid Site.

49.    Section 6 of the SDA, as written, required Progressive to construct and equip its units in accordance with the then-current standards procedures, plans and specifications utilized by Defendants Baskin-Robbins and Dunkin' Donuts for their respective brands.  Each of Defendants' 2004 UFOC and 2005 UFOC (collectively, the "*UFOCs*") stated that "[w]e [Defendants Baskin-Robbins and Dunkin' Donuts] will provide you with a copy of our standard

51

(1:07 CV 3424)

plans and specifications for the brand(s) and type of store" and "[w]e will make available to you [Progressive] the standards for designing, constructing, equipping and operating your Store."[15]

49.1.   On or about February 20, 2004, one or more of the Defendants entered into a Master Agreement, dated of like date, with GPD, under which GPD agreed to provide Defendants with architectural, engineering and construction administration services throughout the Cleveland, Ohio market.  (Pltf.'s Exhibit 44, the "***Master Services Agreement***", or "***MSA***"). The purpose of the MSA was to memorialize an agreement under which GPD would, among other things, prepare site plans and specifications to Defendants.

49.2.   Contrary to the representations made in the UFOCs, the Defendants did not furnish Progressive with any standards for constructing, designing, or equipping any stores. In pursuit of their aggressive expansion plans, the Defendants kept to themselves the plans and specifications for the development of the Progressive Sites, and contrary to Section 6 of the SDA assumed sole and exclusive responsibility for the construction and equipping of the stores at the Progressive Sites.

50.   The Franchisors, Baskin and Dunkin', agreed, pursuant to Section 5 of the Mentor Franchise Purchase Agreement, to develop and equip the Mentor Site as a Dunkin' Donuts/Baskin-Robbins satellite shop in accordance with the Franchisors' then-current standards and specifications.  The Franchisors breached this agreement.  Rather than developing and equipping the Mentor Site in accordance with their then-current standards and specifications, the

---

[15]2004 UFOC, (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3, and 2005 UFOC, at 88 (Item 11 (captioned "Franchisor's Obligations"), Part A (captioned "Initial Services"), ¶¶ 1, 3.

(1:07 CV 3424)

Defendants developed and equipped the Mentor Site by reconfiguring an existing bank building into a QSR.

      50.1.   The Mentor Store lacked sufficient storage space. The trial testimony of Karen Domonkos, Progressive's director of operations, demonstrated that this adversely effected the profitability and efficiency of the Mentor Store.  The Defendants placed the doughnut case and the drive-thru on opposite sides of store, connected by a narrow hallway.  (Transcript of Proceedings, Vol. III, at 729:24-730:4).  This causes congestion and collisions as Progressive's employees, attempting to meet the Franchisors' standards for drive-thru service time, must move through the hallway quickly in opposite directions, some en route from the doughnut case to the drive-thru window, and others en route from the drive-thru window to the doughnut case.  *Id.* at 730:2-4.  And, due to the configuration of the bank building, the drive thru, a critical aspect of any Dunkin' Donuts/Baskin-Robbins store according to the Defendants' Site Development Guide, was designed and constructed by the Defendants' so as to allow for only three cars.  Ms. Domonkos testified that if more than three cars attempt to enter the drive-thru at Mentor, the cars back up into the street.  *Id.* at 730:4-7.

      50.2.   Defendant Third Dunkin' agreed, pursuant to Section 10(a) of the Mentor Lease, to act as general contractor to complete, or to cause completion of any work required to substantially complete the Mentor Site in accordance with Franchisor's plans and specifications with reasonable dispatch after commencement of the term of the Mentor Lease.

      50.3.   The Mentor Lease contemplated that, as general contractor for the construction and equipping of the store at the Mentor Site, Third Dunkin' Realty would select

(1:07 CV 3424)

subcontractors and contract with the same for labor and materials to be furnished at the Mentor

Site.  Thus, Third Dunkin' agreed, pursuant to Section 10(b) of the Mentor Lease, to assign to

Progressive all warranties and guaranties obtained from contractors, suppliers or others with

respect to the performance, work and materials and equipment used in the construction and

development of the Mentor Site and to use reasonable diligence in assisting Tenant in the

enforcement of such warranties and guaranties.  Third Dunkin' breached the agreement – no

assignments were made.

      51.     The Defendants assumed sole and exclusive responsibility for the construction

and equipping of the Chardon Site, as evidenced by the Allied Domecq Global Development

Tracking form (Pltf.'s Exhibit 45), making specific reference to the Chardon Site, and setting

forth, among the roles of various officers, employees, or agents of Defendants, "Dalpiaz, Kevin,"

as "CM," or Construction Manager.  Having Dalpiaz act as a Construction Manager for the

Chardon Site would make little sense if Progressive were constructing a unit at the Chardon Site

itself.  None of the roles referred to in such Global Development Tracking form are assigned to

Progressive officers, employees, or agents.  Thus, Larry Harris, one of Defendants' several

Development Managers, or "DMs" for the Cleveland-area market, refers to the Chardon Site as

"the corporately developed DD/BR located in Chardon Ohio" in his March 21, 2005 message to

Ms. Colleen Roberts and Dalpiaz.  (Pltf.'s Exhibit 46).

      52.     Dunkin' agreed, pursuant to Section 5 of the Euclid Franchise Purchase

Agreement, to develop and equip the Euclid Site as a Dunkin' Donuts satellite shop in

accordance with Dunkin's then current standards and specifications.  Dunkin' breached the

54

(1:07 CV 3424)

agreement.  As heretofore indicated, the outlot restrictions imposed by CVS, the anchor tenant in the strip mall in which the Euclid Site was located, required Dunkin' to chop down the size of the Euclid Store to less than the 2,000 square feet required of Dunkin's then standard building. (Exhibit 79 at 79-2; 81 at 81-2).  As a consequence, the Euclid Store has insufficient storage space and must order doughnuts at least twice daily, inevitably increasing Progressive's direct labor costs and cost of goods sold. (Transcript of Proceedings, Vol. II, at 448:2-13; 467:2-25).

53.     Under Section 10(a) of the Euclid Sublease, Defendant Third Dunkin' agreed to complete, or cause completion of, with reasonable dispatch before commencement of the term of the Euclid Sublease, the Specified Unit at the Euclid Site in accordance with Dunkin's plans and specifications and applicable governmental codes and regulations.

53.1.   As general contractor for the construction and equipping of the Specified Unit at the Euclid Site, Third Dunkin agreed, under Section 10(b) of the Euclid Sublease, to assign to Progressive all warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Euclid Site and to use reasonable diligence in assisting Progressive in the enforcement of such warranties and guaranties. Third Dunkin' breached the agreement – no assignments were made.

54.     Each of the Mentor Lease and the Euclid Sublease expressly contemplated that Third Dunkin' Realty, as general contractor, would cause completion of the Specified Units at the Mentor Site and Euclid Site, respectively, by selecting and contracting for labor, materials, and equipment for such Specified Units with one or more subcontractors.

55

(1:07 CV 3424)

54.1.   Third Dunkin' Realty did, in fact, select subcontractors and contract with them for labor, materials, and equipment for the Specified Units at the Mentor Site, the Chardon Site, and the Euclid Site.

54.2.   Using a sealed-bid process, the Defendants, including Third Dunkin', selected Paramount to furnish equipment for all new stores in the Cleveland-area market.  (Pltf.'s Exhibit 48).  Progressive was not involved in the choice of Paramount, and was not even copied on the letter notifying Paramount that it had been selected by an unnamed franchisee to furnish equipment at the Mentor Site.  (Pltf.'s Exhibit 49).

55.   The Defendants engaged in a practice of selecting subcontractors and then notifying the subcontractors that they had been chosen by a  "franchisee" is evidenced by the October 7, 2004 e-mail from Dalpiaz to a Mr. Ferry ("Go ahead and award the signs to Everbrite. Wagner signs will be the installer.") (Pltf.'s Exhibit50) and Mr. Ferry's letter of the following day (Pltf.'s Exhibit 51), addressed to Mr. Gary Steen at Everbrite, Inc. ("This letter will serve as notification that Everbrite has been chosen by the franchisee to deliver and install the equipment at [the Mentor Site])."

55.1.   Even in the case of the Chardon Site, which was sold by Third Dunkin' Realty to Progressive Chardon Real Estate in July, 2005, the Defendants appear to have selected subcontractors for labor, materials, and equipment, as evidenced, in part, by the July 26, 2005 e-mail of Mr. Gary Steen, on which Mr. David O'Leary of Dunkin' Brands, Inc. was copied ("[Mr. Steen] received my info on the variance issue directly from Dan Beeman of Wagner Signs who is the local installer Kevin Dalpiaz chose to handle the install on this project.").  (Pltf.'s

(1:07 CV 3424)

Exhibit 52).

        55.2.    Third Dunkin' Realty was an active business enterprise that undertook, as general contractor, to complete the construction and equipping of the Specified Sites developed under the SDA, and that, in connection with Third Dunkin' Realty's role as general contractor, selected numerous subcontractors and entered into contracts with these subcontractors for the furnishing of labor, materials, and equipment.

        55.3.    On September 28, 2004, for example, Defendant Third Dunkin' Realty entered into a subcontract (the "***Mentor Site Nyman Subcontract***") with Nyman Construction ("***Nyman***").  (Pltf.'s Exhibit 53).  Under the Mentor Site Nyman Subcontract, Third Dunkin' Realty promised to pay Nyman the sum of $295,997.00, subject to additions and deductions as specified therein, in consideration of Nyman's promise to perform work at the Mentor Site.  The Nyman Mentor Site Contract was signed on behalf of Third Dunkin' Realty by Dalpiaz, who, with full knowledge of Defendants, signed in his capacity as "Agent."  (Pltf.'s Exhibit 53-7).

        55.4.    On or about October 18, 2004, Third Dunkin' entered into a contract with Wagner Electric Sign Co. of Elyria, Ohio (the "***Mentor Site Wagner Subcontract***").  (Pltf.'s Exhibit 54).  Thereunder, Third Dunkin' promised to pay the sum of $12,920.49 to Wagner in consideration of Wagner's promise to manufacture and install signage, awnings and related components at the Mentor Site.  Although the Mentor Site Wagner Subcontract is addressed to "Allied Domecq QSR", it clear from the reference "Owner/Customer" on the second page thereof (under the caption "Permit(s) Fees are charged a cost.") that Third Dunkin', which became the owner of the Mentor Site, signed the contract.  It may also be fairly inferred that

(1:07 CV 3424)

Third Dunkin' Realty, as general contractor, selected Wagner as one of the subcontractors to

furnish labor, materials, and equipment at the Mentor Site – the Mentor Site Wagner

Subcontract, which is addressed to "Kevin Dalpiaz" at "Allied Domecq QSR," states on its very

first page of the Mentor Site Wagner Subcontract: "Thank you for allowing The Wagner Electric

Sign Company the opportunity to  work with [the general contractor] on this sign project."

Again, Dalpiaz signed on behalf of Owner Third Dunkin' in his capacity as Construction

Manager.

      55.5.   The obligations incurred by Third Dunkin' Realty to complete work under

the Mentor Lease and the Euclid Lease, and the substantial monetary obligations incurred by

Third Dunkin's under the Mentor Site Nyman Subcontract,[16]  the Mentor Site Wagner

Subcontract, and numerous other subcontracts for the furnishing of labor, materials, and

equipment at the Progressive Sites are not representative of a passive real estate holding

company.  The fact that Dalpiaz, or any other person, who signed subcontracts on behalf of Third

Dunkin' Realty as "Agent," "Construction Manager," or otherwise might also have been an

employee of Dunkin' Brands, Inc.[17] is a matter of irrelevance; Third Dunkin' was nevertheless

---

[16]To place Defendant Third Dunkin's monetary obligations under subcontracts in
perspective, Progressive the $295,997.00 that Third Dunkin' obligated itself to pay under
the Mentor Site Nyman Subcontract alone exceeded the entire $240,000 in Initial
Franchise Fees under the SDA.  If Third Dunkin' monetary obligations under
subcontracts related to other sites in the Cleveland-area market were equivalent to those
incurred by Third Dunkin for the Mentor Site, Third Dunkin' monetary obligations under
subcontracts for the Cleveland-area market alone would reach into the millions of dollars.
[17]Defendants' Motion for Summary Judgment, at 3.  In fact, as Defendants have admitted,
in their Supplemental Disclosure Statement filed with the Court on March 5, 2009,
Dalpiaz is a Construction Manager for each of Baskin, Dunkin', Third Dunkin', and their
respective affiliates, successors, subsidiaries and parents, all of which are referred to

(1:07 CV 3424)

bound by the acts of its agents to satisfy its significant obligations under subcontracts.

55.6.    Franchisors breached their respective obligations to develop and equip the Progressive Sites under the Franchise Purchase Agreements.

55.7.    Defendants breached the obligations they had assumed with respect to the development and equipping of the Chardon Site.

55.8.    Third Dunkin' breached its agreement under Section 10(b) of each of the Mentor Lease and the Euclid Sublease by failing to assign to Progressive the warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site and the Euclid Site, respectively.  As a consequence, when the subcontractors retained by Third Dunkin' failed to perform under their subcontracts for performance, labor, materials, and equipment at the Mentor Site and the Euclid Site, Progressive was not in privity of contract with these subcontractors, and had no means to sue on their respective subcontracts.  And Third Dunkin' did  nothing to enforce warranties and guaranties obtained from contractors, suppliers or others with respect to the performance, work and materials and equipment used in the construction and development of the Mentor Site and the Euclid Site.

56.    Other than the Initial Franchise Fees described in the SDA, nothing was to have been paid for Progressive's purchase of the franchises granted under the Franchise Agreements under any of the contracts among Progressive or any one or more of the Defendants.

---

collectively for purposes of such Supplemental Disclosure Statement as "Dunkin' Donuts."

(1:07 CV 3424)

56.1.   It is undisputed that Progressive timely paid $120,000 of Initial Franchise Fees on execution of the SDA and an additional $20,000 of Initial Franchise Fees thereafter. (Joint Stipulation of Undisputed Facts at ¶¶ 16 and 47).  By express written agreement of the parties to the SDA, the Initial Franchise Fee for the combined Baskin-Robbins/Dunkin' Donuts franchise for the Mentor Site was modified so as to be reduced from $40,000 to $32,000.  The modification, duly initialed by the parties, appears on the first page of the Mentor Franchise Agreement.  Progressive paid a $40,000 Initial Franchise Fee for the combined Baskin-Robbins/Dunkin' Donuts franchise for the Chardon Site, as duly noted by the words "paid under SDA #341534" appearing on the first page of the Chardon Franchise Agreement.  And Progressive paid $40,000 for the Dunkin' Donuts only franchise for the Euclid Site.

57.   If the Defendants were going to undertake to select Progressive's sites, as they did, then they were obligated to at least select sites in accordance with the objective standards customarily employed by the Defendants to select sites for Baskin-Robbins/Dunkin' Donuts franchises.  The Defendants did not do this.  Rather, they selected for Progressive the sites into which they had already made a significant investment of money.

57.1.   Defendants identified all of the Progressive Sites themselves prior to the SDA, and selected the Progressive Sites as those at which Progressive in particular would be granted franchises to use the proprietary system and marks of Defendants Baskin and Dunkin'. In the course of selecting the Progressive Sites for Progressive, Defendants' agents engaged in conduct and made affirmative statements designed to create the false impression that the Progressive Sites were suitable in terms of objective criteria customarily employed by

60

(1:07 CV 3424)

Defendants in evaluating sites.  The Defendants' 2004 and 2005 UFOCs likewise set forth the

criteria used by the Defendants to select sites.

       57.2.   The focus on population distribution and traffic flow in the Defendants'

Site Development Guide and Due Diligence Appropriation Requests reflect Defendants' belief

that these were key ingredients in determining whether or not a prospective site would have

sufficient customers to survive if operated in accordance with the standards established by

Baskin-Robbins and Dunkin' Donuts.  The suitability of the sites upon which Progressive would

be granted franchises were facts basic to the transactions contemplated by the SDA and the

Leases than.   Progressive  imposed confidence in the Defendants by reason of their stated

position as experienced identifiers of suitable sites, and that Defendants knew of Progressive's

confidence.  (Transcript of Proceedings, Vol. I, at 130:6-13; Vol. II, at 381:18-24).

       57.3.   Defendants had substantially identified all of the Progressive Sites as early

as November of 2003, before the SDA had ever been signed.  The Defendants' role in site

identification, moreover, went beyond identifying potential sites for prospective franchisees

which the franchisees could reject in favor of other sites identified by the franchisees in general.

At all times thereafter, it was the Defendants' intention to select those sites within the Store

Development Area for which Progressive in particular would be granted franchises, and

Defendants knew which sites they would select for Progressive, or at least knew that the first

three would be Mentor, Chardon, and Euclid.

61

(1:07 CV 3424)

57.4.    The Defendants do not operate QSRs[18] Defendants, therefore, must have intended, from the time, no later than November, 2003, when they first began to identify sites within the Cleveland-area market, that each franchisee that acquired an exclusive license to develop stores within a territory in that market would develop stores on the very sites that Defendants had identified within such market.  Otherwise, because Defendants do not operate stores, the sites identified by Defendants would remain unused.  Defendants would be unable to recoup their expenses for the fees and disbursements of Defendants' local real estate counsel and their due diligence expenses paid to GPD.

57.5.    In conclusion, the Defendants' misrepresentations that the Progressive Sites were suitable on the basis of the criteria employed by the Defendants to select sites are a proximate cause of Progressive's economic losses.

57.6.    The Defendants, not Progressive, however, chose all of the Progressive Sites.

57.7.    The Defendants never disclosed to Progressive, prior to the commencement of this case, that the Mentor Site failed to comply with the Defendants' standards relating to the proximity of the Progressive Site to competing QSRs of the same brand. At trial, Progressive proved that the proximity of the Mentor Site to competing QSRs of the same brand is among the causes of Progressive's continuing losses in Mentor.

---

[18]*See* ECF 64, Defendants' letter of September 8, 2009, at 4 ("The fact that Dunkin' does not run any stores itself means nothing with respect to whether its business model is fundamentally flawed or whether it has the ability to assist franchisees with their operations.").

(1:07 CV 3424)

57.8.    In outlining the several considerations adversely effecting sales at the Euclid Store, Mairella, the Defendants' then Operations Manager, wrote to Randy Brashier, one of the Defendants' officers, that "Our store [at the Euclid Site] does not benefit from good ingress/egress and is on the p.m. side of the road."  (Exhibit 101 at 101-4).  At trial, Ms. Mairella testified as to the significance of this fact, testifying that the Dunkin' Donuts brand is a breakfast business, and, therefore, that Dunkin' Donuts franchises appeal primarily to the morning traffic. (Transcript of Proceedings, Vol. II at 292:7-15).

57.9.    It is very important to be on the a.m., as opposed to the p.m., side of the street because, in Progressive's experience of a few years, and what Progressive had been told by the Defendants, sixty percent of sales occur between the hours 5:00 or 6:00 a.m. to 10:00 am. Further, the profit margins on coffee, which is consumed more in the morning than other times of day, is higher than on doughnuts because of coffee's relatively low production cost.  (Transcript of Proceedings, Vol. I at 133:5-20).

57.10.  Progressive's customers at Chardon experienced difficulty by virtue of their inability to get through a drive-thru that does not comport with the standards set forth in the Defendants' Site Development Guide.  (Transcript of Proceedings, Vol. 1 at 140:18-21). Customers are unable to get through the Chardon drive-thru leave in frustration, and that this has had a adverse impact on sales at the Chardon Site.  *Id*.

57.11.  Andrea Mairella wrote in her April 16, 2006 e-mail to Randy Brashier that Progressive's Euclid Store also suffered from its location on the p.m. side of the street and poor ingress and egress.  (Exhibit 103 at 103-4).  Matthew Zaroslinski, Progressive's director of

63

(1:07 CV 3424)

operations before Karen Domonkos, testified as to the consequences of this, explaining that it was "very difficult" for guests to get in and out of the drive-thru because the Euclid they had to turn across Lakeshore Boulevard in order to enter.  (Transcript of Proceedings, Vol. II, at 476:2-19).

57.12.  Losses were caused by the Defendants' failure to disclose that the Euclid Store had been downsized from its original architectural design.

57.13.  Ms. Mairella's April 16, 2006 e-mail to Mr. Brashier also indicated that the Euclid Site enjoyed less population the Defendants' Mayfield, Ohio franchise and that a significant portion of the three-mile radius traditionally required by Defendants was, in the case of the Euclid Site, in Lake Erie.  (Exhibit 101 at 101-4).  The Defendants' Field Marketing Manager, Lynne Schroeder, admitted that Progressive would have to attract customers from outside of the three mile radius.  (Transcript of Proceedings, Vol. III, at 533:3-8).  In her e-mail of April 16, 2006, however, Andrea Mairella indicated that attracting customers from outside of the three-mile radius is unlikely.  Ms. Mairella stated that the Euclid Store would not enjoy crossover traffic from the freeway just a few miles to the south of the Euclid Site, and, therefore, the Euclid Store must rely solely on local patronage.  (Exhibit 103-4).  The Defendants have traditionally looked to the three-mile radius as a material factor in determining whether a particular site was suitable.

57.14.  The Defendants' view that marketing strategies can overcome the losses caused by the unsuitability of the Progressive's Sites is at odds with the Defendants' expertise and experience as embodied in their own publications and communications among themselves.

64

(1:07 CV 3424)

The suitability factors spelled out in the Defendants' UFOCs, in their Site Development Guide, in Mairella's e-mail to Randy Brashier, in her history of the Progressive franchises, and in Ms. Schroder's own opening analysis of the Euclid store exist for a reason. These criteria: a.m. as opposed to p.m. side of the street; ease of ingress and egress, plentiful parking near the door, adequate seating and storage, sufficient average daily traffic, sufficient three-mile population, average household income, etc. are all animated by the same principle. Customers will only patronize a Dunkin' Donuts or Baskin-Robbins franchise if it is convenient to do so.

57.15. In conclusion, although the SDA and the Franchise Agreements signed by Progressive contain various disclaimers, none of the agreements between the parties bar Progressive's claims in this case or shield the Defendants from liability herein.

57.16. Section 6 of the SDA makes a very clear distinction between the *responsibility to identify sites*, an active duty (potentially involving, among other things, the location and appraisal of available real properties within the Store Development Area, environmental site assessments, surveying, the preparation of site sketches and demographic, traffic flow, and other civil engineering reports, and the evaluation of applicable zoning and other restrictions) purportedly placed on Progressive under Section 6 of the SDA, and the *right to approve of sites* (which can, if the process of site identification has been duly completed, consist of an armchair evaluation of a proposed site and the granting or withholding of consent thereto) reserved to the Franchisors. Section 22 of the SDA disclaims representations and warranties about the suitability or potential of sites approved by Baskin and Dunkin', but not sites identified, selected, or chosen by Baskin and Dunkin'.

65

(1:07 CV 3424)

57.17.  In conclusion, although Section 22 of the Defendants' standard-form SDA made the point that it was critical for  Progressive to conduct its own investigation of the trade area or territories under consideration, and for Progressive to rely only on its own information and analysis relating to all aspects of developing a QSRs within the Store Development Area described in the SDA, Progressive's own investigation, and reliance on its own information, were, in fact, non-critical to the point of irrelevance if, as in the present case, the Defendants were going to ignore the site selection process contemplated by their standard-form SDA and undertake to meet their expansion goals by performing the entire investigation themselves and identifying all of the Sites within the Store Development Area ten months before the SDA was signed.

57.18.  In conclusion, although Section 22 of the Defendants' standard-form SDA made the point that it was  critical for Progressive to conduct its own investigation of the trade area or territories under consideration, and for Progressive to rely only on its own information and analysis relating to all aspects of developing a QSRs within the Store Development Area described in the SDA, Progressive's own investigation, and reliance on its own information, were, in fact, non-critical to the point of irrelevance if, as in the present case, the Defendants were going to ignore the site selection process contemplated by their standard-form SDA and undertake to meet their expansion goals by performing the entire investigation themselves and identifying all of the Sites within the Store Development Area ten months before the SDA was signed. And to be clear, the Defendants never expected or intended Progressive to identify any sites under the SDA.  Testimony at trial established that Defendants never even bothered to

(1:07 CV 3424)

furnish Progressive with the then-current edition of their franchisee Site Development Guide, the Defendants' Exhibit O18, at any time before or during the term of the SDA.  (Transcript of Proceedings, Vol. VI, at 1138:7-20). At trial, the Defendants' Associate General Counsel, Jack Laudermilk, Esq., admitted that a franchisee or prospective franchisee that is responsible for conducting its own due diligence in connection with selecting sites for Dunkin' Donuts/Baskin-Robbins quick service restaurants should receive a copy of the Defendants' Site Development Guide before the franchisee or prospective franchisee embarks on its efforts to conduct due diligence.  (Transcript of Proceedings, Vol. V, at 991:7-23).

    57.19.  In conclusion, nor does Section 19 of the SDA shield the Defendants from liability for passing on to Progressive locations that the Defendants knew to be unsuitable. Section 19 simply provides that the success of the business venture contemplated to be undertaken by Developer [Progressive] by virtue of the SDA is Agreement is speculative and depends, to a large extent, upon the ability of Progressive as an independent businessman, as well as other factors.  Although Section 19 of the SDA provides that Baskin and Dunkin' make no representations or warranty as to the potential success of the business venture contemplated by the SDA, to say that the Defendants represented that the sites they selected for Progressive were suitable is not to say, in and of itself, that the Franchisors guaranteed or warranted profitability or success.  The Defendants conceded that success (or profitability) and suitability are two different concepts when they drafted their standard-form SDA so as to disclaim any representations or warranties with respect to the "suitability or potential" of any sites that Progressive selected and that the Franchisors approved.  (*See* SDA at 10, § 22).  If the suitability

(1:07 CV 3424)

and potential were not two different concepts, the Defendants would not have drafted the SDA so as to mention them separately.  Importantly, Section 22 disclaimed representations for neither as to sites that the Defendants selected themselves.

57.20.  In conclusion, none of the Franchise Agreements contain any disclaimers whatsoever regarding sites chosen by Defendants.  Section 18.0 of each of the Franchise Agreements is essentially the same as Section 19 of the SDA, adapted to fit a Franchise Agreement.  None of the disclaimers in the agreements among the parties disclaim any site selection obligations of any of the Defendants, any representations or warranties of any of the Defendants relating thereto, or any other obligations or other matters forming the basis of Progressive's claims, or any representations or warranties relating thereto.  And none of the disclaimers cover any design, construction, development, or support obligations of any of the Defendants, any representations or warranties of any of the Defendants relating thereto, any other obligations or other matters forming the basis of Progressive's claims, or any representations or warranties relating thereto.

57.21.  In conclusion, the disclaimers in the SDA and the Franchise Agreements contemplated no departure from the procedures for site identification and selection set forth therein.  Thus, when Defendants undertook to identify sites prior to the formation of the SDA, and to then select those sites for which Progressive in particular would be granted franchises, Defendants left the alleged safe harbor of the contractual provisions contained in the SDA and the Franchise Agreements.

58.  It is without dispute that the counterclaim/third party defendants failed to pay the

68

(1:07 CV 3424)

remaining $100,000 due on the fees contemplated by the initial agreement.  The underlying

breaches of the agreement as described herein do not permit the counterclaim/third party

defendants to avoid the obligation to pay the fees to which they contracted.  However, the Court

will not award interest on the unpaid amount, nor will the Court grant plaintiffs interest in the

sums awarded herein.  Further, the Court will order each party to bear their own costs and

attorney fees.

IV. Additional Conclusions of Law

1.      The defendant franchisors, Baskin and Dunkin', breached the SDA on each

occasion whereby the Franchisors placed Progressive on "development hold," that is, by

unilaterally suspending Progressive's right to develop Specified Units under Section 1.A

thereunder.

2.      At the times that the Franchisors breached the SDA by suspending Progressive's

rights to develop Specified Units under Section 1.A thereof, Progressive was not itself in

material breach of, and had substantially performed its duties under the SDA.

3.      The defendants are equitably estopped from denying an enforceable contract to

identify suitable sites for additional units for franchise development for the total of six units

contemplated by the SDA.

4.      The plaintiff Progressive is entitled to injunctive relief to pick and develop three

more sites for franchises contemplated by the SDA, providing Progressive picks and develops

the three additional sites within three calendar years from the date of the court's final judgment

entry and consistent with the timing as set forth in the Court's final order.

69

(1:07 CV 3424)

5.     The defendants are equitably estopped by their own conduct from denying an enforceable contract to identify suitable sites for the units contemplated by the SDA.

6.     By selecting sites the defendants knew to be unsuitable under their own criteria, and by using the "development hold" in the process of persuading Progressive to buy the Chardon and Euclid Sites, the defendants are equitably estopped from contending that Progressive is bound by their declarations and waivers in the purchase agreement that would prevent Progressive's entitlement to money damages and injunctive relief.

7.     The Court's fact findings at 22.2, 25.5, 44.3, 44.6, 46, 46.2, 47.9, 48, 48.1, 50, 50.3, 52, 53.1, 55.6, 55.7 and 55.8 declare breaches of obligations as described.

The breaches at 22.2 and 25.5 involve "development holds," and the Court fixes the damages for those breaches against the defendants jointly and severally in the sum of $5,000.

The breaches at 44.3, 44.6, 47.9, 48.1, 50, 50.3, 55.6 and 55.8 involve the Mentor store. The Court grants damages in the sum of $10,000 for the breach at 44.3, and nominal damages of $1,000 for each of the breaches at 44.6, 50, 50.3 and 55.8 for an award of a  total of $14,000, jointly and severally against the defendants.

The breaches at 48 and 55.7 involve the Chardon Site and the Court grants nominal damages of $1,000 for the breaches and an award for a total of $2,000, jointly and severally against the defendants.

The breaches at 46, 46.2, 48.1, 52, 53.1 and 55.8 involve the Euclid store.  The Court grants damages in the sum of $10,000 for the breach at 46, and nominal damages of $1,000 for each of the breaches at 46.2, 48.1, 52, 53.1 and 55.8 for an award of $15,000, jointly and

(1:07 CV 3424)

severally against the defendants.

The Court will not award damages for the breaches at 47.9 and 55.6.

In sum, the plaintiffs are awarded the sum of $36,000 jointly and severally against the defendants for the breaches as above summarized.

8.      The defendants are entitled to an offset of $100,000 based on their counterclaim/third-party complaint against the award of money damages to Progressive.

9.      The calculation of damages due the plaintiff for the induced losses incurred in the operation of the flawed locations of the three sites in Mentor, Chardon, and Euclid are difficult to determine and assess.  The Court concludes that the plaintiff incurred losses at each of the three sites due to the flawed locations and the configuration of the buildings, but declines to adopt the analysis of the plaintiff's expert as to the extent of those losses.  Rather, the Court finds the loss at the Mentor Site for which the defendants are liable to be $150,000.00, the loss at the Chardon Site for which the defendants are liable to be $100,000.00 and the Euclid Site for which the defendants are liable to be $50,000.00.

10.     The Court will enter a money judgment for the plaintiff against the defendants, jointly and severally, in the sum of $236,000.00, i.e. $336,000.00 less the offset of $100,000.00 based on the counterclaim/third-party complaint, and the obligation of the individual third-party defendants with respect to the debt of $100,000.00 shall be deemed satisfied.  The Court will not include any amounts for interest on the amounts to be paid by the defendants or by the counterclaim/third-party defendants.

11.     The Judgment Entry of the Court will also provide the plaintiff with injunctive

(1:07 CV 3424)

relief.

        12.    The Judgment Entry will provide that each party is to bear its own costs.


      IT IS SO ORDERED.


  February 14, 2011                       /s/ David D. Dowd, Jr.
Date                                   David D. Dowd, Jr.
                                        U.S. District Judge